Pamela A. Baker v. Leon Lott, in his official capacity as the Sheriff of Richland County Sheriff's Office, et al.
Case No. 3:24-cv-04303-JDA

# EXHIBIT 11
## to Movant's Statement of Material Facts

*Matthew Smith – Deposition Excerpts*

```
                UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF SOUTH CAROLINA
                       COLUMBIA DIVISION



   PAMELA A. BAKER,

        Plaintiff,

      vs.                              C/A No.: 3:24-cv-04303-JDA

   LEON LOTT IN HIS OFFICIAL CAPACITY
   AS THE SHERIFF OF RICHLAND COUNTY
   SHERIFF'S OFFICE; THE RICHLAND
   COUNTY SHERIFF'S OFFICE; DEPUTIES
   MATTHEW SMITH, MICHAEL DILLARD,
   AND BRYAN HODGE,

        Defendants.


   _____

                  DEPOSITION OF MATTHEW SMITH
   _____



   DATE TAKEN:     Tuesday, May 13, 2025

   TIME START:     9:25 a.m.

   TIME END:       3:53 p.m.

   LOCATION:       Burr & Forman, LLP
                   1221 Main Street, Suite 1800
                   Columbia, South Carolina

   REPORTED BY:    SHERI L. BYERS, RPR
                   EVERYWORD, INC.
                   P.O. Box 1459
                   Columbia, South Carolina  29202
                   803.212.0012
```

```
 1        Q.   What other training did you have about
 2   high-speed police pursuits?
 3        A.   We had the week of training at the Criminal
 4   Justice Academy, and then we had -- I think it was
 5   about a day with the sheriff's department at the
 6   McIntyre Air Force Base.
 7        Q.   What did the one day at McIntyre consist
 8   of?
 9        A.   It was a high-speed course.  They had some
10   lane changing, three-point turns, cross traffic, just
11   pretty much a course to -- for your proficiency.
12        Q.   So you were actually driving a police
13   vehicle through a course for that day?
14        A.   Yes, ma'am.
15        Q.   Okay.  And who was your trainer during that
16   course, if you recall?
17        A.   I do not recall.
18        Q.   Did you ever receive any training
19   concerning the National Institute of Justice or the
20   U.S. Department of Justice policies for high-speed
21   pursuits?
22        A.   I don't recall.
23        Q.   Do you know if any of the policies that you
24   were trained on had been certified by any
25   certification bureau?
```

| | |
|---|---|
| 1 | A. It was presented by an instructor, and I |
| 2 | can't recall their name. |
| 3 | Q. Is the name of the instructor set forth in |
| 4 | your training materials that's back in Exhibit 16? |
| 5 | If you would just take a minute and look at that |
| 6 | exhibit and tell me if it's documented in 16, please. |
| 7 | A. No, ma'am, it's not in this. |
| 8 | Q. Okay. To your knowledge, is there any |
| 9 | documentation of when you were trained on Exhibit 37? |
| 10 | A. Not to my knowledge. |
| 11 | Q. Okay. All right. So in the course of this |
| 12 | instruction, was it -- was there a group of people |
| 13 | participating, to your recollection, when you were |
| 14 | trained on Exhibit 37? |
| 15 | A. Yes, ma'am. |
| 16 | Q. Okay. And was it in a classroom-type |
| 17 | setting, or what was the setting? |
| 18 | A. It was a classroom-type setting. |
| 19 | Q. And was -- in this paper document, there |
| 20 | appears to have been videos. And if you take a |
| 21 | minute and look through it. If you look on page |
| 22 | N-41, was there a video related to Jessica and |
| 23 | Kelli Uhl? |
| 24 | A. Yes, ma'am. |
| 25 | Q. Do you remember what the video showed? |

```
 1        A.    Yes, ma'am.
 2        Q.    What did it show?
 3        A.    It showed a -- I forget where the
 4   trooper -- where he's based out of, but it shows him
 5   responding to a traffic collision call at XX speeds.
 6   And his vehicle left the roadway and struck the two
 7   sisters, Jessica and Kelli Uhl.
 8        Q.    What is XX speeds?
 9        A.    He was traveling above the posted speed
10   limit.
11        Q.    Do you remember how fast he was going?
12        A.    No, ma'am, I don't recall.
13        Q.    So he was going to a traffic accident?
14        A.    Yes, ma'am.
15        Q.    And he was speeding?
16        A.    To my recollection, yes, ma'am.
17        Q.    And it left the roadway and hit these two
18   persons?
19        A.    Yes, ma'am.
20        Q.    If you look on page 40, is there -- there
21   are four photographs there.  Is that the trooper's
22   car?
23        A.    The top two pictures are the trooper's
24   vehicles.
25        Q.    And what are the bottom two?
```

1    A.    Start my working day?

2    Q.    Yes, sir.

3    A.    Yes, ma'am.

4    Q.    Okay.  But you don't remember what time it
5  was?

6    A.    I do not recall what time.

7    Q.    What was the event at JD Shoes that you
8  were working that day?

9    A.    Officer presence.

10   Q.    What does officer presence mean?

11   A.    Officer present means that the specific
12 business just hires us for officers to be visible at
13 their location to deter crime.

14   Q.    Was there a set number of hours you were
15 supposed to be physically present at JD Shoes on
16 December the 29th?

17   A.    There is a set number of hours that they
18 would like for me to be there, yes.

19   Q.    And did you stay there the entire set
20 number of hours?

21   A.    No, ma'am.

22   Q.    What happened to cause you to leave?

23   A.    What happened to cause me to leave JD
24 Shoes?

25   Q.    Correct.

Matthew Smith

```
 1      A.   I got a call for service over the radio.
 2      Q.   What was that call?
 3      A.   The call was from a Lexington sheriff
 4  undercover unit.
 5      Q.   Who was the individual that called you from
 6  the Lexington sheriff unit?
 7      A.   I do not know.
 8      Q.   How did you receive that call?
 9      A.   Through the radio.
10      Q.   Where was the radio?
11      A.   In my car.
12      Q.   So you were in your car, not in the store
13  JD Shoes?
14      A.   Yes, ma'am.
15      Q.   And was your assignment at JD Shoes to stay
16  in your car outside the store?
17      A.   No, ma'am.  It was to be around to show
18  presence.
19      Q.   Inside and out?
20      A.   Yes, ma'am.
21      Q.   Okay.  So you were in your car when the
22  radio transmission from the Lexington sheriff's
23  unit -- did they contact you or was it a general
24  contact?
25      A.   It was a general contact.
```

```
 1      A.   I don't know the numbers by heart.  That's
 2  what I would say.  Or I would check my screen, but in
 3  the time I couldn't.  Now, after the fact, I would
 4  say department records probably have who was the
 5  radio that came over.
 6      Q.   When that statement was made, did you hear
 7  it and understand it?
 8      A.   I don't recall if I heard it.
 9      Q.   Do you recall making any sort of plans or
10  arrangements to wreck him out so that no one would
11  get hurt?
12      A.   Yes, ma'am.
13      Q.   Okay.  Tell me about that.  What did you
14  do?
15      A.   So my process, as soon as I see that he's
16  a -- he's driving the wrong direction, my plan is I
17  need to catch up to him and use a proper procedure to
18  disable his vehicle.
19      Q.   Tell me what you mean by that.
20      A.   I would use my vehicle, do a pit maneuver
21  or use my vehicle to disable his to get him off the
22  roadway.
23      Q.   What is a pit maneuver?
24      A.   A pit maneuver is a precision
25  immobilization technique.
```

```
 1      Q.   Describe it to me step by step.
 2      A.   Step by step.  So -- I don't know how to
 3 describe it.
 4           You would -- so the pursuing vehicle, as in
 5 the cop vehicle --
 6      Q.   Yes, sir.
 7      A.   -- would come to the rear of the fleeing
 8 vehicle, to either side of the rear bumper, behind
 9 the wheel, and they would -- the cop would use the
10 front of his vehicle to push the back end of the
11 fleeing vehicle to cause it to spin out.
12      Q.   That's a pit maneuver?
13      A.   Yes, ma'am.
14      Q.   Are there any other similar maneuvers that
15 could be utilized to stop the fleeing vehicle?
16      A.   Yes, ma'am.
17      Q.   What are those?
18      A.   One is the rolling roadblock.
19      Q.   What is that?
20      A.   That is if you have -- if you have the
21 numbers, as in you have enough officers, they would
22 use each of their vehicles to box in that vehicle and
23 slow him down.  So everybody will brake at the same
24 time kind of stopping that vehicle.
25      Q.   Okay.  Any others?
```

1    Q.   This is where it started.
2    A.   Yes, ma'am.
3    Q.   And it went down Broad River Road, correct?
4    A.   Yes, ma'am.
5    Q.   I mean, down Bush River Road to Broad River
6  Road, correct?
7    A.   Yes, ma'am.
8    Q.   And then down Broad River Road?
9    A.   Yes, ma'am.
10   Q.   And then down Greystone?
11   A.   Yes, ma'am.
12   Q.   And then onto I-26 into oncoming traffic?
13   A.   Yes, ma'am.
14   Q.   So at what point in time did you begin to
15 observe him -- and I'm happy to play your dash cam
16 video for you.
17   A.   Yes, ma'am.  He was driving recklessly from
18 the moment -- the initial part of the chase.
19   Q.   Okay.  So back over on Bush River Road?
20   A.   Yes, ma'am, before we even got on Broad
21 River.
22   Q.   Okay.  And then it said 10-50.  What does
23 10-50 mean?
24   A.   10-50 means collision.
25   Q.   Okay.  All right.  You can play -- do you

```
 1        Q.   Stop right here.
 2             Now, at this point what are the concrete
 3   barriers on the left side of the video?
 4        A.   The concrete barriers are construction
 5   barriers.
 6        Q.   Because there was construction on this
 7   stretch of the interstate, correct?
 8        A.   There was construction on the stretch of
 9   the interstate but no workers present.
10             MS. JONES:  Okay.  Continue.
11                           - - -
12                      (Video played.)
13                           - - -
14   BY MS. JONES:
15        Q.   Stop right here.
16             What -- where is -- what is this lane
17   that's separate from the highway lanes at 3.39 of the
18   video?
19        A.   The lane that we're currently in is the
20   onramp to 126 from Colonial Life.
21        Q.   Colonial Life?
22        A.   Yes.
23        Q.   So it's here?
24        A.   Yes.
25        Q.   That's the other ramp?
```

Matthew Smith

```
 1      Q.   Did you ever terminate a pursuit?
 2      A.   I don't recall.
 3      Q.   You don't recall ever doing it, or you
 4  don't remember one way or the other?
 5      A.   I don't recall ever terminating a pursuit.
 6      Q.   Okay.  Have you ever -- have you ever been
 7  involved in any other litigation?
 8      A.   As in?
 9      Q.   Has anybody ever sued you before?
10      A.   No, ma'am.
11      Q.   Have you ever had any claims made against
12  you that were not -- that didn't turn into lawsuits?
13      A.   Yes.
14      Q.   Okay.  What claims -- prior claims have
15  been made against you?
16      A.   I don't know verbatim the case, but I have
17  had some complaints.
18      Q.   What did they involve?
19      A.   I don't recall.
20      Q.   You don't remember any details?
21      A.   I don't recall.
22      Q.   Were they in regards to your position as a
23  Richland County Sheriff's deputy?
24      A.   Yes.
25      Q.   But you don't know any of the details?
```