PAMELA A. BAKER V. LEON LOTT, IN HIS OFFICIAL CAPACITY AS THE SHERIFF OF RICHLAND COUNTY SHERIFF'S OFFICE, ET AL.
CASE NO. 3:24-CV-04303-JDA

# EXHIBIT 6
## TO PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER FED. R. CIV. P. 37 MOTION FOR SANCTIONS INCLUDING BUT NOT LIMITED TO STRIKING DEFENDANTS' ANSWER AND AWARDING PLAINTIFF ATTORNEY'S FEES

*DEPOSITION EXCERPTS OF MATTHEW SMITH*

```
            UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF SOUTH CAROLINA
                   COLUMBIA DIVISION


   PAMELA A. BAKER,

         Plaintiff,

      vs.                       C/A No.: 3:24-cv-04303-JDA

   LEON LOTT IN HIS OFFICIAL CAPACITY
   AS THE SHERIFF OF RICHLAND COUNTY
   SHERIFF'S OFFICE; THE RICHLAND
   COUNTY SHERIFF'S OFFICE; DEPUTIES
   MATTHEW SMITH, MICHAEL DILLARD,
   AND BRYAN HODGE,

         Defendants.


   _____

               DEPOSITION OF MATTHEW SMITH
   _____


   DATE TAKEN:    Tuesday, May 13, 2025

   TIME START:    9:25 a.m.

   TIME END:      3:53 p.m.

   LOCATION:      Burr & Forman, LLP
                  1221 Main Street, Suite 1800
                  Columbia, South Carolina

   REPORTED BY:   SHERI L. BYERS, RPR
                  EVERYWORD, INC.
                  P.O. Box 1459
                  Columbia, South Carolina  29202
                  803.212.0012
```

1  person has been arrested?
2       A.    Not my job responsibility, but somebody
3  does.
4       Q.    Tell me how that works when you arrest
5  someone who has an outstanding warrant.
6       A.    So when I arrest somebody that has an
7  outstanding warrant, first I've got to confirm that
8  it's actually still valid.  So I would call the desk
9  sergeant, and they will contact wherever agency,
10 municipality it comes from.  Say, "Hey, is this still
11 good, active?"
12            And they will come back and say, "Hey, yes,
13 this is still active," or "no."  And then from there,
14 we'll go about depending on what it says.
15      Q.    So if it's still active, what do you do?
16      A.    When it's still active, we take the person,
17 the suspect down to Alvin S. Glenn Detention Center
18 and I put a hold on them for whatever agency to come
19 and pick them up.
20      Q.    Do you have to complete any paperwork
21 regarding the arrest or taking of the suspect to the
22 Alvin S. Glenn Detention Center?
23      A.    Yes, ma'am.
24      Q.    What paperwork do you have to do?
25      A.    You would have to do a booking report for

```
 1   the jail, and then just bring the warrant to them.
 2        Q.   Is the booking report done electronically
 3   or is it a paper document?
 4        A.   Electronic.
 5        Q.   And what device do you use to enter a
 6   booking report?
 7        A.   We use our MDT, our mobile data terminal.
 8   Our computer.
 9        Q.   That's located where?
10        A.   It will be in the patrol car.
11        Q.   And where would a copy of this booking
12   report then be transmitted?  The data that you enter.
13        A.   It stays on the server in the sheriff's
14   department and then we take it to Alvin S. Glenn.
15   And they should have a copy.
16        Q.   Do you email it to Alvin S. Glenn, or how
17   do they get a copy?
18        A.   Bring it to them personally.
19        Q.   So you print it out?
20        A.   Yes, ma'am.
21        Q.   You can print out a copy of a report in
22   your patrol car?
23        A.   Yes, ma'am.
24        Q.   To whom do you deliver this printout with
25   the prisoner?
```

1   A.   Yes, ma'am.

2   Q.   And what is that mission statement?  Would
3  you read it?

4   A.   Yes, ma'am.  "It is our mission to improve
5  the quality of life of the Richland County community
6  by providing professional, exemplary service through
7  crime prevention, resolution, diverse services, and
8  community partnerships.  Our mission is supported by
9  our core values, compassion, dignity, excellence, and
10 professionalism, coordination and teamwork, and
11 integrity."

12   Q.   If you would please, would you turn to
13 Baker-M-050, Policy 300, Records Division.  Do you
14 see that paragraph C?

15   A.   Yes, ma'am.

16   Q.   Okay.  And what is the first sentence of
17 this policy?

18   A.   "Incident report forms are found within the
19 records management system."

20   Q.   What is the records management system?  Are
21 you familiar with that?

22   A.   No, ma'am, I'm not familiar.

23   Q.   And then the next system -- next sentence,
24 excuse me, please read that.

25   A.   "Deputy shall use the records management

```
 1  system to create incident reports and upload them for
 2  supervisor approval and retention."
 3       Q.   Are you familiar with how to create an
 4  incident report and upload it for supervisor approval
 5  and retention?
 6       A.   Yes, ma'am.
 7       Q.   And what system -- tell me in your words
 8  the description of the system that you actually used.
 9       A.   The system that we use write reports is
10  called TriTech.
11       Q.   TriTech.  And is TriTech also located on
12  the computer in your patrol car?
13       A.   Yes, ma'am.
14       Q.   And the next sentence states, "Supplemental
15  reports and investigative follow-up shall be created
16  in the same manner."
17            During the time that you worked as a
18  deputy, did you create supplemental reports or
19  follow-ups?
20       A.   Yes, ma'am.
21       Q.   Okay.  And how did you go into the TriTech
22  system to supplement a report?
23       A.   You log into the system with your
24  credentials, and if I needed to make a supplemental
25  report, I would find that original report, click on
```

```
 1   it, and then just hit create supplement.
 2       Q.   Okay.  The II paragraph below Section C
 3   states that "If a deputy does not have access to a
 4   computer or MDT with the records management system on
 5   it, incident reports can be emailed to the records
 6   department for input at hwreports@rcsd.net."
 7            Did you ever utilize that email address for
 8   submitting reports?
 9       A.   I don't recall.
10       Q.   Were you able during your time as a deputy
11   at the Richland County Sheriff's Department, were you
12   able to access incident reports and supplemental
13   reports?
14       A.   Yes, ma'am.
15       Q.   Were you able to access copies of traffic
16   accident reports?
17       A.   No, ma'am.
18       Q.   If you wanted to obtain a copy of a traffic
19   accident report, how would you obtain it?
20       A.   Through the South Carolina Highway Patrol.
21       Q.   If you look at paragraph 3 on that page,
22   50, would you read that paragraph?  3A and B?
23       A.   "This department processes and retains the
24   following reports:  Incident reports/supplemental
25   reports; B, copies of traffic accident reports.
```

Matthew Smith

1  sorry, I didn't understand you.
2      A.   Yes, ma'am.  To pursue a vehicle, sometimes
3  there's no supervisors directly involved in the
4  vehicle pursuit.
5      Q.   Was that a common practice at the Richland
6  County Sheriff's Department?
7           MR. SPREEUWERS:  Object to the form.
8           You can answer.
9           THE WITNESS:  It's not a common practice.
10      It's just --
11 BY MS. JONES:
12      Q.   Did it happen weekly?
13      A.   I don't -- I wouldn't know.
14      Q.   How often did it occur in your work?
15      A.   In my region?
16      Q.   In your -- yes.
17      A.   If I had to guess -- I wouldn't know.  I
18 only would know for myself how many pursuits I've
19 been in.
20      Q.   Okay.  Then for yourself, how many?
21      A.   From my whole time at the sheriff's
22 department?
23      Q.   Yes, sir.
24      A.   About ten.
25      Q.   How often did you engage in a vehicle

1    A.   Yes, ma'am.

2    Q.   What do you recall about that?

3    A.   Just as it states, these are some of the
4  effects of high-speed driving.

5    Q.   Have you ever experienced those effects of
6  high-speed driving?

7    A.   I don't recall.

8    Q.   And the next page states "As speed goes up,
9  survival goes down."  What do you recall about this
10  section, if anything?

11    A.   As it states, "As speed goes up, survival
12  goes down," it's a risk in what we do.

13    Q.   Do you recall the next page, N-44, there
14  appears to be a video from a news reporting agency?

15    A.   I don't recall that video.

16    Q.   Okay.  Were you trained to ask yourself the
17  two questions set forth on that page, "Who are you
18  willing to kill responding to this call situation?"
19  And "Who are you willing to allow to die as a result
20  of dangerous driving by an officer that you know
21  about but allowed to go unaddressed?"

22    A.   I remember this slide, yes, ma'am.

23    Q.   The next page relates to Officer Michael
24  Vaughn.  Do you recall the video concerning
25  Officer Vaughn?

```
 1        Q.   Did you ever terminate a pursuit?
 2        A.   I don't recall.
 3        Q.   You don't recall ever doing it, or you
 4   don't remember one way or the other?
 5        A.   I don't recall ever terminating a pursuit.
 6        Q.   Okay.  Have you ever -- have you ever been
 7   involved in any other litigation?
 8        A.   As in?
 9        Q.   Has anybody ever sued you before?
10        A.   No, ma'am.
11        Q.   Have you ever had any claims made against
12   you that were not -- that didn't turn into lawsuits?
13        A.   Yes.
14        Q.   Okay.  What claims -- prior claims have
15   been made against you?
16        A.   I don't know verbatim the case, but I have
17   had some complaints.
18        Q.   What did they involve?
19        A.   I don't recall.
20        Q.   You don't remember any details?
21        A.   I don't recall.
22        Q.   Were they in regards to your position as a
23   Richland County Sheriff's deputy?
24        A.   Yes.
25        Q.   But you don't know any of the details?
```

```
1      A.   I don't recall.
2      Q.   How were you notified about these claims?
3      A.   Supervisors.
4      Q.   Which supervisors?
5      A.   My supervisor at the time was Bryce Hughes.
6      Q.   And you can't tell me what the complaint
7   was about?
8      A.   No, ma'am.
9      Q.   Have you ever downgraded a code 3 to a
10  code 1?
11     A.   Yes.
12     Q.   When?
13     A.   Multiple instances.
14     Q.   What caused you to downgrade a code 3 to a
15  code 1?
16     A.   It could be multiple things from
17  information I'm getting from dispatch, information
18  I'm getting from other officers.
19     Q.   And would the -- what would -- what type of
20  information, if you can give me some examples, would
21  cause you to downgrade a code 3 to a code 1?
22          MR. SPREEUWERS:  Object to the
23      hypothetical.
24          Go ahead.
25          THE WITNESS:  It depends on the situation.
```

```
 1  arrested by the Richland County Sheriff's Department,
 2  doesn't it?
 3       A.   Per this report, yes.
 4       Q.   Okay.  All right.  And it says he was
 5  arrested for multiple narcotics charges, his vehicle
 6  was towed by Midlands Auto, and that there was a
 7  puppy taken to animal control to the shelter.
 8  Correct?
 9       A.   Per his report, yes.
10       Q.   All right.  So what paperwork would
11  Officer Abdullah have to fill out to have his vehicle
12  towed?
13            MR. SPREEUWERS:  Object to the form.
14            You can answer.
15            THE WITNESS:  Officer -- or excuse me,
16       Deputy Abdullah will have to fill out a tow slip
17       to have a vehicle towed.
18  BY MS. JONES:
19       Q.   Okay.  And where -- how -- does the tow
20  slip get entered on the same computer in the patrol
21  car just like the incident reports?
22       A.   Yes.
23       Q.   Okay.  And it's called a tow slip?
24       A.   Yes.
25       Q.   All right.  And would he have to fill out
```

```
 1   any paperwork to transport the animal to the animal
 2   control shelter?
 3              MR. SPREEUWERS:  Object to the form.
 4              You can answer.
 5              THE WITNESS:  No.
 6   BY MS. JONES:
 7       Q.   And what documentation would he have to
 8   fill out related to Pringle's arrest, if any?
 9       A.   For an arrest, he would have to fill out a
10   warrant affidavit and an arresting document or arrest
11   document.
12       Q.   All right.  And are those two forms, the
13   warrant affidavit and the arrest document, are they
14   on the computer system in the patrol car?
15       A.   Yes, ma'am.
16       Q.   And where, since this said it was on
17   Monticello Road and Knightner, K-N-I-G-H-T-N-E-R,
18   Knightner Street, I guess is the way you pronounce
19   it, where would you take -- where would Mr. Pringle
20   have been taken to jail?
21              MR. SPREEUWERS:  Object to the form.
22              THE WITNESS:  Anywhere an arrest is made
23         within Richland County's jurisdiction, they
24         would be taken to Alvin S. Glenn Detention
25         Center.
```