PAMELA A. BAKER V. LEON LOTT, IN HIS OFFICIAL CAPACITY AS THE SHERIFF OF RICHLAND
COUNTY SHERIFF'S OFFICE, ET AL.
CASE NO. 3:24-CV-04303-JDA

# EXHIBIT 22

## TO PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER FED. R. CIV. P. 37 MOTION FOR SANCTIONS INCLUDING BUT NOT LIMITED TO STRIKING DEFENDANTS' ANSWER AND AWARDING PLAINTIFF ATTORNEY'S FEES

*REPORT OF OBJECTIONS*

# *ReportBook Contents*

1.  [11/20/2025] 30(b)(6) Ashe, Kelvin Wayne                        3

2.  [11/20/2025] 30(b)(6) Gilman, Karen                            7

3.  [11/20/2025] 30(b)(6) McDuffie, Joanna                         13

4.  [11/19/2025] 30(b)(6) Pagano, Dominick                         19

5.  [11/20/2025] 30(b)(6) Pritchett, Michael E.                    32

6.  [11/20/2025] 30(b)(6) Spurrier, Jennifer                       38

7.  [9/5/2025] Abdullah, Zaid Abdussabur 09-05-25                  44

8.  [10/2/2025] Dillard_Michael_10-02-2025_Full(6315250...         68

9.  [9/19/2025] HODGE_BRYAN_09-19-2025_Full(630961...              77

10. [9/4/2024] Lott, Leon 09-04-25                                105

11. [5/13/2025] Smith, Matthew - Vol. 1                           121

# TextMap Search Report

**Transcript:** [11/20/2025] 30(b)(6) Ashe, Kelvin Wayne
**Search:** object*

## Pg 8 Ln 19 - Pg 9 Ln 17

```
8:19  Q.    And are the units segregated by geographic location or
  20        how are they divided up?
  21  A.    The units are divided up by regions.  We currently have
  22        eight regions.
  23  Q.    And you're over all those regions?
  24  A.    Yes, I'm over the regions.
  25  Q.    Item number 3 on the list there is -- can you explain to
9: 1        me when and how a determination is made to release a
   2        prisoner, someone you've arrested from the department's
   3        custody to the hospital?
   4             MR. SPREEUWERS:  Object to the form.  You can
   5        answer.
   6  BY MS. JONES:
   7  A.    Okay.  Okay.  To clear this up, when a prisoner is
   8        transported to a hospital or the release once they're at
   9        the hospital?
  10  Q.    Both.
  11  A.    Okay.  If we make an arrest, they may be transported by
  12        EMS.  We would then follow them because they are in the
  13        custody of the sheriff's department.  When they get
  14        down, the way we release it is, one if the treating
  15        physicians decide to release the suspect to our custody.
  16        Then they are taken to the Alvin S. Glenn Detention
  17        Center.
```

## Pg 10 Ln 20 - Pg 12 Ln 8

```
10:20  Q.    If a -- if a suspect is arrested -- if a suspect is
   21        arrested and taken to the hospital, transported to the
   22        hospital, and then the sheriff's department or the
   23        deputy simply leaves the arrestee at the emergency room,
   24        has custody ended?
   25  A.    When we arrest someone and we take them to the hospital,
11: 1        they are released back into our custody once they're in
    2        our custody.  We have to get a release from a treating
    3        physician in order to transport them to the Alvin Glenn
    4        Detention Center.
    5  Q.    And if that didn't happen, is that a violation of the
    6        Richland County Sheriff's Department's policies and
    7        procedures?
    8             MR. SPREEUWERS:  Objection.  Vague.  It's outside
    9        the scope.  You can answer.
   10  BY MS. JONES:
   11  A.    Okay.  No.  Because typically, if we have them in our
   12        custody, we do not release them.  We start a hospital
   13        rotation on them until they are released back to us to
   14        go to Alvin Glenn Detention Center.
   15  Q.    But if that didn't happen?
   16  A.    The only time that would possibly happen would be when
```

## TextMap Search Report

**Transcript:**  [11/20/2025] 30(b)(6) Ashe, Kelvin Wayne
**Search:**  object*

## Pg 10 Ln 20 - Pg 12 Ln 8 continued...

```
11:17      the level of treatment exceeds what they can do in the
   18      ER and they are being put in intensive care unit and
   19      that's when we release, relinquish custody.
   20   Q.  Yes, sir.  But if that didn't happen and the arrestee
   21      was simply released by the emergency physician and there
   22      was no sheriff there, when did custody end?
   23         MR. SPREEUWERS:  Objection.  Vague.  That's outside
   24      the scope.  You can answer.
   25   BY MS. JONES:
12: 1   A.  Okay.  Custody would never end and in my territory I've
    2      never seen that happen at the hospital.  There's only
    3      one time to where we would write a ticket if it warrants
    4      that, but most of the time they are transported to the
    5      Alvin Glenn Detention Center.
    6   Q.  So are you familiar at all with Byron Pringle?
    7   A.  Not really because during this incident I had -- I was
    8      on vacation.
```

## Pg 13 Ln 19 - Pg 14 Ln 21

```
13:19   Q.  There's no documentation that you prepare when an
   20      arrestee is taken to the hospital?
   21   A.  The only documentation would be annotated in the
   22      incident report that he was transported to the hospital
   23      for treatment, and the disposition would be annotated in
   24      the report.
   25   Q.  And when you say disposition, what do you mean by that,
14: 1      sir?
    2   A.  If the treating physician decided that they would
    3      release him, we would receive a form from the physician
    4      saying he is authorized to be admitted to the Alvin
    5      Glenn Detention Center.
    6   Q.  Okay.  All right.  Let me ask you about supervisors and
    7      where they're physically located in regards to the radio
    8      traffic.  Where do they sit and listen to the radios?
    9         MR. SPREEUWERS:  Object to the form.  You can
   10      answer.
   11   BY MS. JONES:
   12   A.  It depends on what level of supervisor you're asking me
   13      about.
   14   Q.  What are the different ones?
   15   A.  We have several different levels.
   16   Q.  Seven?
   17   A.  Several.
   18   Q.  Oh, several.  Excuse me.  I'm sorry.  I misunderstood.
   19   A.  We have master deputies.  We have corporals.  We have
   20      sergeants.  We have lieutenants.  We have captains.  We
   21      have majors.  We have chiefs.
```

# TextMap Search Report

**Transcript:** [11/20/2025] 30(b)(6) Ashe, Kelvin Wayne
**Search:** object*

## Pg 21 Ln 14 - Pg 22 Ln 23

```
21:14  Q.   Okay.  What records, if any, did you review in
   15       preparation for testifying in this deposition?
   16  A.   None.
   17  Q.   None?  Did you review any policies or procedures in
   18       preparation for this deposition?
   19  A.   I reviewed none.
   20  Q.   Are you familiar with policy 803, transportation of
   21       prisoners?
   22  A.   Yes.
   23  Q.   And what documentation would be created to comply with
   24       803?
   25           MR. SPREEUWERS:  Objection.  That's been asked an
22: 1       answer.  Go ahead.
    2  BY MS. JONES:
    3  A.   In reference to the transporting of a prisoner, or?
    4  Q.   Yes, sir.  Yes, sir.
    5  A.   Okay.  Could you explain what you're asking?  Because
    6       this is a policy that covers transportation.
    7  Q.   Yes, sir.  Happy to.  What documentation, if any -- the
    8       answer may be none.  What documentation, if any, is
    9       supposed to be created by a deputy transporting a
   10       prisoner pursuant to that policy?
   11           MR. SPREEUWERS:  Same objection.  You can answer.
   12  BY MS. JONES:
   13  A.   The only policy that we would do, when we take them in
   14       custody, we would do an incident report and arrest
   15       report.
   16  Q.   And is the incident report different from an arrest
   17       report?
   18  A.   Yes.
   19  Q.   And if you would please look at Exhibit 10.  Is this an
   20       incident report or an arrest report?  This document --
   21       and I will tell you that others have testified that on
   22       the first four pages there are -- an incident report.
   23  A.   It is an incident report.
```

## Pg 25 Ln 17 - Pg 26 Ln 19

```
25:17  Q.   I am trying to ask you if there's an existing warrant
   18       for somebody and you're going to arrest them, okay, what
   19       information does a deputy have about the warrant that's
   20       outstanding?
   21  A.   The only thing that would be on there would be an NCC
   22       hit which is normally red and it would actually have a
   23       NIC number.  And it would actually indicate that
   24       possible expedition and it would have a charge indicated
   25       on there, this is wanted by agency for this charge.
26: 1  Q.   Would it be the failure to appear or would it list these
    2       other charges underneath it?
    3  A.   It would list all the other charges underneath it.
```

## TextMap Search Report

**Transcript:** [11/20/2025] 30(b)(6) Ashe, Kelvin Wayne
**Search:** object*

## Pg 25 Ln 17 - Pg 26 Ln 19 continued...

```
26: 4  Q.   It would list everything?
     5  A.   Yes.
     6  Q.   Okay.  And would that be contained in Exhibit 10 and in
     7       regards to Mr. Pringle on pages 18, 19, 20, and 21?
     8       Look at those.
     9            MR. SPREEUWERS:  Objection.  That is outside the
    10       scope.  You can answer.
    11  BY MS. JONES:
    12  A.   Okay.  I will answer you.  I do not know.
    13  Q.   Okay.  All right.  The last thing I would like to ask
    14       you about is to identify and explain to me what a desk
    15       sergeant report is.
    16  A.   The desk sergeant report is a daily report we send out
    17       for two different shifts to -- basically, the primary
    18       reason for it is to inform the command staff of all the
    19       daily events that occur in the county.
```

# TextMap Search Report

**Transcript:** [11/20/2025] 30(b)(6) Gilman, Karen
**Search:** object*

## Pg 11 Ln 9 - Pg 12 Ln 13

```
11: 9   Q.   When you say all of the information, what is available
    10        on that screen when you enter the name and the date of
    11        birth?
    12   A.   So NCIC is our National Crime Information Center.  So
    13        what is available is what is put into it.  So it's not
    14        necessarily the same thing for every -- every name and
    15        date of birth that you put in there.  It would depend on
    16        if other agencies entered information.  So any
    17        information that is entered into the system in regards
    18        to that name and date of birth could come back.
    19   Q.   Okay.  And do the supervisors on duty have access to the
    20        NCIC information?
    21   A.   If they run it in their computer, yes.
    22   Q.   And they all have computers?
    23   A.   Most of them, yes.  Not all of them.  But if they are in
    24        a patrol car and from lieutenant down for sure, on the
    25        road.
12: 1   Q.   How do supervisors learn that a deputy is chasing a
     2        fleeing suspect?
     3             MR. GARFIELD:  Object to the form.  You can answer.
     4   BY MS. JONES:
     5   A.   Usually there is -- usually dispatch informs through
     6        what we call a tone-out.
     7   Q.   Tone-out?
     8   A.   It's a series of beats that alerts you to the fact that
     9        something -- something important is going on.
    10   Q.   And are the supervisors at the Richland County Sheriff's
    11        Department trained to be aware that that series of beats
    12        indicates something important is going on?
    13   A.   Yes.
```

## Pg 18 Ln 5 - Pg 19 Ln 11

```
18: 5   Q.   If the officer's vehicle caused the death of a fleeing
     6        suspect, is that also reported to the solicitor's
     7        office?
     8   A.   I do not know.  I wouldn't -- I don't believe so.  The
     9        investigation of a vehicle is done by a highway patrol.
    10   Q.   Do you know why a shooting of a suspect would go to the
    11        solicitor's office but a vehicle death would not?
    12   A.   I do not know.
    13   Q.   Has that always been the policy and practice that the
    14        Richland County Sheriff's Department has?
    15             MR. GARFIELD:  One second.  I object to the form of
    16        the question.  The question exceeds the scope of the
    17        notice topic areas.  You can answer.
    18   BY MS. JONES:
    19   A.   I do not know.
    20   Q.   Has it been the rule as long as you've been there, the
    21        last 13 years, to your knowledge?
```

## TextMap Search Report

**Transcript:** [11/20/2025] 30(b)(6) Gilman, Karen
**Search:** object*

## Pg 18 Ln 5 - Pg 19 Ln 11 continued...

```
18:22  A.   That an officer-involved shooting goes to the
   23       solicitor's office?
   24  Q.   And the vehicle death does not?
   25           MR. GARFIELD:  Object to the form.  You can answer.
19: 1  BY MS. JONES:
    2  A.   I cannot say that it does not is what I'm saying.
    3  Q.   You don't know?
    4  A.   Correct.
    5  Q.   Okay.  How are the email accounts set up at the Richland
    6       County Sheriff's Department?
    7  A.   Our email accounts are set up in Microsoft Exchange.
    8  Q.   And is each employee assigned an email address?
    9  A.   Yes.  Yes.
   10  Q.   And who assigns those email addresses?
   11  A.   Those of us who deal with the IT department.
```

## Pg 19 Ln 14 - Pg 20 Ln 11

```
19:14  Q.   And where are those email records maintained?
   15  A.   So emails are stored on the Exchange server, but they
   16       are stored in regards to what each individual chooses to
   17       keep in their mailbox.  Not all emails are kept forever.
   18       We don't -- we don't have that capacity in a -- in a
   19       server for 800 different employees.
   20  Q.   Right.  And are you involved in litigation holds for
   21       emails?
   22  A.   No.
   23  Q.   Were you ever involved in a litigation hold regarding
   24       this December 29, 2023, collision?
   25           MR. GARFIELD:  Object to the form.  Beyond the
20: 1       scope.  You can answer.
    2  BY MS. JONES:
    3  A.   No.
    4  Q.   How long are emails kept before they -- do they just
    5       rotate off?  What happens to them?
    6  A.   They -- if they are deleted or whatever, then they don't
    7       exist anymore on the server.
    8  Q.   Do they exist anywhere if they're deleted?
    9  A.   No.
   10  Q.   Who's your server?
   11  A.   It's a Microsoft Exchange server.
```

## Pg 26 Ln 5 - Pg 27 Ln 21

```
26: 5  Q.   And is that a hypothetical, or is that what actually
    6       happened?
    7  A.   No, that's what happened.
    8  Q.   Okay.  So what questions, if any, did you pose to him?
    9  A.   So I -- the question that I did pose to him was in
```

## TextMap Search Report

**Transcript:** [11/20/2025] 30(b)(6) Gilman, Karen
**Search:** object*

## Pg 26 Ln 5 - Pg 27 Ln 21 continued...

```
26:10      regards to when the subject went to the opposite
    11     direction -- in the opposite direction on the highway.
    12     I asked him what his thinking process was in regards to
    13     following -- following the subject onto the highway.
    14  Q.  What did he say?
    15         MR. GARFIELD:  Object to the form.  You can answer.
    16  BY MS. JONES:
    17  A.  Okay.  So I could see when he was there that there was
    18     some ---
    19  Q.  My question is, what did he say?
    20  A.  Oh, what did he say?
    21  Q.  In response to your question.
    22         MR. GARFIELD:  Same objection.  Go ahead.
    23  BY MS. JONES:
    24  A.  He said that there was no way -- there was construction
    25     going in the -- I don't know if he was going north or
27: 1      south.  Sorry, I don't -- in the direction where you
     2     would normally get on the freeway, he could see that
     3     there was barricades and all of that, and there would be
     4     no way to do anything to apprehend the suspect, can't
     5     get over to the other side.  And so he followed the
     6     suspect on the other side.
     7  Q.  Did he say anything else?
     8  A.  No.
     9  Q.  Did you ask any other questions?
    10         MR. GARFIELD:  Object to the form.
    11  BY MS. JONES:
    12  A.  Not really that I can recall that.  I probably didn't
    13     just say questions.  I did tell him that he did -- he
    14     did a good job of staying to the left of the lanes and
    15     his speed was very appropriate.  There wasn't any out of
    16     control.  Everybody had time to move out of the way
    17     while he kept an eye on the -- on the suspect.  So
    18     that's ---
    19  Q.  Did you interview anyone else concerning the December
    20     29, 2023, incident involving Byron Pringle?
    21  A.  No.
```

## Pg 27 Ln 24 - Pg 29 Ln 23

```
27:24  Q.  Who was that?
    25  A.  That would be Chris Duke.
28: 1  Q.  Did you discuss it with Chris Duke?
     2  A.  (No verbal response)
     3  Q.  What was your discussion with Chris Duke?
     4         MR. GARFIELD:  Is that a yes?
     5         THE WITNESS:  Yes, sorry.
     6         MR. GARFIELD:  No, you're good.
     7  BY MS. JONES:
     8  A.  Say -- state your question again.
```

# TextMap Search Report

**Transcript:** [11/20/2025] 30(b)(6) Gilman, Karen
**Search:** object*

## Pg 27 Ln 24 - Pg 29 Ln 23 continued...

```
28: 9   Q.   What was your discussion with Chris Duke?
    10        MR. GARFIELD:  Object to the form.  Exceeds the
    11        scope of the noticed topic areas, but go ahead.
    12   BY MS. JONES:
    13   A.   I discussed my -- my observations and my thoughts
    14        exactly the same that I had told you and what I said to
    15        him.  I advised him what I discussed with Deputy Smith
    16        at the time.
    17   Q.   And did Chris Duke ask you any questions?
    18   A.   No.
    19   Q.   Did he have any comments?
    20        MR. GARFIELD:  Same objection.
    21   BY MS. JONES:
    22   A.   I don't think so.  I mean, he may have, but I don't
    23        recall them.
    24   Q.   Did he view the body cam footage and the car cam
    25        footage?
29: 1   A.   Yes.  He would have, yes.  But he did not in my
     2        presence.
     3   Q.   He did not in your presence?
     4   A.   Correct.
     5   Q.   Did he tell you he had viewed the footage?
     6   A.   Yes.
     7   Q.   Do you know when he viewed it?
     8   A.   I don't know -- I don't know when he viewed it.
     9   Q.   Were you the person who issued the discipline, the
    10        verbal counseling to Deputy Smith concerning this
    11        incident?
    12        MR. GARFIELD:  Object to the form.  You got this.
    13   BY MS. JONES:
    14   A.   Okay.  Verbal counseling is not necessarily a
    15        discipline, but a discussion.  Like I said, there's
    16        always a training opportunity.  Discipline, if any is
    17        determined to be necessary, is done after the pursuit
    18        packet is sent up to our Professional Standards
    19        Division.  We don't -- we don't make those
    20        determinations.
    21   Q.   So you nor Mr. Duke would have made any disciplinary
    22        determination; is that correct?
    23   A.   Correct.
```

## Pg 32 Ln 24 - Pg 33 Ln 22

```
32:24   Q.   Do you know the process or steps undertaken with respect
    25        to the corrective action taken?
33: 1   A.   I don't think I understand your question.
     2   Q.   I'm just trying to find out if you're aware of any
     3        institutional steps that are followed in taking
     4        corrective action.
     5   A.   So the corrective action would be determined by
```

## TextMap Search Report

**Transcript:** [11/20/2025] 30(b)(6) Gilman, Karen
**Search:** object*

---

## Pg 32 Ln 24 - Pg 33 Ln 22 continued...

```
33: 6        professional standards.
    7   Q.   Where it says there, verbal counseling, who made the
    8        determination that verbal counseling was the proper
    9        action to be taken in this case?
   10            MR. GARFIELD: Object to the form.  You can answer.
   11 BY MS. JONES:
   12   A.   I mean, in this -- in this instance, in this document,
   13        the person whose name is associated with the comment,
   14        that would be Chris Duke.
   15   Q.   But you don't know what that verbal counseling was?
   16   A.   I do not.
   17   Q.   The verbal counseling and corrective action, is that a
   18        matter that is reviewed by professional standards?
   19   A.   Not necessarily.
   20   Q.   Under what conditions does professional standards review
   21        it and under what conditions do they not?
   22   A.   They review every pursuit packet.
```

## Pg 34 Ln 7 - Pg 35 Ln 4

```
34: 7   Q.   That's all right.  Did you review any other documents?
    8   A.   I think so.  I believe I looked at the sheriff's
    9        specific testimony.
   10   Q.   His deposition?
   11   A.   Correct.
   12   Q.   Did you read the whole deposition?
   13   A.   Well, I don't know, actually.  I don't know how long it
   14        actually is, but I did review some of the parts of the
   15        deposition.
   16   Q.   How did you determine which parts to review of this
   17        deposition?
   18            MR. GARFIELD: Object to the form.  This is ---
   19 BY MS. JONES:
   20   A.   I did not.  I just don't know if what I had in front of
   21        me was the full deposition or a portion of the
   22        deposition because I could -- you have it numbered.
   23        That's all I'm saying.
   24   Q.   Well, let me ask you this.  What did you do to prepare
   25        to be the witness for the 30(b)(6) deposition today?
35: 1   A.   I reviewed the deposition, and I reviewed these
    2        documents.
    3   Q.   Exhibit 10?
    4   A.   Yes.
```

## Pg 39 Ln 5 - Pg 40 Ln 6

```
39: 5   Q.   Did you discuss your testimony with Chief Polis?
    6   A.   No.
    7            MS. JONES: That's all the questions I have.  Thank
```

# TextMap Search Report

**Transcript:** [11/20/2025] 30(b)(6) Gilman, Karen
**Search:** object*

## Pg 39 Ln 5 - Pg 40 Ln 6 continued...

```
39: 8      you very much.
    9            MR. GARFIELD:  A short break.
   10                    (OFF THE RECORD)
   11            MR. GARFIELD:  Okay.  I've got a couple of
   12      follow-ups.
   13                    CROSS-EXAMINATION
   14  BY MR. GARFIELD:
   15  Q.   So Major Gilman, Ms. Jones was asking you questions
   16      about the term verbal counseling.  Do you recall that?
   17  A.   Yes.
   18  Q.   Okay.  Verbal counseling, which takes place within the
   19      department, does that in and of itself suggest only
   20      something negative?
   21            MS. JONES:  Object to form.
   22  BY MR. GARFIELD:
   23  Q.   Or could it be something positive?
   24  A.   Yes, it could be.  Definitely, it could be something
   25      positive.  Training someone is not a negative thing.
40: 1            MR. GARFIELD:  Okay.  I don't have anything else.
    2            MS. JONES:  No questions.  I'm done.
    3            THE COURT REPORTER:  Okay.  And would you like a
    4      copy of the transcript?
    5            MR. GARFIELD:  Yeah, PDF.
    6  (THERE BEING NO FURTHER QUESTIONS, THIS DEPOSITION CONCLUDED
```

# TextMap Search Report

**Transcript:** [11/20/2025] 30(b)(6) McDuffie, Joanna
**Search:** object*

## Pg 11 Ln 5 - Pg 12 Ln 15

```
11: 5  Q.   And then follow up with any responsive records?
    6  A.   So I mean, our process is that when a request comes in,
    7       we -- we notify them if the records exist, if there --
    8       what the cost is for those records.  We generally allow
    9       them to pay a 25 percent deposit.  We wait until they
   10       get that deposit.  A lot of times people request things
   11       and then never follow through once -- you know, they
   12       never come and pay the money.
   13           Once the deposit is paid, then Jennifer will begin
   14       the process of pulling those records and redacting and
   15       things of that nature, and then we notify them when
   16       they're ready to pick up and go from there.
   17  Q.   And in regards to the lawsuits, do you maintain copies
   18       of the lawsuits?
   19  A.   I don't because they're publicly -- I can pull them up,
   20       a list on the central index and public index.
   21  Q.   So when you get a lawsuit, you send it over to the
   22       county attorney's office?
   23  A.   Yes, ma'am.
   24  Q.   And then you just throw away whatever documents you
   25       have?
12: 1           MR. GARFIELD:  Object to the ---
    2  BY MS. JONES:
    3  Q.   Like the copy of the summons and complaint?
    4           MR. GARFIELD:  Object to the form.
    5  BY MS. JONES:
    6  A.   I don't retain a copy of the summons and complaint
    7       because I can pull those electronically, so those -- I
    8       don't have a -- a mechanism to electronically store all
    9       that information.
   10  Q.   What do you mean you don't have a mechanism?  You're not
   11       able to scan and store documents?
   12  A.   I mean, I guess I could.  There's -- I mean, my computer
   13       will only hold so much information.  There's not like a
   14       cloud-based server or something that I have, or the
   15       department has funds for, to -- for that purpose.
```

## Pg 21 Ln 4 - 25

```
21: 4  Q.   Do you consult him about substantive changes?
    5  A.   That affect policing, yes, ma'am.
    6  Q.   Do policy change requests come to you?
    7  A.   Yes, ma'am.
    8  Q.   And from whom do you get substantive policy change
    9       requests?
   10  A.   It could be anyone in the department.
   11  Q.   You recall anyone who's ever made such a request?
   12  A.   Yes, ma'am.
   13  Q.   Which ones can you recall?
   14  A.   I guess ---
```

# TextMap Search Report

**Transcript:** [11/20/2025] 30(b)(6) McDuffie, Joanna
**Search:** object*

## Pg 21 Ln 4 - 25 continued...

```
21:15            MR. GARFIELD:  I'm just going to object.  This is
   16      beyond the scope.  Go ahead.
   17  BY MS. JONES:
   18  A.   So the department is looking at getting, right now,
   19       something called a hobble device.  And so our officers
   20       are tuning -- I'm sorry -- testing and evaluating those.
   21       And so we are -- myself and Chief Polis have been
   22       discussing policy changes on those if we decide to
   23       implement them.
   24  Q.   Let me ask you to turn to policy 802, vehicle pursuits.
   25  A.   Yes, ma'am.
```

## Pg 22 Ln 11 - Pg 23 Ln 12

```
22:11  Q.   And why were those significant substantive changes made
   12       in 2023?
   13  A.   So we gained additional -- or we were in the process of
   14       gaining additional capabilities, especially dealing with
   15       pit maneuvers, and so that was changed in the policy.
   16       And that was a significant change.
   17  Q.   Were there any other significant changes other than that
   18       one you mentioned, related to pit maneuvers?
   19  A.   Without looking at prior versions, that -- that comes to
   20       the -- I mean, that's what comes to mind.  And I don't
   21       want to make a mistake.
   22  Q.   Were any substantive changes made to policy number 802
   23       following the enactment of section 23-23-85 of the South
   24       Carolina Code?
   25  A.   Not as a result of that, no, ma'am.
23: 1            MR. GARFIELD:  I'm just going to object.  This is a
    2       continuing examination beyond the scope.
    3  BY MS. JONES:
    4  Q.   The gentleman who was here earlier that testified about
    5       the number of chases over the last ten years at the
    6       Richland County Sheriff's Department, what was the
    7       source of the information that you compiled and emailed
    8       to him?
    9  A.   I didn't compile anything, ma'am.
   10  Q.   Okay.  Did you ---
   11            MR. SPREEUWERS:  Just for the record, that was an
   12       email from Jennifer Spurrier.
```

## Pg 24 Ln 24 - Pg 26 Ln 1

```
24:24  Q.   You don't keep the emails where you transmit the
   25       lawsuits over to the county attorney's office?
25: 1  A.   Yes, ma'am.  I guess I could go through emails and then
    2       pull each individual lawsuit.
    3  Q.   So do you know how many times the sheriff's department
```

# TextMap Search Report

**Transcript:** [11/20/2025] 30(b)(6) McDuffie, Joanna
**Search:** object*

## Pg 24 Ln 24 - Pg 26 Ln 1 continued...

```
25: 4        has been sued the last five years because of pursuit
     5        chases?
     6  A.    No, ma'am.  I do not.
     7  Q.    Has any action been taken by the sheriff's department to
     8        change any of its policies and procedures as a result of
     9        injuries that have occurred to public -- to, you know,
    10        individual citizens because of the police pursuit
    11        chases?
    12              MR. GARFIELD:  Objection.  It's beyond the scope.
    13        Go ahead.
    14  BY MS. JONES:
    15  A.    To -- to injuries to specific individuals?  No, however,
    16        we are constantly looking at ways to effectively
    17        end pursuits as quickly as possible.  We are going through
    18        having our officers trained on the pit maneuver, you
    19        know, things like that.  We're constantly testing and
    20        evaluating different ways to end pursuits, like tire
    21        flattening devices, things of that nature.
    22  Q.    Anything other than pit maneuvers and tire flattening
    23        devices?
    24  A.    I'm not quite sure I understand your question.  Those,
    25        you know, are things that -- that we look at to end
26: 1        pursuits, you know.
```

## Pg 30 Ln 13 - Pg 31 Ln 17

```
30:13  Q.    And then does the tax number on that account belong to
    14        the sheriff's department or to the County?
    15  A.    So the -- I can't -- the money goes to the sheriff's
    16        department.  It's then remitted to the County, and then
    17        it -- it's paid out into -- into certain funds.
    18  Q.    But there's a bank account that is the Signal 30
    19        account?
    20  A.    No, ma'am.  The sheriff's department does not maintain a
    21        separate bank account.  The money goes to the County and
    22        to the County accounts.
    23  Q.    The sheriff, how does the sheriff's department deposit
    24        the checks?  Do they mail the checks over to the County,
    25        or do you deposit them at the bank?
31: 1              MR. GARFIELD:  Object to the form.  Do the best you
     2        can.
     3  BY MS. JONES:
     4  A.    I -- I don't know the individual's name.  He, I think,
     5        drives them over to 2020 Hampton Street.
     6  Q.    Oh, okay.  Does someone at the County sign these
     7        contracts with the private business, or does someone at
     8        the Richland County Sheriff's Department sign the
     9        contract?
    10  A.    The sheriff ultimately determines if the deputy -- if
    11        they'll work that Signal 30.  So I can give you an
```

## TextMap Search Report

**Transcript:** [11/20/2025] 30(b)(6) McDuffie, Joanna
**Search:** object*

## Pg 30 Ln 13 - Pg 31 Ln 17 continued...

```
31:12        example.  Many years ago, the sheriff would not let
   13        people work at -- at places that sold alcohol due to the
   14        increase in -- in crime and violence.  He changed his
   15        position on that, and so now he allows deputies to work,
   16        you know, at -- at bars and nightclubs to hopefully curb
   17        some of that violence.  So he makes the decision.
```

## Pg 31 Ln 23 - Pg 33 Ln 14

```
31:23  Q.   Okay.  All right.  What does the off-duty designation
   24        indicate?
   25  A.   That's what can be one or two things that, if it's
32: 1        Signal 30, it's off-duty employment, or off-duty means
    2        they're off-duty, not working.
    3  Q.   And the Signal 30 assignments are voluntary?
    4  A.   Yes, ma'am.
    5  Q.   All right.  What is the Richland County Sheriff's
    6        Department's position, opinion, or belief regarding the
    7        standard and duty law enforcement officers owe to the
    8        public to protect the public from harm caused by or
    9        contributed to by law enforcement actions?
   10             MR. GARFIELD:  I'm going to object to that
   11        question.  It's compound in nature, and it calls for a
   12        legal conclusion.  Do the best you can.
   13  BY MS. JONES:
   14  A.   That's a very hard question to answer.  Generally, law
   15        enforcement officers don't owe any duty greater to the
   16        public than anyone else in terms of their action, unless
   17        some sort of special duty is created for protection.
   18        Obviously, we don't want to, you know, injure anyone.
   19        Unfortunately, the nature of the job sometimes requires
   20        that.  But generally, there's no special duty owed to
   21        the public at large.
   22  A.   Are you aware of any special duties owed to the public?
   23             MR. GARFIELD:  And same objection.  It calls for a
   24        legal conclusion.  Do the best you can.
   25  BY MS. JONES:
33: 1  Q.   I'm just asking you if you're aware of any.
    2  A.   Yes, ma'am.  I mean, there's -- you know, there's
    3        state-created -- state-created danger, things of that
    4        nature.
    5  Q.   What?  Say that again, please.
    6  A.   So there's case law and things of that nature that when
    7        we, you know -- I'll give you an example.  So there was
    8        a case where the Lexington County, I believe it was
    9        Lexington County, subpoenaed a witness to testify in
   10        domestic violence court against the accuser.
   11             There was no courtroom security, and she, I
   12        believe, was injured, and they said, you know, that
   13        there was a duty owed.  Well, normally there's not a
```

## TextMap Search Report

**Transcript:** [11/20/2025] 30(b)(6) McDuffie, Joanna
**Search:** object*

## Pg 31 Ln 23 - Pg 33 Ln 14 continued...

33:14      duty owed to the public, and that instance there was.

## Pg 34 Ln 18 - Pg 36 Ln 16

```
34:18  Q.  Can you think of any others?
   19  A.  I mean, if you wanted to point me to a specific policy,
   20      we could go through each one line by line, but short of
   21      doing that, I mean ---
   22  Q.  The specific ones are 800, 802, and 803.  Really, just
   23      800 and 802.
   24  A.  Do you mind if I ---
   25  Q.  No, please, please.  I've got it out.  You can look at
35: 1      it.
    2  A.  Is there any specific line you need to look at, or?
    3  Q.  No.  My question is, what is the sheriff's department's
    4      opinion regarding the responsibility of the deputy to
    5      abide by the policy set forth in 800 and 802?
    6          MR. GARFIELD:  Object to the form.
    7  BY MS. JONES:
    8  A.  So again, it depends on a specific line in the policy.
    9      We're talking about use of county vehicles.  A deputy is
   10      allowed to use their county vehicle to go to specific
   11      events when designated to be there by the sheriff.  They
   12      can also drive their personal vehicle and don't have to,
   13      so that -- that is not a requirement.  Unauthorized use
   14      of vehicles whenever alcohol is consumed by the driver,
   15      so that would be a requirement that they not drink and
   16      drive.  I mean, so it really is -- I don't know how to
   17      answer your question without a specific reference point.
   18  Q.  Well, my question to you is, how would anyone reading
   19      this manual know what the Richland County Sheriff's
   20      Department considers a requirement and what the Richland
   21      County Sheriff's Department does not consider a
   22      requirement in the manual?
   23          MR. GARFIELD:  Object to the form.
   24  BY MS. JONES:
   25  A.  So in general, words like must are generally a
36: 1      requirement.  Words like shall are generally not
    2      requirements, but permissive, but, again, really it
    3      depends on the line.  Things like require are -- are --
    4      so where it says Baker M314 number 7, A deputy who loses
    5      vehicle privileges is required to park their patrol
    6      vehicle.  So that would be a requirement.
    7  Q.  Any other way to tell in reading the manual?  You said
    8      unauthorized use of vehicle.  That's on page 4 of 12.
    9      Is the entirety of subsection 10 a requirement?
   10  A.  So it is not authorized to drive your vehicle outside of
   11      Richland County unless permission is obtained.  So they,
   12      in theory, would be required to get permission to drive
   13      their county vehicle outside of Richland County in
```

# TextMap Search Report

**Transcript:** [11/20/2025] 30(b)(6) McDuffie, Joanna
**Search:** object*

## Pg 34 Ln 18 - Pg 36 Ln 16 continued...

```
36:14      certain circumstances.  So in some instances, it would
   15      be a requirement.  In others, it would not be a
   16      requirement.
```

## TextMap Search Report

**Transcript:** [11/19/2025] 30(b)(6) Pagano, Dominick
**Search:** object*

# Pg 12 Ln 6 - Pg 15 Ln 8

```
12: 6  Q.   Well, I want to ask you about the accreditation.
     7          What accreditations are held by the officers at the
     8       Richland County Sheriff's Department?
     9  A.   So they hold a class one -- so we have class one
    10       certified officers, and we also have class three
    11       certified officers, and then we also have reserve
    12       officers.  All of their accreditation, their training,
    13       everything is tied to the academy.  Ultimately, the
    14       academy, the state Academy, is the governing body for
    15       certification.
    16  Q    And so every law enforcement officer at the Richland
    17       County Sheriff's Department has to be accredited by the
    18       South Carolina Criminal Justice Academy; is that
    19       correct?
    20  A.   Yes.
    21          MR. GARFIELD:  And I'm just going to insert just an
    22       objection that all the line of questioning about the
    23       South Carolina Criminal Justice Academy is beyond the
    24       scope of this particular witness.
    25  BY MS. JONES:
13: 1  Q.   When you were the commander over the Training Division
     2       from 2013 until 18 months ago, did you oversee the
     3       training for the Richland County Sheriff's deputies
     4       regarding minimum standards for the use of force?
     5  A.   Can you reframe that question for me, please?
     6  Q.   Sure.  When you were in your position as the commander
     7       over the Training Division for the Richland County
     8       Sheriff's Department, did you oversee the training for
     9       the officers regarding the use of force?
    10          MR. GARFIELD:  Object to the form.  You can answer.
    11  BY MS. JONES:
    12  A.   So yes and no.  So ultimately, the standards that are
    13       applied are through the Criminal Justice Academy.  We
    14       learn the use of force continuum through there, and then
    15       state and federal law.  So our training coincides
    16       directly with what's stated in state and federal law and
    17       mandated by the criminal justice academy.
    18  Q.   And the same question, did you oversee the training for
    19       the uniform vehicle pursuit standards and the use of
    20       lethal options during pursuits?
    21          MR. GARFIELD:  Object to the form.  Beyond the
    22       scope.  You can answer.
    23  BY MS. JONES:
    24  A.   I supervised the training aspect, not the actual
    25       policies and procedures and state and federal laws.
14: 1  Q.   Did you train the officers or did the training materials
     2       train the officers on their duty to intervene in the
     3       action of other observed officers?
     4          MR. GARFIELD:  Object to the form.  Beyond the
     5       scope.  You can answer this question.
     6  BY MS. JONES:
```

# TextMap Search Report

**Transcript:** [11/19/2025] 30(b)(6) Pagano, Dominick
**Search:** object*

## Pg 12 Ln 6 - Pg 15 Ln 8 continued...

```
14: 7  A.    So can you give me an example?
    8  Q.    Yeah, did you train your police officers on their duty
    9        as a police officer to intervene if they saw another
   10        officer doing something that they thought was improper
   11        or that wasn't proper?
   12               MR. GARFIELD:  Same objection.
   13  BY MS. JONES:
   14  A.    We have a code of ethics, so we have basically what's
   15        known as police the police.
   16  Q.    Did you train the officers regarding the implementation
   17        and use of body-worn cameras?
   18  A.    I did not.
   19  Q.    Did people who reported to you when you were the
   20        commander implement the training for the use of
   21        body-worn cameras?
   22               MR. GARFIELD:  Object to the form.
   23  BY MS. JONES:
   24  A.    No.
   25  Q.    When you were the commander of the Training Division,
15: 1        did you have a written directive that delineated how
    2        complaints could be made and the investigative process
    3        for complaints against your officers?
    4  A.    So you're asking me if we had a written directive.  We
    5        have policies and procedures.
    6  Q.    Yes.
    7  A.    But that division did not -- does not fall under my
    8        purview.
```

## Pg 15 Ln 14 - Pg 17 Ln 5

```
15:14  Q.    Did you, in your years with the Richland County
   15        Sheriff's Department, have an occasion to report any
   16        complaints regarding the conduct of other officers?
   17               MR. GARFIELD:  Hang on a second.  Major, hang on.
   18        Celeste, can you show me where in this delineation of
   19        pages, in number 31, where this topic was presented to
   20        us before this deposition, about this one?
   21               MS. JONES:  Let's go off the record.
   22                      (OFF THE RECORD)
   23               MR. GARFIELD:  We went off the record for a few
   24        moments and I discussed with opposing counsel the
   25        appropriateness of examination in this case.  She takes
16: 1  the position that noticing a 30(b)(6) -- which we have
    2  designated and produced representatives of the Richland
    3  County Sheriff's Department.
    4        Counsel takes the position that she is allowed
    5  under the Rules of Civil Procedure and or the local
    6  rules to depose him on not only the designated areas as
    7  noticed in the 30(b)(6), but anything in his knowledge.
    8        We object to that.  We think that is improper.  We
```

# TextMap Search Report

**Transcript:** [11/19/2025] 30(b)(6) Pagano, Dominick
**Search:** object*

## Pg 15 Ln 14 - Pg 17 Ln 5 continued...

```
16: 9  have asked her to show us where in the rule that permits
   10  her to ask him those questions, which could include, but
   11  not necessarily limited to any personal information,
   12  professional information.  That is outside of my
   13  knowledge of a 30(b)(6) scope.  And it certainly
   14  violates the spirit of a 30(b)(6) deposition.
   15      And if I'm incorrect on this, I see that Ms. Jones
   16  has Googled this for her response and she's looking at
   17  her phone.  And if I'm wrong, I'd like to see what the
   18  rule says on it.
   19      MS. JONES:  So I'm not here to do your research,
   20  but the witness has to be prepared to testify not just
   21  on their own personal knowledge, but on anything that's
   22  within their scope of knowledge of this witness.  If he
   23  knows, he knows.  If he doesn't, he doesn't.
   24      MR. GARFIELD:  Of course.
   25      MS. JONES:  So you can either have the witness
17: 1      answer the question or instruct the witness not to
    2      answer the question.
    3          MR. GARFIELD:  Then, let's go.  Let's go.
    4          MS. JONES:  So now we've both got our positions
    5      stated.
```

## Pg 17 Ln 7 - Pg 18 Ln 23

```
17: 7  Q.   Okay.  I was asking you about the -- if there was an
    8       occasion when you had filed a complaint at the Richland
    9       County Sheriff's Department concerning the conduct of
   10       another officer.
   11          MR. GARFIELD:  Hang on one second.  I'd like to
   12       take a short break, if it's all right.
   13          MS. JONES:  Okay.
   14                  (OFF THE RECORD)
   15          MS. JONES:  Are you ready?
   16          MR. GARFIELD:  Yes.
   17          MS. JONES:  Can you read the last question back,
   18       please?
   19      (COURT REPORTER PLAYS BACK REQUESTED QUESTION)
   20          MS. JONES:  That's the question.
   21          THE WITNESS:  Are you ready for me to ---
   22          MR. GARFIELD:  Answer on what she's asking.
   23          THE WITNESS:  Okay.
   24  BY MS. JONES:
   25  A.   No, I have never filed a complaint.
18: 1  Q.   Are you familiar with any of the investigation processes
    2       of such complaints or the time frame for resolving any
    3       complaints?
    4          MR. GARFIELD:  I'm just going to object to this
    5       question.  It's outside the scope of the 30(b)(6)
    6       designated subject area.  And that's going to be a
```

## TextMap Search Report

**Transcript:** [11/19/2025] 30(b)(6) Pagano, Dominick
**Search:** object*

## Pg 17 Ln 7 - Pg 18 Ln 23 continued...

```
18: 7        continuing objection.  If we continue on with this, I'll
     8        just make mention of this later on, but you can go ahead
     9        and answer it.
    10   BY MS. JONES:
    11   A.   Can you repeat that question?
    12   Q.   Yes.  Are you familiar with the investigative process
    13        regarding complaints?
    14   A.   Not intimately.  I know how people can report it, but in
    15        terms of the internal process, that is handled by
    16        another division.
    17   Q.   I would like to mark this as Exhibit 54.  It is the
    18        30(b)(6) notice so that we'll have it for the record for
    19        the items that he's been designated to testify to.
    20             In item number 31, did you read or review the
    21        amended complaint that's filed in this action in
    22        preparation for your testimony?
    23   A.   What do you mean by amended complaint?
```

## Pg 22 Ln 3 - Pg 23 Ln 25

```
22: 3   Q.   And that has been the way that the driving training has
     4        been done since 2013 to your knowledge?
     5   A.   Yes, ma'am.
     6   Q.   So just to be clear, you didn't evaluate any of the
     7        training or any of the actions of the defendant officers
     8        in this particular lawsuit; is that correct?
     9   A.   I saw the video.  I saw the body cam footage.
    10   Q.   Okay.  Did you make any determination as to whether or
    11        not any of the officers -- and we can go through them
    12        one at a time, but any of the three officers violated
    13        the policies and procedures of the Richland County
    14        Sheriff's Department?
    15             MR. GARFIELD:  Object to the form.  You can answer.
    16   BY MS. JONES:
    17   A.   No, ma'am.  I don't have anything to do with
    18        disciplinary.
    19   Q.   Okay.  So you made no determination in that regard and
    20        you have no opinion about it?
    21             MR. GARFIELD:  Same objection.  Go ahead.
    22   BY MS. JONES:
    23   A.   I have opinions.  Everyone has a personal opinion, but
    24        it's based on my subject matter expertise, my
    25        professionalism, based on 20-something years of being a
23: 1        law enforcement officer.
     2   Q.   So are you testifying on behalf of the department in
     3        that regard?
     4   A.   I'm here representing the department.
     5   Q.   But in regards to your opinion about whether or not the
     6        individual defendants violated the policies and
     7        procedures?
```

## TextMap Search Report

**Transcript:** [11/19/2025] 30(b)(6) Pagano, Dominick
**Search:** object*

## Pg 22 Ln 3 - Pg 23 Ln 25 continued...

```
23: 8          MR. GARFIELD:  Object to the form of the question.
    9      You're asking about his personal opinion?
   10          MS. JONES:  I'm asking him if he is offering an
   11      opinion on behalf of the sheriff's department concerning
   12      whether or not deputies Smith, Dillard, or Hodge
   13      violated the Richland County Sheriff's Department's
   14      policies and procedures in regards to Pam Baker.
   15          MR. GARFIELD:  Object to the form.  Him providing a
   16      personal opinion in this case is clearly beyond the
   17      scope of the 30(b)(6) case.
   18          MS. JONES:  Wasn't my question.
   19          MR. GARFIELD:  Well, you're asking first if he's
   20      ready to or prepared to render a personal opinion in
   21      this case on behalf of the Richland County Sheriff's
   22      Department?
   23          MS. JONES:  No.  I'm asking him if he is offering
   24      an opinion on behalf of the Richland County Sheriff's
   25      Department as its designated representative.
```

## Pg 24 Ln 18 - Pg 25 Ln 19

```
24:18  Q.  Anything else?
   19  A.  I mean, there's many, many aspects.  Risk to the public,
   20      risk to other first responders, risk of him fleeing and
   21      then further, another younger officer by themselves out
   22      there on a traffic stop that could come across a deadly
   23      force situation.  Lots -- there's lots of different
   24      situations.
   25  Q.  Well, I want to know the risk.  I want to know what the
25: 1      risk, danger to the public, was with respect to the
    2      pursuit undertaken by Officer Smith.
    3  A.  So the -- so the risk to the public was not of our
    4      officers.  The risk to the public was the fleeing
    5      suspect, the fleeing felon.
    6  Q.  That's not my question.  What was the danger to the
    7      public with respect to the pursuit undertaken by Officer
    8      Smith?
    9          MR. GARFIELD:  Object to the form.  You can answer.
   10  BY MS. JONES:
   11  A.  So there's -- there's risks in anything.  Anything that
   12      we do, there's risks in.  So we have to ---
   13  Q.  I'm asking you specifically about the pursuit undertaken
   14      by Officer Smith on December the 29th, 2023.
   15          MR. GARFIELD:  Celeste, I would ask you not to
   16      interrupt the witness.  I think he was trying to answer
   17      your question.  Go ahead and answer, Major.
   18  BY MS. JONES:
   19  A.  So the pursuit by Officer Smith on a fleeing felon is
```

# TextMap Search Report

**Transcript:** [11/19/2025] 30(b)(6) Pagano, Dominick
**Search:** object*

## Pg 25 Ln 25 - Pg 27 Ln 9

```
25:25  Q.  What was the immediate danger to the public, if there
26: 1      was one, when Officer Smith began the pursuit?
    2  A.  So Officer Smith did not begin the pursuit.  The subject
    3      began the pursuit for failure to stop for blue lights
    4      and sirens.  The danger was posed by the subject, by his
    5      erratic driving, his erratic behavior.  He was also
    6      carrying narcotics, had narcotics in the car, which is
    7      fentanyl, which we've had several deputies overdose,
    8      exposed to that while out on traffic stops, which causes
    9      an incident.
   10          His driving the wrong way on a -- on a
   11      known-to-be-busy highway.  At that time, it was mild
   12      traffic going the wrong direction, with vehicles trying
   13      to swerve out of the way.  Obviously could cause injury,
   14      significant injury or death by his actions, absolutely.
   15          The chances of him continuing to get away, to pose
   16      further actions, because this wasn't the first run-in
   17      that law enforcement had with him, and he was actually
   18      being surveyed and detailed by a special team that was
   19      trying to apprehend him.
   20  Q.  My question to you is that when the chase began, when
   21      the pursuit began, what was the immediate danger to the
   22      public?
   23  A.  I just explained that to you.
   24          MR. GARFIELD:  Object to the form.
   25  BY MS. JONES:
27: 1  A.  I just explained what the immediate danger was to the
    2      public.
    3  Q.  So your understanding is when the chase began, the
    4      suspect was -- where was the suspect when the pursuit
    5      began?
    6  A.  He was on the roadway, an active roadway.  He failed to
    7      stop for blue lights and sirens.  He was a known felon.
    8      It came over the radio that he was a felon.  They were
    9      looking for him.  His actions dictated our actions.
```

## Pg 28 Ln 12 - Pg 30 Ln 22

```
28:12  Q.  Okay.  Is your understanding that that was communicated
   13      to Officer Smith before he turned his blue light on?
   14  A.  I don't recall.
   15  Q.  So you don't know?
   16  A.  Exactly.
   17  Q.  All right.  How many times a week does an officer at the
   18      Richland County Sheriff's Department engage in a
   19      vehicular pursuit?
   20  A.  I don't have those numbers.
   21  Q.  Do you know of any year in which -- do you know how many
   22      pursuits were undertaken in any calendar year since
   23      2017?
```

# TextMap Search Report

**Transcript:** [11/19/2025] 30(b)(6) Pagano, Dominick
**Search:** object*

## Pg 28 Ln 12 - Pg 30 Ln 22 continued...

```
28:24          MR. GARFIELD:  Object to the form.  Do the best you
   25     can.
29: 1   BY MS. JONES:
    2   A.   No, ma'am.
    3   Q.   Do you know what records are kept regarding high-speed
    4        pursuits?
    5   A.   We have a reporting system that tracks any type of
    6        incident report that's filed.
    7   Q.   And what is the tracking system that you're referring
    8        to?
    9   A.   So back then it would have been TriTech where incident
   10        reports are filed.  So anytime a case number is
   11        generated, it goes into -- it goes into TriTech.
   12   Q.   What is it now?
   13   A.   They also use another system called Benchmark.
   14   Q.   When did Benchmark start?
   15   A.   I cannot answer that question.  I'm not over that.
   16   Q.   Have you ever been involved in a high-speed pursuit?
   17          MR. GARFIELD:  Object to the form.  You can answer.
   18   BY MS. JONES:
   19   A.   What do you consider high speed, ma'am?
   20   Q.   A vehicular pursuit.
   21   A.   What do you consider ---
   22   Q.   Exceeding the speed limit.
   23   A.   Exceeding the speed, so exceeding the posted speed
   24        limit?
   25   Q.   Correct.
30: 1   A.   Yes.  Yes.
    2   Q.   How many times?
    3          MR. GARFIELD:  Same objection.  Go ahead.
    4   BY MS. JONES:
    5   A.   I couldn't answer that.
    6   Q.   With respect to policy 802, point 3 -- do you want to
    7        see it again?
    8          MR. GARFIELD:  Object to the form.
    9   BY MS. JONES:
   10   Q.   Do you want to see the policy?
   11   A.   I'd like to have the policy in front of me, ma'am, yes.
   12          MR. GARFIELD:  And the objection was just the
   13        number of the policy.
   14   BY MS. JONES:
   15   Q.   Are you looking at 802, point 3?
   16   A.   Point three?
   17   Q.   Under three.
   18   A.   Oh, under three.  Yes, ma'am.
   19   Q.   What does it say?
   20   A.   I don't have my glasses on so bear with me.  So you're
   21        talking about 802, point 3.  You're talking about the
   22        initiation of the pursuit?
```

# TextMap Search Report

**Transcript:** [11/19/2025] 30(b)(6) Pagano, Dominick
**Search:** object*

## Pg 32 Ln 10 - Pg 33 Ln 7

```
32:10  Q.   Why should an officer take into consideration the
   11       physical location and population and density before
   12       determining whether to initiate or continue a pursuit?
   13  A.   To minimize the risk to potential civilians.  So
   14       obviously, there's a difference between a pursuit in a
   15       school zone with kids getting out versus, you know, an
   16       open and blanketed highway.
   17  Q.   An open what?
   18  A.   Blanketed highway, open highway, stretch of road,
   19       straight -- straight road.
   20  Q.   So it would be more dangerous if it was a school zone?
   21          MR. GARFIELD:  Object to the form.
   22  BY MS. JONES:
   23  Q.   Is that what you're saying?
   24  A.   It could be, yes.  If school was letting out and there
   25       was kids in the roadway, of course.
33: 1  Q.   All right.  The next item is existence of vehicular and
    2       pedestrian traffic.
    3          So why should a patrol officer take into
    4       consideration the existence of vehicular or pedestrian
    5       traffic in deciding whether to initiate or continue a
    6       pursuit?
    7  A.   It's all about minimizing the potential risk.
```

## Pg 36 Ln 18 - Pg 37 Ln 15

```
36:18  Q.   Yes.
   19  A.   You mean if we had a civilian ride-along?
   20  Q.   For any passenger.
   21  A.   Yes.
   22  Q.   For a civilian ride-along, or?
   23  A.   Which is like -- that if anyone's driving on the
   24       highway, there's a potential to have a vehicle
   25       collision.
37: 1  Q.   Is that hazard increased when you're in a police car
    2       that's in a high-speed pursuit?
    3          MR. GARFIELD:  Object to the form.
    4  BY MS. JONES:
    5  A.   So with anything we do, there's always an increased
    6       risk.  I can walk outside here right now in uniform, and
    7       I get attacked because I'm a police officer.  So our
    8       line of duty is inherently dangerous.  I mean, we have
    9       now firefighters that are being gunned down for putting
   10       out fires.  So anytime you put on the uniform, it's
   11       inherently danger.
   12  Q.   So it's true that being a passenger in a vehicle, a
   13       police vehicle, in a high-pursuit chase increases the
   14       risk of harm to that passenger, true?
   15  A.   To anyone in that vehicle.
```

## TextMap Search Report

**Transcript:** [11/19/2025] 30(b)(6) Pagano, Dominick
**Search:** object*

## Pg 42 Ln 15 - Pg 43 Ln 17

```
42:15  Q.  But would an investigation be undertaken, or do you
   16      know?
   17  A.  Well, you're saying -- you're saying -- it would
   18      definitely be looked into, yes.
   19  Q.  And when you say, be looked into, what do you mean?
   20      Would there be an investigation, is my question.
   21  A.  In the terms of definition of investigation, it would be
   22      turned over to our professional standards, and yes, they
   23      would -- your definition of investigation, yes, they
   24      would look into it.
   25  Q.  If a police officer violated the provisions in policy
43: 1      802, would that police officer be subject to
    2      disciplinary action?
    3          MR. GARFIELD:  Object to the form.  Asked and
    4      answered.  Go ahead.
    5  BY MS. JONES:
    6  A.  The sheriff determines that.
    7  Q.  Do you know what factors would be involved in making
    8      such a decision?
    9  A.  Totality of the circumstances, so everything involved.
   10      One -- once again, what was the subject's actions?  What
   11      was the officer's actions?  Was there any malice?  What
   12      was going through the officer's mind?  So just like
   13      we're taught at the academy, what's known as the
   14      reasonable man theory or the reasonable officer theory,
   15      what would another officer with the same knowledge, same
   16      level of experience have done?  So once again, this is
   17      just a policy.  It's not law for us.
```

## Pg 46 Ln 3 - Pg 47 Ln 6

```
46: 3  Q.  And is it a general rule that deputies should not pursue
    4      a vehicle driving the wrong way on a highway; is that
    5      correct?
    6  A.  Once again, they take in the totality of the
    7      circumstances.  It's based -- it's based on the totality
    8      of the circumstances.
    9  Q.  But is that the general rule, that deputies should not
   10      pursue a vehicle driving the wrong way?
   11  A.  No, ma'am.  Once again, it's based on the totality of
   12      circumstances.
   13  Q.  Would you agree that a suspect driving the wrong way up
   14      a highway presents an immediate and significant threat
   15      to the lives of the uninvolved motorists?
   16          MR. GARFIELD:  Object to the form.
   17  BY MS. JONES:
   18  A.  Yes, he poses a risk to everyone involved.
   19  Q.  And would the officers also driving the wrong way pose a
   20      risk?
   21          MR. GARFIELD:  Same objection.
```

## TextMap Search Report

**Transcript:** [11/19/2025] 30(b)(6) Pagano, Dominick
**Search:** object*

## Pg 46 Ln 3 - Pg 47 Ln 6 continued...

```
46:22  BY MS. JONES:
   23  A.   No, ma'am.  Because actually if you watch the video,
   24       they were operating with due care.  They were trying to
   25       use the shoulder of the emergency lane, and they were
47: 1       operating with their emergency equipment.  And if you
    2       notice, a lot of vehicles actually pulled to the side
    3       because of their actions, versus where if they didn't do
    4       that, you probably would have had more people at risk.
    5       I didn't count all the vehicles that pulled to the side
    6       because of the blue lights and sirens, but it was -- it
```

## Pg 47 Ln 19 - Pg 49 Ln 3

```
47:19  Q.   Is a misdemeanor a reason to chase someone down the
   20       wrong way of a highway?
   21  A.   Depends on what classification of misdemeanor.  Some are
   22       exempt; some aren't exempt.  So some have a higher
   23       classification almost as a -- as a felony, so it
   24       depends.  On this situation, obviously -- obviously,
   25       this was clear.  This was not a misdemeanor.
48: 1            From my understanding, from what I heard on the
    2       audio tapes, what Lieutenant Blanding said over the
    3       radio, and the fact that we had undercover narcotics
    4       agents on this guy and coming over the radio and we had
    5       a request for assistance from another agency, taking on
    6       all that totality, that he was posing a great risk to --
    7       not only to the officers but to the community at large
    8       and poses a significant risk in the future if they
    9       wouldn't -- let him go.
   10  Q.   But you haven't seen the warrant?
   11  A.   No, ma'am.
   12  Q.   And my question is, would a failure to appear warrant be
   13       a sufficient basis for three police vehicles to chase a
   14       suspect into oncoming traffic going the wrong way on an
   15       interstate with construction beams on each side?
   16            MR. GARFIELD:  Object to the form.  It's several
   17       grounds.  Go ahead.  Do the best you can.
   18  BY MS. JONES:
   19  A.   Once again, it could be, based on the insolvency of the
   20       situation, the known suspect, to allow the suspect to
   21       flee that has no known address or residence.  And once
   22       again, he's facing felony charges and he's already posed
   23       a risk to the community at large and he's continuing to
   24       do that.  Then, yes, once again, these officers have to
   25       weigh in all of that when they make their decisions.
49: 1  Q.   If Pringle was being chased for failure to appear at a
    2       hearing, is that a significant factor?
    3  A.   So you're asking me my personal opinion?
```

## TextMap Search Report

**Transcript:** [11/19/2025] 30(b)(6) Pagano, Dominick
**Search:** object*

## Pg 49 Ln 7 - Pg 50 Ln 25

```
49: 7  Q.   If Pringle was being chased for failure to appear, is
    8       that a significant factor?
    9  A.   What is the failure to appear for?  Is it a general
   10       sessions charge?  A violent crime?
   11  Q.   Failure to appear.
   12  A.   It depends on what the failure to appear.  We would have
   13       to know the context.  I would need to know the context.
   14       My understanding is the deputies, once again, by hearing
   15       the audio, they knew that it was a felony.
   16  Q.   Is a misdemeanor a reason to chase someone the wrong way
   17       down a highway?
   18           MR. GARFIELD:  Object to the form.  Objection.
   19       Asked and answered.
   20  BY MS. JONES:
   21  A.   I already answered this question.
   22  Q.   Would you agree that going down an interstate highway
   23       the wrong way is a significant risk to the public?
   24           MR. GARFIELD:  Object to the form.  Asked and
   25       answered.  Go ahead.
50: 1  BY MS. JONES:
    2  A.   It's a risk to everyone at large.  So once again, the
    3       officers have to weigh the risk versus the reward.
    4  Q.   My specific question is, is it a risk to the public?
    5  A.   It's a risk to everyone, to include the officers' lives.
    6  Q.   So the answer to my question is, yes, it's a risk to the
    7       public and others?
    8           MR. GARFIELD:  Objection.  Go ahead.
    9  BY MS. JONES:
   10  A.   It can be a risk.
   11  Q.   Is it?
   12  A.   It can.
   13  Q.   Not always?
   14           MR. GARFIELD:  Objection.
   15  BY MS. JONES:
   16  Q.   Is that what you're saying?  That's your testimony?
   17  A.   Yes.
   18  Q.   Okay.  Was there supervisors and management control over
   19       Officer Smith and Hodge during the pursuit?
   20  A.   So once again, my understanding from the radio traffic,
   21       Lieutenant Blanding was monitoring the pursuit and also
   22       showed up on the scene, so I would say yes.
   23  Q.   And that's based on?
   24  A.   Listening to the radio traffic and then actually seeing
   25       the video, ma'am.
```

## Pg 52 Ln 15 - Pg 53 Ln 12

```
52:15  Q.   And are these -- is the pursuit packet prepared and
   16       submitted electronically?
   17  A.   Sometimes, yes.  Sometimes, no.  Some of us do not have
```

# TextMap Search Report

**Transcript:** [11/19/2025] 30(b)(6) Pagano, Dominick
**Search:** object*

## Pg 52 Ln 15 - Pg 53 Ln 12 continued...

```
52:18      computers in our vehicles.  And they have -- some of the
   19      paperwork that we have actually still has to be
   20      handwritten.  Like I don't have a computer in my
   21      vehicle.  So I have to handwrite a lot of my -- my
   22      documents.
   23   Q.  Do you engage in pursuits in your job responsibilities
   24      today?
   25          MR. GARFIELD:  Object to the form.  Beyond the
53: 1      scope.  You can answer.
    2   BY MS. JONES:
    3   A.  I mirror or tail.  I do not engage in primary pursuits
    4      because I'm not in a pursuit-rated vehicle.
    5   Q.  All right.  If the police vehicle had the technology in
    6      the vehicle, would the pursuit packet be submitted
    7      electronically?
    8   A.  If it's working correctly, yes, ma'am.
    9   Q.  And how about the incident report?  Is it prepared and
   10      submitted electronically?
   11   A.  It can be, yes, ma'am.  Typically, if they have the
   12      computer, yes.
```

## Pg 54 Ln 2 - Pg 55 Ln 25

```
54: 2   Q.  Okay.  So most of the deputies have computers?
    3   A.  The uniformed deputies working alone, yes.
    4   Q.  Is it most of them or all of them?
    5   A.  It's most of them.  I wouldn't say all.
    6   Q.  And if they have one, they're supposed to submit the
    7      pursuit packets electronically?
    8   A.  Yes.
    9   Q.  And the incident reports?
   10   A.  Yes.
   11   Q.  How about the tow slips?  Are they supposed to be -- are
   12      they capable of being submitted electronically?
   13          MR. GARFIELD:  Object to the form.  Beyond the
   14      scope.  Do the best you can.
   15   BY MS. JONES:
   16   A.  If they have the computer with the -- the system up,
   17      then -- then, yes.  But once again, there are vehicles
   18      that do not have computers, so we still have to do
   19      handwritten.
   20   Q.  Okay.  And when you say submitted electronically, where
   21      does it get submitted to?
   22          MR. GARFIELD:  Object to the form.  Go ahead.
   23   BY MS. JONES:
   24   A.  So I'm not certified to answer that question fully
   25      because I'm not over our IT, but once again, my
55: 1      understanding is when it goes, it's -- everything is
    2      done electronically.  It's the -- the -- kind of the
    3      cloud in the sky, and then it gets pulled onto our
```

## TextMap Search Report

**Transcript:** [11/19/2025] 30(b)(6) Pagano, Dominick
**Search:** object*

## Pg 54 Ln 2 - Pg 55 Ln 25 continued...

```
55: 4      servers where records can print it.  But once again, I'm
     5      not the IT person.  I really can't answer where
     6      everything goes.
     7            MS. JONES:  I'm going to take a break.
     8                 (OFF THE RECORD)
     9            MS. JONES:  Ready?
    10            MR. GARFIELD:  Celeste, I understand you're going
    11      to ask the deponent questions about Plaintiff's Exhibit
    12      number 37?
    13            MS. JONES:  Yes.
    14            MR. GARFIELD:  Okay.  We just object that that's
    15      outside the scope ---
    16            MS. JONES:  Okay.
    17            MR. GARFIELD:  --- of the 30(b)(6) topic areas.
    18 BY MS. JONES:
    19 Q.   Did you gather or bring with you today any documents for
    20      production pursuant to the 30(b)(6) notice?
    21 A.   No, ma'am.
    22 Q.   And if you would look at Exhibit 37, that's been
    23      produced to us by counsel for the sheriff's department
    24      as training materials.
    25 A.   Yes, ma'am.
```

## Pg 57 Ln 9 - Pg 58 Ln 7

```
57: 9 Q.   Do you recall being trained on this particular
    10      provision, We're Not Just Killing Ourselves?  Do you
    11      remember it?
    12 A.   No.  No, ma'am, I honestly do not.
    13 Q.   In the next page, it says Jessica and Kelli Uhl.
    14            Do you recall this collision involving Jessica and
    15      Kelli Uhl?
    16 A.   I -- I do not.
    17 Q.   Let me ask you one last question.  It's Exhibit 22 in
    18      here.  Are you familiar with South Carolina Code section
    19      23-23-85, the establishment of required minimum
    20      standards for all law enforcement agencies; punitive
    21      actions?
    22            MR. GARFIELD:  Object to the form.  Several
    23      grounds, beyond the scope, calls for a legal conclusion.
    24      Go ahead.
    25 BY MS. JONES:
58: 1 A.   No, ma'am.  I -- I know, once again, that there are
     2      minimum standards that we have to meet, but not
     3      specifically this act right here.
     4            MS. JONES:  That's all the questions I have.  Thank
     5      you, sir.
     6            MR. GARFIELD:  Just one moment.
     7                 (OFF THE RECORD)
```

# TextMap Search Report

**Transcript:** [11/20/2025] 30(b)(6) Pritchett, Michael E.
**Search:** object*

## Pg 8 Ln 23 - Pg 9 Ln 21

```
8:23  Q.   Yes, sir.
  24  A.   No, ma'am.
  25  Q.   Okay.  All right.  And in the AIMS database, all
9: 1       incident reports are maintained in that; is that
   2       correct?
   3  A.   All the defensive actions and pursuit actions are in the
   4       AIMS.  We now use a Benchmark system, which everything
   5       goes into that now.
   6  Q.   When you say all the defensive actions are maintained in
   7       the AIMS system, what documents are in the AIMS system?
   8  A.   Incident -- I'm sorry.
   9            MR. SPREEUWERS:  I'm going to object.  This is
  10       outside the scope.  Go ahead.  You can answer.
  11  BY MS. JONES:
  12  A.   Okay.  Incident reports, body cam footage, any other
  13       reports that would go along with the incident.
  14  Q.   Are there separate documents that are created and
  15       maintained related to the investigations?
  16  A.   I'm not sure what you mean by separate documents.
  17  Q.   Maybe I misunderstood you, but I thought you said that
  18       the Professional Standards Division investigates all the
  19       complaints filed against any of the officers; is that
  20       correct?
  21  A.   That is correct.
```

## Pg 10 Ln 7 - Pg 11 Ln 4

```
10: 7  Q.   And so that information is available to you when the
    8       professional standards reports are created each year?
    9  A.   Yes.
   10  Q.   Okay.  There's too many documents in this notebook.
   11            So, you know, one of the areas, number 4, the data,
   12       explain all the data the Professional Standards Division
   13       uses to review all police vehicular pursuits.
   14            And have you told me the list of all the data that
   15       the Professional Standards Division uses to review
   16       police vehicular pursuits?
   17  A.   Yes.
   18            MR. SPREEUWERS:  Object to the form.   Go ahead.
   19  BY MS. JONES:
   20  Q.   And that would be the incident reports and the
   21       investigative witness statements?
   22  A.   Yes.  Car camera footage, body camera footage.
   23  Q.   Okay.  Anything else?
   24  A.   That's it.
   25  Q.   Okay.  Did you undergo any particular certification
11: 1       training or courses to take over your responsibilities
    2       in the Professional Standards Division?
    3  A.   No more than the current leadership classes that we take
    4       and almost 30 years of experience.
```

# TextMap Search Report

**Transcript:** [11/20/2025] 30(b)(6) Pritchett, Michael E.
**Search:** object*

## Pg 17 Ln 6 - Pg 20 Ln 23

```
17: 6  Q.  She does.  Excuse me.  She does, not you.  Okay.  What
    7      are the duties of the Professional Standards Division?
    8  A.  Duties of the Professional Standards Division, we
    9      investigate all complaints that come in on deputies that
   10      civilians file.  We review all use of force, all
   11      defensive actions, all pursuits.  We recommend any
   12      policy changes if needed.
   13  Q.  Have you made any policy change recommendations?  Is
   14      that everything that you do?  Are those all the duties,
   15      the investigation of the complaints, the use of force
   16      reviews, the pursuit reviews, and defensive action
   17      reviews?
   18  A.  Yes.  Yes.
   19  Q.  Okay.  Have you made any policy change recommendations
   20      regarding use of force?
   21          MR. SPREEUWERS:  Objection.  That's outside the
   22      scope.  You can answer.
   23  BY MS. JONES:
   24  A.  No.
   25  Q.  Have you made any policy recommendations to amend any
18: 1      policies in regards to pursuits?
    2          MR. SPREEUWERS:  Objection.  That's also outside
    3      the scope.  You can answer.
    4  BY MS. JONES:
    5  A.  No.
    6  Q.  Have you made any recommendations for any policy changes
    7      related to defensive actions?
    8          MR. SPREEUWERS:  Same objection.  Go ahead.
    9  BY MS. JONES:
   10  A.  No.
   11  Q.  What role, if any, did the Professional Standards
   12      Division engage in in the investigation into the
   13      December 29, 2023, pursuit of Byron Pringle?
   14  A.  Our role in that -- in that incident, just like any
   15      other pursuit incident, we review what occurred.  We
   16      establish if any policies have been violated, and we
   17      make any recommendations if things could have been done
   18      different.
   19  Q.  And did you do that?
   20  A.  We reviewed the incident, yes.
   21  Q.  Did you establish if any policies had been violated?
   22  A.  No policies had been violated.
   23  Q.  And did you make any recommendations for any changes?
   24  A.  There was no need to make any changes.
   25  Q.  All right.  Was the Professional Standards Division
19: 1      involved in any recommendations concerning the
    2      discipline of Officer Smith?
    3          MR. SPREEUWERS:  Objection.  That's outside the
    4      scope.  You can answer.
    5  BY MS. JONES:
    6  A.  We agree with what discipline it -- took place.
```

## TextMap Search Report

**Transcript:** [11/20/2025] 30(b)(6) Pritchett, Michael E.
**Search:** object*

## Pg 17 Ln 6 - Pg 20 Ln 23 continued...

```
19: 7   Q.   And what was that?
    8   A.   Counseling.
    9   Q.   What kind of counseling?
   10   A.   I want to recall verbal counseling.
   11   Q.   What verbal counseling occurred?
   12   A.   I do not recall.
   13   Q.   What records are there to explain the discipline
   14        counseling and verbal counseling related to the
   15        investigation into the December 29th pursuit of Byron
   16        Pringle?
   17             MR. SPREEUWERS: Objection.  Misstates the
   18        testimony, outside the scope.  You can answer.
   19   BY MS. JONES:
   20   A.   As far as records kept in reference to the deputy being
   21        counseled?
   22   Q.   Yes, sir.
   23   A.   That would probably be kept in his personal file, his
   24        201 file.
   25   Q.   And what would that document look like?
20: 1   A.   It could be on a PDF.  It could be an official
    2        counseling statement.
    3   Q.   What do you mean when you say it could be on a PDF?
    4   A.   Professionally, it's a standard counseling form.
    5   Q.   It's a form?
    6   A.   Yes.
    7   Q.   Was a form prepared in regards to the December 29th
    8        incident?
    9             MR. SPREEUWERS: Objection.  That's outside the
   10        scope.
   11             MS. JONES:  No.  Number 5 is the investigation into
   12        the December 29th pursuit.
   13             MR. SPREEUWERS:  Well, since you insist on arguing
   14        this ---
   15             MS. JONES:  It's specifically within the scope.
   16             MR. SPREEUWERS:  Let me finish, and I'll explain to
   17        you how it's not within the scope.  He explained the
   18        investigation and review that was undertaken by
   19        professional standards.  The discipline or the verbal
   20        counseling that you're referring to was not undertaken
   21        by professional standards.  Therefore, that's
   22        referencing something that's outside the scope of topic
   23        number 6.  You may answer.
```

## Pg 21 Ln 5 - Pg 23 Ln 19

```
21: 5   Q.   In the 201 file.  Who creates that?
    6   A.   Those files are created when the deputy is hired into
    7        the department.  Those files are maintained at
    8        headquarters.  Any disciplinary -- any disciplinary
    9        action that comes down on that deputy, those actions are
```

## TextMap Search Report

**Transcript:** [11/20/2025] 30(b)(6) Pritchett, Michael E.
**Search:** object*

## Pg 21 Ln 5 - Pg 23 Ln 19 continued...

```
21:10      placed in the 201 file or in the region file.
   11  Q.  And are those files maintained on the AIMS system?
   12  A.  The disciplinary action?
   13  Q.  Yes, sir.
   14  A.  It all depends on what action was taken, what type of
   15      disciplinary action that was taken.
   16  Q.  Well, which disciplinary actions are maintained on the
   17      AIMS file, and which ones are not?
   18          MR. SPREEUWERS: Objection.  This continues to be
   19      outside the scope.  You can answer.
   20  BY MS. JONES:
   21  A.  Verbal counseling is normally maintained at the region
   22      level.  Official reprimands are maintained at the 201
   23      level, which is placed in the deputy's file.
   24  Q.  And ultimately, who makes the decision about whether
   25      it's at the regional level or the professional standards
22: 1      level?
    2  A.  Depends on the incident.  If the incident requires
    3      immediate counseling from that deputy's chain of
    4      command, it stays at the region.  Any official
    5      reprimand, goes into the 201 file.
    6  Q.  And who has the ultimate authority to decide if it stays
    7      at the region or goes in the 201 file?
    8          MR. SPREEUWERS: Objection.  It's still outside the
    9      scope.  You can answer.
   10  BY MS. JONES:
   11  A.  Command staff makes that decision.
   12  Q.  Did command staff make any decision regarding Officer
   13      Smith, Hodge, or Dillard concerning the December 29,
   14      2023, pursuit of Byron Pringle?
   15          MR. SPREEUWERS: Objection.  It's outside the
   16      scope.  You can answer.
   17  BY MS. JONES:
   18  A.  I have no idea.
   19  Q.  So there's none that you know of?
   20  A.  I have no idea.
   21  Q.  Why do you say you have no idea if you're in charge of
   22      the professional standards reports?
   23          MR. SPREEUWERS: Objection.  It's argumentative.
   24      It's outside the scope.
   25  BY MS. JONES:
23: 1  Q.  I want to know the reasons.
    2  A.  Well, I have a deputy chief that's higher than me.  This
    3      incident happened a couple years ago, two years ago.  I
    4      just don't recall what type of counseling, what type of
    5      action took place, if any, on those deputies.
    6  Q.  Well, what information did you review in preparation to
    7      give your testimony to explain the investigation into
    8      the December 29, 2023, pursuit of Byron Pringle?
    9          MR. SPREEUWERS: Objection.  It's outside the
   10      scope.  You can answer.
```

## TextMap Search Report

**Transcript:** [11/20/2025] 30(b)(6) Pritchett, Michael E.
**Search:** object*

## Pg 21 Ln 5 - Pg 23 Ln 19 continued...

```
23:11  BY MS. JONES:
   12  A.   We reviewed the body cam footage.  We reviewed the body
   13       cam footage and the car footage and the incident reports
   14       of what took place.
   15  Q.   Right, but if you look at item number 6 on the notice,
   16       it asks to explain the investigation into the pursuit.
   17       So I'm not asking you about the pursuit.
   18                 (INAUDIBLE CROSS TALK)
   19  BY MS. JONES:
```

## Pg 25 Ln 4 - Pg 26 Ln 5

```
25: 4  Q.   I'm going to take this one out.  Here's Exhibit 10.
    5       Captain, show me where it is in Exhibit 10.
    6  A.   On page 3 it says, Commanders Review.  It was reviewed
    7       and corrective action taken verbally by Major Duke.
    8            MR. SPREEUWERS:  Can you read that page number
    9       that's down at the bottom, the Bates?
   10            THE WITNESS:  Baker A007.
   11  BY MS. JONES:
   12  Q.   And show me what you're talking about.
   13  A.   Commanders Review.
   14  Q.   That's it?
   15  A.   Yes.
   16  Q.   And it says, verbal counseling.  And who is the person
   17       that did that?
   18  A.   Major Duke.
   19  Q.   What was the reason for the verbal counseling?
   20            MR. SPREEUWERS:  Objection.  It's outside of the
   21       scope.  You can answer.
   22  BY MS. JONES:
   23  A.   When he reviewed the incident, he probably found some
   24       things that he wanted to discuss with the deputies
   25       involved, and they sat down and talked about it.
26: 1  Q.   But you don't know what those are?
    2  A.   Not offhand, no.
    3  Q.   And you didn't review any records or talk to him to find
    4       out what they are?
    5  A.   I cannot recall if I did or not.
```

## Pg 26 Ln 17 - Pg 27 Ln 14

```
26:17  Q.   Is it disseminated to anyone else except for on the
   18       public website?
   19  A.   That, I'm not sure of.  When you mean disseminated, is
   20       it passed out to everybody?
   21  Q.   Is it filed with any agency?  Is it provided?  I want to
   22       know who it's disseminated to.
   23  A.   That, I cannot say.
```

# TextMap Search Report

**Transcript:** [11/20/2025] 30(b)(6) Pritchett, Michael E.
**Search:** object*

## Pg 26 Ln 17 - Pg 27 Ln 14 continued...

```
26:24  Q.   Who would know that?
    25  A.   Command staff, deputy chief.
27: 1  Q.   What pursuits during your three years has the
     2       Professional Standards Division investigated?
     3            MR. SPREEUWERS: Objection.  Vague.  Go ahead.
     4  BY MS. JONES:
     5  A.   We review all pursuits that takes place.
     6  Q.   Is there a difference between review and investigate?
     7  A.   Yes.  If we find some policy violations, we do
     8       investigate it.
     9  Q.   And have you investigated any vehicular pursuits?
    10  A.   We review all vehicle pursuits.  If we find one that we
    11       have issues with, we do look into it.
    12  Q.   And that's my question.  Have you investigated vehicular
    13       pursuits?
    14  A.   Yes.
```

## Pg 27 Ln 23 - Pg 28 Ln 20

```
27:23  Q.   And who would have access to that information?
    24  A.   We in Professional Standards would have access to that
    25       as well as all legal representation.
28: 1  Q.   Would the sheriff have access to it?
     2  A.   I'm sure he would know about it.
     3  Q.   Would the command staff?
     4  A.   I'm sure they would know about it.
     5  Q.   And is that something that you discuss in these meetings
     6       with the command staff?
     7  A.   I'm pretty sure it's discussed.
     8  Q.   Can you recall any vehicular pursuits that Professional
     9       Standards investigated as we sit here today?
    10            MR. SPREEUWERS: Objection.  That continues to be
    11       outside the scope.  You can answer.
    12  BY MS. JONES:
    13  A.   I cannot recall.
    14  Q.   You can't recall even one?
    15  A.   A lot of pursuits happened during the year.  I just
    16       can't say.  One in particular, I just cannot say.
    17  Q.   Other than in the AIMS system and the TriTech system,
    18       are there any other record systems that maintain
    19       post-pursuit records?
    20  A.   Benchmark system.
```

# TextMap Search Report

**Transcript:** [11/20/2025] 30(b)(6) Spurrier, Jennifer
**Search:** object*

## Pg 4 Ln 18 - Pg 5 Ln 19

```
4:18  Q.   And Ms. Spurrier, what are your duties and
  19       responsibilities as the accreditation manager for the
  20       Richland County Sheriff's Department?
  21  A.   I make sure that all of our policies and procedures meet
  22       state standards.  And I show proof through incident
  23       reports and different things that we are following our
  24       policies and procedures and meeting those state
  25       standards.
5: 1  Q.   And what state standards are you referring to?
   2  A.   The SCLEA standards.
   3  Q.   And what does SCLEA stand for?
   4  A.   The South Carolina Law Enforcement Accreditation.
   5  Q.   And why do you provide that information to the State
   6       standards, the SCLEA standards?
   7         MR. SPREEUWERS: Objection.  That's outside the
   8       scope.  You can answer.
   9  BY MS. JONES:
  10  A.   The sheriff's department maintains our accreditation so
  11       that we can show that we are an accredited agency and
  12       that we meet the standards that the State requires and
  13       that our policies and procedures meet the higher level
  14       standards.
  15  Q.   What do you mean, higher level standards?
  16  A.   The State -- the South Carolina Criminal Justice Academy
  17       has nine standards that they are -- required law
  18       enforcement agencies to meet.  SCLEA has more than that.
  19       And our sheriff's department meets those standards.
```

## Pg 8 Ln 4 - Pg 9 Ln 5

```
8: 4  Q.   My understanding from the attorneys is that you've been
   5       designated as the witness, 30(b)(6) witness, for the
   6       sheriff's department in regards to items 23 and 24 in
   7       the notice, which is marked as Plaintiff's Exhibit 54,
   8       and I would ask you to review that and confirm that that
   9       is correct.
  10  A.   Twenty-three and twenty-four, yes.  It has my name
  11       written next to 24 and 25.
  12  Q.   Okay.  Sorry.  We'll fix that.  All right.  And now
  13       would you confirm that that is correct?
  14  A.   Yes.
  15  Q.   Items 23 and 24.  So the first item is the records
  16       related to Byron Pringle.
  17         What records does the Richland County Sheriff's
  18       Department have related to Byron Pringle?
  19         MR. SPREEUWERS: Objection.  Vague.  Go ahead.
  20  BY MS. JONES:
  21  A.   Records related to Byron Pringle, his name can be found
  22       in the jail.  It can be found in the ACES system.  It
  23       can be found in TriTech.
```

## TextMap Search Report

**Transcript:** [11/20/2025] 30(b)(6) Spurrier, Jennifer
**Search:** object*

## Pg 8 Ln 4 - Pg 9 Ln 5 continued...

```
8:24  Q.   Anywhere else?
  25  A.   Those are the systems that I have access to, that I have
9: 1       found.
   2  Q.   Are they anywhere else?
   3  A.   They would be in NCIC or the DMV.
   4  Q.   Anywhere else?
   5  A.   No, ma'am.
```

## Pg 12 Ln 3 - Pg 13 Ln 1

```
12: 3  Q.   Okay.  And in preparation for testifying in regards to
   4        items 23 and 24, what preparation and review did you
   5        undertake?
   6  A.   I was able to, in the databases that I have access to,
   7        look up Mr. Pringle's name.
   8  Q.   But you don't have access to the DMV?
   9  A.   I do not.
  10  Q.   So you didn't look those up?
  11  A.   I did not.
  12  Q.   And what records did you find on the jail record system
  13        related to Mr. Pringle?
  14             MR. SPREEUWERS:  Objection.  It's outside the
  15        scope.  Vague.  You can answer.
  16  BY MS. JONES:
  17  A.   That database provides all of his arrest information
  18        between the City of Columbia Police Department and any
  19        time that he was housed in the Alvin S. Glenn Detention
  20        Center.
  21  Q.   And how far back did those records go on Mr. Pringle?
  22  A.   I don't recall off the top of my head.
  23  Q.   And what records concerning Mr. Pringle did you find in
  24        the ACES system?
  25  A.   The ACES system housed drug information that was found
13: 1        on his person.
```

## Pg 15 Ln 24 - Pg 17 Ln 1

```
15:24  Q.   Did you meet with him today?
  25  A.   Yes.
16: 1  Q.   Did you meet with him following the deposition of
   2        Captain Pritchett?
   3  A.   Yes.
   4  Q.   And were you here for part of Captain Pritchett's
   5        testimony?
   6  A.   Yes.
   7  Q.   And after that, did you meet with the attorneys and
   8        discuss the substance of your testimony?
   9             MR. SPREEUWERS:  Objection.  That's specifically
  10        requesting the substance of the communication with her
```

# TextMap Search Report

**Transcript:** [11/20/2025] 30(b)(6) Spurrier, Jennifer
**Search:** object*

## Pg 15 Ln 24 - Pg 17 Ln 1 continued...

```
16:11     attorneys.  So I will instruct her not to answer that
   12     question.
   13  BY MS. JONES:
   14  Q.   I just want to know if you did discuss it with them.
   15          MR. SPREEUWERS:  Don't answer that question.
   16          MS. JONES:  The deposition has begun.  The rule is
   17     if you discuss things with your attorney during the
   18     course of the deposition, it is discoverable.  And I'm
   19     asking her to tell me if she did have such discussions.
   20          MR. SPREEUWERS:  This witness's deposition had not
   21     begun at the time of any communication, so I'm going to
   22     instruct her not to answer the question.
   23          MS. JONES:  This is a 30(b)(6) deposition.  It
   24     began yesterday.  And it continues until it's completed.
   25          MR. SPREEUWERS:  I've instructed her not to answer.
17: 1     You can move on or you can keep arguing about it.
```

## Pg 18 Ln 12 - Pg 22 Ln 3

```
18:12  Q.   The ACES system?
   13  A.   Yes.
   14  Q.   The TriTech system?
   15  A.   Yes.
   16  Q.   And the NCIC system?
   17  A.   I do not have NCIC access.
   18  Q.   Oh, okay.  And you don't have DMV?
   19  A.   Correct.
   20  Q.   How many people work in the accreditation department?
   21  A.   Me.
   22  Q.   Okay.  Do you provide documentation to SCLEA?
   23          MR. SPREEUWERS:  Objection.  That's outside the
   24     scope.  You can answer.
   25  BY MS. JONES:
19: 1  A.   Yes.
    2  Q.   Okay.  And what documentation do you provide to the
    3     State?
    4          MR. SPREEUWERS:  Same objection.
    5  BY MS. JONES:
    6  A.   Any type of proof to show we are meeting the State
    7     standard.
    8  Q.   So tell me what those documents are.
    9  A.   They can be any type of document to show proof.  There's
   10     no required form.  It could be an incident report, a
   11     photo, anything, any way that you can show proof of the
   12     standard.
   13  Q.   All right.  And what documents do you regularly provide
   14     to the State -- to SCLEA?
   15          MR. SPREEUWERS:  Objection.  Sorry.  Objection.
   16     All this is outside the scope.  You can answer.
   17  BY MS. JONES:
```

## TextMap Search Report

**Transcript:** [11/20/2025] 30(b)(6) Spurrier, Jennifer
**Search:** object*

## Pg 18 Ln 12 - Pg 22 Ln 3 continued...

```
19:18  A.   Generally, it is incident reports.
   19  Q.   Do you provide them with the annual professional
   20       standards report on compliance?
   21  A.   Yes.
   22  Q.   Yes?
   23  A.   Yes.
   24  Q.   Do you provide them any backup documentation for the
   25       professional standards report on compliance?
20: 1  A.   I don't know what backup documentation is.
    2  Q.   Well, I'm just asking you if it's just the report you
    3       provide or if it's the report plus other documents.
    4  A.   It would depend on the specific standard and what they
    5       were requiring.
    6  Q.   So do you get regular communications from the State
    7       asking for information?
    8           MR. SPREEUWERS:  Objection.  Mischaracterizes the
    9       testimony and it's outside the scope.
   10  BY MS. JONES:
   11  Q.   How do you determine what to provide to the State
   12       regarding standards?
   13  A.   The standard is very clear about -- it's broken down
   14       piece by piece what needs to be met.  And so the proof
   15       needs to show that.  And it has to be highlighted
   16       specifically in your proof where you've met the
   17       standard.
   18  Q.   And to whom do you submit these reports?
   19  A.   To your SCLEA auditor.
   20  Q.   And who is your SCLEA auditor for the Richland County
   21       Sheriff's Department?
   22  A.   That depends on the year.  It's not determined until
   23       weeks before your audit.
   24  Q.   And how often does an audit take place?
   25           MR. SPREEUWERS:  Objection.  This continues to be
21: 1       outside the scope.  You can answer.
    2  BY MS. JONES:
    3  A.   For your initial accreditation year, it's -- it's your
    4       first year.  Once you're accredited, it happens three
    5       years after that.
    6  Q.   It was every three years?
    7  A.   Yes.
    8  Q.   When was the Richland County Sheriff's Department
    9       originally accredited?
   10  A.   It was accredited in December of 2024.
   11  Q.   That was the first time?
   12  A.   Yes.
   13  Q.   Was the Richland County Sheriff's Department accredited
   14       by anyone prior to December of 2024?
   15  A.   No.
   16  Q.   Why did the Richland County Sheriff's Department decide
   17       to get accredited in December of 2024?
   18           MR. SPREEUWERS:  Objection.  This continues to be
```

## TextMap Search Report

**Transcript:** [11/20/2025] 30(b)(6) Spurrier, Jennifer
**Search:** object*

## Pg 18 Ln 12 - Pg 22 Ln 3 continued...

```
21:19        outside the scope.  Do we have any idea when we're going
   20        to get back to the topics for which she was designated,
   21        Celeste?  Because at some point, when you continue to
   22        ask a long line of questions that are outside the scope,
   23        that's going to turn into harassing and annoying and
   24        wasting the time of this witness.  So I'd just like an
   25        answer to that question.
22: 1            MR. JONES:  I think this is within the scope.  We
    2        just have a difference of opinion about that.
    3    BY MS. JONES:
```

## Pg 22 Ln 7 - Pg 23 Ln 4

```
22: 7    Q.   Okay.  And no one's ever shared any information with you
    8        in that regard?
    9    A.   Accreditation is important because it provides a level
   10        of security showing that we are meeting not only the
   11        standards of our own sheriff's department, but the
   12        standards that the State has laid out.
   13    Q.   And that's the goal, to meet state standards?
   14    A.   Yes.
   15    Q.   Has the Richland County Sheriff's Department received
   16        any written audit reports from the South Carolina
   17        agency?
   18            MR. SPREEUWERS:  Objection.  Outside the scope.
   19        You can answer.
   20    BY MS. JONES:
   21    A.   No.
   22    Q.   And I think I asked you this, and you said the auditor
   23        changes.
   24            Who is the current auditor for the Richland County
   25        Sheriff's Department at SCLEA?
23: 1    A.   There is no current auditor because we're in our three
    2        year reaccreditation period.
    3    Q.   Who did the accreditation, if you know, in 2024?
    4    A.   Billy Albert and Helen Westmoreland.
```

## Pg 29 Ln 7 - Pg 30 Ln 20

```
29: 7    Q.   And you have no records concerning the transportation of
    8        Mr. Pringle to the hospital on December the 20th?
    9    A.   No.
   10    Q.   And you have no records related to the decision and his
   11        release to go home on the 20th of December?
   12    A.   No.
   13    Q.   Why?
   14    A.   I can't speak to that.  I don't know why there's no
   15        record.
   16    Q.   When there's supposed to be a record and there is no
```

# TextMap Search Report

**Transcript:** [11/20/2025] 30(b)(6) Spurrier, Jennifer
**Search:** object*

## Pg 29 Ln 7 - Pg 30 Ln 20 continued...

```
29:17      record, what action, if any, is taken?
   18          MR. SPREEUWERS:  Objection.  Misstates the
   19      testimony, outside the scope of the answer.  You can
   20      answer.
   21  BY MS. JONES:
   22  A.  That is outside of my scope.  I don't know.  I can -- I
   23      can only attest to where to find the records.
   24  Q.  Okay.  Only where to find them?
   25  A.  Yes.
30: 1  Q.  And that's the extent of your knowledge in regards to
    2      items 23 and 24 in the deposition notice.
    3          MR. SPREEUWERS:  Objection.  Misstates the
    4      testimony.  You can answer.
    5  BY MS. JONES:
    6  A.  I can't attest to what disciplinary actions are taken if
    7      someone doesn't provide a record.
    8  Q.  My question was the limit of your knowledge is only
    9      where to find the records related to Byron Pringle?
   10          MR. SPREEUWERS:  Objection.  Misstates the
   11      testimony.  You can answer.
   12  BY MS. JONES:
   13  A.  Yes.
   14          MS. JONES:  That's all the questions I have.  Thank
   15      you so much, Ms. Spurrier.
   16          MR. SPREEUWERS:  And we're just going to take a
   17      break.  We'll find out if I have questions for her.
   18          THE COURT REPORTER:  Okay.
   19              (OFF THE RECORD)
   20          MR. SPREEUWERS:  No questions.
```

# TextMap Search Report

**Transcript:** [9/5/2025] Abdullah, Zaid Abdussabur 09-05-25
**Search:** object*

## Pg 5 Ln 16 - Pg 6 Ln 14

```
5:16        Q    Okay.  And I realize I skipped a little bit
  17    of important stuff at the beginning, so; you'll have to
  18    forgive me.  In this deposition, for the court reporter's
  19    sake I will ask if you will let me finish my question and
  20    I will let you finish your answer so we don't talk over
  21    each other because he can't type two people talking at
  22    once.
  23             Also, if I ask a question and I mumble, it's
  24    nonsensical to -- you know, it doesn't make sense to you,
  25    please let me know; I'll rephrase it.  Just let me know,
6: 1    hey, you know, I don't understand, can you rephrase, and
   2    I will do my best to do so.  I may even ask a bad
   3    question at some point and get an objection and I'll --
   4    you know, I'll fix the question for you.  I'm sure one of
   5    those will come up.
   6             So you said you graduated high school at 16?
   7        A    Uh-huh.
   8        Q    And then you went to Midlands Tech.  And can
   9    you say the acronym of the program you did there again?
  10        A    The -- it's ADN program.  It's basically like
  11    an Associates degree, pretty much, in nursing.
  12        Q    Okay.  But no interest in doing anything in
  13    nursing?
  14        A    No, no.  Not at all.
```

## Pg 10 Ln 7 - Pg 11 Ln 4

```
10: 7        Q    Okay.  Outside of your attorneys, have you
   8    talked with anyone about your attendance here today?
   9        A    Just my wife.
  10        Q    Okay.  I certainly understand that.  Outside
  11    of your wife and your attorneys, have you talked with
  12    anyone about this lawsuit?
  13        A    No, sir.
  14        Q    Okay.  When you started as a -- or when you
  15    started at the Richland County Sheriff's Department, can
  16    you talk me through a little bit of the training that you
  17    went through back in -- before you started May 10th of
  18    2019?
  19             MR. SPREEUWERS:  Object to the form.
  20             You can answer.
  21        A    You're asking what type of training did I
  22    have prior to my hire date with Richland County?
  23    BY MR. JENKINS:
  24        Q    I guess I would say what training did you go
  25    through when you first got hired?
11: 1        A    So, basically, it's just -- I don't know the
   2    -- the extent of the time, but there's just an in-house
   3    training:  Defensive tactics, legalities, just things of
   4    that sort.
```

# TextMap Search Report

**Transcript:** [9/5/2025] Abdullah, Zaid Abdussabur 09-05-25
**Search:** object*

## Pg 15 Ln 22 - Pg 17 Ln 13

```
15:22          Q      Workday.  Okay.
   23                 So when you work, do you have a radio?
   24          A      Yes.
   25          Q      Do you have a -- how many radios do you have?
16: 1          A      Two.
    2          Q      Two.  Where are those located?
    3          A      I have an in-car radio, and then I have a WT
    4    or a walkie-talkie that's on my person.
    5          Q      Okay.  I guess what calls do you receive to
    6    that radio that's on your person?
    7                 MR. SPREEUWERS:  Object to the form.
    8                 You can answer.
    9          A      As -- just anything that's K-9-related.
   10    Someone flees, so.  Usually, a call like that.
   11    BY MR. JENKINS:
   12          Q      So you don't get any calls from non-K-9
   13    handlers?
   14          A      I hear them on the radio, but I'm not
   15    assigned those calls.
   16          Q      Okay.  Now Richland County is a big county.
   17    Do y'all have different regions within Richland County?
   18          A      Yes.
   19          Q      As a K-9 handler, do you have a specific
   20    region?
   21          A      No.  I'm county-wide.
   22          Q      Okay.  So you pick up calls from K-9 handlers
   23    from across the entire county?
   24                 MR. SPREEUWERS:  Object to the form.
   25    Misstates the testimony.
17: 1                 Go ahead.
    2          A      The -- when you say "the K-9 handlers," what
    3    do you mean by that?
    4    BY MR. JENKINS:
    5          Q      So -- and correct me if I'm wrong:  You said
    6    you receive calls or you -- calls that are -- you receive
    7    assigned calls from other K-9 handlers.  Is that correct?
    8          A      No, sir.  You --
    9          Q      Okay.
   10          A      What I was saying is I receive -- or I would
   11    go to a call that is K-9-related.  So if someone flees or
   12    something like that, then -- then I would be assigned
   13    that call.
```

## Pg 19 Ln 8 - Pg 20 Ln 6

```
19: 8          Q      Okay.  So about what time does it come out in
    9    the morning?
   10          A      About 5:30 in the morning.
   11          Q      Okay.  And then about what time does it come
   12    out in the night shift?
```

# TextMap Search Report

**Transcript:** [9/5/2025] Abdullah, Zaid Abdussabur 09-05-25
**Search:** object*

## Pg 19 Ln 8 - Pg 20 Ln 6 continued...

```
19:13        A     5:00, 5:30 at night.
   14        Q     Okay.  So can you explain to me the cutoffs?
        Like what would be included on the morning report, you
   15   know, and what would be included on the night report?  Is
   16   there a time cutoff?
   17
   18              MR. SPREEUWERS:  Objection.
   19              You can answer.
   20        A     It -- it just depends on whenever all the
        incidents that they believe should -- that are necessary
   21   to be put on there, are gathered at that point.  And then
   22   they would submit it to the entire department.
   23
   24   BY MR. JENKINS:
   25        Q     Okay.  And does the desk sergeant do that?
20: 1        A     Yes.
    2        Q     Okay.  And can you tell me -- it might seem
        pretty intuitive, but is a desk sergeant someone that
    3   sits at a desk at Richland County Sheriff's Department
    4   headquarters?
    5
    6        A     Correct.
```

## Pg 23 Ln 6 - Pg 24 Ln 5

```
23: 6        Q     Okay.  So you believe that the first time you
        heard about the pursuit on December 29th was reading the
    7   Desk Sergeant Report?
    8
    9        A     I don't know a hundred percent, but I --
        I would assume that that's the way that I'd gotten the
   10   news, just because all the major incidents are sent at
   11   that.
   12
   13        Q     And is it sent in an email or is it an
        attachment?  Like tell me how that comes through.
   14
   15        A     It's an email.
   16        Q     Okay.  Bullet point with description or --
   17        A     Yes, but -- basically.
   18        Q     Okay.  What was your immediate reaction when
        you read it?
   19
   20              MR. SPREEUWERS:  Objection.  Relevance.
   21              Go ahead.
   22        A     I don't remember, to be honest.
   23   BY MR. JENKINS:
   24        Q     Understandable.
   25              MR. JENKINS:  Give me two seconds.  My
24: 1   computer is timed out.  Let me pull it back up.
    2        (Richland County Sheriff's Department Policy and
    3   Procedure Manual (879 pages), Plaintiff's Exhibit No. 36,
    4   pre-marked for identification, is made part of this
    5   deposition.)
```

## TextMap Search Report

**Transcript:** [9/5/2025] Abdullah, Zaid Abdussabur 09-05-25
**Search:** object*

## Pg 25 Ln 4 - Pg 27 Ln 4

```
25: 4          Q     What are the important key components of it?
    5          A     Things that have gotten people I guess in
    6    trouble.  Things that have, you know -- from other
    7    agencies that have been basically appealed through their
    8    policies and procedures.  Things that have updated from
    9    the old Policy and Procedure Manual, just because it's
   10    updating consistently.
   11          Q     Eight hundred seventy-nine pages is a lot to
   12    read.
   13          A     Yeah.
   14          Q     So you listed some things that have gotten
   15    people in trouble.  Can you give me a little more color
   16    on that?
   17                MR. SPREEUWERS:  Objection.
   18                You can answer.
   19          A     Just -- basically, it was like total control
   20    theory or -- or total use of force theory, which
   21    basically you have a use of force continuum, and,
   22    basically, there are certain things that you can use
   23    force on and other things.  And people had a difficult
   24    time I guess understanding at what point they should use
   25    force.  So, usually, that's where people get in trouble.
26: 1    BY MR. JENKINS:
    2          Q     And when you say "people," are you talking
    3    about deputies?
    4          A     Just officers, deputies, throughout the
    5    nation.
    6          Q     Okay.  Have you, firsthand, seen instances
    7    where people had issues with use of force at the Richland
    8    County Sheriff's Department?
    9                MR. SPREEUWERS:  Objection.  It's irrelevant.
   10                You can answer.
   11          A     Me, personally?  No.
   12    BY MR. JENKINS:
   13          Q     Okay.  You said that there -- you go over
   14    important things in this; correct?
   15          A     Yes.
   16          Q     Are there things that you think that are in
   17    here that are not important?
   18                MR. SPREEUWERS:  Objection.  Misstates the
   19    testimony.
   20                Go ahead.
   21          A     I mean maybe not important to me.  Like I
   22    don't wear a nail polish.  There might be like a nail
   23    polish thing or something, so; I probably wouldn't read
   24    that, or hair extensions or anything like that, that I'm
   25    not going to waste my time reading.
27: 1    BY MR. JENKINS:
    2          Q     Understandable.  Have you looked at this
    3    since your in-house training?
    4          A     Yes; I have.
```

## TextMap Search Report

**Transcript:** [9/5/2025] Abdullah, Zaid Abdussabur 09-05-25
**Search:** object*

## Pg 28 Ln 1 - Pg 29 Ln 11

```
28: 1          Q     Okay.  So it's only accessible by -- or
     2    strike that.
     3                Is it accessible by only sworn employees,
     4    that website?
     5          A     That, I don't know, honestly.
     6          Q     Okay.  Okay.  And so you said you review this
     7    pretty regularly because things change; is that correct?
     8          A     Correct.
     9          Q     What do these policies and procedures that
    10    you review regularly provide you?
    11                MR. SPREEUWERS:  Objection.  It's vague.
    12                Go ahead.
    13          A     Can you elaborate on that question?  I'm
    14    sorry.
    15    BY MR. JENKINS:
    16          Q     Yeah.  So you're reading this to glean
    17    information from it; correct?
    18          A     To gather -- to gather informa -- correct.
    19    Yeah.
    20          Q     Yes, sir.  So the information that you gather
    21    from this when you read it, you know, what are you using
    22    that for?
    23          A     Using it for my decision-making and --
    24    whenever I'm -- I'm working.  And if I have a question or
    25    something that arises, we have a DAC meeting which
29: 1    basically just means that the deputies come together
     2    monthly with the sheriff and discuss certain things,
     3    usually policy and procedures.
     4                So if I read it and maybe I'm interpreting it
     5    in a -- in a -- in a way that I'm -- that -- maybe I'm
     6    biased to it or whatever the case is, it's explained in
     7    great detail by the sheriff.
     8                So if -- I'll read it, understand it from my
     9    perspective.  And then if I have any questions, it would
    10    be sent up and then I would -- it would be elaborated, of
    11    what the policy and procedure actually means.
```

## Pg 31 Ln 8 - Pg 33 Ln 6

```
31: 8          Q     Okay.  Is it a attachment or is it just an
     9    email?
    10          A     It just all depends on each meeting.  Each
    11    meeting, it could be different.  It could be like a PDF,
    12    or maybe a actual picture of something within policy that
    13    maybe had been amended or something had been changed or
    14    they've added something to it so like they'll have a
    15    picture or something of it.
    16          Q     Okay.  So would you call the information you
    17    receive formal meeting minutes or informal?
    18                MR. SPREEUWERS:  Object to the form.
```

## TextMap Search Report

**Transcript:** [9/5/2025] Abdullah, Zaid Abdussabur 09-05-25
**Search:** object*

## Pg 31 Ln 8 - Pg 33 Ln 6 continued...

```
31:19              You can answer.
   20       A     I -- I don't understand what you mean by
   21    that.
   22    BY MR. JENKINS:
   23       Q     Okay.  So do you know if there's someone that
   24    goes to the DAC meeting on the first Monday of every
   25    month, that types what's -- everything is -- that is said
32: 1    at the meeting?
    2       A     That, I don't know.
    3       Q     Okay.  Describe to me what the report looks
    4    like when it comes to you from the DAC meeting.
    5       A     It's very similar to the Desk Sergeant
    6    Report, just bullet points.  And then it'll -- if it's
    7    something that's very important, it'll -- like I said, it
    8    would have a picture or something of whatever that policy
    9    and procedure that's being changed or whatever the case
   10    is or something that's been updated.
   11              It will basically be in bold red letters or
   12    black letters or asterisks or something of like, hey,
   13    this is being changed, you know:  We did it this way;
   14    this is what we're doing now, or whatever the case is.
   15       Q     Okay.  So if you have something you want
   16    taken to the DAC meeting, do you contact the K-9
   17    representative?
   18       A     Correct.
   19       Q     And then they go and they ask Sheriff Lott to
   20    change it?
   21              MR. SPREEUWERS:  Objection.  Misstates the
   22    testimony.
   23       A     They don't necessarily ask the sheriff to
   24    change anything.  They would just say, hey, you know,
   25    this is an issue that we've had; here are some ideas that
33: 1    we have.  And then he would make the determination of
    2    what -- what's going to change or what's not going to --
    3    or if it changes or if it doesn't change.
    4    BY MR. JENKINS:
    5       Q     So he makes that decision?
    6       A     Correct.
```

## Pg 37 Ln 15 - Pg 38 Ln 22

```
37:15       Q     Okay.
   16       A     -- which, basically, will record 30 seconds
   17    prior to those blue lights.  Or any of those things that
   18    I mentioned that will turn your body-worn camera on,
   19    it'll record 30 seconds prior to that, when the camera is
   20    on standby.
   21              But within policy, whenever you're making
   22    contact with somebody or on routine patrol, then yes,
   23    your camera should be on.
```

# TextMap Search Report

**Transcript:** [9/5/2025] Abdullah, Zaid Abdussabur 09-05-25
**Search:** object*

## Pg 37 Ln 15 - Pg 38 Ln 22 continued...

```
37:24        Q    Okay.  And I've advanced faster on my laptop
   25   to this than you'd probably be able to flip -- feel free
38: 1   to flip, if you would like, in the Policies and
    2   Procedures.  It's Baker M506, but it appears to be Policy
    3   and Procedure 1201:  Use of Body-Worn Cameras, is -- and
    4   those are double-sided, to save space and paper.
    5          Do these Policies and Procedures, under 1201,
    6   Use of Body-Worn Cameras, govern how you operate your
    7   body-worn camera?
    8          MR. SPREEUWERS:  Object to the form.
    9          You can answer.
   10        A    What -- what do you mean by that?  I'm sorry.
   11  BY MR. JENKINS:
   12        Q    So like if you have a question about
   13   something with regards to your body-worn camera, do you
   14   pull this up and look at this?
   15        A    It just depends on what I'm looking for, to
   16   be honest.
   17        Q    Okay.  If you're looking for something --
   18   well, let's see.  Example, Use and Activation, 1201.2(b).
   19   If in the very beginning, when you started it, if you had
   20   a question about when it should be used and activated,
   21   would you turn to this Policy and Procedure Manual?
   22        A    No, sir; I wouldn't.
```

## Pg 39 Ln 12 - Pg 41 Ln 8

```
39:12        Q    Yes, sir.
   13        A    -- and Procedure Manual?  If there's
   14   something in there on the camera that they have maybe
   15   amended or updated on it.  Just again, like I said, if we
   16   had the Axon 3 cameras that we switched to Axon 4, maybe
   17   it might have something in it that would allow me to know
   18   how to maybe put it on stealth mode or something like
   19   that.
   20        Q    What is stealth mode?
   21        A    It just basically removes the lights that are
   22   on the -- on it, so that you don't give away like your
   23   position or something like that.
   24        Q    Okay.  If you don't use your body-worn camera
   25   correctly, do you get reprimanded?
40: 1        A    Yes.
    2          MR. SPREEUWERS:  Objection.
    3          You can answer.
    4  BY MR. JENKINS:
    5        Q    Who would reprimand you?
    6        A    Whoever your immediate supervisor is.
    7   [Coughing.]  Excuse me.  Did you hear me?  I'm sorry.
    8        Q    Will you just re-state it for me?
    9        A    Whoever your immediate supervisor is.
```

# TextMap Search Report

**Transcript:** [9/5/2025] Abdullah, Zaid Abdussabur 09-05-25
**Search:** object*

## Pg 39 Ln 12 - Pg 41 Ln 8 continued...

```
40:10        Q     Okay.  And how would they find out that you
   11    hadn't used your body-worn camera properly?
   12        A     We have audits, usually through Trulioo or
   13    something, we would have, to see like if an incident took
   14    place, who had their cameras on, who didn't.  And they
   15    review it, basically.
   16        Q     Okay.  Do you get your first reprimand from
   17    your immediate supervisor -- or first call from your
   18    immediate supervisor for not using your body-worn camera
   19    correctly, is it a reprimand?
   20                 MR. SPREEUWERS:  Objection.
   21                 You can answer.
   22        A     What do you mean by "reprimand?"
   23    BY MR. JENKINS:
   24        Q     Is it verbal counseling?
   25        A     It just all depends on the individual and --
41: 1    and -- and what exactly the issue was or how grave the
    2    issue is, at that -- at that moment.
    3        Q     Okay.
    4        A     It all just depends.
    5        Q     Have you ever been contacted about your
    6    body-worn camera usage?
    7        A     Like mis -- like usage or misusage?  I'm
    8    sorry.
```

## Pg 41 Ln 21 - Pg 44 Ln 6

```
41:21        Q     Okay.
   22        A     And then when they make contact with that
   23    civilian or with the call that they're going to, they
   24    would double-press the body-worn camera to turn it on,
   25    basically.
42: 1        Q     Okay.  And are they supposed to keep that --
    2    or are you supposed to keep the body-worn camera on
    3    throughout the entirety of the interaction with the
    4    civilian?
    5        A     Yes.
    6        Q     Okay.  What happens if you turn it off?
    7                 MR. SPREEUWERS:  Objection.  It's vague.
    8                 Go ahead.
    9        A     Just all -- again, it just depends on the --
   10    the individual:  What is the reason you turned it off?
   11    It -- it -- it just depends.
   12    BY MR. JENKINS:
   13        Q     What are some reasons you are allowed to turn
   14    off your body-worn camera while you are discussing with a
   15    civilian?
   16                 MR. SPREEUWERS:  Object to the form.
   17                 You can answer.
   18        A     I don't think there is anything within policy
```

# TextMap Search Report

**Transcript:** [9/5/2025] Abdullah, Zaid Abdussabur 09-05-25
**Search:** object*

## Pg 41 Ln 21 - Pg 44 Ln 6 continued...

```
42:19    that says you can turn off your body-worn camera while
   20    having a conversation with a civilian.
   21  BY MR. JENKINS:
   22        Q    Okay.
   23             If you do turn it off, are you subject to
   24    discipline?
   25             MR. SPREEUWERS:  Objection.  Vagueness.
43: 1             Go ahead.
    2        A    Again, I guess it just all depends on the
    3    individual:  What was the reasoning behind it?
    4             Again, maybe if you had another call -- like,
    5    for example, if they had another call that was -- maybe
    6    took higher priority, they would then turn off their body
    7    cam or -- because you don't want those two camera videos
    8    to basically merge together, so you can turn off your
    9    body-worn camera and go to the higher-priority call.
   10             So it just all depends on the -- the
   11    situation.
   12  BY MR. JENKINS:
   13        Q    Okay.  Are there any instances where you can
   14    mute your camera while responding to a call?
   15             MR. SPREEUWERS:  Objection.  Vagueness.
   16             Go ahead.
   17        A    There are times when you can.
   18  BY MR. JENKINS:
   19        Q    Can you tell me what those times are?
   20             MR. SPREEUWERS:  Same objection.
   21             Go ahead.
   22        A    I'm trying to think of a time where it would
   23    be appropriate to do that.
   24             Maybe you're removing yourself from the
   25    person that may be detained or about to be arrested and
44: 1    you maybe want to talk to somebody that has more
    2    knowledge about what the charges should be, what the
    3    other victim had said or whatever the case is.  So you're
    4    discussing things that maybe you just -- that aren't
    5    necessary to be within the body-worn camera, so you just
    6    mute it.
```

## Pg 44 Ln 16 - Pg 46 Ln 7

```
44:16        Q    Okay.  If you cover the camera lens with your
   17    hand, does the video stop?
   18        A    It does not.
   19        Q    Okay.
   20             And so we talked about muting.  But in what
   21    instances while you are responding to a call -- strike
   22    that.
   23             Can you give me an example of why a deputy
   24    might cover their camera while they're responding to a
```

## TextMap Search Report

**Transcript:** [9/5/2025] Abdullah, Zaid Abdussabur 09-05-25
**Search:** object*

---

## Pg 44 Ln 16 - Pg 46 Ln 7 continued...

```
44:25    call, without any outside calls coming in?
45: 1              MR. SPREEUWERS: Objection.  It's vague.
   2    Calls for a hypothetical.
   3              Go ahead.
   4         A    I don't -- I can't think of any reason why a
   5    deputy would do that, to be honest.
   6    BY MR. JENKINS:
   7         Q    Are you allowed to cover your body-worn
   8    camera if you are discussing with another deputy a
   9    violation of the Policies and Procedures?
  10              MR. SPREEUWERS: Objection.
  11              You can answer.
  12         A    I mean I would -- I would -- wait.  Can --
  13    can you rephrase that question?  I'm sorry.
  14    BY MR. JENKINS:
  15         Q    Absolutely.
  16              If you respond to a call and you were
  17    discussing with another deputy on the call about a
  18    violation of these Policies and Procedures, can you cover
  19    your body camera?
  20              MR. SPREEUWERS: Objection.  Vagueness.
  21    Hypothetical.
  22              Go ahead.
  23         A    I mean I -- I would say no.  No, you
  24    shouldn't, or no, you cannot.  You -- I mean that would
  25    have be a huge integrity issue.
46: 1    BY MR. JENKINS:
   2         Q    Why would it be a huge integrity issue?
   3         A    Hiding something.  I -- I feel like if you're
   4    having that conversation with a deputy and that deputy
   5    willingly tries to hide I guess whatever they're trying
   6    to hide, then that's an integrity issue.
   7              But again, this is -- it's all hypothetical.
```

## Pg 46 Ln 20 - Pg 48 Ln 7

```
46:20         Q    Okay.  And forgive my ignorance, but do you
  21    ever ride with another K-9 handler, with both dogs in the
  22    car at the same time?
  23         A    No, sir.
  24         Q    Okay.  I figured as much.
  25         A    Unless it's like an emergency or something.
47: 1         Q    Okay.  So this policy, the use of the
   2    body-worn camera --
   3         A    Yes, sir.
   4         Q    -- are those just suggestions?
   5              MR. SPREEUWERS: Object to the form.
   6              You can answer.
   7         A    I wouldn't say that they're suggestions.
   8    They're within the policy, because that's what we're
```

---

## TextMap Search Report

**Transcript:** [9/5/2025] Abdullah, Zaid Abdussabur 09-05-25
**Search:** object*

## Pg 46 Ln 20 - Pg 48 Ln 7 continued...

```
47: 9        supposed to follow.
    10   BY MR. JENKINS:
    11        Q    That's what you're supposed to follow.  How
    12   heavy is your body-worn camera?
    13        A    I do not know the exact weight, but I guess
    14   it's not too heavy.
    15        Q    Okay.  Can you just decide one day not to
    16   wear it?
    17             MR. SPREEUWERS:  Objection.
    18             Go ahead.
    19        A    No.
    20   BY MR. JENKINS:
    21        Q    Okay.  Why not?
    22        A    If I'm going to be operating within Richland
    23   County under the capacity of a K-9 handler, I'm required
    24   to have my body-worn camera.
    25        Q    And that says that in the policy; correct?
48: 1        A    Correct.
    2         Q    All right.  I'm going to pull up Exhibit 51.
    3    And I'm going to turn the sound down first so it doesn't
    4    blow everybody's eardrums.
    5             (Cover Sheet Referencing Video and Video,
    6         Plaintiff's Exhibit No. 51, pre-marked for
    7         identification, is made part of this deposition.)
```

## Pg 50 Ln 22 - Pg 51 Ln 19

```
50:22        Q    Okay.  Lunch?
    23        A    No idea.
    24        Q    All right.  So you would have started work at
    25   about 5:30?
51: 1        A    I believe so; yes.
    2         Q    Okay.  So this is -- the video says 6:21.  So
    3    you'd been on shift for less than an hour, at this point?
    4         A    Possibly.  I -- I -- I -- I don't remember.
    5         Q    Okay.  The title of this video is "Monticello
    6    and Knightner Street.  Why would that be what this is
    7    titled as?
    8             MR. SPREEUWERS:  Objection to vagueness.
    9             Go ahead.
    10        A    Just where the traffic stop took place.
    11   BY MR. JENKINS:
    12        Q    Okay.
    13        A    Right around in that area.
    14        Q    Okay.  Tell me what you remember about this
    15   traffic stop.
    16        A    I don't remember a lot about the traffic
    17   stop.  But what I do remember it was just -- it was very
    18   quick, very short, and then everything kind of just
    19   transpired fairly quick.
```

## TextMap Search Report

**Transcript:** [9/5/2025] Abdullah, Zaid Abdussabur 09-05-25
**Search:** object*

## Pg 51 Ln 23 - Pg 52 Ln 22

```
51:23          Q      Why was that?
   24          A      An investigator saw a hand-to-hand.  And
   25   while I was behind the vehicle, about to conduct a
52: 1   traffic stop on the vehicle, the vehicle was driving in a
    2   very reckless manner.
    3          Q      Okay.  When you say an investigator saw a
    4   "hand-to-hand," is that a hand-to-hand drug deal?
    5          A      Possibly.  Just -- they were in a very high
    6   drug area where narcotics are sold.  So I -- at that
    7   moment, I guess, they believed that they saw what they --
    8   or I guess they believed that it was narcotics.
    9          Q      Okay.  Does an investigator have a car with
   10   lights or they drive a different vehicle?
   11                 MR. SPREEUWERS:  Objection.
   12                 You can answer.
   13          A      All -- investigators just have all different
   14   types of vehicles.  Some of them are vehicles that have
   15   that equipped and some of them do not.  I don't remember
   16   what -- and -- or I don't remember what that investigator
   17   was driving, at that point in time.
   18   BY MR. JENKINS:
   19          Q      Okay.  If an investigator is contacting you
   20   to perform a traffic stop based on something they saw,
   21   how would they contact you?
   22          A      Through the radio.
```

## Pg 53 Ln 7 - Pg 54 Ln 5

```
53: 7          Q      Okay.  So did this traffic stop occur like on
    8   a region border?  Is that what you're saying?
    9          A      Yes.
   10          Q      Okay.  And what regions were those?
   11          A      Region 4 and 3.
   12          Q      Okay.  So you were in 3, going to 4, or in 4,
   13   going to 3?
   14          A      In 4, going to 3.
   15          Q      Okay.  When he comes -- when an investigator
   16   comes through on the radio and requests a traffic stop,
   17   what -- you know, what do they say?
   18                 MR. SPREEUWERS:  Objection.
   19                 You can answer.
   20          A      It just all depends, you know.  Hey, I have
   21   this car; I saw this, I saw that, you know.  He's already
   22   have done -- he's already committed these traffic
   23   violations or maybe, you know, brandished a weapon.  It
   24   just all depends on what they see.
   25   BY MR. JENKINS:
54: 1          Q      Okay.  Do you remember what the investigator
    2   told you when they called you for this?
    3          A      I don't remember an exact detail.  But again,
```

# TextMap Search Report

**Transcript:** [9/5/2025] Abdullah, Zaid Abdussabur 09-05-25
**Search:** object*

## Pg 53 Ln 7 - Pg 54 Ln 5 continued...

```
54: 4     I -- I -- just the fact that there was a hand-to-hand
     5     that took place or ...
```

## Pg 56 Ln 24 - Pg 58 Ln 1

```
56:24          Q     Okay.  How long did he try to flee from you
   25     in his car?
57: 1          A     It wasn't a very long distance.  But he
    2     increased speed and -- and -- and tried to evade me.  And
    3     whenever he rendered his vehicle immobile, then he took
    4     off on foot.
    5          Q     Do you know how fast he went when he was
    6     trying to flee?
    7          A     I don't -- I don't know.  But he did increase
    8     the speed at which he was going.
    9          Q     Do you know if it was beyond the speed limit?
   10          A     I do believe that it was beyond the speed
   11     limit.
   12          Q     Okay.  Would that be considered a vehicle
   13     pursuit?
   14          MR. SPREEUWERS:  Objection.
   15          You can answer.
   16          A     Yes.  I -- I would say yes.
   17 BY MR. JENKINS:
   18          Q     And to confirm that would be identified as a
   19     vehicle pursuit, would you go to Policies and Procedures?
   20          A     Correct.
   21          Q     Okay.  And why would you go to Policies and
   22     Procedures to confirm that?
   23          A     You're saying to confirm that -- a vehicle
   24     pursuit, you would need to have the Policies and
   25     Procedures?  I'm -- I'm confused with the question.  I'm
58: 1     sorry.
```

## Pg 58 Ln 9 - Pg 59 Ln 9

```
58: 9          Q     Okay.
   10          MR. JENKINS:  We've been going about an hour.
   11     Are y'all cool if we take a quick break before I start
   12     this video?
   13          MR. SPREEUWERS:  Sure.
   14          MR. JENKINS:  All right.
   15     (At this point there is a break in the deposition.)
   16 BY MR. JENKINS:
   17          Q     All right.  Mr. Abdullah, we were kind of
   18     getting started on your traffic stop of Mr. Byron Pringle
   19     on December 20th, 2023.  Is that correct?
   20          A     Correct.
   21          Q     All right.  When the investigator calls you
```

## TextMap Search Report

**Transcript:** [9/5/2025] Abdullah, Zaid Abdussabur 09-05-25
**Search:** object*

## Pg 58 Ln 9 - Pg 59 Ln 9 continued...

```
58:22    and identifies him, how does the investigator -- how are
   23    they able to identify him in the car?
   24                 MR. SPREEUWERS:  Objection.
   25                 You can answer.
59: 1        A    I don't know how he identified him.  And like
    2    I said before, I didn't -- the name that he gave out, I
    3    was thinking it was somebody else, so.
    4    BY MR. JENKINS:
    5        Q    Okay.  When you're in your car, how do you
    6    identify who is in a vehicle in front of you?
    7        A    I can't identify who is in the vehicle, but
    8    maybe I can identify the vehicle in itself that the
    9    investigator said that they were in or whatever.
```

## Pg 64 Ln 16 - Pg 65 Ln 13

```
64:16        Q    "TFO."  Task Force Officer?
   17        A    Yes.
   18        Q    Just making sure.  The acronyms trip me up a
   19    little bit.
   20             But at this point, was he working for the
   21    Richland County Sheriff's Department?
   22        A    Yes.
   23        Q    Okay.  And you said Colin Davis?
   24        A    Correct.
   25        Q    Did you know that Mr. Davis responded to
65: 1    Ms. Baker's incident, as well?
    2                 MR. SPREEUWERS:  Objection.  It's irrelevant.
    3        A    I did not know that.
    4    BY MR. JENKINS:
    5        Q    Okay.
    6             So he is the first one on scene -- or is he
    7    the first one on scene besides yourself?
    8        A    From the position of the body-worn camera, it
    9    -- it -- it appears that he is one of the first people;
   10    yeah.
   11        Q    Okay.  From what you recall, was he one of
   12    the first people that responded?
   13        A    Yes.
```

## Pg 67 Ln 12 - Pg 68 Ln 12

```
67:12        Q    And do they give you like ways to negate it?
   13    Excuse me; that was a very bad question.
   14             Do they give you ways to counteract the
   15    tunnel vision?
   16        A    The only -- I mean they give tips.  The only
   17    way I believe, you know, you're gonna be able to counter
   18    that is just through repetition of higher-intensity
```

# TextMap Search Report

**Transcript:** [9/5/2025] Abdullah, Zaid Abdussabur 09-05-25
**Search:** object*

## Pg 67 Ln 12 - Pg 68 Ln 12 continued...

```
67:19    situations.  And then that is what ultimately gives you
   20    the ability to be cognizant of certain situations.
   21         Q     And when you say "repetition," do you mean
   22    on-the-job or training or both?
   23         A     Both.
   24         Q     Okay.  So more training can help you
   25    alleviate tunnel vision issues?
68: 1              MR. SPREEUWERS:  Objection.  Vagueness.
    2    Misstates the testimony.
    3         A     It could.  It -- it just all depends on the
    4    situation.
    5    BY MR. JENKINS:
    6         Q     Understandable.  So after you get to -- do
    7    you know what Mr. Davis's position was, at that time?
    8         A     Yeah.  I stated earlier.
    9         Q     Okay.
   10         A     I believe that he was TFO for the DEA.
   11         Q     Oh, okay.
   12         A     Colin Davis.  This --
```

## Pg 72 Ln 24 - Pg 73 Ln 23

```
72:24         Q     Okay.  [Video plays.]  And that vehicle --
   25    I know your hand's blocking it now, but.  [Video plays.]
73: 1              All right.  So my question for you is, we've
    2    seen your vehicle and we've seen this vehicle, and we've
    3    seen --
    4         A     Yeah.
    5         Q     -- Mr. Pringle's vehicle.  Have you seen a
    6    third police vehicle in this video?
    7         A     I -- looking at the video, I only saw two.
    8         Q     Okay.  Can TFO Davis -- you know, could he
    9    have ridden in someone else's vehicle?
   10              MR. SPREEUWERS:  Objection.
   11              You can answer.
   12         A     I don't -- I -- I don't know.  He could have.
   13    He might have brought his vehicle.  I don't -- I don't
   14    know, at that time.
   15    BY MR. JENKINS:
   16         Q     Okay.  But you don't think that's his vehicle
   17    on the left side?
   18         A     I do not believe that's his vehicle.
   19         Q     Okay.  All right.  [Video plays.]  All right.
   20    Who's that gentleman in the uniform?
   21         A     Okay.  Now I see him.  That is Carlson.
   22    I don't know his name, but he is a traffic unit officer,
   23    so.
```

# TextMap Search Report

**Transcript:** [9/5/2025] Abdullah, Zaid Abdussabur 09-05-25
**Search:** object*

## Pg 74 Ln 18 - Pg 75 Ln 15

```
74:18          Q     Okay.
   19          A     So it's just changing the channels.
   20          Q     Okay.  So you have a lock button on the
   21   microphone that, once you lock it, it won't pick up?
   22          A     Correct.
   23          Q     [Video plays.]  And that's Mr. Byron Pringle
   24   on the ground; correct?
   25          A     Correct.
75: 1          Q     At this point, did he seem to have an altered
    2   mental state, to you?
    3                MR. SPREEUWERS:  Object to the form.
    4                You can answer.
    5          A     Again, I really wasn't focused on him.  I was
    6   just focused on the entirety of this, going to the next
    7   of what charges do we have, how are we getting this
    8   vehicle removed off the road, and then processing him for
    9   going to Alvin S. Glenn.
   10                At this time, I still believe that he's --
   11   he's going to jail at this time, so.
   12   BY MR. JENKINS:
   13          Q     Okay.  And so you said you were looking at
   14   processing the charges you have?
   15          A     Correct.
```

## Pg 85 Ln 8 - Pg 86 Ln 17

```
85: 8          Q     And you said someone has to sign it.  In this
    9   instance, would a deputy or a sworn employee of the
   10   Richland County Sheriff's Department sign it?
   11          A     Typically, that would be the -- the way that
   12   it's supposed to be.
   13          Q     Does the Richland County Sheriff's Department
   14   get a copy of that document?
   15          A     I don't believe our sheriff's department
   16   does, but then EMS also works for Richland County, so.
   17   I believe there's a way to -- to -- to get those
   18   documents.
   19          Q     So Richland County Sheriff's Department can
   20   access it?
   21          A     I do not --
   22                MR. SPREEUWERS:  Object to the form.
   23                You can answer.
   24          A     I do not believe so, just because I think
   25   that would be like a HIPAA violation.
86: 1   BY MR. JENKINS:
    2          Q     When is the last time you called EMS for a
    3   traffic stop that you did?
    4          A     I have no idea.
    5          Q     Okay.  Do the EMTs ask you any questions when
    6   they arrive on scene?
```

## TextMap Search Report

**Transcript:** [9/5/2025] Abdullah, Zaid Abdussabur 09-05-25
**Search:** object*

## Pg 85 Ln 8 - Pg 86 Ln 17 continued...

```
86: 7            MR. SPREEUWERS:  Object to the hypothetical.
    8            Go ahead.
    9        A      They just may ask like, hey, why are you
   10   calling?  And you just, hey, this is what happened;
   11   I just want him to get checked out and make sure he's
   12   good before he goes to jail or something.
   13 BY MR. JENKINS:
   14        Q      Okay.  And then if the EMTs decide to take
   15   him to the hospital, do they tell you where they're
   16   taking him?
   17        A      Yes.
```

## Pg 87 Ln 6 - Pg 88 Ln 15

```
87: 6        Q      You said earlier, at the beginning of this
    7   body camera footage you were under the impression he was
    8   going to Alvin S. Glenn Detention Center.
    9        A      Uh-huh.
   10        Q      Why did you think that?
   11        A      Just the amount of narcotics and the fact
   12   that I just was in a pursuit with him usually means he's
   13   going to jail, so.
   14        Q      Do you think he should have gone to Alvin S.
   15   Glenn Detention Center?
   16            MR. SPREEUWERS:  Objection.
   17        A      I mean we arrested him, so.  I mean that was
   18   the -- that was the goal:  For him to -- to go to Alvin
   19   S. Glenn.
   20 BY MR. JENKINS:
   21        Q      No, no; I understand that was the goal.  Do
   22   you think, as the person that pursued him -- chased him
   23   on foot, put handcuffs on him -- that he should have gone
   24   to Alvin S. Glenn Detention Center, based on the amount
   25   of narcotics on this person at that time?
88: 1            MR. SPREEUWERS:  Objection.  It's asked and
    2   answered.  It's vague.
    3            Go ahead.
    4        A      I just think that, you know, with the
    5   situation, especially since he is with EMS, the collision
    6   and everything, that his physical well-being is probably
    7   more important.  But I mean, obviously, we -- whether the
    8   whole process or that -- that was the goal, was for him
    9   to -- to go to Alvin S. Glenn.
   10 BY MR. JENKINS:
   11        Q      And his physical well-being is certainly
   12   important.
   13            Have you ever sent someone to the hospital
   14   from a traffic stop?
   15        A      I -- I -- I don't know, to be honest.
```

## TextMap Search Report

**Transcript:** [9/5/2025] Abdullah, Zaid Abdussabur 09-05-25
**Search:** object*

---

## Pg 88 Ln 16 - Pg 89 Ln 20

```
88:16        Q    Do you know, if someone is arrested at a
   17    traffic stop, if they can go to the hospital, get
   18    treated, and then be sent to Alvin S. Glenn Detention
   19    Center?
   20        A    Usually, that is the procedure.  They're --
   21    they're placed under arrest, then they have a medical
   22    emergency or something.  And then from there to Alvin S.
   23    Glenn, is usually the procedure.
   24        Q    We talked about the tow slip, earlier.  Do
   25    you get -- if you don't fill out a tow slip, do you get
89: 1    reprimanded by your immediate supervisor?
    2            MR. SPREEUWERS:  Objection.
    3            You can answer.
    4        A    It -- it just all depends with the situation.
    5    Sometimes TriTech may not work or, you know, might be a
    6    little buggy, so you might have done it and then it just
    7    doesn't show up on the system; it just ...
    8            Could you be reprimanded?  Yes.  Does it
    9    happen all the time?  No.
   10    BY MR. JENKINS:
   11        Q    Okay.  Was TriTech messed up that night when
   12    you submitted your report?
   13        A    I don't -- I don't remember.  It -- it -- it
   14    happens some nights.  Usually -- usually, on night shift,
   15    it's -- it can be buggy; you -- you try to submit
   16    something and you're hitting Submit, Submit, Submit,
   17    Submit, and it just doesn't submit.  It's still saved on
   18    your end, but it's not within the system.  You just
   19    haven't submitted it yet.
   20            So just -- I don't remember that night.
```

## Pg 92 Ln 11 - Pg 93 Ln 9

```
92:11        Q    And when it says Processing, do they scan it
   12    in somewhere?
   13        A    I believe this is just -- just so that they
   14    have like an actual archive of the vehicles that have
   15    been towed, for -- for legal reasons.  But you -- we --
   16    we -- we're not very big on using this anymore, just
   17    because everything's digital.
   18        Q    Completely understand.  But at this time,
   19    this was the policy -- at the time of Mr. Pringle's
   20    arrest, this was the policy.  So when that white, green
   21    and yellow sheet goes to HQ, do you know if it gets
   22    scanned into a computer?
   23            MR. SPREEUWERS:  And I'll object to the
   24    commentary to the extent that was intended to be a
   25    question.
93: 1            Go ahead.
    2        A    I don't know, 100 percent, if it's scanned or
```

# TextMap Search Report

**Transcript:** [9/5/2025] Abdullah, Zaid Abdussabur 09-05-25
**Search:** object*

## Pg 92 Ln 11 - Pg 93 Ln 9 continued...

```
93: 3    not.
    4  BY MR. JENKINS:
    5         Q    Do you know if the paper is kept somewhere?
    6              MR. SPREEUWERS:  It's been asked and
    7  answered.
    8              Go ahead.
    9         A    Even that, I -- I -- I don't know.
```

## Pg 93 Ln 19 - Pg 94 Ln 17

```
93:19         Q    Do you go -- and did you go and chat with any
    20  of the officers, to your recollection?
    21         A    You're saying on body-worn camera, like with
    22  -- with --
    23         Q    Just at this point?  After this point, did
    24  you go speak with Morrow, TFO, Davis, or the other
    25  gentleman that day?
94: 1         A    I didn't speak with any deputies.  I think
    2  I was just doing my -- my paperwork, at this point.
    3         Q    Okay.  Did any of them tell you that he was
    4  going to the -- did any of the deputies tell you that he
    5  was going to -- Mr. Pringle was going to the hospital?
    6              MR. SPREEUWERS:  Objection.  Compound.
    7  Confusing.
    8              Go ahead.
    9         A    I believe -- or maybe -- I don't know if a
    10  deputy told me that he was going to the hospital or if it
    11  was just something that I just can see like he's being
    12  loaded up in -- in -- in EMS and being taken.  I don't
    13  remember, exactly.
    14  BY MR. JENKINS:
    15         Q    So if someone is under arrest and they're
    16  going to the hospital --
    17         A    Yes, sir.
```

## Pg 97 Ln 7 - Pg 98 Ln 3

```
97: 7         Q    How would you find out.  If you wanted to?
    8         A    I would have to go deep into emails and look
    9  at the Desk Sergeant Report, because whenever they send
    10  that out, they have their name attached to it at this
    11  time.
    12         Q    So this occurred 6:20-ish that night?
    13         A    Uh-huh.
    14         Q    Whoever the desk sergeant was would have put
    15  this prior testimony that it was in the report.  And it
    16  would have come out the next morning at 5:30 a.m.?
    17              MR. SPREEUWERS:  Objection.  Misstates what
    18  he just testified to.
```

# TextMap Search Report

**Transcript:** [9/5/2025] Abdullah, Zaid Abdussabur 09-05-25
**Search:** object*

## Pg 97 Ln 7 - Pg 98 Ln 3 continued...

```
97:19            Go ahead.
   20       A    I don't -- I'm confusing the question.  I'm
   21   sorry.
   22   BY MR. JENKINS:
   23       Q    All right.  So earlier we talked about how
   24   you first came -- oh, yeah.  Actually -- I see.  So would
   25   this incident have gone in the Desk Sergeant Report that
98: 1   came out the next day?
    2       A     It -- it may have; it might -- it might not
    3   have.  I'm not sure.
```

## Pg 98 Ln 16 - Pg 99 Ln 15

```
98:16       Q    Okay.  Would a vehicle pursuit go in the Desk
   17   Sergeant Report?
   18       A    Yes, sir.
   19       Q    Do you believe that this incident went in the
   20   Desk Sergeant Report?
   21       A    I believe it did, but I don't know 100
   22   percent.
   23       Q    But whoever was working that night would have
   24   filled out a Desk Sergeant Report that went out the next
   25   morning at 5:30?
99: 1            MR. SPREEUWERS:  Object to the form.
    2            You can answer.
    3       A    The desk sergeant that is working currently,
    4   before their shift ends at 5:30 a.m., they should have
    5   already typed up all the incidents, including this one --
    6   should -- and submitted it through the desk sergeant
    7   email.
    8   BY MR. JENKINS:
    9       Q    Okay.  Is the desk sergeant email, like does
   10   it come -- like is it its own thing?  That's a very bad
   11   question.
   12            Do desk sergeants have their own regular
   13   email address through the Richland County Sheriff's
   14   Department?
   15       A    Correct.
```

## Pg 101 Ln 2 - Pg 102 Ln 15

```
101: 2       Q    Actually, I'm incorrect again.  Let's go to
    3   352, please.  All right.  Can you read what Paragraph 9,
    4   Medical Facility, says for me?
    5       A    Medical Facilities:  When a prisoner is
    6   transported to a medical facility and is admitted by the
    7   attending physician, the officer will immediately notify
    8   the shift supervisor.  The supervisor will, in turn, use
    9   the following procedure to ensure control of the
```

# TextMap Search Report

**Transcript:** [9/5/2025] Abdullah, Zaid Abdussabur 09-05-25
**Search:** object*

## Pg 101 Ln 2 - Pg 102 Ln 15 continued...

```
101:10    prisoner.
    11         Q      Okay.  Are the desk sergeant and the shift
    12    supervisor different people?
    13         A      Yes.
    14         Q      Okay.  Who is the shift supervisor?
    15                MR. SPREEUWERS:  Objection.  Vagueness.
    16                Go ahead.
    17         A      The shift supervisor would be either a master
    18    deputy or a corporal.
    19 BY MR. JENKINS:
    20         Q      And are they, that one individual, the
    21    supervisor for the entire 12-hour shift?
    22         A      It just all depends.  There could be a
    23    corporal and a master deputy; they're both supervisors
    24    that are working a shift.  One may leave, you know, the
    25    other -- it just all depends on the situation.
102: 1         Q      Do you remember if there were one or two
     2    shift supervisors the evening of December 20th, 2023?
     3                MR. SPREEUWERS:  Objection.  Vagueness.
     4                Go ahead.
     5         A      I do not remember who exactly was the
     6    supervisor at the time in Region 3.  But there were a --
     7    there was a supervisor, whether that was a master deputy,
     8    a corporal or a sergeant.
     9 BY MR. JENKINS:
    10         Q      So is there a shift supervisor for each
    11    region?
    12         A      Yes.
    13         Q      Okay.  And when you arrested him, he was in
    14    Region 3?
    15         A      Correct.
```

## Pg 104 Ln 2 - Pg 105 Ln 9

```
104: 2         Q      Okay.  What is a "duty officer?"
     3         A      That's a very good question.  I -- I don't
     4    know what they mean by that.  I would assume the -- the
     5    officer that is I guess transporting the -- the patient
     6    at that time.  I don't know.  That's just my assumption.
     7                But I -- I don't know what they mean by "duty
     8    officer."  That would be a good question to send to our
     9    -- our DAC rep, and have the sheriff explain that.
    10         Q      Because the sheriff reviews these Policies
    11    and Procedures and provides you guidance on them?
    12                MR. SPREEUWERS:  Objection.  Misstates the
    13    testimony.
    14 BY MR. JENKINS:
    15         Q      Provides -- I'm going to rephrase my
    16    question.  That would be a good question to go to your
    17    DAC representative, because they would ask the sheriff
```

## TextMap Search Report

**Transcript:** [9/5/2025] Abdullah, Zaid Abdussabur 09-05-25
**Search:** object*

## Pg 104 Ln 2 - Pg 105 Ln 9 continued...

```
104:18    that question?
    19         A      Correct.
    20         Q      Okay.  Would Officer Morrow have been the
    21    duty officer?
    22              MR. SPREEUWERS:  Objection.  It's already
    23    asked and answered.
    24         A      I don't -- I don't -- I don't know if he --
    25    if he would have been or not.  I don't -- I -- I don't
105: 1    really understand what it's explaining in -- in this
     2    particular thing.
     3              But is Sterling Morrow the one that
     4    transported him to the hospital?  To my knowledge; yes.
     5  BY MR. JENKINS:
     6         Q      Okay.  Does he just follow behind the EMS --
     7    or if you're transporting someone to the hospital, do you
     8    just follow in your car behind EMS?
     9         A      Yes, sir.
```

## Pg 105 Ln 10 - Pg 106 Ln 13

```
105:10         Q      You don't ride in the truck, the EMS truck?
    11         A      Not usually.  It just all depends on the
    12    situation and -- and the -- and the temperament of the --
    13    of the patient.
    14         Q      Okay.
    15         A      In which Pringle appeared to be not combative
    16    with EMS or anything like that.
    17         Q      Okay.
    18              So the supervisor contacts the duty officer
    19    to see if the prisoner should be released from department
    20    custody; correct?
    21              MR. SPREEUWERS:  Objection.  Misstates the
    22    testimony.
    23         A      Where -- where -- where are you reading?  I'm
    24    sorry.
    25  BY MR. JENKINS:
106: 1         Q      I'm sorry.  I wasn't referencing your
     2    testimony; I was referencing the paper.  Paragraph 9 goes
     3    The supervisor will, in turn, use the following
     4    procedures to ensure control of the prisoner.  Next,
     5    subparagraph (a), have the prisoner released from
     6    Department custody, if appropriate, by contacting and
     7    seeking advice from the duty officer.
     8              So my question is, the supervisor would
     9    contact the duty officer and ask if they should release
    10    the prisoner; is that correct?
    11         A      I don't know.  I mean that -- that might be
    12    an interpretation of that.  But again, like I said, I
    13    don't know for certain.
```

# TextMap Search Report

**Transcript:** [9/5/2025] Abdullah, Zaid Abdussabur 09-05-25
**Search:** object*

## Pg 108 Ln 9 - Pg 109 Ln 7

```
108: 9          Q     But the duty officer is also the shift
     10    supervisor?
     11          A     Just from my interpretation.  I -- I don't
     12    know why that was -- why "duty officer" is used.  It --
     13    it just -- it's -- it's an -- it's an odd use of
     14    verbiage, in my opinion.
     15          Q     Okay.
     16          A     I -- I don't know what they mean by that.
     17          Q     Okay.  So based on your interpretation, the
     18    shift -- the Region 3 shift supervisor would have
     19    consulted themselves to release the prisoner from
     20    Department custody?
     21          MR. SPREEUWERS:  Objection.  It's vague and
     22    confusing.
     23          A     I -- I -- I mean "have the prisoner released
     24    from Department custody, if appropriate, by contacting
     25    and seeking advice from the duty officer" -- I -- I --
109: 1    again, I don't know what they mean by "duty officer."
      2          I don't -- the shift supervisor could be
      3    contacting maybe somebody of higher supervision, maybe
      4    their -- a master deputy is contacting a corporal, a
      5    corporal to a sergeant, or maybe even possibly notifying
      6    the desk sergeant, having them make the determination on
      7    that.
```

## Pg 110 Ln 7 - Pg 111 Ln 20

```
110: 7          Q     I understand that.  Who would have the
      8    authority to make that decision?
      9          A     Staff duty would make that determination.
     10    They would send up the charges and -- and everything of
     11    the -- of the individual.  And then whoever is staff duty
     12    would then make that determination if they're going to do
     13    a hospital rotation or a crime scene rotation or whatever
     14    the case is.
     15          Q     Okay.  And we've tossed out a lot of terms
     16    here.  So my question is, is "staff duty" one person a
     17    shift or there are multiple people?
     18          A     Staff duty is a person that is randomly
     19    selected at that given time to be, basically, in charge
     20    of that big-money decision-making at that given time.
     21          Q     Because releasing someone arrested from the
     22    hospital to go home is a big-money decision?
     23          A     Correct.
     24          MR. SPREEUWERS:  Objection.
     25    BY MR. JENKINS:
111: 1          Q     Do you know who made the decision to release
      2    Mr. Pringle from the hospital and not send him to Alvin
      3    S. Glenn Detention Center?
      4          A     I do not.
```

# TextMap Search Report

**Transcript:** [9/5/2025] Abdullah, Zaid Abdussabur 09-05-25
**Search:** object*

## Pg 110 Ln 7 - Pg 111 Ln 20 continued...

```
111: 5         Q    Okay.  In your position of six years at the
      6    Richland County Sheriff's Department, do you believe he
      7    should have been -- Mr. Pringle should have been released
      8    to go home from the Prisma Health Richland Hospital?
      9              MR. SPREEUWERS:  Objection.  Lack of
     10    foundation.  Vague.
     11              Go ahead.
     12         A    I mean it -- it just all depends on the
     13    situation.  Again, I'm -- I'm not in that position to
     14    make those decisions.  I don't believe anybody with only
     15    six or seven years in law enforcement should be making
     16    those decisions.
     17    BY MR. JENKINS:
     18         Q    Okay.  Someone with more experience should be
     19    making those decisions?
     20         A    Correct.
```

## Pg 115 Ln 1 - 24

```
115: 1         Q    Okay.  And after you attend the Academy, you
      2    go through the FTO, the field training process?
      3         A    That's correct.
      4         Q    How long is that?
      5         A    Usually, about two to three months.
      6         Q    Okay.
      7         A    It depends on the -- the deputy and how
      8    quickly we're able to pick it up.
      9         Q    And during your time as a deputy, you get
     10    constant interaction with your supervisors and other
     11    folks in your chain of command if there are any issues
     12    that need to be adjusted or corrected; right?
     13              MR. JENKINS:  Objection to the form.  Vague.
     14              You can answer.
     15         A    Yes.
     16    BY MR. SPREEUWERS:
     17         Q    Okay.  And there's also in-service training,
     18    periodically?
     19         A    Yes, sir.
     20         Q    Regularly, rather?
     21         A    Yes, sir.
     22         Q    And that's put on by the Sheriff's
     23    Department?
     24         A    Correct.
```

# TextMap Search Report

**Transcript:** [10/2/2025] Dillard_Michael_10-02-2025_Full(63152504.1)
**Search:** object*

## Pg 5 Ln 7 - Pg 6 Ln 5

```
5:    14· · · ·that'll be easy for everybody.· And then, same thing
    8 15· · · ·with the court reporter.· We've got to have verbal
      16· · · ·answers.· Head shakes or uh-uhs or shoulder shrugs
    9 17· · · ·don't -- she can't type down that when you say that.· So
      18· · · ·this isn't a marathon.· It's not a sprint.· We can take
   10 19· · · ·a break at any time you need.· Just let me know and say,
      20· · · ·hey, you know, I need a quick break.· I will ask that if
   11 21· · · ·I've got a question that I've asked of you, that you
      22· · · ·answer that question before we take the break.· I'm
   12 23· · · ·confident that at some point in this, I'll ask a bad
      24· · · ·question.· You'll likely hear an objection.· It's
   13 25· · · ·completely normal.· And anything you talked about with
6: 1 ·1· · · ·your attorneys, I don't want to hear about.· If I ask a
      ·2· · · ·question that gets to it, I apologize.· I'm trying to
    2 ·3· · · ·avoid it, because that's none of my business.· And we
      ·4· · · ·will go ahead and get started. Can you state your full
    3   ·5· · · ·name for the record?
      ·6· ·A.· ·Michael John Dillard.
    4 ·7· ·Q.· ·Okay.· And then, what's your date of birth?
      ·8· ·A.· ·It's 4-20-78.
    5 ·9· ·Q.· ·And not the specific address, but what city and state do
```

## Pg 17 Ln 3 - Pg 18 Ln 10

```
17: 3   ·5· ·Q.· ·Okay.· Were you taught anything about transporting
      ·6· · · ·arrested in based -- so, transporting prisoners to the
    4 ·7· · · ·hospital?
      ·8· ·A.· ·Transporting prisoners to the hospital.· Yes.· We did
    5 ·9· · · ·that on occasion.· Yes.
      10· ·Q.· ·Did you ever personally do that?
    6 11· ·A.· ·Yeah.· I've done it all the time.· Yeah.
      12· ·Q.· ·Can you kind of walk me through the process of -- of
    7 13· · · ·deciding who is going to go with the prisoner to the
      14· · · ·hospital?
    8 15· · · · · · ·MR. SPREEUWERS:· Objection.· Vague.
      16· · · · · · ·THE WITNESS:· Who is ---
    9 17· · · · · · ·MR. SPREEUWERS:· Sorry, you can answer.
      18· ·BY MR. JENKINS:
   10 19· ·A.· ·Who is going to the -- to the hospital with the vic --
      20· · · ·with the suspect, you're asking?
   11 21· ·Q.· ·Yes, sir.· There's so many variables in there.· The -- I
      22· · · ·mean, it depends on how many people are going to the
   12 23· · · ·hospital, how many officers are working, if they're
      24· · · ·going to be long-term at the hospital, if they're just
   13 25· · · ·going there for a quick medical clearance.· I mean,
18: 1 ·1· · · ·there's so many variables in that question.· I don't --
      ·2· · · ·don't have to become more exact in that.
    2 ·3· ·Q.· ·Okay.· So, you -- you -- have you yourself personally
      ·4· · · ·transported a prisoner to the hospital before?
    3   ·5· ·A.· ·I've answered yes.
```

## TextMap Search Report

**Transcript:** [10/2/2025] Dillard_Michael_10-02-2025_Full(63152504.1)
**Search:** object*

## Pg 17 Ln 3 - Pg 18 Ln 10 continued...

```
18:   ·6· ·Q.· ·Okay.· And have you ever stayed with that prisoner at
   4  ·7· · · · the hospital after you transported them?
      ·8· ·A.· ·I have.
   5  ·9· ·Q.· ·How long do you usually stay with that prisoner?
      10· · · · · · ·MR. SPREEUWERS:· Objection.· Vague.
   6  11· · · · · · ·THE WITNESS:· I don't ---
      12· · · · · · ·MR. SPREEUWERS:· Go ahead.
   7  13· ·BY MR. JENKINS:
      14· ·A.· ·Again, I mean, it's very -- it's not very exact.  I
   8  15· · · · mean, every -- assuming every single person I take to
      16· · · · hospital has the same exact injuries, which never
   9  17· · · · happens.· So, I don't -- you don't have to rephrase that
      18· · · · question.
  10  19· ·Q.· ·Okay.· Have you ever taken a prisoner to the hospital
      20· · · · and released them to go home from the hospital?
```

## Pg 25 Ln 2 - 12

```
25: 2 ·3· · · · packet.
      ·4· ·A.· ·Yeah.· Yeah.· It's the pursuit packet.
   3  ·5· ·Q.· ·Okay.
      ·6· ·A.· ·Yeah.
   4  ·7· ·Q.· ·Can you tell me what you remember about this pursuit?
      ·8· ·A.· ·What specifically are you asking?
   5  ·9· ·Q.· ·I mean, generally, what -- what do you remember about
      10· · · · this pursuit on December 12th, 2023?
   6  11· · · · · · ·MR. SPREEUWERS:· And before he answers, this is --
      12· · · · this document appears to be a -- a pursuit packet for a
   7  13· · · · pursuit on December 12th, 2023.· I'm going to object to
      14· · · · any line of questioning about this document.· It's
   8  15· · · · totally irrelevant.· Go ahead.
      16· · · · · · ·MR. JENKINS:· Yes.
   9  17· ·BY MR. JENKINS:
      18· ·A.· ·Yeah.· Are you asking me if I -- what I recall of this
  10  19· · · · specific?
      20· ·Q.· ·Yes, sir.
  11  21· ·A.· ·Or -- let me see.· Zimalcrest Broad River.· I would have
      22· · · · to go over it.· I don't -- Zimalcrest.· The motorcycle.
  12  23· · · · Yeah.· Yeah.· I recall that one.· So, I was driving on
```

## Pg 36 Ln 12 - Pg 37 Ln 9

```
36:12 23· · · · this point, so it's not written, so I don't know them,
      24· · · · but I know they do have different -- different rules
  13  25· · · · that they go by.
37: 1 ·1· ·Q.· ·Did the Jacksonville Sheriff's Department have a -- have
      ·2· · · · unwritten policies that pertain to vehicle pursuits when
   2  ·3· · · · you were there?
      ·4· ·A.· ·Yeah.· They had pretty much the same as Savannah.
```

# TextMap Search Report

**Transcript:** [10/2/2025] Dillard_Michael_10-02-2025_Full(63152504.1)
**Search:** object*

## Pg 36 Ln 12 - Pg 37 Ln 9 continued...

```
37: 3      ·5·· Q.··And did the Richland County Sheriff's Department have
           ·6···· unwritten policies pertaining to vehicle pursuits when
    4      ·7···· you were working there?
           ·8···· · · ·MR. SPREEUWERS:· Object to the form.
    5      ·9· ·BY MR. JENKINS:
           10·· A.··No.
    6      11···· · · ·MR. SPREEUWERS:· You can answer, sorry.
           12· ·BY MR. JENKINS:
    7      13· ·A.··Richland County unwritten rules, no, I think there were
           14···· there were a lot more.· So, I mean, there --
    8      15···· it's -- I don't think it's a fair comparison.· All ---
           16· ·Q.··Okay.
    9      17· ·A.· ---- all -- all three of my agencies have been completely
           18···· different, so I mean -- and Richland is definitely
```

## Pg 38 Ln 7 - Pg 39 Ln 12

```
38: 7      13· ·Q.··I'll zoom out for you, it's -- it's Baker N-115, I'll
           14···· represent to you that this is, from my understanding on
    8      15···· how it was produced to us, that this is from the
           16···· training.
    9      17· ·A.··Okay.· I'm sorry.· What was the question?
           18· ·Q.··The second sentence states in this paragraph, sometimes
    10     19···· these policies are not formally written or, if so, they
           20···· are not fully enforced.· In your time as a law
    11     21···· enforcement officer, have you seen vehicle pursuit
           22···· policies not fully enforced?
    12     23···· · · ·MR. SPREEUWERS:· Object to the form.· You can
           24···· answer.
    13     25· ·BY MR. JENKINS:
39: 1      ·1· ·A.··My time as a law enforcement officer, not fully
           ·2···· enforced, I -- nothing on the top of my head ---
    2      ·3· ·Q.··Not sticks.
           ·4· ·A.· ---- nothing sticking out, really.· No.· I'm -- not that
    3      ·5·· · · I can actually comment towards.
           ·6· ·Q.··Okay.· I'm going to zoom out here and go to the next
    4      ·7···· page, Baker N-116 subparagraph B here, it says, the
           ·8···· violator.· This third sentence in this paragraph says,
    5      ·9···· officers should not attempt to duplicate the violator's
           10···· behavior.· In your opinion, and based on your experience
    6      11···· as a law enforcement officer, why should you not attempt
           12···· to duplicate the violator's behavior?
    7      13···· · · ·MR. SPREEUWERS:· Object to the form.· You can
           14···· answer.
    8      15· ·BY MR. JENKINS:
           16· ·A.··The violator could be seen as doing anything necessary
    9      17···· to elude capture and including putting the public at
           18···· danger.
    10     19· ·Q.··Okay.· And when you say doing anything to evade capture,
           20···· would that include going backwards on the interstate?
```

# TextMap Search Report

**Transcript:** [10/2/2025] Dillard_Michael_10-02-2025_Full(63152504.1)
**Search:** object*

## Pg 38 Ln 7 - Pg 39 Ln 12 continued...

```
39:11   21· ·A.· ·That could be one of them, yeah.
        22· ·Q.· ·Okay.· I'm going to zoom back out and go down to the
   12   23· · · · next page, Baker N-117.· This second paragraph under
```

## Pg 41 Ln 7 - Pg 42 Ln 5

```
41:     14· · · · timeframe?
    8   15· ·A.· ·Very few.· Yes.
        16· ·Q.· ·Do you have a number or an estimate?
    9   17· ·A.· ·I would guess two.
        18· ·Q.· ·Okay.· I've scrolled down to Baker M-308.· This third
   10   19· · · · bullet point, says, at its worst, it can be a menace to
        20· · · · the people on the highway and this must be avoided at
   11   21· · · · all times.· Do you agree that a vehicular pursuit can be
        22· · · · a menace to the people on a highway and this must be
   12   23· · · · avoided at all times?
        24· · · · · ·MR. SPREEUWERS:· Object to the form.· Misstates the
   13   25· · · · evidence.· Go ahead.
42: 1   ·1· ·BY MR. JENKINS:
        ·2· ·A.· ·No.· I don't agree with it.
    2   ·3· ·Q.· ·Okay.· Can you tell me why you don't agree with it?
        ·4· ·A.· ·So, it must be avoided at all times.· I mean, like you
    3    ·5· · · · asked earlier, there has to be a -- a balance between
        ·6· · · · dangers to the public of the actual pursuit and the
    4   ·7· · · · escape of that person.· So, that balance was showed in
        ·8· · · · this incident that letting him go was more of a danger
    5   ·9· · · · to the public, so.
```

## Pg 49 Ln 4 - Pg 50 Ln 1

```
49: 4   ·7· ·A.· ·Yes.· So, I was pulling up, I was at Bush River, over
        ·8· · · · the -- going over the bridge of, say, 26, approaching
    5   ·9· · · · the Hawthorne Hotel, and as I was approaching, it was
        10· · · · going out over the radio, that he was -- he had multiple
    6   11· · · · warrants -- felony warrants, and then that he had ran
        12· · · · from law enforcement previously.
    7   13· ·Q.· ·The fact that he ran from law enforcement previously,
        14· · · · did -- did that -- does that affect, in your opinion,
    8   15· · · · the decision as to whether you should engage in a
        16· · · · vehicular pursuit or not?
    9   17· · · · · ·MR. SPREEUWERS:· Objection.
        18· ·BY MR. JENKINS:
   10   19· ·A.· ·No.· But I mean, you know you're going -- he's not gonna
        20· · · · just give up, I mean, doesn't really affect anything.
   11   21· · · · You just -- that just -- all that tells you is that, you
        22· · · · know, he's not going to just put his hands up.
   12   23· ·Q.· ·Okay.· So, when you heard that over the radio, you know,
        24· · · · does -- do you believe we're about to be involved in a
   13   25· · · · vehicle pursuit?
```

# TextMap Search Report

**Transcript:** [10/2/2025] Dillard_Michael_10-02-2025_Full(63152504.1)
**Search:** object*

## Pg 49 Ln 4 - Pg 50 Ln 1 continued...

50: 1 ·1· ·A.· ·No.· I mean, well, my hope was, they said that he was at
·2· · · · the Sunoco gas station, and I was hurrying up to get

## Pg 51 Ln 2 - Pg 52 Ln 5

51: 2 ·3· · · · the other intersection looking right at him as well.
·4· · · · So, there's three of us just staring at each other, and
3 · ·5· · · · that's when I first saw him.· He was pulling out.
·6· ·Q.· ·Okay.· I'll scroll down to the bottom of Baker M-329 and
4 ·7· · · · subparagraph three says, in deciding whether to initiate
·8· · · · or continue a pursuit, the officer shall take the
5 ·9· · · · following into consideration.· The first bullet point is
10· · · · A, the seriousness of the offense and -- and why should
6 11· · · · you take that into consideration when deciding to
12· · · · initiate or continue a pursuit?
7 13· · · · · ·MR. SPREEUWERS:· Object to the form.· You can
14· · · · answer.
8 15· ·BY MR. JENKINS:
16· ·A.· ·So, Tom, along the same lines of the -- the example I
9 17· · · · gave downgrading, the officer that was the pursuing
18· · · · officer -- primary pursuing officer, didn't want to
10 19· · · · endanger the public for a minor traffic violation, but
20· · · · at the same time, if it's a violent felonies or multiple
11 21· · · · felonies, then the risk is elevated.
22· ·Q.· ·Okay.· Why must an officer take the known information on
12 23· · · · the suspect into consideration?
24· · · · · ·MR. SPREEUWERS:· Object to the form.· You can
13 25· · · · answer.
52: 1 ·1· ·BY MR. JENKINS:
·2· ·A.· ·Because that's determines the appropriate response
2 ·3· · · · level.
·4· ·Q.· ·And -- and why does the known information on the suspect
3 ·5· · · · determine the appropriate response level?
·6· ·A.· ·Because if someone comes on the radio, there's a car
4 ·7· · · · that has a license plate that's expired last week is
·8· · · · completely different than we have eyes on a -- an
5 ·9· · · · individual with a multiple felony warrants.· So, the --

## Pg 54 Ln 3 - Pg 55 Ln 1

54: ·6· · · · jump out and run, the suspect that is the dog can be
4 ·7· · · · deployed.
·8· ·Q.· ·Is that an -- an -- an unwritten policy?
5 ·9· ·A.· ·I couldn't tell you.· I know it's a common practice and
10· · · · that I don't -- I can't recall Richland County's
6 11· · · · policies verbatim.· I don't recall what's in them.· But
12· · · · I know it's common practice at Richland County to have
7 13· · · · the -- the K-9 as number two when possible.
14· ·Q.· ·Okay.· What about the K-9 taking over the number one

## TextMap Search Report

**Transcript:** [10/2/2025] Dillard_Michael_10-02-2025_Full(63152504.1)
**Search:** object*

### Pg 54 Ln 3 - Pg 55 Ln 1 continued...

54: 8 · 15· · · · spot without request?· Is that also a common practice?
· · · · · 16· · · · · · MR. SPREEUWERS:· Object to the form.· Misstates the
· · · 9 · 17· · · · evidence.· Go ahead.
· · · · · 18· ·BY MR. JENKINS:
· · · 10 · 19· ·A.· ·It's not common practice, but it happens.
· · · · · 20· ·Q.· ·Okay.· I'm going read on Baker M-333, subparagraph C. It
· · · 11 · 21· · · · states, as a general rule, deputy should not pursue a
· · · · · 22· · · · vehicle driving the wrong direction on a roadway,
· · · 12 · 23· · · · highway, or freeway.· Why should deputies, in your
· · · · · 24· · · · opinion, not pursue a vehicle driving the wrong
· · · 13 · 25· · · · direction on a roadway, highway, or freeway?
55: 1 · ·1 · ·A.· ·Well, it's a general rule, generally speaking.· So, a

### Pg 55 Ln 3 - 13

55: 3 · · · ·5· · · · So, I mean, it's just dangerous.
· · · · · ·6· ·Q.· ·Is the risk increased when a suspect is going the wrong
· · · 4 · ·7· · · · direction?
· · · · · ·8· ·A.· ·It can be, yeah.
· · · 5 · ·9· ·Q.· ·Okay.· This subparagraph D here, deputies involved in a
· · · · · 10· · · · pursuit should not attempt to pass other pursuing
· · · 6 · 11· · · · vehicles unless the situation indicates otherwise or
· · · · · 12· · · · they requested to do so by the pursuing deputy.· Does
· · · 7 · 13· · · · that contradict the -- the K-9 becoming the number two
· · · · · 14· · · · position in the pursuit?
· · · 8 · 15· · · · · · MR. SPREEUWERS:· Objection.· Vagueness.· Misstates
· · · · · 16· · · · the testimony.· Go ahead.
· · · 9 · 17· ·BY MR. JENKINS:
· · · · · 18· ·A.· ·Does it contradict it?· I mean, these are all general
· · · 10 · 19· · · · rules, not hard rules.· So, I mean, the common practice,
· · · · · 20· · · · as I said earlier, is for the K-9 to take number two.
· · · 11 · 21· ·Q.· ·Okay.· On December 29th, 2023, during the pursuit of
· · · · · 22· · · · Mr. Pringle, and as to your understanding, what was the
· · · 12 · 23· · · · end goal of that vehicular pursuit?
· · · · · 24· ·A.· ·Apprehend the suspect.
· · · 13 · 25· ·Q.· ·Okay.· Do you recall what technique was going to be --

### Pg 56 Ln 11 - Pg 57 Ln 8

56:11 · 21· · · · out that it was fueling at the gas station.· My intent
· · · · · 22· · · · was to keep a resting vehicle resting, our static
· · · 12 · 23· · · · vehicle static before it could ever get into a pursuit.
· · · · · 24· ·Q.· ·Yes, sir.· I understand that, but do you remember
· · · 13 · 25· · · · hearing on the radio, if they plan to perform a PIT
57: 1 · ·1· · · · maneuver on Mr. Pringle?
· · · · · ·2· ·A.· ·Who's they?· I mean, you're talking about me, right?
· · · 2 · ·3· ·Q.· ·Do you remember hearing on the radio whether Deputy
· · · · · ·4· · · · Smith or Deputy Hodge stated that they were going to
· · · 3 · ·5· · · · take out Mr. Pringle with -- take out his vehicle?

## TextMap Search Report

**Transcript:** [10/2/2025] Dillard_Michael_10-02-2025_Full(63152504.1)
**Search:** object*

## Pg 56 Ln 11 - Pg 57 Ln 8 continued...

```
57:  ·6· · · · · ·MR. SPREEUWERS:· Objection.· Misstates the
   4 ·7· · · · evidence.· Go ahead.
     ·8· ·BY MR. JENKINS:
   5 ·9· ·A.· ·Do I recall that?· No.
     10· ·Q.· ·Okay.· So, as you all, when I say you all, Deputy Smith,
   6 11· · · · Deputy Hodge, and yourself were going backwards on the
     12· · · · interstate, how did you all intend to stop his vehicle
   7 13· · · · from fleeing?
     14· ·A.· ·Well, once we were on the freeway and we kept going, we
   8 15· · · · pulled off to the left from what I recall.· And soon
     16· · · · afterwards, that's when he crashed.· So, the -- from
```

## Pg 58 Ln 3 - Pg 59 Ln 6

```
58: 3   ·5· ·A.· ·I can see it, yes.
     ·6· ·Q.· ·Okay.· This is Baker M-344.· This is just further down
   4 ·7· · · · in the -- the vehicle pursuit policy from the Richland
     ·8· · · · County Sheriff's Department.· Under 802.12b, it says,
   5 ·9· · · · pursuit shall be immediately terminated in any of the
     10· · · · following circumstances.· And the first one says,
   6 11· · · · whether or traffic conditions substantially increase the
     12· · · · danger of pursuit beyond the worth of apprehending the
   7 13· · · · subject.· In your opinion, why shall the pursuit be
     14· · · · immediately terminated based on traffic conditions?
   8 15· · · · · ·MR. SPREEUWERS:· Object to the form.· You can
     16· · · · answer.
   9 17· ·BY MR. JENKINS:
     18· ·A.· ·Yeah.· So, many traffic conditions can just cause more
  10 19· · · · danger to the pursuers or the pursuer.
     20· ·Q.· ·Does going the wrong way on the interstate substantially
  11 21· · · · increase the danger of the pursuit?
     22· ·A.· ·It can, yes.
  12 23· ·Q.· ·Okay.· And why can't it, based on your opinion as a
     24· · · · deputy at three different law enforcement agencies?
  13 25· ·A.· ·Why can't it?
59: 1 ·1· · · · · · ·MR. SPREEUWERS:· Object to the form.
     ·2· ·BY MR. JENKINS:
   2 ·3· ·Q.· ·Yes, sir.
     ·4· ·A.· ·Just because of the -- the speed and people aren't
   3   ·5· · · · expecting it.
     ·6· ·Q.· ·Okay.· All right.· I'm now going to go to Exhibit 43, go
   4 ·7· · · · to the first page.· Have you ever seen this document
     ·8· · · · before?
   5 ·9· ·A.· ·I don't recall.
     10· ·Q.· ·Okay.· Did -- when you were at the Richland County
   6 11· · · · Sheriff's Department, did the Professional Standards
```

# TextMap Search Report

**Transcript:** [10/2/2025] Dillard_Michael_10-02-2025_Full(63152504.1)
**Search:** object*

## Pg 66 Ln 12 - Pg 67 Ln 10

```
66:   24· · · · know Colin.· It was -- I guess that was the guy on the
   13 25· · · · radio.
67: 1 ·1· ·Q.· ·Say that again.· I -- I lost you a little bit.
       ·2· ·A.· ·So, I know Colin Davis.· I know Colin.· That could have
    2 ·3· · · · been the guy on the radio.
       ·4· ·Q.· ·Okay.· In your experience at the three different
    3 ·5· · · · departments you've worked at as a deputy, when you call
       ·6· · · · in and provide -- call in and provide the license plate
    4 ·7· · · · number to dispatch.· What is the usual turnaround time
       ·8· · · · on them providing you information on that license plate?
    5 ·9· · · · · ·MR. SPREEUWERS:· Object to the form.· You can
      10· · · · answer.
    6 11· ·BY MR. JENKINS:
      12· ·A.· ·Typically they won't unless it comes back with a hit,
    7 13· · · · either a dangerous flag or a wanted flag or something
      14· · · · along those lines.· But majority of times they don't
    8 15· · · · come back to you.· They'll attach it to your call, and
      16· · · · then you can click and access it there.
    9 17· ·Q.· ·If they have a -- a wanted flag, how quickly do they
      18· · · · usually radio you back?
   10 19· ·A.· ·Once they get it.· I mean, but that depends.· I mean,
```

## Pg 69 Ln 11 - Pg 70 Ln 9

```
69:   22· ·Q.· ·Okay.· And can you tell me why it's not a practice?
   12 23· ·A.· ·Because people in the pursuit are focused on the pursuit
      24· · · · and for the safety of the public.· Also, in -- in this
   13 25· · · · situation where another unit, an undercover unit, is
70: 1 ·1· · · · asking for marked patrol units, basically the homework's
       ·2· · · · already been done.· So, me driving at the same time and
    2 ·3· · · · trying to research what's already been searched is
       ·4· · · · pointless.
    3 ·5· ·Q.· ·Okay.· So, do you blindly trust other law enforcement
       ·6· · · · agencies that provide you information?
    4 ·7· · · · · ·MR. SPREEUWERS:· Objection.
       ·8· ·BY MR. JENKINS:
    5 ·9· ·A.· ·All the -- so -- so ---
      10· · · · · ·MR. SPREEUWERS:· Sorry, I spoke over you.· Say that
    6 11· · · · again.
      12· · · · · ·THE WITNESS:· Do you want me to answer that
    7 13· · · · question?
      14· · · · · ·MR. SPREEUWERS:· Yeah.· You can answer.
    8 15· ·BY MR. JENKINS:
      16· ·A.· ·So, it's called a fellow officer rule.· I mean, it's --
    9 17· · · · if there's one sworn officer and he has probable cause
```

## TextMap Search Report

**Transcript:** [10/2/2025] Dillard_Michael_10-02-2025_Full(63152504.1)
**Search:** object*

## Pg 70 Ln 12 - Pg 71 Ln 10

```
70:    24· ·Q.· ·When you received a call from another sworn law
    13 25· · · · enforcement officer at all three of your different
71: 1 ·1· · · · positions, have you ever then called into dispatch to
       ·2· · · · verify that information?
     2 ·3· ·A.· ·After the fact, yes.· But during -- once the action is
       ·4· · · · in the process, you act on it and then afterwards you
     3    ·5· · · · confirm it, yes.
       ·6· ·Q.· ·So, during a vehicle pursuit, you would never verify the
     4 ·7· · · · information provided to you from a -- from a -- a sister
       ·8· · · · agency?
     5 ·9· · · · · · ·MR. SPREEUWERS:· Objection.· Misstates the
       10· · · · testimony.· You can answer.
     6 11· ·BY MR. JENKINS:
       12· ·A.· ·While I'm in a high-speed pursuit, no, I do not.· Are --
     7 13· · · · are you asking if I get on the radio and confirm the
       14· · · · warrant, for example?
     8 15· ·Q.· ·Yes, sir.· Sure.
       16· ·A.· ·No.· That's not feasible.· It's not even close to,
     9 17· · · · sometimes it takes half an hour to confirm a warrant.
       18· · · · So, no, that's not in anybody's thought process.
    10 19· ·Q.· ·Okay.· And I just want to clear it up because I don't --
```

## Pg 77 Ln 9 - Pg 78 Ln 6

```
77: 9 17· · · · either spins out or puts it in a more vulnerable
       18· · · · position to be apprehended.
    10 19· ·Q.· ·Got it.· Have you ever performed a PIT maneuver before
       20· · · · in live action, not in training?
    11 21· ·A.· ·Yes.
       22· ·Q.· ·Okay.· Can you tell me -- I mean, how many times have
    12 23· · · · you performed a PIT maneuver, if you know?
       24· ·A.· ·Not off the top of my head.· I would say more than five.
    13 25· ·Q.· ·Okay.· Have you ever performed a PIT maneuver on someone
78: 1 ·1· · · · that was going the wrong way?
       ·2· · · · · · ·MR. SPREEUWERS:· Objection.· It's vague.· Go ahead.
     2 ·3· ·BY MR. JENKINS:
       ·4· ·A.· ·Yeah.· That doesn't make sense.· I mean, what -- wrong
     3    ·5· · · · way to what?· From me?· I mean, so we're going head to
       ·6· · · · head?
     4 ·7· ·Q.· ·Have you ever been following a vehicle -- behind a
       ·8· · · · vehicle, that was going the wrong direction on a roadway
     5 ·9· · · · and performed a PIT maneuver on it?
       10· ·A.· ·No.
     6 11· ·Q.· ·Okay.· Would that be a dangerous endeavor?
       12· ·A.· ·All pits are dangerous.
```

# TextMap Search Report

**Transcript:** [9/19/2025] HODGE_BRYAN_09-19-2025_Full(63096111.1)
**Search:** object*

## Pg 6 Ln 7 - Pg 7 Ln 4

```
6: 7   13· ·Q· · This is not a marathon.· If you need to go to the
       14· · · · restroom, coffee, soda, whatever, take a break,
   8   15· · · · just let me know.· Happy to take a break whenever
       16· · · · you want.· I just ask that you finish any question
   9   17· · · · before we take that break.
       18· ·A· · Yes.
  10   19· ·Q· · Once we start, anything you chat with your
       20· · · · attorneys about, I can ask about it.
  11   21· · · · · · ·And I'm confident that at some point, I'll
       22· · · · phrase a question poorly or ask a bad question.
  12      23· · · · You'll probably hear an objection.· That's normal.
       24· · · · · · ·Do you have any questions for me before we
  13   25· · · · go?
7: 1   ·1· ·A· · No.
       ·2· ·Q· · Please state your full name.
   2   ·3· ·A· · Brian Keith Hodge.
       ·4· ·Q· · Date of birth?
   3   ·5· ·A· · 05/07/1996.
       ·6· · · · ·MR. GARFIELD:· Do you mind taking personal
   4   ·7· · · · identifying information off the record?
       ·8· · · · · · · · · ·(Off-the-record discussion.)
```

## Pg 10 Ln 12 - Pg 11 Ln 9

```
10:12     23· ·Q· · You started at the Richland County Sheriff's
          24· · · · Department.· You get hired.· What is the next
  13      25· · · · step?
11: 1   ·1· ·A· · You go through their in-service training prior to
        ·2· · · · the Academy.· They call it pre-Academy.
   2    ·3· ·Q· · How long does pre-Academy last?
        ·4· ·A· · I don't know exact timeframe.
   3    ·5· ·Q· · Six months, is that too long?
        ·6· ·A· · Yes, I believe so.
   4    ·7· ·Q· · Does four months sound more correct?
        ·8· · · · · · ·MR. GARFIELD:· Object to the form.
   5    ·9· · · · · · ·Go ahead.
        10· · · · · · ·THE WITNESS:· I'm not exactly sure.
   6    11· ·BY MR. JENKINS:
        12· ·Q· · Tell me a little bit about what happens at
   7    13· · · · pre-Academy.· Go over the stuff you do.
        14· ·A· · Sit through are a lot of legal classes, lectures
   8    15· · · · from professors, somebody at Richland County
        16· · · · Sheriff's Department.· It's somebody from the
   9    17· · · · Richland County Sheriff's Department, Denny
        18· · · · Terrace off of Monticello Road.
```

# TextMap Search Report

**Transcript:** [9/19/2025] HODGE_BRYAN_09-19-2025_Full(63096111.1)
**Search:**  object*

## Pg 16 Ln 12 - Pg 17 Ln 9

```
16:12    23· ·Q· · So this is the end of 2022, and you're still in
         24· · · · FTO, correct?
    13   25· ·A· · I believe so, yes.
17: 1    ·1· ·Q· · You would be in your FTO in the last month of
         ·2· · · · 2022.
     2   ·3· ·A· · Without seeing it on paper, I'm not 100 percent
         ·4· · · · sure.
     3   ·5· ·Q· · If you filled out this paperwork on December
         ·6· · · · 4th, where your initial is -- would you have
     4   ·7· · · · filled out that paperwork?
         ·8· · · · · ·MR. GARFIELD:· Object to the form.
     5   ·9· · · · · ·You can answer.
         10· · · · · ·THE WITNESS:· While I was doing FTO, yes.  I
     6   11· · · · don't know if I finished FTO -- I could have
         12· · · · finished the prior month.· I'm not sure.
     7   13· ·BY MR. JENKINS:
         14· ·Q· · At least December 4, 2022, you were still in FTO.
     8   15· ·A· · Yes.
         16· ·Q· · Can you tell me about how Colin Davis explained
     9   17· · · · vehicle pursuit to you?
         18· ·A· · When he explained it, he showed me one through our
```

## Pg 22 Ln 7 - Pg 23 Ln 5

```
22:      14· · · · footage, all actions were within guidelines of
     8   15· · · · policy and procedure.· Who made that comment?
         16· ·A· · Probably the sergeant at the time or lieutenant,
     9   17· · · · some supervisor position.
         18· ·Q· · This was an incident report.· Does this appear to
    10   19· · · · be a pursuit incident report to you?
         20· ·A· · Just based off the comment at the end, it says
    11   21· · · · pursuit vehicle.· It looks like it, yes.
         22· ·Q· · Do you know in the year 2023 how many pursuits you
    12    23· · · · were involved in?
         24· · · · · ·MR. GARFIELD:· Object to the form.
    13   25· · · · · ·You can answer.
23: 1    ·1· · · · · ·THE WITNESS:· I'm not sure.· It was quite a
         ·2· · · · bit.
     2   ·3· ·BY MR. JENKINS:
         ·4· ·Q· · Can you give me an approximation?
     3   ·5· ·A· · Definitely more than ten to 15.
         ·6· ·Q· · So more than ten to 15.· Of those more than ten to
     4   ·7· · · · 15, how many were you relieved to pursue a
         ·8· · · · vehicle -- lead pursuit?
     5   ·9· ·A· · Not necessarily, no.
```

# TextMap Search Report

**Transcript:** [9/19/2025] HODGE_BRYAN_09-19-2025_Full(63096111.1)
**Search:** object*

## Pg 25 Ln 8 - Pg 27 Ln 10

```
25: 8   15· · · · yourself from having tunnel vision?
        16· ·A· · I don't know exactly how to put it in words, but
     9  17· · · · just try not to -- when I realize I'm super
        18· · · · focused on one thing, just kind of spanning that
    10  19· · · · out, expanding that out, just trying to, like,
        20· · · · slow everything down, if that makes sense.
    11  21· ·Q· · In 043, can you read that for me at the top?
        22· ·A· · There is too much tolerance for negligent driving
    12  23· · · · in our profession.
        24· ·Q· · Do you agree with that statement?
    13  25· · · · · · ·MR. GARFIELD:· Object to the form.
26: 1   ·1· · · · · · ·THE WITNESS:· I think, yes, and, no.· It
        ·2· · · · depends.
     2  ·3· ·BY MR. JENKINS:
        ·4· ·Q· · What does it depend on?
     3  ·5· · · · · · ·MR. GARFIELD:· Same objection.
        ·6· · · · · · ·Go ahead.
     4  ·7· · · · · · ·THE WITNESS:· I think there are a lot of
        ·8· · · · people who do drive negligent.
     5  ·9· ·BY MR. JENKINS:
        10· ·Q· · When it says our profession, can you tell me who's
     6  11· · · · making that statement?
        12· ·A· · I'm assuming it's a police officer of some type
     7  13· · · · from the caption of it.
        14· ·Q· · So when he says our profession, do you understand
     8  15· · · · it to mean police officers?
        16· ·A· · Yes.
     9  17· ·Q· · When you say, some people that drive negligently,
        18· · · · are you referring to other police officers?
    10  19· · · · · · ·MR. GARFIELD:· Same objection.
        20· · · · · · ·Do the best you can.
    11  21· · · · · · ·THE WITNESS:· Can you rephrase the question?
        22· ·BY MR. JENKINS:
    12  23· ·Q· · That quote says, made by Paul Cappitelli, retired
        24· · · · police officer.· When I asked you if you agreed
    13  25· · · · with that statement, you said yes and no.· You
27: 1   ·1· · · · said, and I'm paraphrasing, some people drive
        ·2· · · · negligently.· Is that correct?
     2  ·3· · · · · · ·MR. GARFIELD:· Object to the form.
        ·4· · · · · · ·THE WITNESS:· Yes.· There's a lot of police
     3  ·5· · · · officers that drive dangerously.
        ·6· ·BY MR. JENKINS:
     4  ·7· ·Q· · Do you think there's a lot of police officers that
        ·8· · · · drive dangerously in Richland County?
     5  ·9· · · · · · ·MR. GARFIELD:· Object to the form.
        10· · · · · · ·THE WITNESS:· I'm sure there are.· I haven't
     6  11· · · · really seen it.
        12· ·BY MR. JENKINS:
     7  13· ·Q· · Can you read that first question on the second --
        14· · · · on 044.· The first question.
     8  15· ·A· · Who are you willing to kill responding to this
```

# TextMap Search Report

**Transcript:** [9/19/2025] HODGE_BRYAN_09-19-2025_Full(63096111.1)
**Search:** object*

## Pg 25 Ln 8 - Pg 27 Ln 10 continued...

```
27:    16· · · · call/situation?
    9  17· ·Q· · Is that something you consider when responding?
       18· ·A· · That is always a factor when you're running code.
   10  19· ·Q· · Do you ask yourself that question?
```

## Pg 31 Ln 9 - Pg 32 Ln 10

```
31: 9  17· · · · than the risk of the reported situation at hand.
       18· ·Q· · What does that mean to you?
   10  19· ·A· · If it becomes too unsafe when going to call or
       20· · · · chasing a car, if it becomes greater than the
   11  21· · · · risk, you can downgrade the code.
       22· ·Q· · It says shall there as well, correct?
   12   23· ·A· · Correct.
       24· ·Q· · Do you believe that the risk to the public became
   13  25· · · · greater than the risk, his failure to appear for a
32: 1  ·1· · · · court hearing in Lexington County?
       ·2· · · · · ·MR. GARFIELD:· Objective form on several
    2  ·3· · · · grounds.
       ·4· · · · · · ·Go ahead.
    3  ·5· · · · · · ·MR. JENKINS:· No.· I don't think it ever
       ·6· · · · became greater than the risk, what we were doing.
    4  ·7· ·BY MR. JENKINS:
       ·8· ·Q· · Can you explain that to me?
    5  ·9· · · · · · ·MR. GARFIELD:· Same objection.
       10· · · · · · ·THE WITNESS:· He had felony warrants for
    6  11· · · · trafficking fentanyl.· And we knew he was also
       12· · · · trafficking fentanyl.· The way he was driving in
    7  13· · · · the situation did not meet the requirement.
       14· ·BY MR. JENKINS:
    8  15· ·Q· · You said the way he was driving.· What do you
       16· · · · mean?
    9  17· ·A· · When you go the wrong way on the interstate,
       18· · · · there's no turnaround point.
   10  19· ·Q· · At that point is it more important to allow him to
```

## Pg 33 Ln 13 - Pg 34 Ln 10

```
33:13  25· · · · Abdullah's arrest?
34: 1  ·1· ·A· · Through the DEA task force.
       ·2· ·Q· · What individuals on the DEA task force?
    2  ·3· ·A· · Colin Davis.
       ·4· ·Q· · Same Colin Davis as your FTO?
    3  ·5· ·A· · Yes.
       ·6· ·Q· · You knew who Mr. Pringle was?
    4  ·7· ·A· · Yes.
       ·8· ·Q· · You had his address, Social Security number, pants
    5  ·9· · · · size?
       10· · · · · · ·MR. GARFIELD:· Object to the form.
```

# TextMap Search Report

**Transcript:**· [9/19/2025] HODGE_BRYAN_09-19-2025_Full(63096111.1)
**Search:**· object*

## Pg 33 Ln 13 - Pg 34 Ln 10 continued...

34: 6· ·11· · · · · · ·THE WITNESS:· I wouldn't know all that.· From
· · · · · ·12· · · · my understanding, he was homeless.
· · · 7· ·13· ·BY MR. JENKINS:
· · · · · ·14· ·Q· · Baker 74.· Look at the first sentence at the top
· · · 8· ·15· · · · slide.· Can you read that for me?
· · · · · ·16· ·A· · It is the policy of the Richland County Sheriff's
· · · 9· ·17· · · · Department that deputies hold the highest value
· · · · · ·18· · · · for the sanctity of human life.
· · 10· ·19· ·Q· · Read that second sentence as well.
· · · · · ·20· ·A· · Deputies, pursuit supervisors, and commanders must

## Pg 35 Ln 12 - Pg 37 Ln 5

35:12· · ·23· ·Q· · What would those be to you?
· · · · · ·24· ·A· · Felonies.
· · 13· ·25· ·Q· · All felonies?
36: 1· ·1· ·A· · I wouldn't say all felonies.
· · · · · ·2· ·Q· · What about misdemeanors?
· · · 2· ·3· ·A· · It depends.· It could turn out to be more
· · · · · ·4· · · · important.· It's not just based on one thing.
· · · 3· ·5· ·Q· · So you would say when you're balancing the need
· · · · · ·6· · · · for immediate apprehension, do you think all
· · · 4· ·7· · · · misdemeanors warrant immediate apprehension?
· · · · · ·8· · · · · ·MR. GARFIELD:· Object to the form.
· · · 5· ·9· · · · · ·THE WITNESS:· I think all charges should be
· · · · · ·10· · · · immediate apprehension.
· · · 6· ·11· ·BY MR. JENKINS:
· · · · · ·12· ·Q· · But this says there's a balance for all human life
· · · 7· ·13· · · · is paramount.
· · · · · ·14· ·A· · It does say that.
· · · 8· ·15· ·Q· · Do you think there's a tilt in the balance?
· · · · · ·16· · · · · ·MR. GARFIELD:· Object to the form.
· · · 9· ·17· · · · · ·THE WITNESS:· No.
· · · · · ·18· ·BY MR. JENKINS:
· · 10· ·19· ·Q· · You stated immediate apprehension for all crimes
· · · · · ·20· · · · is what the law is for.· Is that correct?
· · 11· ·21· ·A· · If you steal something, you should be immediately
· · · · · ·22· · · · apprehended.
· · 12· · ·23· ·Q· · Even if they -- if you engage in a pursuit, you
· · · · · ·24· · · · believe they should be immediately apprehended?
· · 13· ·25· · · · · ·MR. GARFIELD:· Object to the form.
37: 1· ·1· · · · · ·THE WITNESS:· If they steal something, what
· · · · · ·2· · · · might be small to you might be big to somebody
· · · 2· ·3· · · · else.
· · · · · ·4· ·BY MR. JENKINS:
· · · 3· ·5· ·Q· · It doesn't matter what it is.· As a police
· · · · · ·6· · · · officer, your job is to immediately apprehend?
· · · 4· ·7· ·A· · It's a balance.
· · · · · ·8· ·Q· · Look at Baker 75.· Read the second sentence of
· · · 5· ·9· · · · that top paragraph.

## TextMap Search Report

**Transcript:** [9/19/2025] HODGE_BRYAN_09-19-2025_Full(63096111.1)
**Search:** object*

## Pg 35 Ln 12 - Pg 37 Ln 5 continued...

37:⸱⸱⸱10·⸱A·⸱⸱The second sentence.

## Pg 37 Ln 11 - Pg 38 Ln 11

```
37:⸱⸱⸱22·⸱A·⸱⸱Pursuit is authorized only if the officer has a
   12·⸱⸱23·⸱⸱⸱⸱⸱reasonable belief that the suspect, if allowed to
       ⸱⸱24·⸱⸱⸱⸱⸱flee, would present a danger to human life or
   13·⸱⸱25·⸱⸱⸱⸱⸱cause serious injury.· In general, pursuits for
38: 1·⸱⸱·1·⸱⸱⸱⸱⸱minor violations are discouraged.
       ⸱⸱·2·⸱Q·⸱⸱The balance for the minor violations doesn't
    2·⸱⸱·3·⸱⸱⸱⸱⸱appear anywhere in the policy, does it?
       ⸱⸱·4·⸱A·⸱⸱I've only seen two slides.· In general, there's a
    3·⸱⸱·5·⸱⸱⸱⸱⸱balance whether it's discouraged or not.
       ⸱⸱·6·⸱Q·⸱⸱Are there balances in policy?
    4·⸱⸱·7·⸱⸱⸱⸱⸱⸱⸱MR. GARFIELD:· Object to the form.
       ⸱⸱·8·⸱⸱⸱⸱⸱⸱THE WITNESS:· I don't know if I could say
    5·⸱⸱·9·⸱⸱⸱⸱that.
       ⸱⸱10·⸱BY MR. JENKINS:
    6·⸱⸱11·⸱Q·⸱⸱What would you call them?
       ⸱⸱12·⸱⸱⸱⸱⸱⸱⸱MR. GARFIELD:· Same objection.
    7·⸱⸱13·⸱⸱⸱⸱⸱⸱⸱THE WITNESS:· Officer discretion.
       ⸱⸱14·⸱BY MR. JENKINS:
    8·⸱⸱15·⸱Q·⸱⸱What do you mean by officer discretion?
       ⸱⸱16·⸱A·⸱⸱Not putting the general public at risk.
    9·⸱⸱17·⸱Q·⸱⸱Read the next slide.
       ⸱⸱18·⸱A·⸱⸱This slide states, the decision to initiate a
   10·⸱⸱19·⸱⸱⸱⸱⸱pursuit must be based on the pursuing officer's
       ⸱⸱20·⸱⸱⸱⸱⸱conclusion that the immediate danger to the
   11·⸱⸱21·⸱⸱⸱⸱⸱officer and the public created by the pursuit is
       ⸱⸱22·⸱⸱⸱⸱⸱less than the immediate or potential danger to the
```

## Pg 39 Ln 2 - 12

```
39: 2·⸱⸱·3·⸱⸱⸱⸱⸱involving Mr. Pringle?
       ⸱⸱·4·⸱A·⸱⸱I was not the initiating, no.
    3·⸱⸱·5·⸱Q·⸱⸱Will you read Subparagraph A?
       ⸱⸱·6·⸱A·⸱⸱Subparagraph A says, think about what you're doing
    4·⸱⸱·7·⸱⸱⸱⸱⸱at all times.· You're operating the most lethal
       ⸱⸱·8·⸱⸱⸱⸱⸱weapon.· That weapon is your patrol cruiser.
    5·⸱⸱·9·⸱⸱⸱⸱⸱Academic EMG around.
       ⸱⸱10·⸱Q·⸱⸱Do you agree with this statement that your patrol
    6·⸱⸱11·⸱⸱⸱⸱⸱cruiser is the most lethal weapon in the police
       ⸱⸱12·⸱⸱⸱⸱⸱arsenal?
    7·⸱⸱13·⸱⸱⸱⸱⸱⸱⸱MR. GARFIELD:· Object to the form.
       ⸱⸱14·⸱⸱⸱⸱⸱⸱THE WITNESS:· No.
    8·⸱⸱15·⸱BY MR. JENKINS:
       ⸱⸱16·⸱Q·⸱⸱You disagree with the instruction you were
    9·⸱⸱17·⸱⸱⸱⸱⸱provided?
       ⸱⸱18·⸱A·⸱⸱This is stating it weighs more.· Just because it
```

# TextMap Search Report

**Transcript:** · [9/19/2025] HODGE_BRYAN_09-19-2025_Full(63096111.1)
**Search:** · object*

## Pg 39 Ln 2 - 12 continued...

```
39:10  19· · · · could kill people doesn't mean that it makes it
       20· · · · more lethal than anything else we use.
       11  21· ·Q· Look at 115.· Read the paragraph starting with
       22· · · · many police departments.
       12    23· ·A· · Many police departments have established policies
```

## Pg 40 Ln 13 - Pg 42 Ln 6

```
40:13  25· · · · suspected violation, is committing a crime.
41: 1  ·1· · · · People who are fleeing from police act in
       ·2· · · · unpredictable and unsafe ways.· Officers should
       2  ·3· · · · not attempt to duplicate the violator's behavior.
       ·4· · · · A fleeing violator often has no concern for
       3  ·5· · · · his/her safety or the safety of others.· In some
       ·6· · · · situations, a violator will perform dangerous
       4  ·7· · · · maneuvers if he/she thinks the maneuvers will
       ·8· · · · enhance his/her chance of escape.
       5  ·9· ·Q· What does that mean to you?
       10· · · · · ·MR. GARFIELD:· Object to the form.
       6  11· · · · · ·THE WITNESS:· It means that a violator might
       12· · · · · do something that's dangerous.· It doesn't mean
       7  13· · · · that you should do it.
       14· ·BY MR. JENKINS:
       8  15· ·Q· Why should you not do something that the violator
       16· · · · does that's dangerous?
       9  17· · · · · ·MR. GARFIELD:· Object to the form.
       18· · · · · ·THE WITNESS:· If he drives off a bridge, I'm
       10  19· · · · not going to drive off a bridge.
       20· ·BY MR. JENKINS:
       11  21· ·Q· Do you think heavy traffic increases the chance of
       22· · · · a mishap?
       12    23· ·A· · I think it's a factor.
       24· ·Q· Do you think it increases the chance of a mishap,
       13  25· · · · especially at high speeds?
42: 1  ·1· · · · · ·MR. GARFIELD:· Same objection.
       ·2· · · · · · ·THE WITNESS:· I think it could.
       2  ·3· ·BY MR. JENKINS:
       ·4· ·Q· Baker 117, under risk assessment.· Under that,
       3  ·5· · · · will you read the second sentence of the second
       ·6· · · · paragraph?
       4  ·7· ·A· · The primary concern of the police in an emergency
       ·8· · · · situation should be the protection of the lives
       5  ·9· · · · and safety of all citizens and officers.
       10· ·Q· Was the vehicle pursuit an emergency situation?
       6  11· ·A· · Yes.
```

# TextMap Search Report

**Transcript:** [9/19/2025] HODGE_BRYAN_09-19-2025_Full(63096111.1)
**Search:** object*

## Pg 42 Ln 6 - Pg 43 Ln 10

```
42:   12· ·Q·· Was your primary concern the protection of all
   7  13· ··· citizens?
      14· ·A·· Of all citizens.
   8  15· ·Q·· Look at paragraph 5, Subparagraph C at the bottom.
      16· ··· Do you see that?
   9  17· ·A·· Yes.
      18· ·Q·· Do you agree with the statement, there is seldom a
  10  19· ··· need for more than two officers in a pursuit?
      20· ·A·· I do not agree with that.
  11  21· ·Q·· Tell me why, please.
      22· ····· ·MR. GARFIELD:· Object to the form.
  12   23· ····· ·THE WITNESS:· Seldom, doesn't mean there
      24· ··· needs to be more or less.· Everybody's got a role
  13  25· ··· in that pursuit, whether it's the vehicles they're
43: 1 ·1· ··· pursuing, they're part of the pursuit, even if
      ·2· ··· they're paralleling.· Depends on the
   2  ·3· ··· circumstances.
      ·4· ·BY MR. JENKINS:
   3  ·5· ·Q·· What do you mean by paralleling?
      ·6· ·A·· Driving next to the pursuit, maybe a few blocks to
   4  ·7· ··· the left or to the right, whatever it may be.
      ·8· ·Q·· Do you agree with this definition of tunnel
   5  ·9· ··· vision?
      10· ····· ·MR. GARFIELD:· Object to the form.
   6  11· ····· ·THE WITNESS:· Yes.
      12· ·BY MR. JENKINS:
   7  13· ·Q·· Go all the way to 300.· In this paragraph, it
      14· ··· discusses a pursuit review report.· Tell me what a
   8  15· ··· pursuit review report is.
      16· ·A·· You would have to ask internal affairs.· I don't
   9  17· ··· do that.· That's not my job.
      18· ·Q·· You said you've had more than ten to 15 pursuits.
  10  19· ··· After the pursuit ends, did someone in internal
      20· ··· affairs come to speak with you regarding the
```

## Pg 44 Ln 2 - Pg 45 Ln 5

```
44:    ·4· ·Q·· Go to 308.· Can you read the third bullet point on
   3   ·5· ··· the second slide?
       ·6· ·A·· 308.· At its worst, it can be a menace to the
   4   ·7· ··· people on the highway, and this must be avoided at
       ·8· ··· all times.
   5   ·9· ·Q·· Based on what context?
       10· ·A·· I couldn't tell you what they're referring to.
   6   11· ·Q·· Based on the hazards involving pursuit driving, do
       12· ··· you believe the third bullet point is discussing
   7   13· ··· pursuit driving?
       14· ····· ·MR. GARFIELD:· Object to the form.
   8   15· ····· ·THE WITNESS:· Without reading everything, I
       16· ··· wouldn't know if it's pursuit driving or what it
```

## TextMap Search Report

**Transcript:** [9/19/2025] HODGE_BRYAN_09-19-2025_Full(63096111.1)
**Search:** object*

## Pg 44 Ln 2 - Pg 45 Ln 5 continued...

```
44: 9  17· · · ·is.· I'd have to read the whole thing.
       18· ·BY MR. JENKINS:
   10  19· ·Q· · At worst, it could be a menace.· What does that
       20· · · ·statement mean to you?
   11  21· ·A· · That specific statement, it could be a menace --
       22· · · ·I'm not sure what the actual definition menace
   12     23· · · ·really.
       24· ·Q· · What do you think it means?
   13  25· · · · · · ·MR. GARFIELD:· Object to the form.
45: 1  ·1· · · · · · ·THE WITNESS:· A nuisance.
       ·2· ·BY MR. JENKINS:
    2  ·3· ·Q· · Should you have avoided the pursuit in
       ·4· · · ·December of 2023?
    3  ·5· ·A· · No.
       ·6· ·Q· · What was the moving force behind your decision to
    4  ·7· · · ·continue the pursuit?
       ·8· ·A· · The moving force, the hazards if he got away, was
    5  ·9· · · ·one of the big ones.· The way he was driving.· He
       10· · · ·was under the influence of narcotics.
```

## Pg 49 Ln 1 - 11

```
49:    ·2· · · ·it at that time.
    2  ·3· ·Q· · Okay.· We'll take a jump and go to 142.· Under
       ·4· · · ·Policy 500.3, code of ethics, will you read
    3  ·5· · · ·Subparagraph B, starting with integrity?
       ·6· ·A· · Integrity.· All officers of the department will
    4  ·7· · · ·display a high degree of integrity required by the
       ·8· · · ·Law Enforcement Code of Ethics.· For purpose of
    5  ·9· · · ·these guidelines, the Law Enforcement Code of
       10· · · ·Ethics which follows is adopted as a rule.
    6  11· ·Q· · What does the word integrity mean to you?
       12· · · · · · ·MR. GARFIELD:· Object to the form.
    7  13· · · · · · ·THE WITNESS:· Integrity is doing the right
       14· · · ·thing all the time.
    8  15· ·BY MR. JENKINS:
       16· ·Q· · Okay.· And, so, you've seen this policy before?
    9  17· ·A· · Yes.
       18· ·Q· · Did you see the policy before the
   10  19· · · ·December 29, 2023, chase?
       20· ·A· · Yes.
   11  21· ·Q· · Okay.· Were you trained on this policy?
       22· ·A· · Yes.
```

## Pg 51 Ln 8 - Pg 52 Ln 6

```
51:    16· ·Q· · Okay.· Does safe manner have anything to do with
    9  17· · · ·the environment around where you are driving?
       18· ·A· · Yes.
```

## TextMap Search Report

**Transcript:** [9/19/2025] HODGE_BRYAN_09-19-2025_Full(63096111.1)
**Search:** object*

## Pg 51 Ln 8 - Pg 52 Ln 6 continued...

```
51:10  19· ·Q· · Okay.· Have you ever violated this policy?
       20· ·A· · Not that know of.
    11 21· ·Q· · Do you think you drove your vehicle in a safe
       22· · · · manner in the pursuit of Mr. Pringle on
    12   23· · · · December 29, 2023?
       24· ·A· · Yes, I do.
    13 25· ·Q· · Backwards up the interstate is a safe manner?
52: 1  ·1· · · · · ·MR. GARFIELD:· Object to the form.
       ·2· · · · · ·THE WITNESS:· The way I did it, yes.
     2 ·3· ·BY MR. JENKINS:
       ·4· ·Q· · Okay.· Does speed affect whether your vehicle is
     3 ·5· · · · being driven in a safe manner?
       ·6· ·A· · Speed, road conditions, lighting.· All of that
     4 ·7· · · · does.
       ·8· ·Q· · Okay.· Does a construction zone affect -- does the
     5 ·9· · · · existence of driving in a construction zone affect
       10· · · · whether the vehicle is being driven in a safe
     6 11· · · · manner?
```

## Pg 65 Ln 4 - Pg 66 Ln 1

```
65: 4  ·7· · · · of the interstate, correct?
       ·8· ·A· · It could be a way to get off the interstate.
     5 ·9· ·Q· · What is -- can you define an exit ramp for me?
       10· ·A· · Well, an exit ramp, when used the right direction,
     6 11· · · · is an exit to get off the interstate.
       12· ·Q· · Okay.
     7 13· ·A· · But there were no exit ramps on the direction that
       14· · · · we were going.
     8 15· ·Q· · Okay.· If someone drives the wrong way on an exit
       16· · · · ramp, can they still exit the interstate?
     9 17· · · · · ·MR. GARFIELD:· Object to the form.
       18· · · · · ·THE WITNESS:· State that again.
    10 19· ·BY MR. JENKINS:
       20· ·Q· · All right.· So if someone leaves the interstate
    11 21· · · · via a ramp, commonly referred to as an exit ramp,
       22· · · · even if they're going the wrong direction, they
    12   23· · · · still exit the interstate, correct?
       24· ·A· · If they are exiting the interstate, yes.
    13 25· ·Q· · Okay.· Existence of vehicular and pedestrian
66: 1  ·1· · · · traffic, Subparagraph E.· Why does the existence
       ·2· · · · of vehicular traffic make it more dangerous?
```

## Pg 67 Ln 8 - Pg 68 Ln 6

```
67:  16· · · · · · ·In your words, why is that an important
     9 17· · · · factor in determining whether to continue or
       18· · · · initiate a pursuit?
    10 19· ·A· · It all comes into, is this person going to be
```

## TextMap Search Report

**Transcript:** [9/19/2025] HODGE_BRYAN_09-19-2025_Full(63096111.1)
**Search:** object*

### Pg 67 Ln 8 - Pg 68 Ln 6 continued...

```
67:  20· · · · somebody that is going to be a risk to the general
  11 21· · · · public more so than his charges.
     22· ·Q· · Okay.· Do you think driving 80 miles an hour
  12   23· · · backwards up the interstate weaving in and out of
     24· · · · traffic is something that would be a risk to the
  13 25· · · · general public?
68: 1 ·1· · · · · · · ·MR. GARFIELD:· Object to the form.
     ·2· · · · · · · ·You can answer.
   2 ·3· · · · · · · ·THE WITNESS:· I would say, yes, and, no.
     ·4· ·BY MR. JENKINS:
   3 ·5· ·Q· · Please tell me how you would say, no.
     ·6· ·A· · You could spin around accidentally and then drive
   4 ·7· · · · the wrong way.· There's no traffic.· And then you
     ·8· · · · stop and you fix that issue.· So, yes, and, no.
   5 ·9· · · · It could be.· It could be a risk, it could not be.
     10· ·Q· · Can you explain that scenario that you just said
   6 11· · · · again?
```

### Pg 72 Ln 11 - Pg 73 Ln 8

```
72:11 21· ·Q· · Let's say -- have you ever transported a non-sworn
     22· · · · employee in your patrol vehicle?
  12   23· ·A· · Yes.
     24· ·Q· · Okay.· Can you -- are you authorized to engage in
  13 25· · · · a pursuit with a non-sworn individual?· Strike
73: 1 ·1· · · · that.· That was a bad question.
     ·2· · · · · · · ·Are you authorized to engage in a high-speed
   2 ·3· · · · vehicular pursuit with a non-sworn Richland County
     ·4· · · · Sheriff's Department employee in your patrol
   3 ·5· · · · vehicle?
     ·6· · · · · · · ·MR. GARFIELD:· Object to the form.
   4 ·7· · · · · · · ·THE WITNESS:· Non-Richland County, yes, we
     ·8· · · · are.
   5 ·9· ·BY MR. JENKINS:
     10· ·Q· · Say that again.
   6 11· ·A· · We're allowed to on a high-speed pursuit with
     12· · · · non-Richland County employees, yes.
   7 13· ·Q· · What employees would you be able to --
     14· ·A· · I have state constables ride with me quite often.
   8 15· · · · I have other law enforcement people that ride with
     16· · · · us.
```

### Pg 82 Ln 10 - Pg 83 Ln 7

```
82:10 19· · · · that runs down the middle of 26?
     20· ·A· · You could if you had two people that have done it
  11 21· · · · before and they know what they're doing, yes.
     22· ·Q· · Okay.
  12   23· ·A· · But it takes -- like I said, it takes time.
```

# TextMap Search Report

**Transcript:** [9/19/2025] HODGE_BRYAN_09-19-2025_Full(63096111.1)
**Search:** object*

---

## Pg 82 Ln 10 - Pg 83 Ln 7 continued...

```
82:  24· ·Q·  · Okay.· And do you believe that would have been
    13 25· ·  · · more dangerous than performing a pit maneuver on
83: 1 ·1·  · · · him while he was doing 70 miles an hour going
       ·2·  · · · backwards up the interstate?
    2  ·3· ·A·  · I don't think it would have been possible.
       ·4·  · · · MR. GARFIELD:· Objection.
    3  ·5· ·BY MR. JENKINS:
       ·6· ·Q·  · What would?· Say that again.
    4  ·7· ·A·  · A box-in would not be possible --
       ·8· ·Q·  · Okay.
    5  ·9· ·A·  · -- during that situation.
      10· ·Q·  · So this policy, starting on 335, 802.10, pursuit
    6 11·  · · · intervention.· Were you trained on this before
      12·  · · · December 29, 2023?
    7 13· ·A·  · Yes.
      14· ·Q·  · But you weren't trained on the use of a pit
```

## Pg 86 Ln 5 - Pg 87 Ln 9

```
86: 5 ·9·  · · · very dangerous, very potent drug.· And there has
      10·  · · · been quite -- quite a bit of deaths from that,
    6 11·  · · · because people don't understand it.· That in
      12·  · · · itself makes him a danger to society if he
    7 13·  · · · continues.· Who knows how many people he could
      14·  · · · kill.
    8 15· ·Q·  · So you believe Mr. Pringle should have been in
      16·  · · · jail.
    9 17· ·A·  · Do I believe he should have been in jail?
      18· ·Q·  · Yes, sir.
   10 19·  · · · · ·MR. GARFIELD:· Object to the form.
      20·  · · · · ·THE WITNESS:· Yes.· If he's a felon, yes.
   11 21· ·BY MR. JENKINS:
      22· ·Q·  · Okay.· Can you read -- go to 336, under
   12 23·  · · · Subparagraph B, intervention standards, and read
      24·  · · · the second sentence starting with, certain
   13 25·  · · · applications.
87: 1 ·1· ·A·  · Certain applications of intervention tactics may
      ·2·  · · · be construed to be a use force, including deadly
    2 ·3·  · · · force, are subject to policies guiding such use,
      ·4·  · · · and the deputy's individual actions must be
    3 ·5·  · · · objectively reasonable.
      ·6· ·Q·  · What does objectively reasonable mean to you?
    4 ·7·  · · · · ·MR. GARFIELD:· Object to the form.
      ·8·  · · · · ·THE WITNESS:· I'm trying to figure out how to
    5 ·9·  · · · state this.
      10· ·BY MR. JENKINS:
    6 11· ·Q·  · Take your time.
      12· ·A·  · Something, I would say, other deputies were using.
    7 13· ·Q·  · Okay.· Were you ever trained on this policy?
      14· ·A·  · Yes.
```

## TextMap Search Report

**Transcript:** [9/19/2025] HODGE_BRYAN_09-19-2025_Full(63096111.1)
**Search:** object*

## Pg 86 Ln 5 - Pg 87 Ln 9 continued...

87: 8 15· ·Q· · Were you trained on it?
· · · · 16· ·A· · Yes.
· · · 9 17· ·Q· · Have you ever violated it?

## Pg 88 Ln 3 - Pg 90 Ln 1

88:· · ·6· · · · immediate apprehension with the danger created by
· · · 4 ·7· · · · the pursuit.· When the need for apprehension does
· · · · ·8· · · · not outweigh the danger created by the pursuit,
· · · 5 ·9· · · · then the pursuit shall be terminated.
· · · · 10· ·Q· · Do you believe you should have terminated the
· · · 6 11· · · · pursuit on December 29, 2023?
· · · · 12· ·A· · No, I do not.
· · · 7 13· ·Q· · Do you believe that the need for apprehension of
· · · · 14· · · · Mr. Pringle did not outweigh the danger he created
· · · 8 15· · · · in the pursuit?
· · · · 16· · · · · · MR. GARFIELD:· Object to the form.
· · · 9 17· · · · · · THE WITNESS:· I think that we made the right
· · · · 18· · · · decision in pursuing him.· The cost of
· · 10 19· · · · apprehending him outweighed the danger of the
· · · · 20· · · · pursuit.· Yes.
· · 11 21· ·BY MR. JENKINS:
· · · · 22· ·Q· · Okay.· The pursuit that was for his failure to
· · 12 · 23· · · · appear in Lexington County.
· · · · 24· · · · · · MR. GARFIELD:· Object to the form.
· · 13 25· · · · · · THE WITNESS:· I'm not sure -- that's not what
89: 1 ·1· · · · the pursuit was for.· The pursuit was for -- we
· · · · ·2· · · · didn't pursue him because he didn't appear.· We
· · · 2 ·3· · · · pursued him because after a traffic stop, he
· · · · ·4· · · · decided to run.· And our knowledge was that he had
· · · 3 ·5· · · · fentanyl warrants and that he's a fentanyl dealer
· · · · ·6· · · · and he had just left a buy.
· · · 4 ·7· ·BY MR. JENKINS:
· · · · ·8· ·Q· · Okay.· How do you know he had just left a buy?
· · · 5 ·9· ·A· · There was DEA task force who was following him.
· · · · 10· ·Q· · Okay.· He was just at a buy.· Why didn't you
· · · 6 11· · · · arrest him while he was at the buy?
· · · · 12· ·A· · Because at the time it would have been more
· · · 7 13· · · · dangerous.
· · · · 14· ·Q· · Please explain to me how that would have been more
· · · 8 15· · · · dangerous than pursuing him backwards up I26 at
· · · · 16· · · · 70 miles an hour.
· · · 9 17· · · · · · MR. GARFIELD:· Object to the form.
· · · · 18· · · · · · THE WITNESS:· Sure.· Let's say you're a drug
· · 10 19· · · · dealer, and he is the person buying the drugs.
· · · · 20· · · · Typically, drug dealers and people buying drugs
· · 11 21· · · · carry guns.· There's no point in getting in a
· · · · 22· · · · shoot out where you can't control where the
· · 12 · 23· · · · bullets are going, and they could go wherever,
· · · · 24· · · · versus apprehending somebody during a vehicle

## TextMap Search Report

**Transcript:** [9/19/2025] HODGE_BRYAN_09-19-2025_Full(63096111.1)
**Search:** object*

## Pg 88 Ln 3 - Pg 90 Ln 1 continued...

```
89:13  25· · · · pursuit where, for the most part, you can control
90: 1  ·1· · · · where they go.
       ·2· BY MR. JENKINS:
```

## Pg 92 Ln 9 - Pg 93 Ln 10

```
92:    18· ·Q· · Sorry.· Go ahead.
   10  19· ·A· · Suspects, just because you stop chasing them, they
       20· · · · don't slow down in speed.· They don't -- they
   11  21· · · · continue driving the same erratic behavior and as
       22· · · · fast as they typically can.
   12    23· ·Q· · Do you think that -- well, what do you base that
       24· · · · on?
   13  25· ·A· · Training and experience.
93: 1  ·1· ·Q· · Okay.· If there's a report that disagrees with
       ·2· · · · you, would you disagree with that?
    2  ·3· · · · · ·MR. GARFIELD:· Object to the form.
       ·4· · · · ·THE WITNESS:· I mean, just because somebody
    3  ·5· · · · writes it doesn't mean it's real.
       ·6· BY MR. JENKINS:
    4  ·7· ·Q· · So you couldn't have terminated it because there
       ·8· · · · was no way for him to get off the interstate, is
    5  ·9· · · · what you're saying.
       10· · · · · ·MR. GARFIELD:· Object to the form.· Misstates
    6  11· · · · his testimony.
       12· · · · · ·Go ahead.· You can answer.
    7  13· · · · ·THE WITNESS:· All right.· So -- what was the
       14· · · · question?· Could you repeat that question?
    8  15· BY MR. JENKINS:
       16· ·Q· · You said you could not have terminated the pursuit
    9  17· · · · on December 29, 2023, correct?
       18· ·A· · Correct.
   10  19· ·Q· · Why not?
       20· ·A· · Because him putting himself on the wrong way of
```

## Pg 94 Ln 1 - 11

```
94: 1  ·1· · · · collide with somebody else or multiple people.
       ·2· ·Q· · Okay.· In your previous answer, you mentioned
    2  ·3· · · · something about a way off the interstate, correct?
       ·4· ·A· · There is a way off the interstate typically if you
    3  ·5· · · · are driving the right way on the interstate, yes.
       ·6· ·Q· · That's not what I'm asking.· You stated previously
    4  ·7· · · · that you could not have terminated the pursuit
       ·8· · · · once he started going backwards, because there was
    5  ·9· · · · not a way for him to get off the interstate.
       10· · · · Correct?
    6  11· · · · · ·MR. GARFIELD:· Object to the form.
       12· · · · · ·THE WITNESS:· There is not a way for him
```

## TextMap Search Report

**Transcript:** [9/19/2025] HODGE_BRYAN_09-19-2025_Full(63096111.1)
**Search:** object*

## Pg 94 Ln 1 - 11 continued...

```
94: 7   13· · · · legally to get off the interstate.· Legally.
        14· ·BY MR. JENKINS:
     8  15· ·Q· · Okay.· Is there a way for him to illegally get off
        16· · · · the interstate?
     9  17· ·A· · If he goes the wrong way off the exit ramp with
        18· · · · people coming down it, it still poses the fact
    10  19· · · · that he's going the wrong way, whether it's on the
        20· · · · exit ramp or on the interstate.
    11  21· ·Q· · But he would have been off the interstate at that
```

## Pg 102 Ln 7 - Pg 103 Ln 5

```
102:    14· ·Q· · Okay.· That's fine.· Why do you not follow it very
     8  15· · · · closely?
        16· ·A· · Well, some of the stuff that they talk about is
     9  17· · · · like ridiculous to me.· An example is like
        18· · · · region 8 asks for four Raptors, because they want
    10  19· · · · better cars.· Like -- stuff like that, that
        20· · · · doesn't pertain to me that's unrealistic.
    11  21· ·Q· · So what is a Raptor?
        22· ·A· · It's a -- it's a very fast truck.
    12    23· ·Q· · Why do they want that?
        24· · · · · · ·MR. GARFIELD:· Object to the form.
    13  25· · · · · · ·THE WITNESS:· I don't know why they want
103: 1  ·1· · · · that.
        ·2· · · · · · ·MR. JENKINS:· Okay.· Let's take a quick
     2  ·3· · · · break.
        ·4· · · · · · · · (A short break transpired.)
     3  ·5· ·BY MR. JENKINS:
        ·6· ·Q· · So do you remember -- so in December -- actually,
     4  ·7· · · · let me back up.· Back in 2023, were you on the
        ·8· · · · schedule you're currently on with 28 days of
     5  ·9· · · · dayshift, 28 days of night shift?
```

## Pg 112 Ln 4 - Pg 113 Ln 5

```
112: 4  ·7· · · · it's a domestic violence case, I'm not going to --
        ·8· · · · I'm not going to release him so he can go back and
     5  ·9· · · · get into an argument with his wife or his daughter
        10· · · · or whatever.· Those are all things that you have
     6  11· · · · to take into account.
        12· ·Q· · What about a fentanyl dealer?
     7  13· ·A· · Would I do that, me personally, no.
        14· ·Q· · Okay.· Why?
     8  15· ·A· · That's just my thought process on it.
        16· ·Q· · Okay.· But like why is that your thought process?
     9  17· · · · · · ·MR. GARFIELD:· Object to the form.
        18· · · · · · ·THE WITNESS:· I think that fentanyl dealers,
    10  19· · · · they're a huge risk because of the fact that
```

# TextMap Search Report

**Transcript:** [9/19/2025] HODGE_BRYAN_09-19-2025_Full(63096111.1)
**Search:** object*

## Pg 112 Ln 4 - Pg 113 Ln 5 continued...

```
112:   20· · · ·they're dealing fentanyl, and it kills people.
   11  21· ·BY MR. JENKINS:
       22· ·Q· ·Okay.· Do you think Mr. Pringle should have been
   12    23· · · ·released from the hospital to go home on
       24· · · ·December 20, 2023?
   13  25· · · · · · ·MR. GARFIELD:· Object to the form.
113: 1 ·1· · · · · · ·THE WITNESS:· I don't know that he was.
       ·2· ·BY MR. JENKINS:
    2  ·3· ·Q· ·If you will, go to Exhibit 50.
       ·4· ·A· ·Of the same binder?
    3  ·5· ·Q· ·No, sir.· I don't think so.· I think it's in -- I
       ·6· · · ·think he's got it down there.· If you will, go to
    4  ·7· · · ·the seventh page.· This, I'll represent to you,
       ·8· · · ·are records produced by Prisma Health from the
    5  ·9· · · ·Prisma Health Richland Hospital pertaining to
       10· · · ·Byron Lindell Pringle, and you see that on the top
```

## Pg 113 Ln 6 - Pg 115 Ln 8

```
113: 6  11· · · ·right.· Are you on the double-sided page?
        12· ·A· ·I'm on page 9.
     7  13· ·Q· ·It should actually say page 1 for the records.
        14· · · ·It's not from me.· Sorry.· It's 007.· Do you see
     8  15· · · ·that number at the bottom right?
        16· ·A· ·Oh, okay.
     9  17· ·Q· ·If you'll take a look at that for me.· Do those
        18· · · ·appear to be medical records for
    10  19· · · ·Byron Lindell Pringle for an admission of
        20· · · ·December 20, 2023?
    11  21· · · · · · ·MR. GARFIELD:· Objection.
        22· · · · · · ·THE WITNESS:· I see the date here.· Yes,
    12    23· · · ·2023.
        24· ·BY MR. JENKINS:
    13  25· ·Q· ·And if you go to the bottom of the page under
114: 1 ·1· · · ·discharge information, about three -- three
       ·2· · · ·quarters of the way down, the discharge
    2  ·3· · · ·information is on that left side.
       ·4· ·A· ·I see that.
    3  ·5· ·Q· ·Yeah.· It says, destination home.· On the right
       ·6· · · ·side of the page.
    4  ·7· ·A· ·Okay.
       ·8· ·Q· ·Do you have any reason to contest that these
    5  ·9· · · ·records aren't accurate?
       10· · · · · · ·MR. GARFIELD:· Objection.
    6  11· · · · · · ·THE WITNESS:· I mean, I don't know.· I don't
       12· · · ·know if that's an auto-fillable thing or not.  I
    7  13· · · ·don't know if they put that every time somebody
       14· · · ·goes to jail or not.· I've honestly never seen the
    8  15· · · ·records.· I don't really look at their -- their
       16· · · ·personal medical records.
```

# TextMap Search Report

**Transcript:** [9/19/2025] HODGE_BRYAN_09-19-2025_Full(63096111.1)
**Search:** object*

## Pg 113 Ln 6 - Pg 115 Ln 8 continued...

```
114: 9   17· ·BY MR. JENKINS:
         18· ·Q· · Okay.
     10  19· ·A· · So that could say home every time, and I wouldn't
         20· · · · know the difference.
     11  21· ·Q· · Okay.· Do you think the Richland County Sheriff's
         22· · · · Department should have taken him to Alvin S. Glenn
     12     23· · · · Detention Center on December 20, 2023?
         24· · · · · ·MR. GARFIELD:· Objection.
     13  25· · · · · ·THE WITNESS:· That would be a decision I
115: 1   ·1· · · · would only be able to make if I was in that
         ·2· · · · situation.· I would have to evaluate all the
      2  ·3· · · · different things.
         ·4· ·BY MR. JENKINS:
      3  ·5· ·Q· · If you were, what do you think?
         ·6· · · · · ·MR. GARFIELD:· Same objection.
      4  ·7· · · · · ·THE WITNESS:· I don't know all the -- the
         ·8· · · · formalities of what happened with that charge.
      5  ·9· ·BY MR. JENKINS:
         10· ·Q· · Okay.· Do you know an Officer Maro?
      6  11· ·A· · We have a few Officer Maros.
         12· ·Q· · That's fair.· How many sworn deputies are there
      7  13· · · · again?
         14· ·A· · I think in the 800s.· Quite a bit.
      8  15· ·Q· · Understood.· On December 29, 2023, I believe we've
         16· · · · established that you were working the dayshift,
```

## Pg 119 Ln 9 - Pg 120 Ln 7

```
119:     18· ·Q· · Is an operator somebody that's working dispatch
     10  19· · · · usually?
         20· ·A· · I think so, but I'm not 100 percent certain on how
     11  21· · · · that part reads out.
         22· ·Q· · Okay.· Going to Baker A-015.· This phrase here, E6
     12     23· · · · ADV EMS will have to come suicide.· (Shared.)
         24· · · · What does suicide mean in this instance?
     13  25· ·A· · We call it suicide -- so going to opposite way on
120: 1   ·1· · · · the highway.
         ·2· ·Q· · Why do you call that suicide?
      2  ·3· · · · · ·MR. GARFIELD:· Object to form.
         ·4· · · · · ·THE WITNESS:· Well, we call it that because a
      3  ·5· · · · while back, back in the day, people use to do that
         ·6· · · · to commit suicide.· So it's just a phrase.· That
      4  ·7· · · · way we understand which way it is.
         ·8· ·BY MR. JENKINS:
      5  ·9· ·Q· · Okay.· Go to 020.· Is this CAD information as
         10· · · · well?
      6  11· ·A· · So the CAD information is different.· So CAD
         12· · · · information gets put into the CAD.· This is what
      7  13· · · · looks like NCIC information.
```

# TextMap Search Report

**Transcript:** [9/19/2025] HODGE_BRYAN_09-19-2025_Full(63096111.1)
**Search:** object*

## Pg 129 Ln 12 - Pg 130 Ln 10

```
129:    24· · · · head.
    13  25· ·Q· · But does that say I26?
130: 1  ·1· ·A· · That says 126.
        ·2· · · · · · · · · (Audio playing.)
     2  ·3· ·Q· · Is Mike Kilo Delta 362 the license plate number?
        ·4· ·A· · I don't remember.
     3  ·5· ·Q· · How do you read a license plate number over the
        ·6· · · · radio?
     4  ·7· ·A· · That's how I would read it.
        ·8· ·Q· · Do you believe that is the license plate number?
     5  ·9· · · · · · ·MR. GARFIELD:· Object to the form.
        10· · · · · · ·THE WITNESS:· My assumption is, yes, that
     6  11· · · · would be it.
        12· BY MR. JENKINS:
     7  13· ·Q· · So this radio feed, dispatch, can they hear all of
        14· · · · this ongoing?
     8  15· ·A· · Yes.
        16· ·Q· · Okay.· And as -- if someone were to call dispatch
     9  17· · · · on their radio, that would be all on the same
        18· · · · radio channel, correct?
    10  19· ·A· · Yes.
```

## Pg 134 Ln 10 - Pg 135 Ln 8

```
134:    20· ·A· · No.
    11  21· · · · · · · · · (Audio playing.)
        22· ·Q· · So Deputy Smith says he's driving real reckless.
    12    23· · · · Would you agree that he was driving real
        24· · · · reckless -- Mr. Pringle was driving real reckless.
    13  25· ·A· · Mr. Pringle was driving real reckless, yes.
135: 1  ·1· ·Q· · And as we looked at earlier in some of the
        ·2· · · · training materials, did it say that you should not
     2  ·3· · · · attempt to mirror the fleeing suspect's evasive
        ·4· · · · tactics?
     3  ·5· · · · · · · ·MR. GARFIELD:· Object to the form.
        ·6· · · · · · · ·THE WITNESS:· If that's what the policy says.
     4  ·7· BY MR. JENKINS:
        ·8· ·Q· · Okay.
     5  ·9· ·A· · I have to reread it again.
        10· ·Q· · Okay.
     6  11· ·A· · I don't know verbatim, but...
        12· ·Q· · But are you supposed to follow them?
     7  13· ·A· · To mirror exactly, no.
        14· ·Q· · Okay.· Why not?
     8  15· ·A· · Well, I'm going to drive how I want to drive.· I'm
```

# TextMap Search Report

**Transcript:** [9/19/2025] HODGE_BRYAN_09-19-2025_Full(63096111.1)
**Search:** object*

## Pg 138 Ln 5 - Pg 139 Ln 2

```
138: 5  ·9· ·A· · I'm testifying about what it looks like.
        10· · · · · · · · (Video playing.)
     6  11· ·Q· · Is that you speaking again?
        12· ·A· · I believe so.
     7  13· · · · · · · · (Video playing.)
        14· ·Q· · And for time's sake, I can speed this up, but if
     8  15· · · · you want to watch the -- to my next spot, if you
        16· · · · prefer to watch it to authenticate it, I can do
     9  17· · · · that as well.
        18· ·A· · You're running the show.
    10  19· · · · · · ·MR. JENKINS:· Robbie, any objection?
        20· · · · · · ·MR. GARFIELD:· No.· That's fine.
    11  21· · · · · · ·MR. JENKINS:· I'm fast forwarding to 2:50 in
        22· · · · the video.
    12    23· · · · · · · · (Video playing.)
        24· ·BY MR. JENKINS:
    13  25· ·Q· · Is that your vehicle?
139: 1  ·1· ·A· · Yes.
        ·2· ·Q· · Okay.· Did Deputy Smith at any time ask you to
     2  ·3· · · · pass him?
        ·4· ·A· · No.· He did not need to.
```

## Pg 139 Ln 9 - Pg 140 Ln 12

```
139: 9  17· · · · he's never been trained to forcibly move a vehicle
        18· · · · off the roadway.· So, technically, no.
    10  19· ·Q· · Okay.· Does it contradict your training?
        20· ·A· · It doesn't contradict my training, no.
    11  21· ·Q· · Did anyone from the department ever reprimand you
        22· · · · for passing two vehicles without being requested?
    12    23· ·A· · No, because I didn't violate policy.
        24· ·Q· · But they would have contacted you if you had
    13  25· · · · violated the policy?
140: 1  ·1· ·A· · Correct.
        ·2· · · · · · ·MR. GARFIELD:· Object to the form.
     2  ·3· ·BY MR. JENKINS:
        ·4· ·Q· · If the policies and procedures are just guidelines
     3  ·5· · · · and not rules, why would they contact you if you
        ·6· · · · violated them?
     4  ·7· · · · · · ·MR. GARFIELD:· Objection.
        ·8· · · · · · ·THE WITNESS:· Restate.
     5  ·9· ·BY MR. JENKINS:
        10· ·Q· · If the policies and procedures are not rules and
     6  11· · · · they're just guidelines, why would they contact
        12· · · · you if they violated them?
     7  13· · · · · · ·MR. GARFIELD:· Same objection.
        14· · · · · · ·THE WITNESS:· Well, if you did something
     8  15· · · · wrong, you would be contacted.
        16· ·BY MR. JENKINS:
     9  17· ·Q· · Okay.· So if you related the policies and
```

# TextMap Search Report

**Transcript:** [9/19/2025] HODGE_BRYAN_09-19-2025_Full(63096111.1)
**Search:** object*

## Pg 139 Ln 9 - Pg 140 Ln 12 continued...

```
140:    18· · · · procedures, you would be contacted?
    10  19· ·A· · If you -- the policy and procedures is a
        20· · · · guideline, right.· So it's a fluid, always
    11  21· · · · changing thing.· In this situation, it was a
        22· · · · fluid, changing thing.· The policy is not God's
    12    23· · · · word.· It is not one -- one thing that stays
```

## Pg 140 Ln 13 - Pg 141 Ln 10

```
140:13  25· · · · violate the policy.
141: 1  ·1· · · · · · · · · (Video playing.)
        ·2· ·Q· · So are you in an exit ramp right there?
    2   ·3· ·A· · No.· I'm at an entry ramp.
        ·4· ·Q· · Okay.· You're at an entry ramp.· Could you have
    3   ·5· · · · gotten off the interstate if you continued to
        ·6· · · · follow in that lane?
    4   ·7· ·A· · No.· There was a car in front of me.
        ·8· ·Q· · Okay.· You passed lots of cars in front of you.
    5   ·9· · · · Could you have gone around that car and got off?
        10· · · · · · ·MR. GARFIELD:· Object to the form.
    6   11· · · · · · ·Go ahead and answer.
        12· · · · · · ·THE WITNESS:· In a safe way I could have.
    7   13· · · · · · · · · · (Video playing.)
        14· ·Q· · I'm going to 10:3 in the video.
    8   15· · · · · · ·MR. JENKINS:· And, Robbie, if it's okay with
        16· · · · you, I will announce on the record where I'm fast
    9   17· · · · forwarding to.· I'm trying to speed up as much as
        18· · · · I can.
    10  19· · · · · · ·MR. GARFIELD:· I'd appreciate that.
        20· · · · · · ·MR. JENKINS:· Yeah.· Fast forwarding to
```

## Pg 148 Ln 2 - Pg 149 Ln 3

```
148:    ·4· · · · won't be able to turn around, and he's going into
    3   ·5· · · · oncoming traffic, which is a safety risk.
        ·6· ·Q· · Okay.· How many lanes are in that part of the
    4   ·7· · · · interstate?
        ·8· ·A· · I don't know for sure.
    5   ·9· ·Q· · Okay.· I drove it this morning.· I'll represent to
        10· · · · you that there are three main lanes, excluding
    6   11· · · · dotted exit and entry ramps.· Are you saying that
        12· · · · he couldn't have turned around in a Nissan Versa
    7   13· · · · within three lanes?
        14· · · · · · ·MR. GARFIELD:· Object to the form.
    8   15· · · · · · ·Go ahead.
        16· · · · · · ·THE WITNESS:· I don't know what he would do.
    9   17· · · · Only he can testify to that.
        18· ·BY MR. JENKINS:
    10  19· ·Q· · He can't.
```

## TextMap Search Report

**Transcript:** [9/19/2025] HODGE_BRYAN_09-19-2025_Full(63096111.1)
**Search:** object*

## Pg 148 Ln 2 - Pg 149 Ln 3 continued...

```
148:  20· · · · · · ·MR. GARFIELD:· Objection.· Argumentative.
   11 21· · · · · · · · (Video playing.)
      22· ·Q· · At this point, do you think tunnel vision is
   12    23· · · · affecting you?
      24· ·A· · No.
   13 25· ·Q· · No.· Why was it not affecting you at this point?
149: 1 ·1· ·A· · I mean, currently, I can't even see the car.· So
      ·2· · · · I'm not focusing on that car.· So it's not
    2 ·3· · · · affecting me if I'm looking everywhere else.
      ·4· ·Q· · Okay.· You can't see the car at this point?
    3 ·5· ·A· · I -- that might be the car.
```

## Pg 157 Ln 3 - 13

```
157: 3 ·5· ·A· · I don't -- I think that's an ethical thing.  I
      ·6· · · · don't think there's any policy that says you can't
    4 ·7· · · · technically.
      ·8· ·Q· · When you say ethical thing, what do you mean by
    5 ·9· · · · that?
      10· ·A· · Like why would you be covering up your body worn
    6 11· · · · camera, is my question.
      12· ·Q· · Okay.· Do you think covering up your body worn
    7 13· · · · camera would exhibit a level of a lack of
      14· · · · integrity?
    8 15· · · · · · ·MR. GARFIELD:· Objection.
      16· · · · · · ·THE WITNESS:· If you do it on purpose to hide
    9 17· · · · something, I think it would.
      18· ·BY MR. JENKINS:
   10 19· ·Q· · Okay.· I'm going to go to -- I stopped at 5:06.  I
      20· · · · think I said that.· We're going to 11:09.· 11:07.
   11 21· · · · · · · · (Video playing.)
      22· ·Q· · Stopped at 11:58.· From approximately 11:09 in
   12    23· · · · this video until 11:55, your body worn camera was
      24· · · · covered and appeared to be muted.· Why?
   13 25· ·A· · Well, one, like I said, I was resting my hand.
```

## Pg 158 Ln 11 - Pg 159 Ln 8

```
158:11 21· ·A· · Yes.
      22· · · · · · · · (Video playing.)
   12    23· ·Q· · Okay.· Stopped at 15:09.· From approximately 14:44
      24· · · · in this video to 15:08 in this video, you muted
   13 25· · · · your body worn camera footage again.· Why?
159: 1 ·1· ·A· · Same thing.· I was talking to one of my friends.
      ·2· · · · We were talking about stuff unrelated.
    2 ·3· ·Q· · Okay.· Is there -- you know, are you allowed to
      ·4· · · · mute your body worn camera whenever you feel like
    3 ·5· · · · it?
      ·6· · · · · · ·MR. GARFIELD:· Objection.
```

## TextMap Search Report

**Transcript:** [9/19/2025] HODGE_BRYAN_09-19-2025_Full(63096111.1)
**Search:** object*

### Pg 158 Ln 11 - Pg 159 Ln 8 continued...

```
159: 4  ·7· · · · · · ·THE WITNESS:· You're allowed to mute your
        ·8· · · · body worn camera, whether it's -- whatever it's
     5  ·9· · · · for.· It could be, I'm just talking about
        10· · · · something unrelated to the case, somebody is
     6  11· · · · giving with some type of personal identifying
        12· · · · information that isn't related to the case.
     7  13· ·BY MR. JENKINS:
        14· ·Q· · All right.· I'm going to 17:05.· Go to 17 flat.
     8  15· · · · · · · · · (Video playing.)
        16· ·Q· · I'm going to stop it at 17:13.· Did you just say
```

### Pg 164 Ln 9 - Pg 165 Ln 7

```
164:    18· ·Q· · Okay.· Do you believe you fell back on your
     10 19· · · · training in the pursuit on December 29, 2023?
        20· ·A· · Yes.
     11 21· ·Q· · Okay.· Do you believe you fell back on your
        22· · · · policies and procedures in the chase on
     12    23· · · · December 29, 2023?
        24· ·A· · Yes.
     13 25· ·Q· · So we talked about Mr. Pringle being a fentanyl
165: 1  ·1· · · · dealer.· Is that the main danger you believe that
        ·2· · · · he posed to the Richland County community?
     2  ·3· · · · · · · · ·MR. GARFIELD:· Object to the form.
        ·4· · · · · ·THE WITNESS:· No.
     3  ·5· ·BY MR. JENKINS:
        ·6· ·Q· · Okay.· What do you believe the main danger he
     4  ·7· · · · posed to the Richland County community was?
        ·8· ·A· · Main danger.· It's a cumulative thing.· It's not
     5  ·9· · · · just one thing.· It's every aspect.
        10· ·Q· · Okay.· Did you ever receive any disciplinary
     6  11· · · · action for your involvement in the pursuit of
        12· · · · Byron Pringle on December 29, 2023?
     7  13· ·A· · No, I did not.
```

### Pg 167 Ln 8 - Pg 168 Ln 8

```
167: 8  15· ·A· · That he needed to be stopped?
        16· ·Q· · Yes, sir.
     9  17· ·A· · Yes.
        18· ·Q· · And that if you had let him back on the street and
     10 19· · · · somebody died of a fentanyl -- or a drug overdose,
        20· · · · it would come back on y'all?
     11 21· ·A· · Yes, it would.· It we know that he's selling
        22· · · · fentanyl.
     12    23· ·Q· · Knowing that, how could you reconcile releasing
        24· · · · him from the hospital nine days before?
     13 25· · · · · · · · ·MR. GARFIELD:· Object to the form.
168: 1  ·1· · · · · · · ·THE WITNESS:· That's something you're going
```

## TextMap Search Report

**Transcript:** [9/19/2025] HODGE_BRYAN_09-19-2025_Full(63096111.1)
**Search:** object*

### Pg 167 Ln 8 - Pg 168 Ln 8 continued...

```
168:    ·2· · · · to have to ask somebody else.
    2   ·3· ·BY MR. JENKINS:
        ·4· ·Q· · Do you know who I would ask?
    3   ·5· · · · · · · ·MR. GARFIELD:· Same objection.
        ·6· · · · · · ·THE WITNESS:· The arresting officer.
    4   ·7· ·BY MR. JENKINS:
        ·8· ·Q· · Okay.· Do you know who the arresting officer was?
    5   ·9· ·A· · From earlier when we talked about it, I'm assuming
        10· · · · it was Abdullah.
    6   11· ·Q· · Would the arresting officer usually have to go to
        12· · · · the hospital with the individual?
    7   13· ·A· · No.
        14· ·Q· · Okay.
    8   15· ·A· · It depends.
```

### Pg 173 Ln 9 - Pg 176 Ln 2

```
173:    18· ·Q· · Would that include your military experience?
    10  19· ·A· · Yes.
        20· ·Q· · Your law enforcement experience?
    11  21· ·A· · Yes.
        22· ·Q· · Your experience being assigned as a K-9 officer?
    12     23· ·A· · Yes.
        24· ·Q· · Would it be fair to say that fentanyl is extremely
    13  25· · · · dangerous?
174: 1  ·1· ·A· · Extremely dangerous.
        ·2· ·Q· · That it can easily kill people?
    2   ·3· · · · · · ·MR. JENKINS:· I'm going to object to form.
        ·4· ·BY MR. GARFIELD:
    3   ·5· ·Q· · Okay.· He can object.
        ·6· · · · · · ·That it can easily kill people?
    4   ·7· ·A· · It can easily kill people, yes.
        ·8· ·Q· · To your knowledge, is it a synthetic opioid?
    5   ·9· ·A· · Yes.
        10· ·Q· · You said that it was potent.· Would you consider
    6   11· · · · it more potent or far more potent than any other
        12· · · · opioids?
    7   13· · · · · · ·MR. JENKINS:· Object to the form.
        14· ·BY MR. GARFIELD:
    8   15· ·Q· · Go ahead.
        16· ·A· · It is far more potent than other forms of
    9   17· · · · narcotics.
        18· ·Q· · What is your -- what is your basis to -- to say
    10  19· · · · something like that or believe that?
        20· ·A· · For instance, heroin, you can touch heroin, and it
    11  21· · · · doesn't really affect you just by touching your
        22· · · · skin.· Fentanyl, on the other hand, can very
    12     23· · · · quickly within seconds have you passed out.
        24· ·Q· · And in fact, a dose as small as 2 milligrams,
    13  25· · · · about the size of a few grains of salt, than can
```

## TextMap Search Report

**Transcript:** [9/19/2025] HODGE_BRYAN_09-19-2025_Full(63096111.1)
**Search:** object*

## Pg 173 Ln 9 - Pg 176 Ln 2 continued...

```
175: 1  ·1· · · · be lethal, couldn't it?
        ·2· · · · · · ·MR. JENKINS:· Object to the form.
     2  ·3· · · · · · ·THE WITNESS:· That's enough to kill somebody.
        ·4· BY MR. GARFIELD:
     3  ·5· ·Q.· All right.· What amount of -- and I'm asking the
        ·6· · · · same question another way.· What amount of
     4  ·7· · · · fentanyl could be lethal in most occasions?
        ·8· · · · · · ·MR. JENKINS:· Object to the form.
     5  ·9· · · · · · ·THE WITNESS:· An exact amount.· It doesn't
        10· · · · take a lot.· It could be as small as -- less than
     6  11· · · · a dime.
        12· BY MR. GARFIELD:
     7  13· ·Q.· He was -- y'all were trying to apprehend him for a
        14· · · · number of things, one thing being trafficking
     8  15· · · · fentanyl; is that right?
        16· ·A.· Correct.
     9  17· ·Q.· All right.· Would you consider trafficking of
        18· · · · fentanyl in South Carolina a serious felony?
    10  19· · · · · · ·MR. JENKINS:· Object to the form.
        20· · · · · · ·THE WITNESS:· Yes.
    11  21· · · · · · ·MR. GARFIELD:· And what's the basis?
        22· · · · · · ·MR. JENKINS:· The basis would be, he told me
    12  23· · · · earlier when we were talking about felonies, he
        24· · · · wasn't sure how to classify what -- which ones
    13  25· · · · were high danger.
176: 1  ·1· BY MR. GARFIELD:
        ·2· ·Q.· Okay.· So would you classify trafficking fentanyl
     2  ·3· · · · a minor, a major, or serious felony?
        ·4· ·A.· I would consider that a serious felony.
```

## Pg 176 Ln 11 - Pg 177 Ln 8

```
176:11  21· · · · than these others that I mentioned.
        22· ·A.· Correct.
    12  23· ·Q.· All right.· And, so, the difference in these
        24· · · · levels of offenses are really just -- and
    13  25· · · · oftentimes the quantity of the drugs involved?
177: 1  ·1· ·A.· Correct.
        ·2· ·Q.· All right.· So when we talk about trafficking
     2  ·3· · · · fentanyl, we're talking normally not just dealing
        ·4· · · · drugs, but dealing a great deal of drugs or a
     3  ·5· · · · volume of drugs.
        ·6· · · · · · ·MR. JENKINS:· Object to the form.
     4  ·7· BY MR. GARFIELD:
        ·8· ·Q.· Would that be right?
     5  ·9· ·A.· Correct.
        10· ·Q.· Okay.· And I think you also testified that he was
     6  11· · · · dealing fentanyl pretty close to the time of the
        12· · · · pursuit or just before it?
     7  13· ·A.· Just before it.
```

# TextMap Search Report

**Transcript:** [9/19/2025] HODGE_BRYAN_09-19-2025_Full(63096111.1)
**Search:** object*

## Pg 176 Ln 11 - Pg 177 Ln 8 continued...

```
177:    14· ·Q· · And you also testified that there were active
    8   15· · · · felony warrants for trafficking fentanyl; is that
        16· · · · right?
```

## Pg 180 Ln 2 - 12

```
180: 2  ·3· ·Q· · Okay.· What is meant by that expression?
        ·4· ·A· · Typically, if somebody is dealing drugs, they also
     3  ·5· · · · have firearms, which could lead to a number of
        ·6· · · · things, whether it's shootings, whether it's
     4  ·7· · · · retaliation for drug-related offenses or whatever
        ·8· · · · it may be.
     5  ·9· ·Q· · Okay.· Was there a reasonable or a more than
        10· · · · reasonable assumption on law enforcement's part
     6  11· · · · that Mr. Pringle had some type of weapons in the
        12· · · · car with him?
     7  13· · · · · · ·MR. JENKINS:· Object to the form.
        14· · · · · · ·THE WITNESS:· Yes.
     8  15· ·BY MR. GARFIELD:
        16· ·Q· · What would be the basis of that assumption?
     9  17· ·A· · He's been stopped before, from my knowledge, that
        18· · · · he had a firearm on him.· He's assault with a
    10  19· · · · concealed weapon that I knew about from NCIC.· And
        20· · · · then he was trafficking fentanyl.· Most
    11  21· · · · traffickers carry firearms.
        22· ·Q· · So let's bring you back to that moment at the time
    12  23· · · · that you engaged your emergency equipment.· You
```

## Pg 182 Ln 7 - Pg 183 Ln 4

```
182: 7  13· · · · attempt to escape on foot during a pursuit?
        14· ·A· · Correct.
     8  15· ·Q· · Okay.· And would another reason why K-9 officers
        16· · · · are typically involved in pursuits is that the
     9  17· · · · K-9s would keep the officers at a safer distance
        18· · · · from any threat?
    10  19· ·A· · Yes.
        20· ·Q· · Would it be fair to say that all of these are sort
    11  21· · · · of critical safety tools during dangerous
        22· · · · situations, to have a dog?
    12  23· · · · · · ·MR. JENKINS:· Object to the form.
        24· ·BY MR. GARFIELD:
    13  25· ·Q· · Let me ask it this way.· If an officer is at a
183: 1  ·1· · · · safer distance from a threat or a suspect, would
        ·2· · · · that reduce the risk of injury to both the dog and
     2  ·3· · · · the handler?
        ·4· ·A· · Yes.
     3  ·5· ·Q· · How about deterrence, would the presence of a K-9
        ·6· · · · sometimes de-escalate a situation, a tense
```

# TextMap Search Report

**Transcript:** [9/19/2025] HODGE_BRYAN_09-19-2025_Full(63096111.1)
**Search:** object*

## Pg 182 Ln 7 - Pg 183 Ln 4 continued...

```
183: 4  ·7· · · · situation?
        ·8· ·A· · Yes.
```

## Pg 183 Ln 13 - Pg 184 Ln 10

```
183:13  25· ·A· · Correct.
184: 1  ·1· ·Q· · Okay.· So talking why again K-9 officers are
        ·2· · · · regularly involved in pursuits.· Once a vehicle is
     2  ·3· · · · finally stopped or even immobilized, would a K-9
        ·4· · · · unit be called in to perform, you know, an alert
     3  ·5· · · · or a hit on the vehicle?
        ·6· ·A· · Can you restate that question?
     4  ·7· ·Q· · Sure.· Would a K-9 be utilized on the vehicle
        ·8· · · · itself for like, you know, drugs or things that
     5  ·9· · · · officers can see or can't see?
        10· · · · · ·MR. JENKINS:· Object to the form.
     6  11· · · · · ·THE WITNESS:· Yes.
        12· ·BY MR. GARFIELD:
     7  13· ·Q· · Okay.· What -- what -- what kind of things -- for
        14· · · · instance, you have K-9 Koby at the time.· What was
     8  15· · · · he certified in?
        16· ·A· · So K-9 Koby was certified in tracking,
     9  17· · · · apprehension, narcotics, building searches,
        18· · · · article searches, area searches.
    10  19· ·Q· · So he would be able to locate potentially the
        20· · · · presence of drugs even if they aren't like
```

## Pg 189 Ln 9 - Pg 190 Ln 6

```
189: 9  17· ·A· · It did not.
        18· ·Q· · Did it affect or impair your ability to avail
    10  19· · · · yourself of your role, you know, consistent with
        20· · · · your training and your experience?
    11  21· ·A· · It did not.
        22· ·Q· · How about your -- I think according to that last
    12     23· · · · portion I read about officer discretion and
        24· · · · officer decision making, did it impact your
    13  25· · · · ability to use good judgment and make good
190: 1  ·1· · · · decisions?
        ·2· · · · · ·MR. JENKINS:· Object to the form.
     2  ·3· ·BY MR. GARFIELD:
        ·4· ·Q· · Did it impact your ability to make good decisions
     3  ·5· · · · and use good judgment?
        ·6· ·A· · It did not.
     4  ·7· ·Q· · During the course of the pursuit?
        ·8· ·A· · Correct.
     5  ·9· ·Q· · Okay.· I'm going to show you Baker-M-333.· So this
        10· · · · one portion is under policy procedure 802, vehicle
     6  11· · · · pursuits.· You were asked on letter C, and it
```

## TextMap Search Report

**Transcript:** [9/19/2025] HODGE_BRYAN_09-19-2025_Full(63096111.1)
**Search:** object*

### Pg 189 Ln 9 - Pg 190 Ln 6 continued...

```
190:    12· · · · starts off by saying, as a general rule, deputies
```

### Pg 190 Ln 10 - Pg 191 Ln 8

```
190:    20· ·Q· · Okay.· So just because it is mentioned as a
     11 21· · · · general rule here, there are many scenarios that
        22· · · · would not violate policies and procedures?
     12   23· ·A· · Correct.
        24· ·Q· · And that even if they did violate policies and
     13 25· · · · procedures, you testified that these procedures
191: 1 ·1· · · · are -- are mainly -- are actually guidelines.
        ·2· ·A· · Correct.
      2 ·3· ·Q· · Okay.· They're not Scripture or anything like
        ·4· · · · that.
      3 ·5· · · · · ·MR. JENKINS:· Object to the form.
        ·6· · · · · ·THE WITNESS:· No.
      4 ·7· ·BY MR. GARFIELD:
        ·8· ·Q· · Okay.· Well, you said it's not, you know, written
      5 ·9· · · · by God or anything like that.
        10· ·A· · Yes.
      6 11· ·Q· · So this is not the Holy word.· These are
        12· · · · guidelines structured to provide this to police
      7 13· · · · officers.
        14· ·A· · Correct.
      8 15· ·Q· · It's 2:10 p.m. on Friday.· Approximately how many
```

### Pg 199 Ln 1 - 13

```
199: 1 ·1· · · · · · · · · ·CERTIFICATE OF REPORTER
        ·2
      2 ·3· · · · · · ·I, Robin Dunn, Court Reporter and Notary Public
        · · ·for the State of South Carolina at Large, do hereby
      3 ·4· ·certify:
        ·5· · · · · ·That the foregoing deposition was taken before
      4 · · ·me on the date and at the time and location stated on Page
        ·6· ·1 of this transcript; that the deponent was duly sworn to
      5 · · ·testify to the truth, the whole truth and nothing but the
        ·7· ·truth; that the testimony of the deponent and all
      6 · · ·objections made at the time of the examination were
        ·8· ·recorded by me and were thereafter transcribed; that the
      7 · · ·foregoing deposition as typed is a true, accurate and
        ·9· ·complete record of the testimony of the deponent and of
      8 · · ·all objections made at the time of the examination to the
        10· ·best of my ability.
      9 11· · · · · ·I further certify that I am neither related to
        · · ·nor counsel for any party to the cause pending or
     10 12· ·interested in the events thereof.
        13· · · · · ·Witness my hand, I have hereunto affixed my
     11 · · ·official seal this 7th day of October, 2025, Lexington,
```

# TextMap Search Report

**Transcript:** [9/19/2025] HODGE_BRYAN_09-19-2025_Full(63096111.1)
**Search:** object*

## Pg 199 Ln 1 - 13 continued...

```
199:   14· ·South Carolina.
   12     15
   16  16
   13  17
```

# TextMap Search Report

**Transcript:** [9/4/2024] Lott, Leon 09-04-25
**Search:** object*

## Pg 6 Ln 3 - Pg 7 Ln 1

```
6: 3        Q    Thank you.  Therefore, I assume, by
   4  answering the questions I ask you, you understood
   5  that question.
   6             Is that a fair assumption?
   7        A    Yes, ma'am.
   8        Q    Thank you.  Also, as you walked in, you
   9  walked by Pamela Baker, the plaintiff in this
  10  lawsuit.  As you walked in, you did not introduce
  11  yourself, nor did you ask Ms. Baker's name.  So I'm
  12  at this time going to introduce you to the victim,
  13  and that's Pamela Baker.
  14             Have you reached out to her any time
  15  before today?
  16             MR. GARFIELD:  Object to the form.
  17        You can answer.
  18             THE WITNESS:  Not that I'm aware of.
  19  BY MS. GOLDING:
  20        Q    Why not?
  21        A    I just did not.
  22        Q    Did anything prevent you from reaching
  23  out to the victim?
  24        A    No, ma'am.
  25        Q    Okay.  How old are you?
7: 1        A    71.
```

## Pg 10 Ln 22 - Pg 12 Ln 20

```
10:22        Q    Okay.  And can you tell me what you
  23  recall is the information you've provided to
  24  Live PD?
  25        A    No, ma'am.
11: 1        Q    Okay.  When is the last time you provided
   2  information to Live PD?
   3        A    I'm not aware.
   4        Q    Do you know what type of information you
   5  have provided to Live PD?
   6        A    No, ma'am.
   7        Q    How often have you provided information
   8  to Live PD?
   9             MR. GARFIELD:  And hold on a second.
  10        I'm objecting to the form of this whole line
  11        of questioning, just --
  12             MS. GOLDING:  Okay.  That's fine.
  13             MR. GARFIELD:  Didn't want to mess
  14        up your rhythm but --
  15             MS. GOLDING:  No.  That's fine.  I
  16        forgot my question.  I'm sorry.
  17             THE WITNESS:  Me, too.
  18             MS. GOLDING:  Okay.  Madam Court
  19        Reporter, you mind asking -- finding that last
```

# TextMap Search Report

**Transcript:** [9/4/2024] Lott, Leon 09-04-25
**Search:** object*

## Pg 10 Ln 22 - Pg 12 Ln 20 continued...

```
11:20      question?
   21              COURT REPORTER:  "How often have you
   22      provided information to Live PD?"
   23              THE WITNESS:  I don't know.  I can't
   24      answer that.
   25   BY MS. GOLDING:
12: 1      Q    Do you keep any type of documentation,
    2   whether a file in the computer or elsewhere, that
    3   collects or provides your guidance as to your
    4   communications with Live PD?
    5      A    No, ma'am.
    6      Q    Do you recall the person or persons with
    7   Live PD that you provided information to?
    8              MR. GARFIELD:  Object to the form.
    9      You can answer.
   10              THE WITNESS:  No, ma'am.
   11   BY MS. GOLDING:
   12      Q    Are you familiar with the Police Research
   13   Executive Forum?
   14      A    Is that PERF?  What is it?
   15      Q    I'm asking you the question.
   16      A    No, ma'am.
   17      Q    Okay.  Does the Richland County Sheriff's
   18   Department have associations with national
   19   organizations involved in law enforcement?
   20      A    Yes, ma'am.
```

## Pg 17 Ln 24 - Pg 19 Ln 13

```
17:24      Q    Who on behalf of the sheriff's department
   25   is associated with state accreditation?
18: 1      A    Our staff attorney and our accreditation
    2   manager.
    3      Q    Who is the current accreditation manager?
    4      A    Jennifer Spurrier.
    5      Q    Any association to Steve Spurrier, the
    6   coach?
    7      A    Could be.
    8      Q    Do you know?
    9      A    Yes, ma'am.
   10      Q    Tell me.
   11              MR. GARFIELD:  Object to the form.
   12      I mean, what relevance?
   13   BY MS. GOLDING:
   14      Q    What is --
   15              MR. GARFIELD:  Rationality,
   16      relevance.
   17   BY MS. GOLDING:
   18      Q    What is the relationship?
   19      A    Ex-daughter-in-law.
```

# TextMap Search Report

**Transcript:** [9/4/2024] Lott, Leon 09-04-25
**Search:** object*

## Pg 17 Ln 24 - Pg 19 Ln 13 continued...

```
18:20      Q     Thank you.
   21            MS. GOLDING:  Just that information
   22      for you, this is a jury trial so I get to ask
   23      those type of questions.  But thank you anyhow
   24      for objecting.  I'm glad you object.
   25            MR. GARFIELD:  Well, I appreciate
19: 1      the instruction that allows me to go ahead and
    2      put -- the rules allow me to put the grounds
    3      of the objection.  Thank you.
    4            MS. GOLDING:  I appreciate that.
    5      Thank you.
    6  BY MS. GOLDING:
    7      Q     Now, how long has Jennifer Spurrier been
    8  the accreditation manager?
    9      A     I'm not sure.  Maybe three years.
   10      Q     Okay.  And what is the responsibility of
   11  the accreditation manager?
   12      A     To get us accredited.  She establishes
   13  policy and procedures in writing.
```

## Pg 25 Ln 4 - Pg 26 Ln 20

```
25: 4      Q     In the Exhibit 53, Section 2323-85(A)(i)
    5  -- that is in front of you on the video -- on the
    6  screen -- it states that:  The standards must
    7  include policies regarding the use of force and
    8  response to resistance by law enforcement officers.
    9            Did I read that correctly?
   10      A     Yes, ma'am.
   11      Q     Okay.  What is your understanding of the
   12  meaning of the words "use of force"?
   13      A     Using force against someone.
   14      Q     What is your understanding of that
   15  meaning, "use of force"?
   16            MR. GARFIELD:  Object to the form.
   17            THE WITNESS:  Any type of use of
   18      force.
   19  BY MS. GOLDING:
   20      Q     Okay.  What is your understanding of use
   21  of force?
   22            MR. GARFIELD:  Same objection.
   23            THE WITNESS:  When you use force of
   24      any kind against someone.
   25  BY MS. GOLDING:
26: 1      Q     What is your understanding of the word
    2  force?
    3      A     Physical force.
    4      Q     What is your understanding of the words
    5  physical force?
    6            MR. GARFIELD:  Object to the form.
```

# TextMap Search Report

**Transcript:** [9/4/2024] Lott, Leon 09-04-25
**Search:** object*

## Pg 25 Ln 4 - Pg 26 Ln 20 continued...

```
26: 7              THE WITNESS:  Using some type of
    8       physical force against someone.  Touching
    9       someone, laying your hands on someone.
   10  BY MS. GOLDING:
   11       Q    You inserted the word physical.  Is the
   12  word "physical" in Section 2323-85(A)(i)?
   13       A    No, ma'am.  But you asked me for a
   14  definition of force and that's what I gave you.
   15       Q    Okay.  So you -- why do you include the
   16  word physical into your understanding of the word
   17  use of force?
   18       A    Because you kept asking the same question
   19  over and over so I wanted to give you an answer so
   20  you would stop.
```

## Pg 37 Ln 13 - Pg 38 Ln 15

```
37:13       Q    So if you're in your office and you have
   14  your radio on, can you hear all communications by
   15  deputies over the radio?
   16       A    Can I hear them?
   17       Q    Yes, sir.
   18       A    There's noise from them.
   19       Q    I'm sorry?
   20       A    There's noise from them.  I can't say
   21  that I hear them all the time, no, ma'am.
   22       Q    Okay.  So but your radio, if the volume
   23  is turned up, has communications of all deputies
   24  going on at that time.
   25              MR. GARFIELD:  Object to the form.
38: 1       You can answer.
    2              THE WITNESS:  There's communications
    3       being -- there's communications on there.  I
    4       can't say that all the deputies on there that
    5       I can hear, no, ma'am.
    6  BY MS. GOLDING:
    7       Q    Is there some type of filter that your
    8  radio has as to what can and can't be heard by you?
    9       A    No, ma'am.
   10       Q    Okay.  The radio that you have in your
   11  office and the radio that you have in your car, is
   12  that the same type of radio that is in a uniformed
   13  officer's vehicle?
   14       A    I don't know if it's the same type of
   15  radio or not.
```

# TextMap Search Report

**Transcript:** [9/4/2024] Lott, Leon 09-04-25
**Search:** object*

## Pg 39 Ln 15 - Pg 40 Ln 11

```
39:15      Q    So what part does the written
   16  professional standards play in providing the utmost
   17  professionalism from Richland County to --
   18      A    They handle complaints of officer
   19  conduct, investigate the use of force in a fair and
   20  consistent and transparent manner.
   21      Q    My question is, what part do the written
   22  professional standards play in ensuring there is
   23  professionalism exhibited to the citizens?
   24      A    Just what I read.
   25           MR. GARFIELD:  Object to the form.
40: 1  BY MS. GOLDING:
    2      Q    I'm sorry.  I didn't --
    3      A    Just what I read.  That's how they do it.
    4      Q    That's how what do it?
    5      A    That's how professional standards ensures
    6  the professionalism of the Richland County
    7  Sheriff's Department.
    8      Q    Okay.  So written professional standards
    9  are very important to ensure professionalism of the
   10  department; would you agree with that?
   11      A    Written professional standards?
```

## Pg 46 Ln 21 - Pg 47 Ln 18

```
46:21      Q    Is there any type of documentation you
   22  would review to refresh your memory as to any type
   23  of issues brought to your attention by the
   24  Professional Standards Unit?
   25      A    No, ma'am.
47: 1      Q    It appears in Exhibit 43 that the vehicle
    2  pursuits that occurred between -- between 2018 to
    3  2021 increased significantly.
    4           Do you have any knowledge as to why there
    5  was a significant increase in vehicle pursuits
    6  between 2018 and 2021?
    7           MR. GARFIELD:  Objection.
    8           THE WITNESS:  No, ma'am.
    9  BY MS. GOLDING:
   10      Q    With respect to vehicle pursuits that are
   11  set forth in this report, a review by the
   12  Professional Standards Unit is not triggered by a
   13  complaint; is that correct?
   14      A    Correct.
   15      Q    What does a review by the Professional
   16  Standards Unit encompass with respect to vehicle
   17  pursuits?
   18      A    I don't know.
```

## TextMap Search Report

**Transcript:** [9/4/2024] Lott, Leon 09-04-25
**Search:** object*

---

## Pg 49 Ln 14 - Pg 50 Ln 12

```
49:14      Q    Okay.  With respect to page 22 in
   15   Exhibit 45, it states:  There were 448 vehicle
   16   pursuits for CY 2023.
   17           Did I read that correctly?
   18      A    Yes, ma'am.
   19      Q    It appears that this is the first year
   20   that the actual number of vehicle pursuits were put
   21   into this report.
   22           Do you know why?
   23      A    No, ma'am.
   24      Q    What was your reaction when you first
   25   read that in the calendar year 2022 there were 448
50: 1   vehicle pursuits?
    2               MR. GARFIELD:  Objection.
    3               THE WITNESS:  No reaction.
    4   BY MS. GOLDING:
    5      Q    With respect to vehicle pursuits, this
    6   report, does that also include the high-speed
    7   chases?  Is that the same thing, vehicle pursuits
    8   and high-speed chases?
    9      A    Well, high-speed chases would be included
   10   in vehicle pursuits.  Not all vehicle pursuits are
   11   what you'd say is a high-speed chase.
   12           Define a high-speed chase.
```

## Pg 51 Ln 7 - Pg 52 Ln 19

```
51: 7      Q    Is there any criteria that you are
    8   contacted any time there's a vehicle pursuit?
    9      A    No, ma'am.
   10      Q    Is there any criteria that you are
   11   contacted any type of high-speed chase?
   12      A    No, ma'am.
   13      Q    And I didn't get -- understand, with
   14   respect to high-speed chases, the definition.
   15           Do you agree that high-speed chases are
   16   defined as chases by a Richland County department
   17   employee that exceeds the speed limit?
   18               MR. GARFIELD:  Objection.
   19               THE WITNESS:  No, ma'am.  I would
   20      not define it that way.
   21   BY MS. GOLDING:
   22      Q    How would you define high-speed chase?
   23      A    And I will answer that like this:  I
   24   don't consider 30 miles an hour as a high-speed
   25   chase.  You may be somewhere where the speed limit
52: 1   is 25 miles an hour, and if you're going 30 miles
    2   an hour, you're exceeding that speed limit but
    3   that's not a high-speed chase.
    4      Q    How would you define a high-speed chase?
```

## TextMap Search Report

**Transcript:** [9/4/2024] Lott, Leon 09-04-25
**Search:** object*

___

## Pg 51 Ln 7 - Pg 52 Ln 19 continued...

```
52: 5      A    I can't define it.  I don't have a
   6  definition for it.
   7      Q    What is your understanding of a
   8  high-speed chase?
   9           MR. GARFIELD:  Objection.  Asked and
  10      answered.
  11           THE WITNESS:  I have no definition
  12      of it.
  13  BY MS. GOLDING:
  14      Q    Okay.  With respect to the Professional
  15  Standards Unit, does it have any criteria that it
  16  follows with respect to disciplining --
  17      A    I don't --
  18      Q    -- employees?
  19      A    I don't understand your question.
```

## Pg 70 Ln 10 - Pg 71 Ln 10

```
70:10      Q    So is there an officer supervisor review
  11  in every incident report?
  12      A    Yes, ma'am.
  13      Q    Why is there an officer supervisor
  14  review?
  15      A    That's just the procedure.
  16      Q    Well, previously you identified there was
  17  an approving officer, Rebecca Smith.  And now there
  18  is an officer supervisor review.  So what's the
  19  difference between what Karen Gilmore reviewed and
  20  what Rebecca Smith reviewed?
  21           MR. GARFIELD:  Objection.  You can
  22      answer.
  23           THE WITNESS:  One's a supervisor and
  24      one is a low-level supervisor.
  25  BY MS. GOLDING:
71: 1      Q    Which one's the low-level supervisor?
   2      A    Rebecca Smith.
   3      Q    Okay.  What's the difference in those two
   4  reviews, one by the --
   5      A    I don't have that -- a clue.
   6      Q    You need to let me finish my question.
   7           What's the difference in the reviews, one
   8  review done by the low level and the review done by
   9  the officer supervisor?
  10      A    I don't know.
```

## Pg 73 Ln 15 - Pg 74 Ln 14

```
73:15      Q    With respect to the commander's review,
  16  what's the difference between the officer
```

# TextMap Search Report

**Transcript:** [9/4/2024] Lott, Leon 09-04-25
**Search:** object*

## Pg 73 Ln 15 - Pg 74 Ln 14 continued...

```
73:17  supervisor review and the commander's review?
   18       A    It's going up a different level.
   19       Q    Is there a different review that's
   20  entailed?
   21       A    I don't know.
   22       Q    Is there some type of established
   23  criteria that needs to be followed in the
   24  commander's review?
   25       A    I don't know.
74: 1       Q    What does it entail?  What does the
    2  commander do when he reviews?
    3            MR. GARFIELD:  Objection.
    4            THE WITNESS:  I don't know.
    5  BY MS. GOLDING:
    6       Q    I'm sorry?
    7       A    I don't know.
    8       Q    Okay.  In this commander's review, it has
    9  it dated January 3, 2023, which is a number of days
   10  after the incident.
   11            Why is there a time period between the
   12  incident date of December 2029 and the commander's
   13  review on January 3, 2024?
   14       A    I don't know.
```

## Pg 78 Ln 17 - Pg 79 Ln 14

```
78:17       Q    Exhibit 39 is a reply that your attorneys
   18  filed in this lawsuit.  And the reason I marked it
   19  is on the first page, the last sentence, it
   20  basically states that there's a five-year period of
   21  time, and by one count it appears there have been
   22  as many 1,500 police pursuits of various kind
   23  during the stated time frame.
   24            Do you consider 1,500 police pursuits
   25  during a five-year time frame as to be above
79: 1  average or exceeding the number of --
    2            MR. GARFIELD:  Objection.
    3            THE WITNESS:  No, ma'am.  Over a
    4       five-year period of time?
    5  BY MS. GOLDING:
    6       Q    Yes, sir.
    7       A    No, ma'am.
    8       Q    Why don't you consider that to be
    9  excessive?
   10       A    I don't know what the word excessive
   11  would mean in police pursuits in a number.
   12       Q    Well, what -- on a yearly basis, how many
   13  pursuits does your department engage in?
   14       A    I don't know.
```

# TextMap Search Report

**Transcript:** [9/4/2024] Lott, Leon 09-04-25
**Search:** object*

## Pg 86 Ln 14 - Pg 87 Ln 19

```
86:14      Q    In reviewing -- you have read through
   15  Exhibit Number 10 that I've asked a number of
   16  questions about.  In your review of Exhibit
   17  Number 2, Officer Smith's report, did you reach a
   18  conclusion that there was an immediate danger to
   19  the public in his pursuit?
   20      A    I didn't do an evaluation of it.
   21      Q    Other than an evaluation, did you come up
   22  with a thought that there existed an immediate
   23  danger?
   24      A    No, ma'am.  I have no opinion on that.
   25      Q    So when you looked at Exhibit Number 10,
87: 1  you didn't see any information in Exhibit 10 that
    2  would lead you to believe that any immediate danger
    3  to the public existed in the pursuit undertaken by
    4  Officer Smith.
    5          MR. GARFIELD:  Object to the form.
    6          THE WITNESS:  No, ma'am.
    7  BY MS. GOLDING:
    8      Q    Okay.  Was, in fact, there an immediate
    9  danger to the public in the pursuit that was
   10  undertaken by Officer Smith?
   11      A    I don't know.
   12      Q    Okay.  Why don't you know?
   13      A    Because I don't know.  I wasn't there.
   14  Didn't participate in it.
   15      Q    So the only basis you have for knowing if
   16  an immediate danger existed is if you were present
   17  at the pursuit; is that what you're testifying to?
   18      A    That's what I base my conclusion on, yes,
   19  ma'am.
```

## Pg 88 Ln 8 - Pg 89 Ln 18

```
88: 8      Q    Were you present in a pursuit in the
    9  calendar year 2022?
   10      A    No, ma'am.
   11      Q    Were you present in a pursuit in the
   12  calendar year 2021?
   13      A    No, ma'am.
   14      Q    Were you present in a pursuit in the
   15  calendar year 2020?
   16      A    No, ma'am.
   17      Q    Were you present in a pursuit in the
   18  calendar year 2019?
   19          MR. GARFIELD:  Object to the form.
   20      Go ahead.
   21          THE WITNESS:  No, ma'am.
   22  BY MS. GOLDING:
   23      Q    Were you present in a pursuit in the
```

# TextMap Search Report

**Transcript:** [9/4/2024] Lott, Leon 09-04-25
**Search:** object*

## Pg 88 Ln 8 - Pg 89 Ln 18 continued...

```
88:24  calendar year 2018?
    25            MR. GARFIELD:  Same objection.  Go
89: 1      ahead.
     2            THE WITNESS:  I don't know.
     3  BY MS. GOLDING:
     4      Q    Were you present in a pursuit in the
     5  calendar year 2017?
     6      A    I don't know.
     7            MR. GARFIELD:  Same objection.
     8  BY MS. GOLDING:
     9      Q    Do you know of any year in which you were
    10  present in a vehicle pursuit?
    11      A    I can't recall a year.
    12      Q    With respect to the policy 802.3, under 3
    13  it says:  In deciding whether to initiate or
    14  continue a pursuit, the officer shall take the
    15  following into consideration.  The first is the
    16  seriousness of the offense.
    17            Did I read that correctly?
    18      A    Yes, ma'am.
```

## Pg 91 Ln 9 - Pg 92 Ln 8

```
91: 9      Q    Sheriff lot, are you required to know the
    10  policies and procedures of the Richland County
    11  Sheriff's Department?
    12      A    Am I required?
    13      Q    Yes, sir.
    14      A    Yes, ma'am.
    15      Q    And do you today know the policies and
    16  procedures of the Richland County Sheriff's
    17  Department?
    18      A    Probably, yes.
    19      Q    So why can you not answer these very
    20  simple questions I'm asking you since you know the
    21  policies and procedures?
    22            MR. GARFIELD:  Objection.
    23            THE WITNESS:  I can't answer that.
    24  BY MS. GOLDING:
    25      Q    There is a criteria of officer training
92: 1  and experience.
     2            Why should an officer take into
     3  consideration his training and experience before --
     4      A    Where are you reading that at?
     5      Q    I'm sorry.  It's the next, Baker M-330.
     6  It's a continuation of the factors of an officer
     7  taking into consideration before initiating.
     8      A    What page?
```

# TextMap Search Report

**Transcript:** [9/4/2024] Lott, Leon 09-04-25
**Search:** object*

## Pg 92 Ln 12 - Pg 93 Ln 22

```
92:12       Q    One of the criterias for -- to take into
   13 consideration whether initiating or continuing a
   14 pursuit is officer training and experience.
   15            Why is that a factor that the officer
   16 must take into consideration before initiating or
   17 continuing a pursuit?
   18       A    I still don't see where you're reading.
   19            MR. GARFIELD:  You're talking about
   20       "I"?
   21            MS. GOLDING:  Yes.
   22            THE WITNESS:  I can't answer that.
   23 BY MS. GOLDING:
   24       Q    Okay.  With respect to Officer Smith, or
   25 really any officer, if an officer has five
93: 1 months -- if he's at five months out of a
    2 probationary period, is that a factor that negates
    3 engaging in a pursuit?
    4            MR. GARFIELD:  Objection.
    5            THE WITNESS:  No.
    6 BY MS. GOLDING:
    7       Q    Why not?
    8       A    Because it doesn't.
    9       Q    Why?
   10       A    Because it just doesn't.
   11       Q    There has to be a reason why not.
   12            MR. GARFIELD:  Objection.
   13       Argumentative.  Do the best you can.
   14            THE WITNESS:  It doesn't negate it.
   15 BY MS. GOLDING:
   16       Q    Okay.  And what is probationary period?
   17 What is that with respect to the training of an
   18 officer?
   19       A    Doesn't have anything to do with the
   20 training.  The probationary period is what the
   21 county places on an employee for one year after
   22 they've been hired Places.
```

## Pg 95 Ln 18 - Pg 96 Ln 19

```
95:18       Q    Okay.  If Deputy Hodge overtook
   19 Deputy Smith and in fact another vehicle in this
   20 pursuit, was he in violation of this vehicle
   21 policy?
   22       A    I can't answer that.
   23       Q    Why not?
   24       A    It would have been factors I don't know.
   25       Q    But assuming -- let's just assume for the
96: 1 sake of argument that Deputy Hodge passed
    2 Deputy Smith and another pursuing vehicle without
    3 requesting, or without being requested, in fact,
```

# TextMap Search Report

**Transcript:** [9/4/2024] Lott, Leon 09-04-25
**Search:** object*

## Pg 95 Ln 18 - Pg 96 Ln 19 continued...

```
96: 4   would he have been in violation of this policy?
    5        A    I have no idea.
    6             MR. GARFIELD:  Objection,
    7        hypothetical, compound question.  Go ahead.
    8             THE WITNESS:  I can't answer that.
    9   BY MS. GOLDING:
   10        Q    If a police officer with the
   11   Richland County Sheriff's Department or deputy
   12   violates this provision B that we just read, what
   13   are the consequences?
   14        A    I have no idea.
   15        Q    If a deputy sheriff violates this
   16   provision in overtaking the pursuing vehicle,
   17   Officer Smith, would an investigation be
   18   undertaken?
   19        A    I don't know.
```

## Pg 96 Ln 20 - Pg 98 Ln 3

```
96:20        Q    If a police officer violated this
   21   provision and overpassed and went beyond --
   22   overtook the first responding vehicle, would that
   23   police officer have been subject to disciplinary
   24   action?
   25        A    I don't know the factors involved.
97: 1        Q    Why don't you know any facts about this
    2   wreck that occurred on December 2029 -- excuse
    3   me -- December 2023 that seriously injured Pamela
    4   Baker?
    5             MR. GARFIELD:  Objection to the
    6        form, several grounds.  Do the best you can.
    7             THE WITNESS:  Because I was not
    8        involved in it and I have people that handle
    9        that.
   10   BY MS. GOLDING:
   11        Q    As the chief law enforcement officer of
   12   Richland County, you don't believe that you have a
   13   responsibility of knowing when someone dies in a
   14   vehicle pursuit?
   15             MR. GARFIELD:  Object to the form.
   16             THE WITNESS:  Yeah, I would be
   17        advised if someone died.
   18   BY MS. GOLDING:
   19        Q    Do you know if someone died in this
   20   incident?
   21        A    I do now, yes, ma'am.
   22        Q    When did you first learn that someone
   23   died?
   24        A    I can't say.  I don't know.
   25        Q    What is the policy with regard to
```

# TextMap Search Report

**Transcript:** [9/4/2024] Lott, Leon 09-04-25
**Search:** object*

## Pg 96 Ln 20 - Pg 98 Ln 3 continued...

```
98: 1   terminating a pursuit?
    2        A    That is left to the discretion of the
    3   supervisors and the people involved in the chase.
```

## Pg 100 Ln 4 - Pg 101 Ln 12

```
100: 4        Q    And what are those factors?
     5        A    Depending on what you're chasing him for
     6   and various factors.  Each case is independently
     7   decided.
     8        Q    And what was this suspect being chased
     9   for?
    10        A    I don't know.
    11        Q    Okay.  If the Suspect Pringle was being
    12   chased for failure to appear at a hearing, is that
    13   a significant factor?
    14             MR. GARFIELD:  Object to the form.
    15             THE WITNESS:  I don't know.
    16   BY MS. GOLDING:
    17        Q    Is a misdemeanor a reason to chase
    18   someone down the wrong way of a highway?
    19             MR. GARFIELD:  Same objection.
    20             THE WITNESS:  Can't answer that.
    21   BY MS. GOLDING:
    22        Q    Why not?
    23        A    Just can't answer.
    24        Q    Have no reason other than you're not
    25   gonna answer.
101: 1             MR. GARFIELD:  Hold on.  Hold on.
     2        Objection.  That's argumentative, Henrietta.
     3        You know that.
     4   BY MS. GOLDING:
     5        Q    Would you agree, generally, that the
     6   necessity to apprehend a suspect is outweighed by
     7   the risk to the public?
     8        A    Not always, no.
     9        Q    Would you agree that going down the wrong
    10   direction on a roadway is a significant risk to the
    11   public?
    12        A    It can be.
```

## Pg 102 Ln 9 - Pg 103 Ln 6

```
102: 9        Q    What's the purpose of a supervisor being
    10   present for the actual chase, or being involved?
    11        A    I don't understand your question.
    12        Q    Certainly.  Back into the policies,
    13   802.8, Supervisor Control and Responsibilities.  It
    14   has:  Available supervisory and management control
```

# TextMap Search Report

**Transcript:** [9/4/2024] Lott, Leon 09-04-25
**Search:** object*

## Pg 102 Ln 9 - Pg 103 Ln 6 continued...

```
102:15  will be exercised over all vehicle pursuits
    16  involving deputies from the Richland County
    17  Sheriff's Department.
    18         My question is, why must there be
    19  available supervisory and management control for
    20  all vehicle pursuits?
    21              MR. GARFIELD:  Object to the form.
    22              THE WITNESS:  It doesn't say the
    23      word "must" anywhere.  It says available.  So
    24      if there's one available, yes.  If there's not
    25      one available, then there's not one available.
103: 1  BY MS. GOLDING:
     2      Q    It says:  Will be exercised over vehicle
     3  pursuits?
     4      A    If available.
     5      Q    Where does it say "if"?
     6      A    Well, it says available.
```

## Pg 104 Ln 14 - Pg 106 Ln 17

```
104:14      Q    I've heard the term suicide chase or
    15  something to that effect.  Are you familiar with
    16  that term?
    17      A    Never heard it before?
    18      Q    So have you ever heard the term "going
    19  suicide" when relating to vehicle pursuits?
    20      A    No, ma'am.
    21      Q    Would you agree that if there was no
    22  violent crime committed before the pursuit
    23  initiated, that that is a factor that should have
    24  negated a pursuit?
    25              MR. GARFIELD:  Object to the form.
105: 1              THE WITNESS:  No, ma'am.
     2  BY MS. GOLDING:
     3      Q    Why not?
     4      A    Just don't.
     5      Q    Why not?  Do you have a reason?
     6      A    No.  Just don't.
     7      Q    Did you know that nine days before this
     8  pursuit, this individual, Pringle, had been
     9  arrested by your department?
    10      A    I have heard that.
    11      Q    And who told you that?
    12      A    I have no idea.
    13      Q    Did you know that nine days before this
    14  incident, this high-speed chase, Pringle had been
    15  arrested and released by your department?
    16              MR. GARFIELD:  Object to the form.
    17              THE WITNESS:  No, ma'am.
    18  BY MS. GOLDING:
```

# TextMap Search Report

**Transcript:** [9/4/2024] Lott, Leon 09-04-25
**Search:** object*

## Pg 104 Ln 14 - Pg 106 Ln 17 continued...

```
105:19      Q    Did you have any knowledge that Pringle
    20  had been released a few days before this high-speed
    21  chase?
    22              MR. GARFIELD:  Same objection.
    23              THE WITNESS:  Did I know before?
    24  BY MS. GOLDING:
    25      Q    No.  As of today, did you --
106: 1      A    Yes, ma'am.
     2      Q    Okay.  When did you find out that your
     3  department had released Pringle eight or nine days
     4  before this high-speed chase?
     5      A    I do not know.
     6              MR. GARFIELD:  Same objection.
     7      Asked and answered.
     8  BY MS. GOLDING:
     9      Q    What would be the reason for releasing a
    10  suspect after an arrest?
    11      A    I do not know.
    12      Q    No knowledge?
    13      A    No, ma'am.
    14      Q    To your knowledge, has the Richland
    15  County Sheriff's Department rolled back high-speed
    16  chase procedures over the last ten years?
    17      A    I don't know.
```

## Pg 106 Ln 18 - Pg 107 Ln 16

```
106:18      Q    How many times has the Richland County
    19  Sheriff's Department been sued due to injuries
    20  relating to high-speed chases?
    21      A    I do not know.
    22      Q    To your knowledge, how many times has the
    23  Richland County Sheriff's Department been sued last
    24  five years because of high-speed chases?
    25      A    I do not know.
107: 1      Q    Do you know that your attorneys produced
     2  three banker boxes of lawsuits relating to
     3  high-speed chases, lawsuits against the
     4  Richland County Sheriff's Department?
     5              MR. GARFIELD:  Object to the form.
     6              THE WITNESS:  No, ma'am.
     7              MR. GARFIELD:  Mischaracterization
     8      of discovery.
     9  BY MS. GOLDING:
    10      Q    Is -- is it important to you that people,
    11  citizens are injured in high-speed chases?  Is that
    12  an important factor to you that high-speed chases
    13  have resulted in injuries to people of the public?
    14      A    People of the what?
    15      Q    The public.
```

# TextMap Search Report

**Transcript:** [9/4/2024] Lott, Leon 09-04-25
**Search:** object*

## Pg 106 Ln 18 - Pg 107 Ln 16 continued...

```
107:16      A   Yes.
```

## Pg 107 Ln 25 - Pg 109 Ln 3

```
107:25      Q    Well, what have you done because of
108: 1  injuries that the public has suffered due to
     2  high-speed chases by officers in your department?
     3      A    I can't answer that.
     4      Q    You can't answer or you do not know?
     5  Have you done anything?
     6      A    I can't answer.
     7      Q    You have to answer my question.  Have you
     8  done anything as a result of injuries occurred that
     9  resulted to the public because of high-speed chases
    10  by your department?
    11          MR. GARFIELD:  Hang on a second.
    12      Objection, argumentative, several other
    13      grounds.
    14          THE WITNESS:  I don't know.
    15          MS. GOLDING:  He can't -- he has to
    16      answer every question.
    17          MR. GARFIELD:  I think he is
    18      answering the question.
    19          MS. GOLDING:  No.  He's saying he
    20      can't answer.  He has to answer.
    21          THE WITNESS:  I don't have an answer
    22      for that.
    23          MS. GOLDING:  Okay.  Thank you.
    24          THE VIDEOGRAPHER:  Go off the
    25      record.
109: 1          MS. GOLDING:  Thank you.
     2          THE VIDEOGRAPHER:  The time is
     3      12:27.  We are off the record.
```

# TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 16 Ln 11 - Pg 17 Ln 7

```
16:11        Q.    Okay.  And when did you first review or go
   12   through this Policy and Procedure Manual?
   13        A.    It had to be about the time I first got on
   14   while doing in-service training.
   15        Q.    And would that have been the two-week
   16   period after the eight weeks at the academy?
   17        A.    No, ma'am.  This is prior.
   18        Q.    So it would have been at the academy you
   19   actually went through the Richland County Sheriff's
   20   Department Policy and Procedure Manual?
   21             MR. SPREEUWERS:  Objection.  Misstates the
   22   prior testimony.
   23   BY MS. JONES:
   24        Q.    Did you understand the question?
   25        A.    No, ma'am.
17: 1        Q.    When did you first review and study this
    2   Policy and Procedure Manual?
    3        A.    About the time that I got hired on at the
    4   sheriff's department.
    5        Q.    And was that before you went to the academy
    6   or after you went to the academy?
    7        A.    This is before.
```

## Pg 22 Ln 9 - Pg 23 Ln 18

```
22: 9        Q.    And what's your understanding of the
   10   purpose behind the pursuit policies?
   11        A.    It's a guideline.
   12        Q.    A guideline for what reason?
   13        A.    To -- it's a guideline on how to perform
   14   our job duties as a deputy sheriff.
   15        Q.    Were you given any instruction,
   16   Trooper Smith, about the statutory or legal
   17   requirements for minimum standards for law
   18   enforcement pursuits?
   19             MR. SPREEUWERS:  Objection, vagueness.
   20             THE WITNESS:  Can you repeat the question.
   21   BY MS. JONES:
   22        Q.    Were you given any instruction concerning
   23   statutory requirements for minimum standards for law
   24   enforcement agencies?
   25             MR. SPREEUWERS:  Same objection.
23: 1             THE WITNESS:  I don't remember.
    2   BY MS. JONES:
    3        Q.    Okay.  Let me ask you if you've ever seen a
    4   copy of this statute, 23-23-85.
    5        A.    I haven't seen this.
    6        Q.    I beg your pardon?
    7        A.    I have not seen this.
    8        Q.    Okay.
```

## TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 22 Ln 9 - Pg 23 Ln 18 continued...

```
23: 9       A.   Do you want that back?
    10       Q.   You can put it right here if you haven't
    11 seen it.
    12            Have you ever -- were you trained on or
    13 have you ever seen this Chapter 37 of the
    14 South Carolina Criminal Justice Academy?  And there
    15 is a red tag on the particular section that relates
    16 to high-pursuit training or high-pursuit chases --
    17 high-speed chases.
    18       A.   I have not seen this.
```

## Pg 29 Ln 21 - Pg 30 Ln 18

```
29:21       Q.   You can print out a copy of a report in
    22 your patrol car?
    23       A.   Yes, ma'am.
    24       Q.   To whom do you deliver this printout with
    25 the prisoner?
30: 1       A.   To whoever is working at the jail.  The
     2 intake, I guess, officer.
     3       Q.   And from that point forward, what
     4 communication, if any, does the sheriff's department
     5 have with the NCIC to confirm that the suspect has
     6 been arrested?
     7            MR. SPREEUWERS:  Objection, vagueness.
     8            THE WITNESS:  I wouldn't know.  That's not
     9 my job responsibility.  That's up to the desk
    10 sergeant.
    11 BY MS. JONES:
    12       Q.   The Richland County Sheriff's Department
    13 desk sergeant?
    14       A.   Yes, ma'am.
    15       Q.   Okay.  And the desk sergeant is more than
    16 one person.  It would be whoever is working that
    17 particular day?
    18       A.   Yes, ma'am.
```

## Pg 34 Ln 14 - Pg 35 Ln 12

```
34:14       Q.   And where would you have received the
    15 schedule from?
    16       A.   One of the supervisors of my shift.
    17       Q.   How often did you get a schedule from the
    18 Richland County Sheriff's Department when you were
    19 working there?  What increments?
    20       A.   What kind of schedule are you asking?
    21       Q.   Yes, sir.
    22       A.   The training schedule or just work
    23 schedule?
```

## TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 34 Ln 14 - Pg 35 Ln 12 continued...

```
34:24        Q.   Well, for this annual training, what kind
   25 of schedule did you receive?
35: 1             MR. SPREEUWERS:  Objection, vagueness.
    2             THE WITNESS:  We received a training
    3        schedule.  I mean, it was a couple of months out
    4        prior to the training.
    5 BY MS. JONES:
    6        Q.   Was it a particular day that you would
    7 notify -- you were notified that the training would
    8 occur on?
    9        A.   Yes, ma'am.
   10        Q.   And would that information come to you in
   11 written format or electronically?
   12        A.   It'll come electronically.
```

## Pg 42 Ln 18 - Pg 43 Ln 21

```
42:18        Q.   If you wanted to obtain a copy of a traffic
   19 accident report, how would you obtain it?
   20        A.   Through the South Carolina Highway Patrol.
   21        Q.   If you look at paragraph 3 on that page,
   22 50, would you read that paragraph?  3A and B?
   23        A.   "This department processes and retains the
   24 following reports:  Incident reports/supplemental
   25 reports; B, copies of traffic accident reports.
43: 1        Q.   So is this records division policy
    2 accurate?
    3             MR. SPREEUWERS:  Objection, vagueness.
    4             THE WITNESS:  To my knowledge it would be
    5        accurate.
    6 BY MS. JONES:
    7        Q.   Okay.  Well, I thought you said you
    8 couldn't access a copy of a traffic accident report?
    9             MR. SPREEUWERS:  Objection, argumentative.
   10 BY MS. JONES:
   11        Q.   Is that correct or not?
   12        A.   That's correct.
   13        Q.   You could or could not access a traffic
   14 accident report when you were a deputy at the
   15 Richland County Sheriff's Department?
   16        A.   I could not access a traffic accident
   17 report.
   18        Q.   Okay.  Did you ever ask anyone in the
   19 Richland County Sheriff's Department where they kept
   20 copies of traffic accident reports?
   21        A.   No, ma'am.
```

## TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 54 Ln 24 - Pg 56 Ln 12

```
54:24      Q.   And what is the stated purpose of the
   25 Vehicle Pursuit Policy?
55: 1      A.   The purpose in 802.1, "The purpose of the
    2 policy is to establish guidelines and
    3 responsibilities for deputies, supervisors, and
    4 communication personnel while engaged in a vehicle
    5 pursuit.  This policy will serve as the standard for
    6 the administrative review of the actions of personnel
    7 for topics covered by this policy."
    8      Q.   And are the topics covered by the policy
    9 set forth in 802.2 and 802.3?
   10      A.   Say that one more time.
   11      Q.   Are the standards for the pursuit policy
   12 set forth in 802.2 -- and we can go through them one
   13 at a time.  Would you rather do that?
   14      A.   Yeah, that works.
   15      Q.   Okay.  All right.  802.2, what is the
   16 policy?
   17           MR. SPREEUWERS:  Object to the form.
   18           You can answer.
   19           THE WITNESS:  The policy stated in 80 --
   20      excuse me, 802.2 states that "It is the policy
   21      of the Richland County Sheriff's Department that
   22      deputies shall act as professional and operate
   23      motor vehicles in accordance with South Carolina
   24      law, official policy, and with due regard for
   25      the safety of all other persons.
56: 1           "Sworn deputies of the Richland County
    2      Sheriff's Department are expected to make
    3      reasonable efforts to apprehend violators who
    4      flee or otherwise attempt to elude; however, the
    5      department recognizes the value in the sanctity
    6      of human life.  The emergency operation of a
    7      vehicle and the pursuit of a fleeing vehicle may
    8      present a risk to the general public, the
    9      deputy, and the suspect; therefore, it is the
   10      policy of the Richland County Sheriff's
   11      Department to prevent or end all pursuits as
   12      quickly and safely as possible."
```

## Pg 60 Ln 21 - Pg 62 Ln 24

```
60:21      Q.   And what's the importance of that, if you
   22 know?
   23      A.   The importance of the presence of other
   24 persons in the police and suspect vehicle?
   25      Q.   Yes, sir.
61: 1      A.   That would be -- in the police vehicle,
    2 that would be like a ride-along.  In the suspect
    3 vehicle, that will be family members, kids, who else
```

## TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 60 Ln 21 - Pg 62 Ln 24 continued...

```
61: 4  in that suspect vehicle.
    5       Q.   And what impact would the presence of other
    6  persons in the police and suspect vehicle have on a
    7  decision to initiate or continue a pursuit?
    8            MR. SPREEUWERS:  Object to the
    9       hypothetical.
   10            Go ahead.
   11            THE WITNESS:  It depends on the situation.
   12  BY MS. JONES:
   13       Q.   Were you trained on that?
   14       A.   Yes, ma'am.
   15       Q.   Were you retrained on it?
   16       A.   I don't recall.
   17       Q.   Okay.  To your knowledge, was that
   18  violated --
   19       A.   I don't recall.
   20       Q.   -- in the incident involving the Pringle
   21  chase and the collision with Ms. Baker?
   22            MS. JONES:  Object to the form.
   23            You can answer.
   24            THE WITNESS:  I don't recall.
   25  BY MS. JONES:
62: 1       Q.   Okay.  And paragraph 4 of policy 802, what
    2  does it state?
    3       A.   Paragraph 4, "No officer," that one?
    4       Q.   Yes, sir.
    5       A.   "No officer with a civilian rider in his
    6  vehicle will participate in any high-speed pursuit."
    7       Q.   Were you trained on that policy?
    8       A.   Yes, ma'am.
    9       Q.   And were you retrained on it?
   10       A.   I don't recall.
   11       Q.   Okay.  Do you recall any instances where
   12  that policy provision was violated?
   13            MR. SPREEUWERS:  Object to the form.
   14            You can answer.
   15            THE WITNESS:  I don't recall.
   16  BY MS. JONES:
   17       Q.   Okay.  And on the next page, Baker-M-331,
   18  at the top, subparagraph 2 --
   19       A.   Yes, ma'am.
   20       Q.   -- what does it state?
   21       A.   It states that "SC Code 56-5-760 does not
   22  relieve the driver of an authorized emergency vehicle
   23  from the duty to drive with due regard for the safety
   24  of all persons."
```

## TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 65 Ln 20 - Pg 66 Ln 19

```
65:20      Q.   Did you ever engage in a pursuit without a
   21 supervisor exercising control over the pursuit?
   22      A.   Yes, ma'am.
   23      Q.   Okay.  Why?
   24      A.   Listed in my job functions.
   25      Q.   It was listed in your job functions?  I'm
66: 1 sorry, I didn't understand you.
    2      A.   Yes, ma'am.  To pursue a vehicle, sometimes
    3 there's no supervisors directly involved in the
    4 vehicle pursuit.
    5      Q.   Was that a common practice at the Richland
    6 County Sheriff's Department?
    7           MR. SPREEUWERS:  Object to the form.
    8           You can answer.
    9           THE WITNESS:  It's not a common practice.
   10      It's just --
   11 BY MS. JONES:
   12      Q.   Did it happen weekly?
   13      A.   I don't -- I wouldn't know.
   14      Q.   How often did it occur in your work?
   15      A.   In my region?
   16      Q.   In your -- yes.
   17      A.   If I had to guess -- I wouldn't know.  I
   18 only would know for myself how many pursuits I've
   19 been in.
```

## Pg 76 Ln 16 - Pg 77 Ln 17

```
76:16      Q.   Okay.  Were you trained to ask yourself the
   17 two questions set forth on that page, "Who are you
   18 willing to kill responding to this call situation?"
   19 And "Who are you willing to allow to die as a result
   20 of dangerous driving by an officer that you know
   21 about but allowed to go unaddressed?"
   22      A.   I remember this slide, yes, ma'am.
   23      Q.   The next page relates to Officer Michael
   24 Vaughn.  Do you recall the video concerning
   25 Officer Vaughn?
77: 1      A.   I do not.
    2      Q.   Do you recall the next slide that states or
    3 poses the question "Is speed an issue in your agency
    4 and what are you doing about it?"
    5      A.   I do recall the slide.
    6      Q.   Tell me about that.  What do you recall?
    7           MR. SPREEUWERS:  Objection, vagueness.
    8           THE WITNESS:  I just recall this exact
    9      slide.  Just the questions.
   10 BY MS. JONES:
   11      Q.   Was there any discussion about whether
   12 speed is an issue at the Richland County Sheriff's
```

## TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 76 Ln 16 - Pg 77 Ln 17 continued...

```
77:13  Department?
    14       A.   Not that I recall.
    15       Q.   Do you recall any instructions on reporting
    16  an issue if you observed one?
    17       A.   Yes, ma'am.
```

## Pg 80 Ln 20 - Pg 81 Ln 19

```
80:20       Q.   Did you inquire after?
    21       A.   Yes, ma'am.
    22       Q.   And to whom did you make such an inquiry?
    23  Who did you ask about it?
    24       A.   It was the sheriff.
    25       Q.   Sheriff Lott?
81: 1       A.   Yes, ma'am.
     2       Q.   When did that conversation take place?
     3       A.   It happened after the incident.
     4       Q.   Was it soon after the incident or a long
     5  time?
     6            MR. SPREEUWERS:  Object to the form.
     7       Vagueness.
     8            THE WITNESS:  It was not too far.  It was
     9       still the same day.
    10  BY MS. JONES:
    11       Q.   Oh, the same day?
    12       A.   Yes, ma'am.  It was after the incident.  It
    13  was still the same day.
    14       Q.   Tell me -- my understanding is this
    15  incident occurred in the afternoon.  Do you recall
    16  that?
    17       A.   I don't know exactly the time, but the --
    18  it was towards the -- or the second part of the day,
    19  after noon.
```

## Pg 82 Ln 2 - 22

```
82: 2       Q.   JD?
     3       A.   Shoes.
     4       Q.   What is JD Shoes?  Is that a person or a
     5  location?
     6       A.   No, ma'am.  It's a location off of Broad
     7  and Bush River.  In the mall.
     8       Q.   What type of location is it?
     9       A.   It's a shoe store.  Shoe department.
    10       Q.   Okay.  Did you -- was that a planned
    11  meeting?  How did that occur?
    12            MR. SPREEUWERS:  Objection, misstates the
    13       testimony.
    14            THE WITNESS:  How did that meeting occur?
```

# TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 82 Ln 2 - 22 continued...

```
82:15  BY MS. JONES:
    16        Q.    Yeah, how did it come about?
    17        A.    The sheriff called me.
    18        Q.    And what phone number did he call you on?
    19        A.    I don't recall.
    20        Q.    At that point in time, on December the
    21  29th, 2023, what phones were you using?
    22        A.    I had my personal and my work phone.
```

## Pg 83 Ln 10 - Pg 84 Ln 6

```
83:10        Q.    Okay.  And what was the shift that you were
    11  working on December 29th?
    12        A.    I was working overtime.  It was -- we
    13  called it Signal 30.
    14        Q.    When you say you were working overtime, had
    15  you already worked 12 hours that day?  Is that what
    16  you're telling me?
    17        A.    No, ma'am.
    18        Q.    What does that mean?
    19        A.    It's --
    20        Q.    What does overtime mean?
    21              MR. SPREEUWERS: Objection.  Please let the
    22        witness finish his answer.
    23  BY MS. JONES:
    24        Q.    What does overtime mean?
    25        A.    It's more time than your normal hours.
84: 1        Q.    What were your normal hours?
     2        A.    It was the -- I believe it's 80 hours a
     3  week or 85 hours.  It's between those two numbers.  I
     4  can't recall.  But those are the hours per my normal
     5  shift.  Anything after that is we call Signal 30.  A
     6  special duty.
```

## Pg 106 Ln 8 - Pg 107 Ln 9

```
106: 8        Q.    Now, so is that the end of that one?
     9              MR. JENKINS:  No.
    10              MS. JONES:  Okay.
    11                    - - -
    12              (Audio played.)
    13                    - - -
    14  BY MS. JONES:
    15        Q.    Stop there.
    16              Did you observe him driving, quote, real
    17  reckless?
    18        A.    Yes, ma'am.
    19        Q.    Was that you that made that statement?
    20        A.    Yes, ma'am.
```

# TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 106 Ln 8 - Pg 107 Ln 9 continued...

```
106:21      Q.   Okay.  And how long was he driving real
    22  reckless?
    23           MR. SPREEUWERS:  Object to the form.
    24           You can answer.
    25  BY MS. JONES:
107: 1      Q.   This is where it started.
     2      A.   Yes, ma'am.
     3      Q.   And it went down Broad River Road, correct?
     4      A.   Yes, ma'am.
     5      Q.   I mean, down Bush River Road to Broad River
     6  Road, correct?
     7      A.   Yes, ma'am.
     8      Q.   And then down Broad River Road?
     9      A.   Yes, ma'am.
```

## Pg 110 Ln 19 - Pg 112 Ln 6

```
110:19      Q.   And we still don't have any sound.
    20           Is that Mr. Pringle changing lanes there?
    21      A.   Yes, ma'am.  That is Mr. Pringle's vehicle
    22  directly in front of me.
    23                    - - -
    24               (Video played.)
    25                    - - -
111: 1  BY MS. JONES:
     2      Q.   Stop right there.
     3           What caused you to turn on the sound?
     4      A.   When we --
     5           MR. SPREEUWERS:  Objection.
     6           Go ahead.
     7           THE WITNESS:  Any time we activate our blue
     8      lights, the camera turns on.
     9  BY MS. JONES:
    10      Q.   So is it correct that prior to right now on
    11  the video, at .32, you didn't have your blue light
    12  on?
    13      A.   Yes, ma'am.  I did not have my blue lights
    14  on.
    15      Q.   So when you turned your blue light on at
    16  .32 on the recording, that's when the sound was
    17  activated?
    18           MR. SPREEUWERS:  Objection.  Misstates the
    19      testimony.
    20           Go ahead.
    21           THE WITNESS:  At this time in the video,
    22      once I activated my blue lights, the sound turns
    23      on.
    24  BY MS. JONES:
    25      Q.   Okay.  So when you activate the blue light,
112: 1  sound comes on?
```

## TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 110 Ln 19 - Pg 112 Ln 6 continued...

```
112: 2       A.   Yes, ma'am.
     3       Q.   So would it be correct that before you
     4  activated the blue lights, there was no sound?
     5       A.   Correct.  Before I activated my blue
     6  lights, there's no sound being recorded.
```

## Pg 114 Ln 1 - 24

```
114: 1       Q.   What's he doing now?
     2       A.   He's swerving all over the road.
     3            MS. JONES:  Swerving all over the road.
     4            Continue.
     5                     - - -
     6                 (Video played.)
     7                     - - -
     8  BY MS. JONES:
     9       Q.   Now stop right here.
    10            What did you have to do in order not to hit
    11  the red vehicle in front of you and the black vehicle
    12  to your left?
    13            MR. SPREEUWERS:  Object to the form.
    14            You can answer.
    15  BY MS. JONES:
    16       Q.   What, if anything, did you have to do?
    17       A.   I had to hit my brakes.
    18       Q.   Okay.  And when you hit your brakes, what
    19  happened, if you recall?
    20       A.   My vehicle slowed down.
    21            MS. JONES:  Okay.  Go ahead.
    22                     - - -
    23                 (Video played.)
    24                     - - -
```

## Pg 118 Ln 16 - Pg 119 Ln 25

```
118:16       Q.   And you followed him?
    17       A.   Yes, ma'am.
    18                     - - -
    19                 (Video played.)
    20                     - - -
    21  BY MS. JONES:
    22       Q.   Okay.  Do you know how many cars
    23  Mr. Pringle and your patrol car passed in the
    24  oncoming traffic before the wreck?
    25       A.   I do not know.
119: 1       Q.   Have you ever counted them?
     2       A.   No, ma'am.
     3       Q.   Would it surprise you to know that it was
     4  72 cars?
```

# TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 118 Ln 16 - Pg 119 Ln 25 continued...

```
119: 5          MR. SPREEUWERS:  Objection, argumentative.
      6 BY MS. JONES:
      7     Q.   Does that surprise you?
      8          MR. SPREEUWERS:  Same objection.
      9          THE WITNESS:  I wouldn't know in an
     10     incident.
     11 BY MS. JONES:
     12     Q.   And you've never reviewed the video or
     13 counted them?
     14          MR. SPREEUWERS:  Objection, misstates the
     15     evidence.
     16          THE WITNESS:  Yes, I reviewed the video,
     17     but I did not count the amount of cars.
     18          MS. JONES:  Okay.
     19               - - -
     20          (Video played.)
     21               - - -
     22 BY MS. JONES:
     23     Q.   All right.  Stop right here.
     24          Who is that?
     25     A.   That is K-9 Specialist Hodge.
```

## Pg 121 Ln 15 - Pg 122 Ln 24

```
121:15     Q.   Stop right here.
     16          What -- where is -- what is this lane
     17 that's separate from the highway lanes at 3.39 of the
     18 video?
     19     A.   The lane that we're currently in is the
     20 onramp to 126 from Colonial Life.
     21     Q.   Colonial Life?
     22     A.   Yes.
     23     Q.   So it's here?
     24     A.   Yes.
     25     Q.   That's the other ramp?
122: 1     A.   Yes, ma'am.
      2     Q.   So you could have gotten off the interstate
      3 at that point?
      4          MR. SPREEUWERS:  Object to the form.
      5 BY MS. JONES:
      6     Q.   Is that correct?
      7     A.   The incident didn't require that.
      8     Q.   Well, I understand that's your position.
      9 But my question to you is, was it possible, at that
     10 point in time, to stop the chase and exit the
     11 interstate at that ramp?
     12          MR. SPREEUWERS:  Object to the form.
     13          You can answer.
     14          THE WITNESS:  It is a possibility.
     15          MS. JONES:  Okay.  Continue.
```

# TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 121 Ln 15 - Pg 122 Ln 24 continued...

```
122:16                      - - -
   17              (Video played.)
   18                      - - -
   19  BY MS. JONES:
   20      Q.   Now stop it right here.
   21           At what point in time did you lose sight of
   22  Mr. Pringle?
   23      A.   I lost sight of Mr. Pringle as he crest
   24  this, I guess, hill on this turn.
```

## Pg 124 Ln 2 - Pg 125 Ln 13

```
124: 2      Q.   The individual that just got out of the
   3  vehicle in front of you, is that Deputy Hodge and his
   4  dog?
   5      A.   Yes, ma'am.
   6      Q.   Okay.  All right.  And the vehicle that's
   7  crashed in the middle of the -- of the thing, is that
   8  Mr. Pringle's vehicle?
   9      A.   Yes, that is Mr. Pringle's vehicle.
   10     Q.   All right.  Do you have -- can you tell me,
   11  if you know, how Mr. Pringle's vehicle was turned
   12  around so that it's facing going back into Columbia
   13  as opposed to going out into incoming traffic?
   14          MR. SPREEUWERS:  Object to the form.
   15          You can answer.
   16          THE WITNESS:  You're asking how his vehicle
   17      was flipped around --
   18  BY MS. JONES:
   19      Q.   Yes.
   20      A.   -- instead of going the direction he was?
   21      Q.   How did it flip around?
   22      A.   From the collision.
   23      Q.   What happened in the collision, if you
   24  know?
   25      A.   I don't know.
125: 1          MR. SPREEUWERS:  Object to the form.
   2          THE WITNESS:  I don't know exactly what
   3      happened in the collision because I didn't
   4      witness the collision.
   5  BY MS. JONES:
   6      Q.   Yes, sir.
   7      A.   I don't know.
   8          MS. JONES:  Pam, you need to leave.
   9                      - - -
   10         (Ms. Baker exits the deposition room.)
   11                      - - -
   12              (Video played.)
   13                      - - -
```

## TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 125 Ln 21 - Pg 127 Ln 2

```
125:21      Q.   Did the Lexington County deputy that
    22  started with the original call, was he involved in
    23  the chase?
    24      A.   I don't know.
    25      Q.   Was he on the scene after the collision?
126: 1      A.   There was a Lexington undercover at the
     2  scene after the collision.  I don't know who.
     3      Q.   Okay.  After this collision and the chase
     4  ended, what were your duties and responsibilities in
     5  regards to reporting the events --
     6          MR. SPREEUWERS:  Object to the form.
     7  BY MS. JONES:
     8      Q.   -- if any?
     9      A.   My duties after the collision for reporting
    10  the event?
    11      Q.   (Nods head.)
    12      A.   Would be to notify the desk, which is the
    13  desk sergeant.  Formulate a report.  And that's for
    14  reporting the incident.
    15      Q.   Is there a -- is there a policy about which
    16  deputy is responsible for making the report?
    17          MR. SPREEUWERS:  Object to the form.
    18          You can answer.
    19          THE WITNESS:  I don't know if there is a
    20      policy.
    21  BY MS. JONES:
    22      Q.   Is there a practice?
    23      A.   There is a practice.
    24      Q.   What is the practice?
    25      A.   The practice is the individual who
127: 1  initiated said event has the obligation to notify the
     2  desk.
```

## Pg 132 Ln 3 - Pg 133 Ln 7

```
132: 3      Q.   Okay.  And what does -- what is meant by
     4  your entry here where it says Counts 1?
     5      A.   Counts 1 means how many of this offense is
     6  being completed.
     7      Q.   What do you mean when you say offense?
     8  This offense?
     9      A.   Offense is just what the report labels this
    10  under as an offense.
    11      Q.   Is the offense related to this chase and
    12  him running from the law, or is it related to
    13  something else?
    14          MR. SPREEUWERS:  Object to the form.
    15          You can answer.
    16          THE WITNESS:  The offense is related to the
    17      call to -- to what we were doing for the call.
```

# TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 132 Ln 3 - Pg 133 Ln 7 continued...

```
132:18   BY MS. JONES:
    19       Q.   Okay.  Well, what do you consider that to
    20   include!
    21            MR. SPREEUWERS:  Object to the form.
    22            THE WITNESS:  I don't understand.
    23   BY MS. JONES:
    24       Q.   Is it the chase or is it the warrant that
    25   you were trying to arrest him for?
133: 1       A.   This is for assisting other agencies, that
     2   would mean the warrant.
     3       Q.   Okay.  The warrant.
     4       A.   I am acting on the warrant.
     5       Q.   All right.  The narrative of Baker-A-003 to
     6   0004, who prepared that narrative?
     7       A.   I prepared that narrative.
```

## Pg 138 Ln 8 - Pg 139 Ln 4

```
138: 8       Q.   And then at some point in time, they go
     9   before a judge and are sentenced to jail or released
    10   on bond; is that correct?
    11       A.   Yes, ma'am.
    12       Q.   All right.  And at that point in time
    13   they're not wanted anymore because their case has
    14   been adjudicated; is that right?
    15       A.   It can be a number of things, yes, ma'am.
    16       Q.   Right.  So my question to you is:  How do
    17   you know that this warrant is outstanding and that
    18   Mr. Pringle hadn't already been arrested for it?
    19            MR. SPREEUWERS:  Object to the form.
    20            You can answer.
    21            MS. JONES:  If you know.
    22            THE WITNESS:  I do not know.
    23   BY MS. JONES:
    24       Q.   Did you ever ask if he had already been
    25   arrested for the failure to appear?
139: 1       A.   Not in the incident, no.
     2       Q.   Later on did you ask?
     3       A.   After the incident, after the collision,
     4   yes.
```

## Pg 149 Ln 1 - Pg 150 Ln 2

```
149: 1       Q.   What happened?
     2       A.   I don't recall.
     3       Q.   You don't remember?
     4       A.   I don't recall.
     5       Q.   Okay.  Is there any record of the action
     6   taken other than this, to your knowledge?
```

## TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 149 Ln 1 - Pg 150 Ln 2 continued...

```
149: 7        A.   I do not know.
     8        Q.   How many times during your work at the
     9   Richland County Sheriff's Department did you have
    10   corrective action taken against you?
    11             MR. SPREEUWERS:  Object to the form.
    12             You can answer.
    13             THE WITNESS:  I don't know.  I don't recall
    14        how many times I've been -- corrective action
    15        had been taken place.
    16   BY MS. JONES:
    17        Q.   Do you recall any time other than this one?
    18        A.   I don't recall this one or any other time.
    19        Q.   And how long did you work there?
    20        A.   About two and a half years.
    21             MS. JONES:  The next page -- let's take a
    22        break for lunch.  I didn't realize it was 1:00.
    23                          - - -
    24             (A lunch recess transpired.)
    25                          - - -
150: 1        (Ms. Baker rejoins the deposition.)
     2                          - - -
```

## Pg 150 Ln 18 - Pg 151 Ln 16

```
150:18        Q.   Okay.  And the report reflects that there
    19   was one bag.  Or it says, "Quarter bag contained
    20   compressed purple powder."
    21        A.   Yes, I see that.
    22        Q.   So let me ask you this:  Is this the
    23   contents of all three bags that you took out of the
    24   car and collected or just one, or do you know?
    25        A.   I don't know.
151: 1        Q.   Okay.  Let me ask you what the normal
     2   practice and procedure is.  Would it have been to
     3   test all three bags or just one?
     4             MR. SPREEUWERS:  Object to the form.
     5             You can answer.
     6             THE WITNESS:  The normal procedure to --
     7        for drug analysis, when we submit it, is to each
     8        separate bag, that the evidence bag that it
     9        comes in.
    10   BY MS. JONES:
    11        Q.   Would be checked?
    12        A.   For the evidence bag, yes.
    13        Q.   Okay.  So were all three bags in one
    14   evidence bag, or were they in three separate evidence
    15   bags?
    16        A.   I don't recall.
```

# TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 151 Ln 23 - Pg 152 Ln 21

```
151:23      Q.   What are you referring to when you say
    24  headquarters?
    25      A.   The Richland County Sheriff's Department
152: 1  headquarters?
     2      Q.   Okay.  Is there contained within Exhibit 10
     3  that record of the evidence bag form or that
     4  document?
     5      A.   Not in 10.
     6      Q.   Let me ask you this:  By what name do you
     7  refer to the report that's contained in Exhibit 10?
     8  What's that called?
     9      A.   Which report?
    10      Q.   Exhibit 10.
    11          MR. SPREEUWERS:  Object to the form.
    12          You can answer.
    13          THE WITNESS:  There's multiple reports
    14      here.
    15  BY MS. JONES:
    16      Q.   Okay.  All right.  Well, tell me what
    17  pages -- what constitutes the first report in
    18  Exhibit 10.
    19      A.   The first report that goes from Baker-A-001
    20  to -- from Baker-A-001 to Baker-A-004, that's my
    21  initial incident report.
```

## Pg 155 Ln 25 - Pg 156 Ln 24

```
155:25      Q.   And on page A-18 to 19, this information
156: 1  about Byron Pringle, it has an ID number at the
     2  bottom of page 18, right above his name, Byron
     3  Lyndell Pringle.
     4          Do you know what those numbers refer to?
     5      A.   I know the number next to ID and O, that's
     6  his driver's license number.
     7      Q.   Do you know what DDL number is?
     8      A.   The one right next to it, DD number?
     9      Q.   Correct.
    10      A.   I do not.
    11      Q.   And this information was performed by you,
    12  correct?
    13          MR. SPREEUWERS:  Object to the form.
    14          You can answer.
    15          THE WITNESS:  This information was inputted
    16      into the CAD by me.
    17  BY MS. JONES:
    18      Q.   By you.  And you accessed this information
    19  from what database?
    20      A.   I accessed this information from the CAD
    21  system.
    22      Q.   From the CAD system.  So the CAD system had
```

# TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:**  object*

## Pg 155 Ln 25 - Pg 156 Ln 24 continued...

```
156:23  his full name, Byron Lyndell Pringle?
    24       A.   Yes, ma'am, after the incident, yes.
```

## Pg 157 Ln 5 - Pg 158 Ln 1

```
157: 5       Q.   Social Security number or the last four
     6  digits of it?
     7       A.   Yes.
     8       Q.   His race?
     9       A.   Yes.
    10       Q.   And his driver's license status?
    11       A.   Yes.
    12       Q.   Let me ask you what this report means.  For
    13  example, in the next line down, it says, "SUSP,
    14  driving under suspension, BEG 4-18-2023."
    15            Does that mean beginning 4-18-2023?
    16            MR. SPREEUWERS:  Object to the form.
    17            You can answer.
    18            THE WITNESS:  Yes.  That means his
    19       suspension begins on that date.
    20  BY MS. JONES:
    21       Q.   Okay.  And then it's got an end date.
    22       A.   Yeah.
    23       Q.   Correct?
    24       A.   Yes.
    25       Q.   7-18-23?
158: 1       A.   Yes.
```

## Pg 158 Ln 16 - Pg 159 Ln 12

```
158:16       Q.   And on the next page, and I know you've
    17  answered some questions about this previously,
    18  Baker-A-20.  That begins with MKE/wanted person -
    19  caution.  Do you see that?
    20       A.   Yes.
    21       Q.   And it ends with the NCI number at the
    22  bottom of the page.  Do you see that?
    23       A.   Yes.
    24       Q.   Okay.  What does ES -- no -- DLU refer to,
    25  if you know?
159: 1            MR. SPREEUWERS:  Objection.  It's been
     2       asked and answered.
     3            THE WITNESS:  I do not know.
     4  BY MS. JONES:
     5       Q.   Okay.  You don't know.  Okay.
     6            And in the line above that, it says ORI is
     7  Lexington County.  What is ORI?
     8       A.   ORI means the originating agency.
     9       Q.   Okay.  So the information, the originating
```

## TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

---

## Pg 158 Ln 16 - Pg 159 Ln 12 continued...

```
159:10   agency on this warrant number 353958585 is the
    11   Lexington County Sheriff's Department?
    12       A.  Say that one more time.
```

## Pg 160 Ln 17 - Pg 161 Ln 16

```
160:17       Q.  And what is MAIT?  Do you know what MAIT
    18   stands for?
    19       A.  It's a big word.  It's multi agency --
    20       Q.  Is this it?  This is actually Exhibit 12
    21   that's in that notebook.
    22       A.  Yes.  SO MAIT stands for multidisciplinary
    23   accident investigation team.
    24       Q.  Do you know why the MAIT team from the
    25   South Carolina Highway Patrol conducted an
161: 1   investigation in regards to the chase of Mr. Pringle
     2   and the head-on collision with Ms. Baker?
     3           MR. SPREEUWERS:  Object to the form.
     4   Misstates testimony.
     5           Go ahead.
     6           THE WITNESS:  Say that one more time.
     7   BY MS. JONES:
     8       Q.  Do you know why, the reason, that the
     9   South Carolina Highway Patrol MAIT team conducted
    10   this investigation?
    11       A.  Yes.
    12       Q.  Why?
    13       A.  The MAIT team has requirements on when they
    14   come out and do the investigation.  One including
    15   when the law enforcement officer is involved and
    16   including death --
```

## Pg 162 Ln 17 - Pg 164 Ln 2

```
162:17       Q.  All right.  Did you give a statement to the
    18   MAIT investigative team?
    19       A.  I don't recall.
    20       Q.  Do you know who was in charge of the MAIT
    21   investigation?
    22       A.  I do not.
    23       Q.  Are you familiar with a South Carolina
    24   Sheriff's Department form entitled Injury Report?
    25       A.  No, I don't recall.
163: 1       Q.  Are you familiar with the South Carolina
     2   Sheriff Department report entitled Officer Defensive
     3   Action Report?
     4           MR. SPREEUWERS:  Object to the form.
     5           You can answer.
     6           THE WITNESS:  The South Carolina --
```

# TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 162 Ln 17 - Pg 164 Ln 2 continued...

```
163: 7  BY MS. JONES:
     8       Q.   Sheriff's Department Officer Defensive
     9  Action Report?
    10       A.   I don't know what that form is.
    11       Q.   Okay.  How about one called Professional
    12  Development Form?
    13       A.   Yes.
    14       Q.   Okay.  What is the Professional Development
    15  Form?
    16            MR. SPREEUWERS:  Object to the form.  You
    17       can answer.
    18            THE WITNESS:  Professional Development Form
    19       is a form used to counsel an individual.
    20  BY MS. JONES:
    21       Q.   Okay.  Are you familiar with the
    22  South Carolina Sheriff Department Stop Stick
    23  Deployment Form?
    24       A.   Not that form.
    25       Q.   Are you familiar with a South Carolina
164: 1  Sheriff's Department Vehicle Tow Receipt?
     2       A.   No.
```

## Pg 165 Ln 8 - Pg 166 Ln 3

```
165: 8  BY MS. JONES:
     9       Q.   And this is when you all were trying to
    10  remove Mr. Pringle?
    11       A.   Yes, ma'am.
    12       Q.   Stop right here.
    13            Who is that?
    14       A.   I do not know.
    15       Q.   What is the -- the required policy or what
    16  is the policy about individuals being on the scene
    17  who are not officers?
    18            MR. SPREEUWERS:  Objection.  Misstates the
    19       evidence.
    20            THE WITNESS:  I do not know the policy
    21       verbatim, but he was a law enforcement officer.
    22       I just don't know him personally.
    23  BY MS. JONES:
    24       Q.   What law enforcement company or division
    25  did he work for?
166: 1       A.   He worked for Richland.
     2       Q.   Richland County Sheriff's Department?
     3       A.   Yes, ma'am.
```

# TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 168 Ln 8 - Pg 171 Ln 13

```
168: 8        Q.   And did you move it?
      9        A.   Yes, ma'am.
     10             MS. JONES:  Okay.  Continue.
     11                      - - -
     12                  (Video played.)
     13                      - - -
     14   BY MS. JONES:
     15        Q.   Who is that in Mr. Hodge's --
     16   Deputy Hodge's vehicle?
     17        A.   That is a civilian ride-along.
     18        Q.   Is that a violation of the policy?
     19             MR. SPREEUWERS:  Object to the form.
     20             You can answer.
     21             THE WITNESS:  It's not a violation of
     22        policy for a civilian ride-along to be riding
     23        with Deputy Hodge.
     24   BY MS. JONES:
     25        Q.   Okay.  Explain that to me.
169: 1             MR. SPREEUWERS:  Object to the form.
      2             THE WITNESS:  Explain what?
      3   BY MS. JONES:
      4        Q.   Okay.  Well, all right.  If you look at
      5   Exhibit 36, the policies.  Baker-M-330.  The Vehicle
      6   Pursuits Policy 802.3, Section 4.  Read it.  What
      7   does it say?
      8        A.   It states, "No officer with a civilian
      9   rider in his vehicle will participate in any
     10   high-speed pursuit."
     11        Q.   Did Hodge participate in the high vehicle
     12   pursuit [sic]?
     13             MR. SPREEUWERS:  Object to the form.
     14             You can answer.
     15             THE WITNESS:  Hodge did participate in
     16        the --
     17   BY MS. JONES:
     18        Q.   High-speed pursuit?
     19        A.   -- vehicle pursuit.
     20        Q.   And he had a civilian rider in his vehicle,
     21   correct?
     22        A.   Correct, he did.
     23        Q.   So how is that not a violation of that
     24   policy?
     25             MR. SPREEUWERS:  Object to the form.
170: 1             You can answer.
      2             THE WITNESS:  I can only speak for my
      3        actions, not Deputy Hodge's.
      4   BY MS. JONES:
      5        Q.   No, but I'm asking you, how is that not a
      6   violation of this policy?
      7             MR. SPREEUWERS:  Objection.  It's
      8        argumentative.
```

## TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 168 Ln 8 - Pg 171 Ln 13 continued...

```
170: 9           THE WITNESS:  The policy is a guideline.
    10  BY MS. JONES:
    11       Q.   So they're guidelines.  You don't have to
    12  follow them?  Is that your understanding?
    13           MR. SPREEUWERS:  Object to the form.
    14       Argumentative and misstates the testimony.
    15           THE WITNESS:  It can be taken into
    16       consideration.
    17  BY MS. JONES:
    18       Q.   Say that again.
    19       A.   Take into consideration.
    20       Q.   Take what into consideration?
    21       A.   The totality of the circumstances.
    22       Q.   So you don't have to follow -- is your
    23  testimony you don't have to follow these policies
    24  based on circumstances?
    25           MR. SPREEUWERS:  Object to the form.  That
171: 1       continues to be argumentative and continues to
     2       purposefully misstate the testimony.  Go ahead.
     3           THE WITNESS:  That's not what I said.
     4  BY MS. JONES:
     5       Q.   What did you say?
     6       A.   They are guidelines.
     7       Q.   The policies are guidelines?
     8       A.   Yes.
     9       Q.   What does that mean when you say they're
    10  guidelines?
    11       A.   They are -- policy and procedures that an
    12  officer has to use his discretion with in order to
    13  conduct his job functions.
```

## Pg 171 Ln 14 - Pg 174 Ln 21

```
171:14       Q.   Show me in this manual where it says that.
    15       A.   It says -- as it states on Baker-M-008,
    16  100.1 policy, "The information in this manual is
    17  intended to provide supervisors, deputies,
    18  administrative personnel, and other employees with
    19  general guidance regarding policies."
    20       Q.   So your basis of that is this first
    21  sentence that says "The information in this manual is
    22  intended to provide supervisors, deputies,
    23  administrative personnel and other employees with
    24  general guidance regarding, policies, practices, and
    25  procedures of the Richland County Sheriff's
172: 1  Department"?
     2           MR. SPREEUWERS:  Object to the form.
     3       Continues to be argumentative.
     4           THE WITNESS:  What are you asking?
     5  BY MS. JONES:
```

# TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 171 Ln 14 - Pg 174 Ln 21 continued...

```
172: 6        Q.   That's your basis for saying these are
     7  guides?
     8        A.   That's what it says right there in the
     9  policy.
    10        Q.   Is there anything else that you're relying
    11  on other than that sentence?
    12        A.   That, my experience, and the incident at
    13  hand.
    14        Q.   Okay.  When you were trained on these
    15  policies and procedures, were you instructed that
    16  they are guidance?
    17             MR. SPREEUWERS:  Object to the form.
    18             You can answer.
    19             THE WITNESS:  I don't recall what they were
    20        instructed verbatim.
    21  BY MS. JONES:
    22        Q.   Well, when did you form the opinion that
    23  the policies and procedures are guidance?
    24             MR. SPREEUWERS:  Object to the form.
    25        Misstates the testimony.
173: 1             THE WITNESS:  By reading the paragraph,
     2        which I just stated.
     3  BY MS. JONES:
     4        Q.   And when did you read that?
     5        A.   As I stated in previous testimony, when I
     6  began my employment with the Richland County
     7  Sheriff's Department, we went over policies and
     8  procedures.
     9        Q.   And were you instructed by one of your
    10  superiors or instructors that these policies and
    11  procedures, this Exhibit 36, is guidance?
    12             MR. SPREEUWERS:  Object to the form.
    13        Misstates the testimony.
    14             You can answer.
    15             THE WITNESS:  I didn't recall verbatim what
    16        someone said.
    17  BY MS. JONES:
    18        Q.   What's the difference to you between a
    19  policy and guidance?
    20             MR. SPREEUWERS:  Objection.  Misstates the
    21        testimony.
    22             Go ahead.
    23             THE WITNESS:  What's the difference between
    24        a policy and guidance?
    25  BY MS. JONES:
174: 1        Q.   Yeah.
     2        A.   A policy is what you use to guide through
     3  whatever it is.
     4        Q.   Are you saying there that -- I don't
     5  understand that.  Say that again?  The policy is what
     6  you're to guide through?
```

# TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 171 Ln 14 - Pg 174 Ln 21 continued...

```
174: 7        A.   What helps guide your decision when it
      8   comes to policy.
      9        Q.   Okay.  Were you tested on any of the -- did
     10   you have to take any tests on any of the policies?
     11             MR. SPREEUWERS:  Object to the form.
     12             You can answer.
     13             THE WITNESS:  I don't recall.
     14   BY MS. JONES:
     15        Q.   Did you take any tests on the Richland
     16   County Sheriff's Department pursuit policies?
     17        A.   I don't recall.
     18        Q.   Okay.  Did you take any tests on the
     19   circumstances under which you should engage in a
     20   pursuit?
     21        A.   I don't recall.
```

## Pg 176 Ln 12 - Pg 178 Ln 4

```
176:12        Q.   When?
     13        A.   Multiple instances.
     14        Q.   What caused you to downgrade a code 3 to a
     15   code 1?
     16        A.   It could be multiple things from
     17   information I'm getting from dispatch, information
     18   I'm getting from other officers.
     19        Q.   And would the -- what would -- what type of
     20   information, if you can give me some examples, would
     21   cause you to downgrade a code 3 to a code 1?
     22             MR. SPREEUWERS:  Object to the
     23        hypothetical.
     24             Go ahead.
     25             THE WITNESS:  It depends on the situation.
177: 1   BY MS. JONES:
      2        Q.   Well, that's what I'm asking you about.
      3   Give me an example.
      4        A.   The example would be if a call came out as
      5   a domestic disturbance with a weapon.  I'm running
      6   lights and sirens to that due to the life-threatening
      7   emergency.  Then if I get an officer -- another
      8   officer gets on the scene and states the suspect has
      9   left prior to my arrival, then I would downgrade from
     10   a code 3 to a code 1.
     11        Q.   Okay.  Because the urgency would have --
     12   wouldn't exist anymore?
     13             MR. SPREEUWERS:  Object to the form.
     14             You can answer.
     15             THE WITNESS:  Because the life-threatening
     16        situation has deescalated.
     17   BY MS. JONES:
     18        Q.   Okay.  I think you've told me about the
```

## TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

___

## Pg 176 Ln 12 - Pg 178 Ln 4 continued...

```
177:19   call from Sheriff Lott and from the -- and the call
    20   with the lawyer for the sheriff's department, the
    21   general counsel, and your supervisor.  Did you
    22   discuss this incident with anyone else that you can
    23   recall?
    24       A.   I don't recall.
    25           MS. JONES:  Let's go back to the body cam
178: 1   footage.
     2                       - - -
     3               (Video played.)
     4                       - - -
```

## Pg 178 Ln 21 - Pg 180 Ln 20

```
178:21       Q.   Young adults.  How old do you have to be to
    22   be an Explorer, if you know?
    23       A.   He was 14 to 18.
    24       Q.   So why was he telling him to get back in
    25   the car, if you know?
179: 1       A.   Because he's not supposed to be out of the
     2   car on the scene.
     3       Q.   What's the basis of your saying he's not
     4   supposed to be out of the car at the scene?
     5       A.   He's a ride-along.  He's supposed to stay
     6   inside the vehicle.
     7       Q.   Is that a policy or a guidance?
     8           MR. SPREEUWERS:  Object to the form.
     9           You can answer.
    10           THE WITNESS:  I don't recall, but ...
    11           Here we go.  As stated, Baker-M-818, "The
    12       citizen is to remain in the vehicle during all
    13       traffic stops and when the deputy is responding
    14       to calls.  At no time will the citizen enter
    15       into a private residence of a victim or a
    16       suspect."
    17   BY MS. JONES:
    18       Q.   And on the next page, on M-819,
    19   paragraph J, what does it say?
    20       A.   "Any noncompliance with the prescribed
    21   guidelines will be reported immediately to the
    22   on-duty regional commander with written documentation
    23   forwarded, directed to the sheriff or his designee."
    24       Q.   And did you do that in regards to this
    25   ride-along?
180: 1       A.   I did not.
     2       Q.   Why not?
     3       A.   He was not my ride-along.
     4       Q.   Any other reason?
     5       A.   No, ma'am.
     6       Q.   Was that a violation of that requirement
```

# TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 178 Ln 21 - Pg 180 Ln 20 continued...

```
180: 7  for you not to report it?
     8           MR. SPREEUWERS:  Object to the form.
     9           You can answer.
    10           THE WITNESS:  Per policy, yes.
    11           MS. JONES:  All right.  Continue.
    12                    - - -
    13               (Video played.)
    14                    - - -
    15  BY MS. JONES:
    16      Q.   Will you stop it there.
    17           Do you know who those two people are?  The
    18  one in the camouflage jacket and the one in the red
    19  sweatshirt?
    20      A.   I don't know the one in the camouflage.
```

## Pg 185 Ln 23 - Pg 191 Ln 6

```
185:23      Q.   And do you know what department he worked
    24  in or division?
    25      A.   At the time when I was working, he was a
186: 1  canine specialist.
     2      Q.   And this report states that on
     3  December 20th, 2023, and if you read the whole thing,
     4  he arrested Byron Pringle.
     5      A.   Let me read it.
     6      Q.   Yes, please read it.
     7      A.   What was the question?
     8      Q.   This is on December the -- this report
     9  states on December 20th, 2023, Pringle was arrested
    10  for multiple narcotics charges.
    11           MR. SPREEUWERS:  I'm going to object to any
    12      questions about this as being without
    13      foundation.
    14           THE WITNESS:  From my knowledge, in this
    15      report made by Deputy Abdullah, it states that
    16      Pringle was arrested for multiple narcotics
    17      charges.
    18  BY MS. JONES:
    19      Q.   On December 20th, 2023?
    20      A.   Per his report, yes.
    21      Q.   Per his report.  Okay.
    22           And are these the kind of reports that the
    23  Richland County Sheriff's Department maintains in the
    24  routine course of its business in law enforcement?
    25      A.   Yes.
187: 1      Q.   Okay.  And are these the kind of reports
     2  that when you were working there you would rely upon
     3  in conducting your services as a deputy sheriff?
     4           MR. SPREEUWERS:  Object to the form.
     5           You can answer.
```

# TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 185 Ln 23 - Pg 191 Ln 6 continued...

```
187: 6          THE WITNESS:  Can you say that again.
     7  BY MS. JONES:
     8      Q.   Would you rely on these kinds of reports
     9  when you were working there?
    10      A.   Yes.
    11      Q.   Yes.  And have you ever known Mr. Abdullah
    12  to make a false report?
    13          MR. SPREEUWERS:  Object to the form.
    14          You can answer.
    15          THE WITNESS:  I wouldn't know.
    16  BY MS. JONES:
    17      Q.   Do you have any basis to think that this
    18  report is inaccurate or false?
    19          MR. SPREEUWERS:  Object to the form.
    20          You can answer.
    21          THE WITNESS:  No.
    22  BY MS. JONES:
    23      Q.   All right.  So in this report on its face
    24  says that nine days before the high-speed chase and
    25  head-on collision with Ms. Baker, Byron Pringle was
188: 1  arrested by the Richland County Sheriff's Department,
     2  doesn't it?
     3      A.   Per this report, yes.
     4      Q.   Okay.  All right.  And it says he was
     5  arrested for multiple narcotics charges, his vehicle
     6  was towed by Midlands Auto, and that there was a
     7  puppy taken to animal control to the shelter.
     8  Correct?
     9      A.   Per his report, yes.
    10      Q.   All right.  So what paperwork would
    11  Officer Abdullah have to fill out to have his vehicle
    12  towed?
    13          MR. SPREEUWERS:  Object to the form.
    14          You can answer.
    15          THE WITNESS:  Officer -- or excuse me,
    16      Deputy Abdullah will have to fill out a tow slip
    17      to have a vehicle towed.
    18  BY MS. JONES:
    19      Q.   Okay.  And where -- how -- does the tow
    20  slip get entered on the same computer in the patrol
    21  car just like the incident reports?
    22      A.   Yes.
    23      Q.   Okay.  And it's called a tow slip?
    24      A.   Yes.
    25      Q.   All right.  And would he have to fill out
189: 1  any paperwork to transport the animal to the animal
     2  control shelter?
     3          MR. SPREEUWERS:  Object to the form.
     4          You can answer.
     5          THE WITNESS:  No.
     6  BY MS. JONES:
```

# TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 185 Ln 23 - Pg 191 Ln 6 continued...

```
189: 7        Q.   And what documentation would he have to
      8   fill out related to Pringle's arrest, if any?
      9        A.   For an arrest, he would have to fill out a
     10   warrant affidavit and an arresting document or arrest
     11   document.
     12        Q.   All right.  And are those two forms, the
     13   warrant affidavit and the arrest document, are they
     14   on the computer system in the patrol car?
     15        A.   Yes, ma'am.
     16        Q.   And where, since this said it was on
     17   Monticello Road and Knightner, K-N-I-G-H-T-N-E-R,
     18   Knightner Street, I guess is the way you pronounce
     19   it, where would you take -- where would Mr. Pringle
     20   have been taken to jail?
     21             MR. SPREEUWERS:  Object to the form.
     22             THE WITNESS:  Anywhere an arrest is made
     23        within Richland County's jurisdiction, they
     24        would be taken to Alvin S. Glenn Detention
     25        Center.
190: 1   BY MS. JONES:
      2        Q.   Okay.  Did the sheriff's department --
      3   Richland County Sheriff's Department receive any
      4   notification from the Alvin S. Glenn Detention Center
      5   when an arrestee is released from custody?
      6             MR. SPREEUWERS:  Object to the form.
      7             THE WITNESS:  I don't know.
      8   BY MS. JONES:
      9        Q.   Did you ever see any such reports when you
     10   were working there?
     11        A.   No.
     12        Q.   How would you determine if someone you
     13   arrested was still in jail or had been released?
     14        A.   You would go to the Alvin S. Glenn's
     15   website.
     16        Q.   Is there any other way you would check it?
     17        A.   Besides physically going up to the jail,
     18   no.
     19        Q.   Okay.  And what would you look for on the
     20   website?  The Alvin S. Glenn website?
     21             MR. SPREEUWERS:  Object to the form.
     22             THE WITNESS:  What would I look for?
     23   BY MS. JONES:
     24        Q.   Yes.  What would you look for to determine
     25   if a person you arrested had been released from jail?
191: 1        A.   I would input their information.
      2        Q.   When you say their information, you mean
      3   their name?
      4        A.   Yes.
      5        Q.   Just their name?
      6        A.   Just their name.
```

## TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 192 Ln 14 - Pg 199 Ln 2

```
192:14      Q.   Did you know that your department had the
    15  records on Mr. Pringle showing his name, his last
    16  known address, his -- the jumpsuit size for his jail
    17  suit, his DNA, his date of birth, all that
    18  information on him?  Where his tattoo was on his arm?
    19      A.   I did not have no knowledge that we had
    20  that.
    21      Q.   Did you at any point in time on
    22  December 29th, 2023, consider not engaging in the
    23  chase with Mr. Pringle and arresting him at a later
    24  time?
    25          MR. SPREEUWERS:  Object to the form.
193: 1          You can answer.
     2          THE WITNESS:  Say it one more time.
     3  BY MS. JONES:
     4      Q.   Did you at any point on December 29th,
     5  2023, consider not engaging in a high-speed chase
     6  with Mr. Pringle and simply arresting him at a later
     7  time?
     8          MR. SPREEUWERS:  Object to the form.
     9          You can answer.
    10          THE WITNESS:  In the moment, I don't
    11      recall.
    12  BY MS. JONES:
    13      Q.   Okay.  Did you undertake any efforts to
    14  determine what information the Richland County
    15  Sheriff's Department had about Mr. Pringle on
    16  December 29th, 2023, before the chase or during the
    17  chase?
    18      A.   I could not.
    19      Q.   And you never asked?
    20      A.   Mid pursuit?
    21      Q.   At any point in time on December the 29th?
    22      A.   After the collision and incident happened.
    23      Q.   Did you ever ask before the pursuit?
    24      A.   No.
    25      Q.   Okay.  Did you ask anybody at the Lexington
194: 1  County law enforcement -- sheriff's office what
     2  information they had on Mr. Pringle?
     3          MR. SPREEUWERS:  Object to the form.
     4          You can answer.
     5          THE WITNESS:  I did not.
     6  BY MS. JONES:
     7      Q.   Did you ever ask Deputy Hodge to pass you
     8  or overtake you in the pursuit?
     9      A.   I did not.
    10      Q.   Did you ever ask for a copy of the warrant
    11  that is included in your initial investigative
    12  report, Exhibit 10?
    13      A.   I have not.
    14      Q.   Have you ever seen a warrant regarding that
```

## TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 192 Ln 14 - Pg 199 Ln 2 continued...

194:15  NIC number?
    16      A.   Have I seen the warrant regarding that NIC
    17  number?
    18      Q.   Correct.
    19      A.   No, I did not.
    20      Q.   And the only information you were able to
    21  ascertain after the fact is that there was a warrant
    22  for failure to appear?
    23          MR. SPREEUWERS:  Object to the form.
    24          You can answer.
    25          THE WITNESS:  That and among other
195: 1      information.
     2  BY MS. JONES:
     3      Q.   But that was the only warrant, failure to
     4  appear?
     5      A.   I don't recall if that was the only one.
     6      Q.   If there was another one, would it be
     7  included in your documentation?
     8          MR. SPREEUWERS:  Object to the form.
     9          You can answer.
    10          THE WITNESS:  Yes, it would.
    11  BY MS. JONES:
    12      Q.   And is it in this report, Baker-A-20,
    13  Exhibit 10?
    14      A.   What was the question again?  I'm sorry.
    15      Q.   Is there any other offense or warrant noted
    16  in your initial report except for the failure to
    17  appear?
    18      A.   There is other offenses but no other
    19  warrants that were mentioned in my report.
    20      Q.   Okay.  Just that one warrant for failure to
    21  appear?
    22      A.   Yes.
    23      Q.   So this entire chase and head-on collision
    24  with Pam Baker was based on a warrant for failure to
    25  appear; is that correct?
196: 1          MR. SPREEUWERS:  Objection.
     2      Mischaracterizes the testimony.
     3  BY MS. JONES:
     4      Q.   Say that question one more time.  Isn't it
     5  correct -- isn't it true that the only warrant that
     6  you knew of when you initiated this chase that
     7  resulted in the head-on collision with Ms. Baker was
     8  for failure to appear?
     9          MR. SPREEUWERS:  Mischaracterizes the
    10      evidence and the testimony.
    11          You can answer.
    12          THE WITNESS:  At the time I didn't know the
    13      information.
    14  BY MS. JONES:
    15      Q.   No.  But I'm asking you as we sit here

## TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 192 Ln 14 - Pg 199 Ln 2 continued...

```
196:16   today, that's the only warrant was failure to appear,
    17   correct?
    18        A.   Yes.
    19             MR. SPREEUWERS:  Same objection.
    20   BY MS. JONES:
    21        Q.   The civilian in Hodges' car, is it your
    22   testimony you don't know his name?
    23             MR. SPREEUWERS:  Asked and answered.
    24             Go ahead.
    25             THE WITNESS:  That is my statement.  I
197: 1        don't know who that is.
     2   BY MS. JONES:
     3        Q.   Okay.  So if I told you his name, you
     4   wouldn't recognize it?
     5        A.   I would not recognize it.
     6        Q.   Okay.  In your training as a law
     7   enforcement officer, are you trained on any
     8   fundamental rights that citizens have?
     9             MR. SPREEUWERS:  Object to the form.
    10             You can answer.
    11             THE WITNESS:  Can you elaborate?
    12   BY MS. JONES:
    13        Q.   Are you given any training on fundamental
    14   rights?
    15             MR. SPREEUWERS:  Same objection.
    16   BY MS. JONES:
    17        Q.   Like a citizen's right to not be endangered
    18   by excessive use of force?
    19             MR. SPREEUWERS:  Object to the form.
    20             THE WITNESS:  I don't recall.
    21             MR. SPREEUWERS:  Multiple grounds.
    22             THE WITNESS:  I don't recall that.
    23   BY MS. JONES:
    24        Q.   Do you think that citizens like Ms. Baker
    25   have a right to -- a fundamental right to not be
198: 1   subjected to undue force?
     2             MR. SPREEUWERS:  Same objection, multiple
     3        grounds.
     4             THE WITNESS:  I agree.
     5   BY MS. JONES:
     6        Q.   Okay.  And in your profession as a law
     7   enforcement officer, should those rights be
     8   safeguarded?
     9             MR. SPREEUWERS:  Same objection.
    10             THE WITNESS:  In the scope of my job
    11        duties, yes.
    12   BY MS. JONES:
    13        Q.   Yes.  And is it part of professionals, such
    14   as yourself, to uphold those right for people like
    15   Ms. Baker --
    16             MR. SPREEUWERS:  Object to the form.
```

## TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

---

## Pg 192 Ln 14 - Pg 199 Ln 2 continued...

```
198:17            MS. JONES:  -- to the public?
   18            THE WITNESS:  Yes.  Different incidents
   19      have different risks, but yes.
   20    BY MS. JONES:
   21        Q.   There's one other exhibit I want to ask you
   22    about.  It is Exhibit 17.  Would you take a look at
   23    Exhibit 17.
   24            And the first question I have is, do you
   25    recognize this document?
199: 1        A.   I don't recognize the document, but I do
    2    recognize the incident.
```

## Pg 200 Ln 4 - Pg 201 Ln 11

```
200: 4        Q.   Did you prepare an incident report on
    5    this -- regarding this incident?
    6        A.   I'm pretty sure I did, yes.
    7        Q.   It's got on Baker-L-27 that it was your
    8    supervisor, Ethyn Perkins, reviewed it on 12-27-23,
    9    correct?
   10        A.   Yes.
   11        Q.   And in the comments it states -- and it
   12    also says that Ethyn Perkins responded to the scene;
   13    is that correct?
   14            MR. SPREEUWERS:  Objection, misstates what
   15      it says.
   16            THE WITNESS:  I'm sorry.  Ask me --
   17    BY MS. JONES:
   18        Q.   See right there where it says "Respond to
   19    the scene?  Yes"?
   20        A.   Yes.
   21        Q.   What does that mean?
   22        A.   Somebody responded to the scene.
   23        Q.   Was it Ethyn Perkins?
   24            MR. SPREEUWERS:  Objection, misstates what
   25      it says.
201: 1            THE WITNESS:  I wouldn't know from this
    2      documentation.  It says yes next to it.
    3    BY MS. JONES:
    4        Q.   So you don't know what yes refers to?
    5        A.   It says "Yes" next to "Responds to the
    6    scene."
    7        Q.   What does that mean?
    8        A.   It means he responded to the scene.
    9        Q.   Who responded to the scene?
   10        A.   From this documentation, it's per
   11    Ethyn Perkins responded to the scene.
```

# TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 202 Ln 18 - Pg 203 Ln 17

```
202:18      Q.   Karen Gilman, is that the same officer who
   19   called you following the Pringle chase and collision
   20   with Ms. Baker?
   21      A.   That is.
   22      Q.   But you don't recall what she said to you?
   23      A.   I don't recall.
   24      Q.   All right.  Did you arrest this suspect on
   25   Christmas Eve?  Plaintiff's Exhibit 17.
203: 1      A.   I don't recall if I did or not.
    2      Q.   Did you catch him?
    3      A.   I did.
    4      Q.   Okay.  Did you have to crash him, or did he
    5   pull over?
    6           MR. SPREEUWERS:  Object to the form.
    7           You can answer.
    8           THE WITNESS:  I did not have to crash him.
    9      He pulled over into his home.
   10   BY MS. JONES:
   11      Q.   Okay.  And is it your testimony that the
   12   narrative on Baker-L-026, you would have filled that
   13   in?
   14      A.   That is not my testimony.
   15      Q.   What is your testimony about the narrative?
   16      A.   My testimony is that this is not my
   17   incident report.  This is a totally separate report.
```

## Pg 203 Ln 23 - Pg 205 Ln 8

```
203:23      Q.   Who is Jennifer Spurrier?
   24      A.   I do not know.
   25      Q.   So to the best of your recollection, there
204: 1   is an incident report about this arrest or about this
    2   incident that you created --
    3      A.   Yes.
    4      Q.   -- but is not Exhibit 17?
    5      A.   Yes, correct.
    6      Q.   Okay.  Can you give me any explanation or
    7   reason for Deputy Hodge violating the policy about
    8   having a ride-along in his vehicle?
    9           MR. SPREEUWERS:  Objection, multiple
   10      grounds.
   11           You can answer.
   12           THE WITNESS:  I only can speak for my
   13      actions that day.
   14   BY MS. JONES:
   15      Q.   So you can't tell me anything that you know
   16   of?
   17      A.   I can only speak for my actions.
   18      Q.   That's not my question.  I ask you if you
   19   know of anything.  I'm not asking you about your
```

# TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 203 Ln 23 - Pg 205 Ln 8 continued...

```
204:20  actions.  Do you know of any explanation or reason
    21  why Deputy Hodge violated the ride-along policy?
    22       MR. SPREEUWERS:  Objection, multiple
    23  grounds.
    24       You can answer.
    25       THE WITNESS:  I do not.  That's Hodge's
205: 1  actions.
     2  BY MS. JONES:
     3       Q.   Do you know of any reason why the pursuit
     4  of Pringle continued on to the interstate into
     5  ongoing traffic?
     6       A.   Yes.
     7       Q.   What reason?
     8       A.   Because he was a lethal driver.
```

## Pg 205 Ln 9 - Pg 207 Ln 16

```
205: 9       Q.   Any other reason?
    10       A.   No.
    11       Q.   And what do you mean by he was a lethal
    12  driver?
    13       A.   A lethal driver due to him going the wrong
    14  way into traffic.  He puts himself and especially the
    15  public at a higher risk that someone is going to get
    16  seriously injured or hurt.
    17       Q.   Any other reason to chase him into ongoing
    18  traffic?
    19       MR. SPREEUWERS:  Object to the form.
    20       You can answer.
    21       THE WITNESS:  No other reason.
    22  BY MS. JONES:
    23       Q.   Okay.  And you knew it was Mr. Pringle from
    24  the very start of the chase, correct?
    25       MR. SPREEUWERS:  Objection.  It's been
206: 1  asked and answered.
     2       You can answer.
     3       THE WITNESS:  At the time, from the
     4  information I got from the Lexington County
     5  sheriff's deputies, that Pringle -- they had
     6  eyes on Mr. Pringle and he was driving that
     7  vehicle.
     8       MS. JONES:  Okay.  All right.  I'm going to
     9  take a break.  I think I am almost done.
    10            - - -
    11       (A recess transpired.)
    12            - - -
    13       MS. JONES:  Okay.  So I don't have any
    14  further questions at this time.  I am going to
    15  leave the record open because we are still
    16  missing records.
```

## TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 205 Ln 9 - Pg 207 Ln 16 continued...

```
206:17          MR. SPREEUWERS:  What records are you
     18     missing?
     19          MS. JONES:  All the ones he testified to on
     20     here.  The electronic records, the reports that
     21     he filled out, you know.  I didn't keep a
     22     running list of them.  The training CD.  And
     23     hopefully, we won't have to do it again, but I'm
     24     leaving the record open just in case.
     25          MR. SPREEUWERS:  So to make it clear, we
207: 1     object to that because all that --
      2          MS. JONES:  I'm sure you do.
      3          MR. SPREEUWERS:  I'd appreciate the
      4     opportunity to finish before I'm interrupted.
      5          We object to that because none of that has
      6     any relevance, so we're not agreeing to keep the
      7     deposition open.
      8                    - - -
      9                  EXAMINATION
     10                    - - -
     11  BY MR. SPREEUWERS:
     12     Q.   Trooper Smith, you talked about your
     13  training in some detail today.  And you talked about
     14  eight weeks of in-house training at the sheriff's
     15  department when you were first hired, right?
     16     A.   Yes, sir.
```

## Pg 207 Ln 24 - Pg 208 Ln 24

```
207:24     Q.   And then you underwent eight weeks of
     25  training in the South Carolina Criminal Justice
208: 1  Academy after that?
      2     A.   Yes.
      3     Q.   And then you went through another eight
      4  weeks or two months in the field training officer
      5  process, correct?
      6     A.   Yes.
      7     Q.   And turn to Exhibit 16 for me.  So you were
      8  asked a number of questions about Baker-G-134
      9  through -- I'm sorry, 151.  And is it your
     10  understanding that these records relate to your field
     11  training officer phase of training?
     12          MS. JONES:  Objection, leading.
     13          MR. SPREEUWERS:  The rules state that
     14     examination should proceed as if at trial, which
     15     would include leading questions on cross.
     16  BY MR. SPREEUWERS:
     17     Q.   You can answer the question.
     18     A.   The forms that you mentioned right here are
     19  from my field training officer program.
     20     Q.   Okay.  All right.  So these records don't
```

# TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 207 Ln 24 - Pg 208 Ln 24 continued...

```
208:21  relate to any training that you would have received
     22  at the preacademy in-house training at the sheriff's
     23  department, right?
     24       A.   Correct.
```

## Pg 209 Ln 22 - Pg 215 Ln 15

```
209:22       Q.   36.  Turn to policy 800.2.  It's on
     23  Baker-M-312.  Read that third paragraph of policy
     24  800.2 on page Baker-M-312.
     25       A.   This policy provides restrictions on
210: 1  certain driving assignments as well as guidelines and
      2  directions for the exercise of deputy and supervisory
      3  discretion and decision making.  And includes factors
      4  to be considered in balancing the means to suspect
      5  apprehension and the way it is advisable to terminate
      6  a pursuit.
      7       Q.   So when you were asked a bunch of questions
      8  about the policy and procedures being guidelines for
      9  the exercise of your discretion, that's an additional
     10  place where this policy indicates that it's providing
     11  guidelines for the --
     12            MS. JONES:  Objection, leading.
     13            MR. SPREEUWERS:  Can you wait until I
     14       finish my question so that I can have clear
     15       communication with my witness?
     16            MS. JONES:  Objection, leading.
     17            MR. SPREEUWERS:  Thank you.
     18  BY MR. SPREEUWERS:
     19       Q.   Now, restarting.  Is that another place in
     20  this policy and procedure guideline that indicates
     21  that these are -- the policies are intended to be
     22  guidelines to help guide your use of discretion while
     23  on duty?
     24       A.   Correct.
     25       Q.   Okay.  And you understand that there are a
211: 1  huge number of circumstances that can face a law
      2  enforcement officer while on duty, correct?
      3       A.   Correct.
      4       Q.   And it would not be feasible or possible to
      5  write a policy manual that would cover all of those
      6  potential scenarios, correct?
      7       A.   Correct.
      8       Q.   And that's why you're taught and trained to
      9  employ your officer discretion in consultation with
     10  the guidelines and supervisor input, things like
     11  that, to try to get the best outcome in every
     12  situation, right?
     13            MS. JONES:  Objection, leading.
     14            THE WITNESS:  Correct.
```

# TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 209 Ln 22 - Pg 215 Ln 15 continued...

```
211:15            MR. SPREEUWERS:  And you can just have a
    16     standing objection to all leading.  That's an
    17     improper objection, but you can have a standing
    18     one so that we don't have to keep --
    19            MS. JONES:  I didn't know you were the
    20     judge and you could rule on the objection,
    21     Steve.
    22            MR. SPREEUWERS:  I'm just telling you what
    23     the rules say.  I assume you read them the same
    24     way I do.
    25            MS. JONES:  I don't read them the same way
212: 1     you do.
     2  BY MR. SPREEUWERS:
     3     Q.   Earlier in your testimony, you mentioned
     4  that there were perhaps ten pursuits that you had
     5  been involved in.  You estimated about ten pursuits
     6  that you had been involved in.  Was that correct?
     7     A.   It was about ten.
     8            MS. JONES:  Objection, misstatement of the
     9     testimony.
    10  BY MR. SPREEUWERS:
    11     Q.   And was that the total number of pursuits
    12  that you recall being involved --
    13            MS. JONES:  Objection, leading.
    14            MR. SPREEUWERS:  Celeste, you've got to
    15     stop interrupting me.
    16            MS. JONES:  You interrupted me the entire
    17     time with a bunch of objections that are
    18     improper under the rules.  You can only object
    19     to the form of the question.
    20            MR. SPREEUWERS:  Stating the basis for the
    21     objection.  That's what the rules say.  So if
    22     all of that means you're going to interrupt
    23     every question I've got, then we're going to
    24     have to stop the deposition and get the judge on
    25     the phone.
213: 1            MS. JONES:  I think you should.
     2            MR. SPREEUWERS:  Okay.
     3  BY MR. SPREEUWERS:
     4     Q.   You testified about ten depositions -- or
     5  excuse me, ten pursuits that you had been involved in
     6  during your time as a law enforcement officer with
     7  the sheriff's department; is that correct?
     8     A.   Correct.
     9            MS. JONES:  Objection.  Misstatement of the
    10     testimony.
    11  BY MR. SPREEUWERS:
    12     Q.   Is that what your testimony was?
    13     A.   It was about ten pursuits.
    14     Q.   Okay.  And to clarify, you also testified
    15  about some of those pursuits in which circumstances
```

# TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 209 Ln 22 - Pg 215 Ln 15 continued...

213:16   did not allow a supervisor to become involved; is
    17   that correct?
    18        A.   Correct.
    19        Q.   Okay.  And what is your estimate out of
    20   those ten pursuits, how many that the circumstances
    21   dictated that a supervisor was not able to get
    22   involved?
    23             MS. JONES:  Object to the form.
    24        Misstatement of the testimony, and it's leading.
    25             MR. SPREEUWERS:  You can answer.
214: 1             THE WITNESS:  Out of about ten, I will say
     2        about half.
     3   BY MR. SPREEUWERS:
     4        Q.   Okay.  And what are some of the
     5   circumstances that could prevent or not allow a
     6   supervisor to become involved in a pursuit?
     7             MS. JONES:  Objection, leading,
     8        hypothetical.
     9             MR. SPREEUWERS:  You can answer.
    10             THE WITNESS:  Some evidence that would
    11        present itself that a supervisor cannot
    12        supervise a chase will be if that supervisor is
    13        on a call.  He's not nowhere close near where
    14        the pursuit is happening.  The supervisor is in
    15        the office.  There's a number of different stuff
    16        depending on the incident.
    17   BY MR. SPREEUWERS:
    18        Q.   Okay.  What about if the pursuit is over
    19   quickly?
    20        A.   That is also a reason.
    21        Q.   Okay.  All right.  On Exhibit 17, on page
    22   Baker-L-27, you were asked about the commander's
    23   review section and the officer indicated there is
    24   Karen Gilman.  Does that section indicate that
    25   Karen Gilman is the one who actually did the verbal
215: 1   counseling?
     2             MS. JONES:  Objection, leading.
     3             MR. SPREEUWERS:  You can answer.
     4             THE WITNESS:  That does not.
     5   BY MR. SPREEUWERS:
     6        Q.   Okay.  Who would have normally done a
     7   verbal counseling?
     8        A.   It would have been my immediate supervisor.
     9        Q.   Okay.  Was your immediate supervisor at the
    10   time Ethyn Perkins?
    11        A.   Correct.
    12        Q.   And the section right above that, does that
    13   indicate that your supervisor, Ethyn Perkins,
    14   verbally counseled you?
    15        A.   Correct.

# TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:**  object*

---

## Pg 215 Ln 16 - Pg 216 Ln 16

```
215:16      Q.   Okay.  All right.  We heard radio traffic
    17 earlier that was all the information that you had
    18 available when you initiated this pursuit; is that
    19 correct?
    20      A.   Correct.
    21      Q.   Okay.  And that radio traffic, according to
    22 your report, came from an undercover Lexington County
    23 Sheriff's Department agent; is that correct?
    24      A.   Correct.
    25      Q.   What's the import of the fact that this
216: 1 call came over your radio from another jurisdiction?
     2           MS. JONES:  Objection, calls for
     3      speculation and misstates the system.
     4           MR. SPREEUWERS:  You can answer.
     5           THE WITNESS:  The fact that an undercover
     6      officer from a neighboring jurisdiction came
     7      over to Richland County Sheriff's Department's
     8      tac channel, tac four, pretty much shows the
     9      importance of the urgency for which they needed
    10      officers to respond to that specific incident.
    11 BY MR. SPREEUWERS:
    12      Q.   What's the importance of the fact it was an
    13 undercover officer?
    14      A.   The importance for an undercover officer
    15 means that whoever this undercover person was
    16 investigating had to be a serious offender.
```

## Pg 217 Ln 10 - Pg 219 Ln 5

```
217:10      Q.   That's what came over the radio?
    11      A.   Yes, sir.
    12      Q.   And you heard that?
    13      A.   Correct.
    14      Q.   Okay.  And you also heard that undercover
    15 officer from Lexington County Sheriff's Department
    16 say over the radio that he has GSC SC bench warrants?
    17      A.   Correct.
    18      Q.   Is your understanding that that refers to
    19 general sessions court?
    20      A.   Correct.
    21           MS. JONES:  Objection, leading.  And a
    22      misstatement of his prior testimony that he
    23      didn't know.
    24 BY MR. SPREEUWERS:
    25      Q.   Okay.  You can -- you know that general
218: 1 sessions court is where the more serious charges are
     2 prosecuted?
     3      A.   Correct.
     4      Q.   Okay.  And a bench warrant is a directive
     5 from a judge to take a particular individual into
```

## TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 217 Ln 10 - Pg 219 Ln 5 continued...

```
218: 6  custody, correct?
     7            MS. JONES:  Objection, leading.
     8            MR. SPREEUWERS:  You can answer.
     9            THE WITNESS:  Correct.
    10  BY MR. SPREEUWERS:
    11       Q.   Okay.  And, in fact, you confirmed through
    12  NCIC after the fact that there were valid and
    13  outstanding warrants for this individual, correct?
    14            MS. JONES:  Objection, misstatement,
    15       leading.
    16            MR. SPREEUWERS:  You can answer.
    17            THE WITNESS:  Correct.
    18  BY MR. SPREEUWERS:
    19       Q.   Okay.  And during the course of that radio
    20  traffic, you also understood that the support of an
    21  air unit would not be available due to the weather
    22  conditions, right?
    23       A.   Correct.
    24       Q.   When Mr. Pringle made the decision to
    25  divert from the entrance ramp to I-126 inbound to the
219: 1  exit ramp to I-126 inbound, that radio traffic, you
     2  heard a supervisor come out over the radio and you
     3  were told to wreck Mr. Pringle out or words to that
     4  effect, correct?
     5       A.   Correct.
```

## Pg 220 Ln 18 - Pg 221 Ln 16

```
220:18       Q.   Okay.  And it's supposed to initiate,
    19  automatically start recording on your dash cam as
    20  well as your body-worn camera, correct?
    21       A.   Correct.
    22       Q.   Okay.  And so around December of 2023,
    23  we've got two instances where your body camera did
    24  not automatically initiate when you initiated your
    25  blue lights; is that correct?
221: 1       A.   Correct.
     2       Q.   Is that the nature of your counseling that
     3  you received was about the body-worn camera
     4  initiation?
     5            MS. JONES:  Objection, leading,
     6       misstatement of his prior testimony.
     7            MR. SPREEUWERS:  You can answer.
     8            THE WITNESS:  I don't recall.
     9  BY MR. SPREEUWERS:
    10       Q.   Okay.  All right.  Trooper Smith, have you
    11  read the lawsuit that's been brought against you in
    12  this case?
    13       A.   I have not.
    14       Q.   Okay.  Are you aware that you have been
```

## TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 220 Ln 18 - Pg 221 Ln 16 continued...

```
221:15   accused of using excessive force against Ms. Baker?
    16        A.   I did not.
```

## Pg 225 Ln 3 - Pg 228 Ln 20

```
225: 3        Q.   Did you say it?
     4        A.   I don't recall.
     5        Q.   You don't recall.  Okay.  All right.  And
     6   of the -- you say you only had ten pursuits now?
     7        A.   About ten pursuits.
     8        Q.   And half of them you had no supervision?
     9        A.   Direct supervision.  They were involved in
    10   the chase.
    11        Q.   No direct supervision for at least half of
    12   them, and that's pretty typical?
    13             MR. SPREEUWERS:  Objection, misstates
    14        testimony.
    15             You can answer.
    16             THE WITNESS:  The policy doesn't state that
    17        we can pursue with or without.
    18   BY MS. JONES:
    19        Q.   Didn't ask you about the policy.  I asked
    20   you if that was pretty typical that half the time
    21   there would be no supervision?
    22        A.   Correct.
    23        Q.   Okay.  And in this particular chase, you
    24   were chasing him into ongoing traffic, up the
    25   interstate the wrong way in a construction zone, and
226: 1   your intent was to wreck him out?
     2        A.   Correct.
     3        Q.   And you did that despite the danger that it
     4   posed to everyone on that interstate, correct?
     5             MR. SPREEUWERS:  Object to the form.
     6             You can answer.
     7             THE WITNESS:  Say that question one more
     8        time.
     9   BY MS. JONES:
    10        Q.   You made that decision to try to wreck him
    11   out in a construction zone going up the wrong side of
    12   the interstate in a high-speed chase without regard
    13   for the rights of any of the innocent people coming
    14   down the interstate, correct?
    15             MR. SPREEUWERS:  Object to the form.  It's
    16        argumentative.
    17             You can answer.
    18             THE WITNESS:  Not correct.  I did have the
    19        due regard of the public in mind.
    20   BY MS. JONES:
    21        Q.   And you were going to wreck him out in a
    22   construction zone, and that was the regard you gave
```

## TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 225 Ln 3 - Pg 228 Ln 20 continued...

```
226:23  to all those people?
    24      A.   Correct.
    25      Q.   Okay.  And the force that you applied in
227: 1  chasing him was -- I think in your report you said it
     2  was up to 85 miles per hour; is that correct?
     3      A.   No, that's not correct.  I didn't apply
     4  force.
     5      Q.   You didn't drive your vehicle up that
     6  interstate the wrong way?
     7      A.   I did.
     8      Q.   And what you're trying to testify to,
     9  that's not the application of force?
    10      A.   I'm trying to understand, how is that
    11  force?
    12      Q.   Is it your testimony that in your opinion
    13  that is not the application of force?
    14          MR. SPREEUWERS:  Object to the form.
    15          You can answer.
    16  BY MS. JONES:
    17      Q.   Going 85 miles an hour up the interstate
    18  the wrong way chasing somebody.
    19      A.   I said I don't recall what speed I was
    20  going at.
    21      Q.   Not my question.  Is it your testimony, and
    22  I know you don't want to answer this question, but
    23  isn't it true that you applied the force chasing
    24  Mr. Pringle up the interstate to the point that he
    25  head-on collided with Pam Baker?
228: 1          MR. SPREEUWERS:  Object to the form.
     2  BY MS. JONES:
     3      Q.   Isn't that true?
     4      A.   I don't understand what force I applied.
     5      Q.   You don't understand what the force of a
     6  chase is?  You don't understand that?
     7      A.   I'm trying to elaborate, what's your force?
     8  Because my force is different.
     9      Q.   Oh, so you have a different opinion of it?
    10          MR. SPREEUWERS:  Object to the
    11  argumentative.
    12          THE WITNESS:  I have a different definition
    13      of force.
    14  BY MS. JONES:
    15      Q.   Does your definition of force include
    16  chasing is force?  Chasing somebody up the interstate
    17  the wrong way?
    18      A.   No, that's not force.
    19      Q.   That's not force in your opinion?
    20      A.   No, in my opinion, it's not force.
```

## TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 228 Ln 21 - Pg 232 Ln 5

```
228:21      Q.   The only warrant to this day that you have
    22  found any evidence of that was outstanding on
    23  Mr. Pringle on December the 29th, 2023, was a failure
    24  to appear; isn't that correct?
    25      A.   Say that one more time.  Sorry.
229: 1      Q.   The only warrant that you have located on
     2  Mr. Pringle --
     3      A.   Yes, ma'am.
     4      Q.   -- that existed on December the 29th, 2023,
     5  was failure to appear?
     6          MR. SPREEUWERS:  Objection.  You can
     7      answer.
     8          THE WITNESS:  Correct.
     9  BY MS. JONES:
    10      Q.   That's the only thing in all of your
    11  investigation you've been able to locate, isn't it?
    12          MR. SPREEUWERS:  Same objection.  Go ahead.
    13          THE WITNESS:  Besides the offense that he
    14      committed while I was on scene or during the
    15      incident, yes.
    16  BY MS. JONES:
    17      Q.   You knew when he ran from you?
    18      A.   Correct.
    19      Q.   What crime did he commit that you saw him
    20  commit before the chase began?
    21          MR. SPREEUWERS:  Objection, misstates the
    22      testimony.  Go ahead.
    23  BY MS. JONES:
    24      Q.   Did you see him commit any crime in your
    25  presence on December 29th before the chase began?
230: 1      A.   That I witnessed, no.
     2      Q.   Do you know of anyone who witnessed him
     3  committing a crime on December the 29th, 2023, before
     4  the chase began?
     5      A.   I did not.
     6      Q.   Okay.  Isn't it true that on December 29th,
     7  2023, you had available to you, that you did not
     8  review, the actual records on Mr. Pringle?
     9          MR. SPREEUWERS:  Object to the form.
    10      You can answer.
    11  BY MS. JONES:
    12      Q.   You could have looked it up on your
    13  computer in your car, correct?
    14      A.   Correct.
    15      Q.   And you didn't do that?
    16      A.   No.
    17      Q.   And none of your supervisors did that and
    18  told you or gave you any information that what the
    19  Lexington County officer told you was false?
    20      A.   I'm sorry.  Say that one more time.
    21      Q.   At any point during the chase, did any of
```

## TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

---

## Pg 228 Ln 21 - Pg 232 Ln 5 continued...

```
230:22   the Richland County dispatchers or supervisors inform
   23    you that there was no heroin charge?
   24          A.   No one informed me.
   25          Q.   And they also could have looked that
231: 1   information up if they wanted to, correct?
    2          A.   Correct.
    3          Q.   And they chose not to do that?
    4               MR. SPREEUWERS:  Objection.
    5               You can answer.
    6               THE WITNESS:  I don't know what they chose
    7          to do, but none --
    8    BY MS. JONES:
    9          Q.   You chose not to do it?
   10          A.   Correct.
   11          Q.   And to your knowledge, Hodge chose not to
   12    do it?
   13               MR. SPREEUWERS:  Objection.
   14               You can answer.
   15               THE WITNESS:  I don't know what Hodge's
   16          decisions were.  I only know mine.
   17    BY MS. JONES:
   18          Q.   Did you have any duty to communicate with
   19    the other officers engaged in the case?
   20               MR. SPREEUWERS:  Objection.  You can
   21          answer.
   22               THE WITNESS:  Yes.
   23    BY MS. JONES:
   24          Q.   And did you undertake to communicate with
   25    them regarding the chase?
232: 1          A.   Yes.
    2          Q.   What did you communicate to them?
    3          A.   What I communicated during the chase to the
    4    other officers were the speed of the fleeing vehicle,
    5    what direction we were taking, that type of stuff.
```

## Pg 232 Ln 22 - Pg 233 Ln 22

```
232:22          Q.   Yes.
   23          A.   Yes.
   24          Q.   What didn't function properly?
   25          A.   It didn't turn on when I activated my blue
233: 1   lights.
    2          Q.   The body cam?
    3          A.   That's what you're referring to, yes.  The
    4    body cam didn't activate.
    5          Q.   So you tried to turn it on before your blue
    6    lights came on.  Is that what you're testifying to?
    7               MR. SPREEUWERS:  Objection, misstates the
    8          testimony.
    9               THE WITNESS:  As I stated in previous
```

# TextMap Search Report

**Transcript:** [5/13/2025] Smith, Matthew - Vol. 1
**Search:** object*

## Pg 232 Ln 22 - Pg 233 Ln 22 continued...

```
233:10        testimony, when I turn on my blue lights, the
   11        car is supposed to send a signal to both the
   12        dash camera and my body camera to turn on.  I
   13        realized when I was on scene trying to get
   14        Mr. Pringle out of the vehicle, that it wasn't
   15        on.  And I activated it.
   16 BY MS. JONES:
   17        Q.   Okay.  Do you know if the body cam turned
   18 on for Hodge and Dillard?
   19        A.   I do not know.
   20             MS. JONES:  That's all the questions I
   21        have.
   22             MR. SPREEUWERS:  Nothing further.
```

## Pg 235 Ln 2 - 17

```
235: 2
                    I, Sheri L. Byers, Registered
   3 Professional Reporter and Notary Public for the State
     of South Carolina at Large, do hereby certify:
   4
                    That the foregoing deposition was taken
   5 before me on the date and at the time and location
     stated on page 1 of this transcript; that the deponent
   6 was duly sworn to testify to the truth, the whole
     truth and nothing but the truth; that the testimony of
   7 the deponent and all objections made at the time of
     the examination were recorded stenographically by me
   8 and were thereafter transcribed; that the foregoing
     deposition as typed is a true, accurate and complete
   9 record of the testimony of the deponent and of all
     objections made at the time of the examination to the
  10 best of my ability.
  11                 I further certify that I am neither
     related to nor counsel for any party to the cause
  12 pending or interested in the events thereof.
  13                 Witness my hand, I have hereunto
     affixed my official seal this 27th day of May, 2025,
  14 at Lexington, Lexington County, South Carolina.
  15
  16
  17
```