PAMELA A. BAKER V. LEON LOTT, IN HIS OFFICIAL CAPACITY AS THE SHERIFF OF RICHLAND COUNTY SHERIFF'S OFFICE, ET AL.
CASE NO. 3:24-CV-04303-JDA

# EXHIBIT 25
## TO PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER FED. R. CIV. P. 37 MOTION FOR SANCTIONS INCLUDING BUT NOT LIMITED TO STRIKING DEFENDANTS' ANSWER AND AWARDING PLAINTIFF ATTORNEY'S FEES

*30(B)(6) DEP. DESIGNEE PAGANO DEPOSITION EXCERPTS*

```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF SOUTH CAROLINA
                    COLUMBIA DIVISION
                 C.A. No.: 3:24-cv-04303-JDA
```

PAMELA BAKER,

        PLAINTIFF,

vs.

LEON LOTT, individually and in his official
capacity as the Sheriff of Richland County;
THE RICHLAND COUNTY SHERIFF'S DEPARTMENT;
and DEPUTIES MATTHEW SMITH, MICHAEL DILLARD,
and BRYAN HODGE,

        DEFENDANTS.

        30(b)(6) D E P O S I T I O N

| | |
|---|---|
| WITNESS: | DOMINICK PAGANO |
| DATE: | NOVEMBER 19, 2025 |
| TIME: | 2:36 P.M. |
| LOCATION: | BURR & FORMAN, LLP |
| | 1221 MAIN STREET, SUITE 1800 |
| | COLUMBIA, SOUTH CAROLINA 29201 |
| REPORTED BY: | AMBER SOMERO |

```
                        LEGAL EAGLE
                    Post Office Box 5682
                Greenville, South Carolina 29606
                        864-467-1373
                  depos@legaleagleinc.com
```

```
 1   A.   The -- the case material.
 2   Q.   Be more specific.  What case materials did you review?
 3   A.   Pretty much the -- the -- the areas that I was going to
 4        need to answer.  Predominantly, my responsibility from
 5        training.
 6   Q.   Your responsibility from training.  And what is your
 7        job?
 8   A.   So my current job is, I'm a major over our operations.
 9   Q.   What operations?
10   A.   So operations is when -- I should clarify that a little
11        bit more.  That's our -- we don't like to say special,
12        but it will -- used to be called special operations.
13        That's our SWAT team, our EOD, our K-9, waterborne
14        operations, fugitive task force.
15   Q.   And you are the supervisor over all of those areas?
16   A.   One of the supervisors.
17   Q.   How many supervisors are there?
18   A.   You have there lower ranking supervisors just like in a
19        line.  So you have master deputies.  You have corporals.
20        You have sergeants.  You have a lieutenant.  Typically,
21        you would have a captain.  Then you would have a major,
22        and then you would have a chief.  And then ultimately
23        the sheriff is the ultimate authority.
24   Q.   So who do you report to?
25   A.   Chief Polis and the sheriff.
```

1   Q.   And in your position as a major over operations, what
2        are your duties and responsibilities?
3   A.   My duties and responsibilities as a major over
4        operations is to support the men and women out in the
5        field, oversee daily operations, and of course, any
6        concerns or needs that the deputies may need underneath
7        my command to address them appropriately.
8   Q.   Are you involved in the training of law enforcement
9        officers at the sheriff's department?
10  A.   Currently, no.
11  Q.   Were you ever?
12  A.   Yes.
13  Q.   When?
14  A.   I was the commander over the Training Division.
15  Q.   When?
16  A.   Roughly, approximately, I was promoted to captain in the
17       Training Division, 2013, approximately 2013 or 2014, up
18       until my recent promotion to major, which was a year and
19       a half ago.
20  Q.   And when you were the commander of the Training
21       Division, what were your duties and responsibilities?
22  A.   So I oversaw my staff, which I had a lieutenant, which
23       is our executive officer.  I had sergeants.  I had
24       corporals, and then I had training instructors.  My job
25       was to handle the daily tasks, so that would be payroll,

1     you do an online retraining course?
2  A. Yes.
3  Q. And that has been the way that the driving training has
4     been done since 2013 to your knowledge?
5  A. Yes, ma'am.
6  Q. So just to be clear, you didn't evaluate any of the
7     training or any of the actions of the defendant officers
8     in this particular lawsuit; is that correct?
9  A. I saw the video. I saw the body cam footage.
10 Q. Okay. Did you make any determination as to whether or
11    not any of the officers -- and we can go through them
12    one at a time, but any of the three officers violated
13    the policies and procedures of the Richland County
14    Sheriff's Department?
15        MR. GARFIELD: Object to the form. You can answer.
16 BY MS. JONES:
17 A. No, ma'am. I don't have anything to do with
18    disciplinary.
19 Q. Okay. So you made no determination in that regard and
20    you have no opinion about it?
21        MR. GARFIELD: Same objection. Go ahead.
22 BY MS. JONES:
23 A. I have opinions. Everyone has a personal opinion, but
24    it's based on my subject matter expertise, my
25    professionalism, based on 20-something years of being a

1    law enforcement officer.
2  Q.  So are you testifying on behalf of the department in
3    that regard?
4  A.  I'm here representing the department.
5  Q.  But in regards to your opinion about whether or not the
6    individual defendants violated the policies and
7    procedures?
8      MR. GARFIELD:  Object to the form of the question.
9    You're asking about his personal opinion?
10      MS. JONES:  I'm asking him if he is offering an
11    opinion on behalf of the sheriff's department concerning
12    whether or not deputies Smith, Dillard, or Hodge
13    violated the Richland County Sheriff's Department's
14    policies and procedures in regards to Pam Baker.
15      MR. GARFIELD:  Object to the form.  Him providing a
16    personal opinion in this case is clearly beyond the
17    scope of the 30(b)(6) case.
18      MS. JONES:  Wasn't my question.
19      MR. GARFIELD:  Well, you're asking first if he's
20    ready to or prepared to render a personal opinion in
21    this case on behalf of the Richland County Sheriff's
22    Department?
23      MS. JONES:  No.  I'm asking him if he is offering
24    an opinion on behalf of the Richland County Sheriff's
25    Department as its designated representative.

1          into a populated area or a convenience store or
2          something like that and cause death or great bodily harm
3          to someone else.
4    Q.    What I want you to confirm, yes or no, is, are there
5          internal practices, policies, or whatever you want to
6          call them, that are different from what's contained in
7          Exhibit 36 in front of you?
8    A.    Based on their subject matter, yes.
9    Q.    If a police officer with the sheriff's department, or
10         deputy, violates the policy set forth in Exhibit 36,
11         what are the consequences?
12   A.    Exhibit 36?  So you're talking about the manual itself,
13         ma'am?
14   Q.    Yes, sir.
15   A.    So once again, the policy is just a general guideline.
16         It's not law.  So what's looked at, obviously, was their
17         malice.  We have to have open leeway because the policy
18         is not all end all.  There's a lot of situations where
19         the policy does not apply and the officers, based on
20         their experience and training, have to make split-minute
21         decisions -- or split-second decisions, I should say.
22             So this policy is not all-encompassing.  If I had
23         to go through 23 years of law enforcement experience and
24         then another 10 years of military experience and put it
25         into a manual, this table's not even big enough.

1  Q.  That's not my question.  My question is, if a deputy, a
2      police officer with the sheriff's department, violates
3      the policy set forth in Exhibit 36, what are the
4      consequences?
5  A.  So the consequences would be the -- it would -- their
6      actions would be reviewed to determine if there was any
7      malice or wrongdoing on the officer, and then
8      appropriate action would be dictated.  Ultimately, the
9      sheriff is the final disciplinary person.  So he will
10     make that decision.
11 Q.  And if a violation occurred, would an investigation be
12     undertaken?
13 A.  So once again, our professional standards would handle
14     that.
15 Q.  But would an investigation be undertaken, or do you
16     know?
17 A.  Well, you're saying -- you're saying -- it would
18     definitely be looked into, yes.
19 Q.  And when you say, be looked into, what do you mean?
20     Would there be an investigation, is my question.
21 A.  In the terms of definition of investigation, it would be
22     turned over to our professional standards, and yes, they
23     would -- your definition of investigation, yes, they
24     would look into it.
25 Q.  If a police officer violated the provisions in policy

```
 1           802, would that police officer be subject to
 2           disciplinary action?
 3                MR. GARFIELD:  Object to the form.  Asked and
 4           answered.  Go ahead.
 5      BY MS. JONES:
 6      A.   The sheriff determines that.
 7      Q.   Do you know what factors would be involved in making
 8           such a decision?
 9      A.   Totality of the circumstances, so everything involved.
10           One -- once again, what was the subject's actions?  What
11           was the officer's actions?  Was there any malice?  What
12           was going through the officer's mind?  So just like
13           we're taught at the academy, what's known as the
14           reasonable man theory or the reasonable officer theory,
15           what would another officer with the same knowledge, same
16           level of experience have done?  So once again, this is
17           just a policy.  It's not law for us.
18      Q.   Who makes the determination to terminate a pursuit?
19      A.   So the determination to end a pursuit can be done either
20           by the officer or any supervisor.
21      Q.   And who was the supervisor for Officer Smith?
22      A.   My understanding at the time was you had a corporal and
23           a lieutenant.
24      Q.   Who were they?
25      A.   I believe it was Corporal Smith, Rebecca Smith, I
```

```
 1            From my understanding, from what I heard on the
 2       audio tapes, what Lieutenant Blanding said over the
 3       radio, and the fact that we had undercover narcotics
 4       agents on this guy and coming over the radio and we had
 5       a request for assistance from another agency, taking on
 6       all that totality, that he was posing a great risk to --
 7       not only to the officers but to the community at large
 8       and poses a significant risk in the future if they
 9       wouldn't -- let him go.
10   Q.  But you haven't seen the warrant?
11   A.  No, ma'am.
12   Q.  And my question is, would a failure to appear warrant be
13       a sufficient basis for three police vehicles to chase a
14       suspect into oncoming traffic going the wrong way on an
15       interstate with construction beams on each side?
16            MR. GARFIELD:  Object to the form.  It's several
17       grounds.  Go ahead.  Do the best you can.
18   BY MS. JONES:
19   A.  Once again, it could be, based on the insolvency of the
20       situation, the known suspect, to allow the suspect to
21       flee that has no known address or residence.  And once
22       again, he's facing felony charges and he's already posed
23       a risk to the community at large and he's continuing to
24       do that.  Then, yes, once again, these officers have to
25       weigh in all of that when they make their decisions.
```

1  Q.  If Pringle was being chased for failure to appear at a
2      hearing, is that a significant factor?
3  A.  So you're asking me my personal opinion?
4  Q.  No.  I'm asking you as a 30(b)(6) witness.  The sheriff
5      said he didn't know.
6  A.  So reframe that for me a little bit.
7  Q.  If Pringle was being chased for failure to appear, is
8      that a significant factor?
9  A.  What is the failure to appear for?  Is it a general
10     sessions charge?  A violent crime?
11 Q.  Failure to appear.
12 A.  It depends on what the failure to appear.  We would have
13     to know the context.  I would need to know the context.
14     My understanding is the deputies, once again, by hearing
15     the audio, they knew that it was a felony.
16 Q.  Is a misdemeanor a reason to chase someone the wrong way
17     down a highway?
18         MR. GARFIELD:  Object to the form.  Objection.
19     Asked and answered.
20 BY MS. JONES:
21 A.  I already answered this question.
22 Q.  Would you agree that going down an interstate highway
23     the wrong way is a significant risk to the public?
24         MR. GARFIELD:  Object to the form.  Asked and
25     answered.  Go ahead.

```
 1   BY MS. JONES:
 2   A.   It's a risk to everyone at large.  So once again, the
 3        officers have to weigh the risk versus the reward.
 4   Q.   My specific question is, is it a risk to the public?
 5   A.   It's a risk to everyone, to include the officers' lives.
 6   Q.   So the answer to my question is, yes, it's a risk to the
 7        public and others?
 8             MR. GARFIELD:  Objection.  Go ahead.
 9   BY MS. JONES:
10   A.   It can be a risk.
11   Q.   Is it?
12   A.   It can.
13   Q.   Not always?
14             MR. GARFIELD:  Objection.
15   BY MS. JONES:
16   Q.   Is that what you're saying?  That's your testimony?
17   A.   Yes.
18   Q.   Okay.  Was there supervisors and management control over
19        Officer Smith and Hodge during the pursuit?
20   A.   So once again, my understanding from the radio traffic,
21        Lieutenant Blanding was monitoring the pursuit and also
22        showed up on the scene, so I would say yes.
23   Q.   And that's based on?
24   A.   Listening to the radio traffic and then actually seeing
25        the video, ma'am.
```

1      appears, it says 1-12 of '22, and I know when we did it,
2      when I went through, it was before that.  So I cannot
3      speculate on the material inside.  I just know the
4      general basis of Below 100 and what it stands for.
5  Q.  If you would turn to page 39, it's Baker N-039.
6  A.  039, ma'am?
7  Q.  Yes, sir.
8  A.  Okay.
9  Q.  Do you recall being trained on this particular
10     provision, We're Not Just Killing Ourselves?  Do you
11     remember it?
12 A.  No.  No, ma'am, I honestly do not.
13 Q.  In the next page, it says Jessica and Kelli Uhl.
14         Do you recall this collision involving Jessica and
15     Kelli Uhl?
16 A.  I -- I do not.
17 Q.  Let me ask you one last question.  It's Exhibit 22 in
18     here.  Are you familiar with South Carolina Code section
19     23-23-85, the establishment of required minimum
20     standards for all law enforcement agencies; punitive
21     actions?
22         MR. GARFIELD:  Object to the form.  Several
23     grounds, beyond the scope, calls for a legal conclusion.
24     Go ahead.
25 BY MS. JONES:

```
 1   A.   No, ma'am.  I -- I know, once again, that there are
 2        minimum standards that we have to meet, but not
 3        specifically this act right here.
 4             MS. JONES:  That's all the questions I have.  Thank
 5        you, sir.
 6             MR. GARFIELD:  Just one moment.
 7                      (OFF THE RECORD)
 8             MR. GARFIELD:  We don't have any questions.
 9             MS. JONES:  We're done.
10             THE COURT REPORTER:  Would you like a copy of the
11        transcript?
12             MR. GARFIELD:  I would, yeah, PDF, please.
13   (THERE BEING NO FURTHER QUESTIONS, THIS DEPOSITION CONCLUDED
14   AT 4:11 P.M.)
15
16
17
18
19
20
21
22
23
24
25
```