PAMELA A. BAKER v. LEON LOTT, IN HIS OFFICIAL CAPACITY AS THE SHERIFF OF RICHLAND COUNTY SHERIFF'S OFFICE, ET AL.
CASE NO. 3:24-CV-04303-JDA

# EXHIBIT 27
## TO PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER FED. R. CIV. P. 37 MOTION FOR SANCTIONS INCLUDING BUT NOT LIMITED TO STRIKING DEFENDANTS' ANSWER AND AWARDING PLAINTIFF ATTORNEY'S FEES

*30(B)(6) DEP. DESIGNEE GILMAN DEPOSITION EXCERPTS*

```
                IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF SOUTH CAROLINA
                         COLUMBIA DIVISION
                    C.A. No.: 3:24-cv-04303-JDA


PAMELA BAKER,

              PLAINTIFF,

vs.


LEON LOTT, individually and in his official
capacity as the Sheriff of Richland County;
THE RICHLAND COUNTY SHERIFF'S DEPARTMENT;
and DEPUTIES MATTHEW SMITH, MICHAEL DILLARD,
and BRYAN HODGE,

              DEFENDANTS.



                30(b)(6)  D E P O S I T I O N



WITNESS:        KAREN GILMAN
DATE:           NOVEMBER 20, 2025
TIME:           12:48 P.M.
LOCATION:       BURR & FORMAN, LLP
                1221 MAIN STREET, SUITE 1800
                COLUMBIA, SOUTH CAROLINA 29201

REPORTED BY:    AMBER SOMERO
```

```
                         LEGAL EAGLE
                      Post Office Box 5682
                 Greenville, South Carolina 29606
                          864-467-1373
                     depos@legaleagleinc.com
```

```
 1        injury to a civilian.
 2   A.   So in regards to this specific situation?
 3   Q.   Yes.
 4   A.   Okay.  In regards to this specific situation, a civilian
 5        was involved in injuring another civilian, so the -- the
 6        documents that would be prepared would be an incident
 7        report and a pursuit packet in this specific instance.
 8   Q.   And that would be all the required records?
 9   A.   Yes.
10   Q.   If the deputy was involved in the injury to the
11        civilian, would there be any other reports?
12   A.   If the deputy themselves injured the civilian?
13   Q.   Correct.
14   A.   If the deputy themselves injured it, there would be a
15        defensive action report as well.
16   Q.   And are there any written guidelines to explain when a
17        defensive action report has to be completed?
18   A.   Yes.  So, yes.
19   Q.   Where are those guidelines?
20   A.   They would be in the -- in the training.  I believe
21        they're in the training -- in the Training Division in
22        regards to training DARs.  I'm not sure if they're in --
23        I'm not sure if the specifics are in policy or
24        procedure.
25   Q.   And what do you mean?  What do you mean when you use the
```

1       term DARs in training?
2   A.  That would be a defensive action report.
3   Q.  And "in training" refers to what?
4   A.  That refers to tasing somebody, having to pull your
5       firearm on somebody.  Any kind of hard, empty-hand
6       control.  Anything that the deputy was required to do to
7       perform their duties in regards to gain control of a
8       subject or in defense of their life or somebody else's.
9   Q.  Is that the same report that a deputy would have to
10      prepare in an incident involving the death of a fleeing
11      suspect?
12  A.  If they were the ones that caused the death of the
13      fleeing suspect.
14  Q.  So only if they were the ones causing the death of the
15      fleeing suspect?
16  A.  Correct.
17  Q.  And who makes the determination about whether or not
18      they caused the death of the fleeing suspect?
19  A.  Well, if there's a defensive action in regards to a
20      fleeing suspect where, for example, a deputy has to use
21      their firearm, there is an investigation that would be
22      considered an officer-involved shooting and there's an
23      investigation that would determine -- that goes up to
24      the solicitor as well and then it's determined.
25  Q.  How are those issues transmitted to the solicitor's

```
 1        office?
 2   A.   Through our legal counsel, I believe.
 3   Q.   Okay.  Is that a process that you're involved in?
 4   A.   No.
 5   Q.   If the officer's vehicle caused the death of a fleeing
 6        suspect, is that also reported to the solicitor's
 7        office?
 8   A.   I do not know.  I wouldn't -- I don't believe so.  The
 9        investigation of a vehicle is done by a highway patrol.
10   Q.   Do you know why a shooting of a suspect would go to the
11        solicitor's office but a vehicle death would not?
12   A.   I do not know.
13   Q.   Has that always been the policy and practice that the
14        Richland County Sheriff's Department has?
15            MR. GARFIELD:  One second.  I object to the form of
16        the question.  The question exceeds the scope of the
17        notice topic areas.  You can answer.
18   BY MS. JONES:
19   A.   I do not know.
20   Q.   Has it been the rule as long as you've been there, the
21        last 13 years, to your knowledge?
22   A.   That an officer-involved shooting goes to the
23        solicitor's office?
24   Q.   And the vehicle death does not?
25            MR. GARFIELD:  Object to the form.  You can answer.
```

PAMELA A. BAKER vs LEON LOTT, ET AL.
30(b)(6) Gilman, Karen 11/20/2025
19

```
 1   BY MS. JONES:
 2   A.   I cannot say that it does not is what I'm saying.
 3   Q.   You don't know?
 4   A.   Correct.
 5   Q.   Okay.  How are the email accounts set up at the Richland
 6        County Sheriff's Department?
 7   A.   Our email accounts are set up in Microsoft Exchange.
 8   Q.   And is each employee assigned an email address?
 9   A.   Yes.  Yes.
10   Q.   And who assigns those email addresses?
11   A.   Those of us who deal with the IT department.
12   Q.   So that's in your department?
13   A.   Yes.
14   Q.   And where are those email records maintained?
15   A.   So emails are stored on the Exchange server, but they
16        are stored in regards to what each individual chooses to
17        keep in their mailbox.  Not all emails are kept forever.
18        We don't -- we don't have that capacity in a -- in a
19        server for 800 different employees.
20   Q.   Right.  And are you involved in litigation holds for
21        emails?
22   A.   No.
23   Q.   Were you ever involved in a litigation hold regarding
24        this December 29, 2023, collision?
25             MR. GARFIELD:  Object to the form.  Beyond the
```

1       going to watch together, basically, and then if I have
2       questions as regards to any different things that I see,
3       decision making or whatever, and I'm going to ask him
4       what his thought process was.
5   Q.  And is that a hypothetical, or is that what actually
6       happened?
7   A.  No, that's what happened.
8   Q.  Okay. So what questions, if any, did you pose to him?
9   A.  So I -- the question that I did pose to him was in
10      regards to when the subject went to the opposite
11      direction -- in the opposite direction on the highway.
12      I asked him what his thinking process was in regards to
13      following -- following the subject onto the highway.
14  Q.  What did he say?
15          MR. GARFIELD: Object to the form. You can answer.
16  BY MS. JONES:
17  A.  Okay. So I could see when he was there that there was
18      some ---
19  Q.  My question is, what did he say?
20  A.  Oh, what did he say?
21  Q.  In response to your question.
22          MR. GARFIELD: Same objection. Go ahead.
23  BY MS. JONES:
24  A.  He said that there was no way -- there was construction
25      going in the -- I don't know if he was going north or

1      south.  Sorry, I don't -- in the direction where you
2      would normally get on the freeway, he could see that
3      there was barricades and all of that, and there would be
4      no way to do anything to apprehend the suspect, can't
5      get over to the other side.  And so he followed the
6      suspect on the other side.
7   Q. Did he say anything else?
8   A. No.
9   Q. Did you ask any other questions?
10         MR. GARFIELD:  Object to the form.
11  BY MS. JONES:
12  A. Not really that I can recall that.  I probably didn't
13     just say questions.  I did tell him that he did -- he
14     did a good job at staying to the left of the lanes and
15     his speed was very appropriate.  There wasn't any out of
16     control.  Everybody had time to move out of the way
17     while he kept an eye on the -- on the suspect.  So
18     that's ---
19  Q. Did you interview anyone else concerning the December
20     29, 2023, incident involving Byron Pringle?
21  A. No.
22  Q. Did you discuss it with anyone other than Deputy Smith?
23  A. I may have discussed it with my captain at the time.
24  Q. Who was that?
25  A. That would be Chris Duke.

1   A.   Yes.  He would have, yes.  But he did not in my
2        presence.
3   Q.   He did not in your presence?
4   A.   Correct.
5   Q.   Did he tell you he had viewed the footage?
6   A.   Yes.
7   Q.   Do you know when he viewed it?
8   A.   I don't know -- I don't know when he viewed it.
9   Q.   Were you the person who issued the discipline, the
10       verbal counseling to Deputy Smith concerning this
11       incident?
12            MR. GARFIELD:  Object to the form.  You got this.
13  BY MS. JONES:
14  A.   Okay.  Verbal counseling is not necessarily a
15       discipline, but a discussion.  Like I said, there's
16       always a training opportunity.  Discipline, if any is
17       determined to be necessary, is done after the pursuit
18       packet is sent up to our Professional Standards
19       Division.  We don't -- we don't make those
20       determinations.
21  Q.   So you nor Mr. Duke would have made any disciplinary
22       determination; is that correct?
23  A.   Correct.
24  Q.   This incident report and these documents would have been
25       sent to the Professional Standards Division for that

```
 1        determination?
 2   A.   Yes.  So in the reporting system, it automatically goes
 3        there.
 4   Q.   Okay.
 5   A.   So it automatically goes where it needs to go for the
 6        proper review by the proper entity?
 7   Q.   Do all pursuit incident reports go automatically to the
 8        Professional Standards Division?
 9   A.   So after -- after the immediate supervisor reviews it,
10        they -- they enter their name and signature.  It goes to
11        the next level, which it would have went to my captain,
12        and then once the captain does it, it goes up to
13        professional standards.  So it automatically goes into
14        their box within the TriTech system.
15   Q.   And that is for all vehicular pursuits by deputies?
16   A.   Correct.
17   Q.   Okay.  Are there any other documents that relate to the
18        officer-supervisor review other than Exhibit 10?
19   A.   No.
20   Q.   Is Christopher Duke still with the sheriff's department?
21   A.   No.
22   Q.   When did he leave?
23   A.   A couple months ago.
24   Q.   Did he retire?
25   A.   Yes.
```