PAMELA A. BAKER v. LEON LOTT, IN HIS OFFICIAL CAPACITY AS THE SHERIFF OF RICHLAND COUNTY SHERIFF'S OFFICE, ET AL.
CASE NO. 3:24-CV-04303-JDA

# EXHIBIT 3

## TO PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE THE REPORT AND TESTIMONY OF JOHN J. RYAN, AS TO LAW ENFORCEMENT AND VEHICULAR PURSUIT STANDARDS

*DEPOSITION EXCERPTS OF JOHN T. RYAN*

Page 1

1            IN THE UNITED STATES DISTRICT COURT
               DISTRICT OF SOUTH CAROLINA
2                    COLUMBIA DIVISION

3              C/A NO. 3:24-cv-04303-JDA

4

5   PAMELA A. BAKER,

6            Plaintiff,

7   vs.

8   LEON LOTT, individually and in his
    official capacity as the Sheriff of
9   Richland County; THE RICHLAND COUNTY
    SHERIFF'S DEPARTMENT; DEPUTY MATTHEW
10  SMITH; DEPUTY MICHAEL DILLARD and
    DEPUTY BRYAN HODGE,

11

12            Defendants.

    _____/
13

14

15

16  DEPOSITION OF:        JOHN J. RYAN

17  DATE:                 JANUARY 28, 2026

18  TIME:                 10:00 A.M. TO 11:55 A.M.

19  LOCATION:             219 GERANIUM COURT
                          MARCO ISLAND, FLORIDA 34145
20
    TAKEN BY:             PLAINTIFF
21
    STENOGRAPHER:         VICTORIA MILLER, RPR
22

23

24

25



Deposition of John J. Ryan                                      BAKER vs LOTT, et al.

Page 9

1          Q.    Are you a stockholder in Legal Liability

2    Risk Management --

3          A.    No, I'm not.

4          Q.    -- Group?

5          A.    I'm an independent contractor.  That's it.

6          Q.    So you have contractual relationship with

7    Law Enforcement Risk Management Group, Inc.?

8          A.    It's always been a handshake.  There is no

9    actual contract.  But they have independent

10   contractors with various subject matter expertise

11   that do training, that do audits, that do a variety

12   of different functions.

13         Q.    And is the officer or director of that

14   James R. Alsup?

15         A.    Again, I have never seen their corporate

16   paperwork.  So his wife could be on it, too, because

17   she's very active in the organization.

18         Q.    And who is Lou Reider? R-E-I-D-E-R?

19         A.    So Lou Reider is a former deputy chief of

20   Los Angeles.  Lou is the one that introduced me to

21   Jim Alsup many, many years ago.  So, Lou is another

22   one of our co-directors.

23         Q.    And you're engaged -- When you're engaged

24   to be an expert witness, do the payments for your

25   services go to LLRMG or to you personally?



Page 10

1     A.    They go to them.  I don't touch any

2  billing or any checks.

3     Q.    Okay.  What are the terms of your

4  independent contractor relationship with LLRM -- Do

5  you say LLRMG or LLRMI?

6     A.    So it's LLRMI, but I think the corporate

7  name is Law Enforcement Risk Management Group.  But

8  Like I said, I'm not involved in that.  You know we

9  -- And I say we, the instructor and all of that, go

10  by LLRMI that was formed under a previous company.

11        And when Mr. Alsup sold that company, he

12  kept the LLRMI portion of it, but I think he formed

13  -- And that's probably the 2015 date.  I think

14  that's probably when he formed Law Enforcement Risk

15  Management Group.

16     Q.    Yes, sir.  What are the terms of your

17  contract to your independent contractor relationship

18  with LLRMI or LLRMG, whatever one it is?

19     A.    Yeah, I'm not sure I understand your

20  question.  I mean, everything is done on a

21  handshake.  There's no contractual terms.  There's

22  nothing in writing.  LLRMI pays me by the job.

23        So if I'm out doing an audit, I get paid

24  for the audit and the work that I do on the audit.

25  If I'm out doing training, they pay me by the day.

Deposition of John J. Ryan                                 BAKER vs LOTT, et al.

Page 11

1   When I do cases, they have take a portion of that.

2         So if that's what you're referencing, by

3   terms, that's it.  But it's all on a handshake.  I

4   don't think they've done they a written contract

5   with any of the probably 40 or 50 independent

6   contractors that do work for them.

7       Q.   So there are 40 or 50 independent

8   contractor in the group that work through this

9   company?

10      A.   I would say that I'm probably pretty close

11   to that number, yes.

12      Q.   And are there any in particular that you

13   work with on a consistent basis?

14      A.   From a training perspective, yes.  So, for

15   example, I'll be certifying use of force instructors

16   next week.  I also certified use of force

17   instructors two weeks ago.  So I have a young man

18   named Matt Greely who trained a portion of that

19   five-day program.  I have another guy, Mike Irwin

20   who's retired from the Illinois State Police that

21   teaches a portion of that program.  So those would

22   be two that I work with pretty regularly.

23        I do an advanced internal affairs program

24   with Lou Reider so I work with Lou pretty regularly.

25   Trying to think if there's any of my programs.

Page 12

```
1                 The vast majority of the training programs
2    I do by myself.
3         Q.    When you say you certify officers, who do
4    you certify them to?
5         A.    They're certified as use of force
6    instructors and that certification has been accepted
7    by the local POST, whatever state we're in.
8                 So, for example, the Indiana Law
9    Enforcement Academy, I did one in Indiana a couple
10   of weeks ago.  That program gets certified through
11   the Indiana POST.  And that's generally how it
12   happens.
13        Q.    So you're certifying them to the law
14   enforcement entity where they're employed?
15        A.    No.  Post is Police Officer Standards and
16   Training.  Every state has a Police Officer
17   Standards and Training.  So our programs are
18   accredited through them.  And then the officers
19   submit or the department submits those records to
20   the State POST.  Then the State POST recognizes them
21   as being certified.
22        Q.    And the State POST, are those entities
23   created by the state or are they private not for
24   profit entities?
25        A.    No, ma'am, they're created by the state.
```

Page 13

1       Q.    And what kind of businesses or persons to

2   you represent in your work?

3       A.    I'm not sure I understand the question.

4   But I do audits, training.  I write policy for law

5   enforcement agencies around the country through

6   LLRMI.  So whoever LLRMI contracts with, that would

7   be who's paying LLRMI.  But, as I said, I'm an

8   independent contractor to LLRMI.

9       Q.    Yes, sir.  My question is what kind of

10  businesses or individuals does LLRMI do work for?

11      A.    Well, it's largely law enforcement as far

12  as training goes.  As far as consultation, like in

13  litigation, then it's lawyers.  And it's lawyers on

14  both sides, either plaintiffs' lawyers or lawyers

15  defending law enforcement.

16           At times when we do audits, it might be a

17  department itself.  For example, I recently audited

18  all the training for the Nashville Metro Police

19  Department that they wanted to have done.

20      Q.    And when was the last time you testified

21  in a case for a lawyer?

22      A.    For a lawyer?  I want to say the last

23  trial was in either November or December.

24      Q.    And where was that?

25      A.    That was out in California.

Page 18

1      Q.    Okay.  What, in your mind, qualifies you
2    to be an expert in the area of pursuit?
3      A.    Well, let's start at the beginning.
4    Having been involved either as a primary, secondary,
5    assist or supervisor in probably hundreds of
6    pursuits.  So I have broad experience in pursuits
7    themselves.  From my time --
8      Q.    I'm sorry.
9      A.    Yeah.
10     Q.    Please continue.
11     A.    From my time back as a sworn officer, I
12   wrote pursuit policies.  I write pursuit policies in
13   23 or 24 states that are widely adopted by agencies.
14          In addition to that, I had overall review
15   of pursuits both when I was active and I review
16   pursuits on a regular basis now through audits,
17   through cases, or just an agency will ask me to take
18   a look at a pursuit they had that they have
19   questions about.  So I routinely do that on a
20   regular basis and offer opinions on it.
21          I have written on pursuits.  I read all of
22   the studies on pursuits and critically analyze them.
23   And I train on pursuits throughout the United States
24   on a regular basis.  So all of those things lead to
25   my subject matter expertise in pursuits.

Page 19

1      Q.    And when was the last time you

2  participated as the primary or secretary assist in a

3  pursuit?

4      A.    Probably sometime around 2002.

5      Q.    And you said your time as a sworn officer.

6  Are you a sworn officer?

7      A.    No, not today.  I'm retired.

8      Q.    And when was the last time you were a

9  sworn officer?

10      A.    2002.

11      Q.    What is a sworn officer?

12      A.    A sworn officer is someone who is

13  presently active as a police officer in an agency.

14  I work with police agencies every week, but I'm not

15  longer an active officer making arrests, going to

16  calls, supervising officers.

17           My level of supervision now is when a

18  agency calls upon me to answer questions and even my

19  old agency, when they call upon me to answer

20  questions.

21      Q.    And who makes the determination or

22  designation, who confers that designation to someone

23  to be a sworn officer?

24      A.    It depends on the state.  So some states

25  it is required that you be certified by the state.

Page 21

1   Exhibit 57, Plaintiff's Exhibit 57.

2                (Plaintiff's Exhibit No. 57, Expert

3                Report of John J. Ryan, was marked for

4                Identification.)

5   BY MS. JONES:

6        Q.    And I want to ask you some questions first

7   about Schedule -- I think it's Schedule A to your

8   report?

9        A.    Yes, ma'am.

10       Q.    Can you tell me what is Schedule A to your

11  report?

12       A.    So this is a start of my CV and part of

13  what is required under Rule 26 to be filed.  So it

14  has my education; my employment; certifications;

15  awards, some of my law enforcement achievement

16  awards, although clearly not all of them; my

17  professional affiliations when I was admitted to the

18  practice of law; some volunteer organization.  And

19  then I have a list that goes back to 2017 of cases

20  that I have testified either in deposition or trial.

21  That's what is in Schedule A.

22       Q.    Thank you.

23             Can you tell me if there are any edits,

24  changes or additions to Schedule A?

25       A.    I don't know what you mean by that.  So my



Deposition of John J. Ryan          BAKER vs LOTT, et al.

Page 22

```
 1   assistant keeps this up on a weekly basis.  So
 2   whatever was filed with the reports, there certainly
 3   would be updates probably since the report was
 4   filed.
 5        Q.   And who is your assistant?
 6        A.   My assistant is Amanda King.
 7        Q.   And does Ms. Kind work for LLRMI?
 8        A.   She does.
 9        Q.   And is she located there in Florida or is
10   she in Indiana?
11        A.   She's in Indiana.
12        Q.   When you say she keeps up with that, do
13   you mean that when you are hired in additional
14   cases, or just perform additional training through
15   LLRMI, she adds it to your CV?
16        A.   Yeah.  Not necessarily when I'm hired in a
17   case, but certainly when I give testimony or deposed
18   as required by the rule.
19        Q.   Okay.  To your knowledge, is Schedule A
20   still currently correct?
21        A.   If you can tell me what the last case on
22   the copy that you have is, because she just
23   overnighted this to me.  So this may be more current
24   than what you have.  Because what you have may be
25   what was filed court with the report as is required
```

DIAMOND
COURT REPORTING

Page 23

1    by the rule.

2         Q.   Let's see.  July 2025, Estates of Alexis

3    Rae Rael et al versus Board of County Commissioners

4    for the County of Bernalillo.

5         A.   Yeah.  So there are additions to that.  So

6    the California case that I testified in from

7    November 13th to November 17th is on there.  McCoy

8    versus City of Philadelphia, I was deposed

9    November 21st of '25.  Hadimoro versus City of

10   Albuquerque, I was deposed on January 6th.  Presley

11   versus City of Asprousis, I was deposed on

12   January 8th.  And Washington versus Wilson, I was

13   deposed on January 23rd of '26.

14        Q.   If would you please could you please

15   provide a copy of your updated CV to counsel, and

16   counsel would you provide that to me, please?

17        A.   Of course I can provide it.

18        Q.   Have you ever testified in South Carolina?

19        A.   I have many times.

20        Q.   And have you ever testified in federal

21   court in South Carolina?

22        A.   I'd have to go back and look.  I believe

23   so, but I wouldn't verify a hundred percent without

24   actually going back and trying to recreate that.

25        Q.   But you can't recall any as you sit here

DIAMOND
COURT REPORTING

Deposition of John J. Ryan                                    BAKER vs LOTT, et al.

Page 28

1    well.

2        Q.    Do you recall working on a case, Felix

3    versus Anderson County?

4        A.    Not off the top of my head, but certainly

5    you can remind me of it, if you like.

6        Q.    I want ask -- I have a few more questions

7    to ask you about your background.

8              Have you ever been terminated or

9    investigated for receiving gifts from vendors when

10   you were at the Providence Rhode Island City Police

11   Department?

12       A.    Not while I was there.  And I've never

13   been terminated from any job.  But I will tell you

14   that there was some nonsense allegations made six

15   and a half years after I retired, more than ten

16   years after the events that obviously I prevailed

17   on.  And they were nonsense at the outset, and they

18   were nonsense in the end.

19       Q.    Were you investigated by the FBI?

20       A.    No, I was not.  I was never the target or

21   subject of an FBI investigation.  I was a witness.

22   If fact, I was on the FBI or the U.S. attorney's

23   witness list for the trial of May and Buddy Scianci.

24   And I knew so little that they didn't even call me

25   as a witness because I didn't know anything about

Page 29

1   any criminal wrongdoing.

2       Q.    Did you request or receive a grant of

3   immunity from the U.S. Attorney's Office in that

4   proceeding?

5       A.    Absolutely not.  If you know anything

6   about immunity in federal court, it's got to be

7   granted by a judge.  You've got to go before the

8   judge.  That never happened.

9           I met with the FBI several times

10  voluntarily.  I told them exactly what took place in

11  the police department, none of which was any

12  wrongdoing.  And they tried to make my look bad.  In

13  my mind, they didn't let the facts get in the way of

14  a good story.  I had a significant argument with the

15  particular agent I was dealing with.  I walked out.

16          The U.S. attorney called me and asked me

17  to please come back, and I said your agent doesn't

18  want to let the facts get in the way of a good

19  story.  At which point, I decided to go back with an

20  attorney.

21          And the attorney, because the FBI does not

22  record interviews, they do these 302s which are

23  their words, not my words.  He insisted there be a

24  proffer agreement so that they couldn't, you know,

25  allege that I had in the previous four of five

Page 30

1  interviews that I had said something different.  So

2  he insisted on a proffer agreement which is not

3  immunity.

4      Q.   Can you tell me if, are you aware of any

5  recognized written or published standards related to

6  police pursuits?

7      A.   No.  I can tell you that the policies are

8  all over the map, quite honestly.  I do a regular

9  survey every couple of years of pursuit policies.

10 And there are some commonality, so there's three

11 basic types.

12          The IACP recognizes four basic types.  The

13 IACP recognizes a discretionary policy.  A

14 discretionary with supervisory override, which I

15 think is nonsense because I think a supervisor can

16 always override an officer's decision to pursue.  So

17 I think the supervisory really gets sucked into the

18 other three.

19          Then there's restrictive.  But even under

20 restrictive policies, we see those all over the map.

21 As I survey those, I see that, you know, some

22 agencies adopt a violent felony only.  Some do

23 violent felony plus impaired drivers.  Some do

24 violent felony or a driver that poses a threat to

25 the public by their driving.  So even under

Page 33

```
 1        A.   It changes over time.  So law enforcement
 2   changes over time.  That's why you have to keep up
 3   to date.  That's the benefit I have of being out
 4   training officers every week.  I was in Santa Fe
 5   with the New Mexico sheriff's last week and spent a
 6   day with them, talking about all kinds of law
 7   enforcement issues.
 8        Q.   Are you familiar with the Police Executive
 9   Research Forum Report?
10        A.   I am.  That's the one that I called
11   Director Clements on.
12        Q.   And do you think that that particular
13   study and guide for law enforcement executives is
14   authoritative; is that correct?
15        A.   It is absolutely not authoritative.  It's
16   not consistent with the generally accepted practice
17   nationwide.  I had a conversation with Hugh Clements
18   if you go to the front of that document, you'll see
19   he's got a letter in there.  Hugh is a very close
20   friend of mine.  And I had a conversation, in fact
21   he called me just two weeks ago, because he's the
22   chief of the Brown University Police after their
23   active shooter.  And he called me for some advice.
24             So, yes, I had a long consideration where
25   I was critical of what they relied on in that
```

Deposition of John J. Ryan                                    BAKER vs LOTT, et al.

Page 34

1    report.  Again, they cite back to Jeff Alpert in his

2    study of 143 prisoners or 146 prisoners in Omaha

3    Nebraska, Aiken County, South Carolina, Miami-Dade,

4    a study that he, himself, says in a declaration, a

5    signed declaration under penalty of perjury that his

6    study can't predict what a particular person will do

7    in any particular pursuit case, even if the police

8    terminate the pursuit.

9         Q.   And your opinion, the ones that you have

10   based on your experience, are there any studies to

11   back up your opinions that are published?

12        A.   Oh, I think there's a lot of things that

13   back up what I say.  First off, you can look at

14   IACP's recognition that all these different types of

15   policies are proper.

16             That's consistent with my survey and my

17   audits of law enforcement agencies nationwide,

18   because I see that agencies do have this wide

19   variation of policies across -- I say it's three

20   years.  IACP says it's four.  They added a

21   supervisory piece.  But, again, supervisors always

22   have authority to direct officers' actions.  So I

23   don't know that you need a separate category for

24   that.

25             So, yes, I think there are things that

Page 35

1    support including IACP recognition and the way they

2    guide rather than mandate.  But gain, the IACP

3    doesn't set the national standard.  So really, the

4    generally accepted practice comes from agencies

5    themselves.

6        Q.    So the standard for police pursuits in

7    your opinion is that there are no mandates, there's

8    just a wide variation of non-mandatory policy?

9        A.    So in a sense, you're partially correct,

10   but not completely correct.  There's a generally

11   accepted practice.  And the generally accepted

12   practice is that you can have a discretionary policy

13   that leaves it completely to the officer.

14           You can have a restrictive policy, but the

15   restrictive policy generally restricts by the nature

16   of the crime or the nature of the infraction.  Or

17   many agencies add the impaired drivers because they

18   recognize that 12,000 people a year are killed by

19   impaired drivers.  So they recognize the need to get

20   impaired drivers off the road.

21           Some agencies break up that restriction

22   between moving violations that create a danger to

23   the public versus things like defective equipment,

24   like a taillight out.  So some agencies break it out

25   that way.

Page 44

1    But certainly officers would have to know when they

2    can make a custodial arrest.  So you don't need to

3    put in policy what the officer already knows.

4         Q.   And is it your opinion that no one type of

5    policy is proper?

6         A.   Yeah.  I think it's been accepted, even by

7    the IACP, which is the largest organization.  And,

8    again, I don't agree with all of their policies, but

9    I do agree with them because I've done the surveys

10   as well that within the generally accepted practice

11   is the three types of policies that I've identified.

12        Q.   In your opinion South Carolina does not

13   have a restrictive policy for police pursuits; is

14   that correct?

15        A.   As a state law, yeah.  I don't know of any

16   state law in South Carolina.  And I certainly would

17   in updating policies that there is a state

18   restriction that's more restrictive than what

19   Richland County has.

20        Q.   And in paragraph 92 of your report, you

21   say the Richland County Sheriff's Office has a

22   restrictive pursuit policy based on limitations to

23   felonies or misdemeanors that would normally require

24   custodial arrests, correct?

25        A.   Correct.



Page 52

```
 1              However, in this particular case, in this
 2    particular case, it's clear that there is, the
 3    officers had information concerning a felony and
 4    they're not only complying with the generally
 5    accepted practices and training, they're also
 6    compliant with the Richland County policies based on
 7    the information they had at the time.
 8         Q.   But your opinion, your professional
 9    opinion is that violations of a written policy, even
10    where the policy provides restrictions is not
11    determinative in a chase.   Is that what you said?
12         A.   Absolutely.   I mean, I was on Scott versus
13    Harris.   And I did work on that case.   And that's
14    what the Supreme Court held.
15              So, clearly, yes, that's in fact the case
16    as a matter of law.   I'm not here to give legal
17    opinions, but we do train officers that they're held
18    to their internal policies for purposes of
19    accountability in their agencies.   But that doesn't
20    mean a pursuit can't be consistent with generally
21    accepted practices nationwide even if it does
22    violate their own policies.
23              In this particular case, it doesn't
24    violate their own policy because the restrictions
25    were met based on what the officer knew at the time.
```

Page 53

1     Q.    And that is based on your read of Scott

2     versus Harris?

3     A.    Not just my reading, I was involved in the

4     case.  You know, I assisted with providing policy

5     research to one of the groups that wrote an amicus

6     brief.  I was up at the court sitting with the

7     sitting president of the Georgia Chief's Association

8     on the day of oral argument.

9           I had lunch with Karen Blum who wrote the

10    amicus brief which is part of the amicus brief for

11    the National Police Accountability Project.

12          So, yeah, I mean, it's not just my

13    knowledge of the decision or my read of the

14    decision, I train -- I provide CLEs on Section 1983

15    for lawyers all the time.  And that's the clearest

16    part of the law.

17          But I also teach it to agencies that their

18    policies are internal and don't create any

19    heightened duties to third parties; that they're

20    there for internal accountability.

21          Obvious, we know that Deputy Scott,

22    because I cover this in training all the time, we

23    know that Deputy Scott violated the policy as did

24    Deputy Reynolds in Scott v. Harris on when you can

25    pursue.  And he also violated policy when he asked