```
            IN THE UNITED STATES DISTRICT COURT
                DISTRICT OF SOUTH CAROLINA
                    COLUMBIA DIVISION
```

PAMELA A. BAKER,

        Plaintiff,

vs.                              CASE NO.:3:24-CV-04303-JDA

LEON LOTT, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS THE SHERIFF OF RICHLAND COUNTY; THE RICHLAND COUNTY SHERIFF'S DEPARTMENT; AND DEPUTIES MATTHEW SMITH, MICHAEL DILLARD AND BRYAN HODGE,

        Defendants.


## D E P O S I T I O N

| | |
|---|---|
| WITNESS: | BRYAN HODGE |
| DATE: | Friday, September 19, 2025 |
| TIME: | 9:34 a.m. |
| LOCATION: | Burr & Forman<br>1221 Main Street, Suite 1800<br>Columbia, South Carolina  29201 |
| TAKEN BY: | Attorney for the Plaintiff |
| REPORTED BY: | Robin Dunn<br>South Carolina Court Reporter |

LEGAL EAGLE

Post Office Box 5682

Greenville, South Carolina 29606

864-467-1373

depos@legaleagleinc.com

| | | |
|---|---|---|
| 1 | A | He was a fentanyl dealer. |
| 2 | Q | How did you know that? |
| 3 | A | Through other officers' prior experience and |
| 4 | | knowledge of him, my prior knowledge of |
| 5 | | Mr. Pringle. |
| 6 | Q | Can you tell me about your prior knowledge of |
| 7 | | Mr. Pringle? |
| 8 | A | He was known in the area. One of our K-9 officers |
| 9 | | had chased him. |
| 10 | Q | When was that? |
| 11 | A | I don't remember. Prior to when this happened. |
| 12 | Q | What K-9 officer was that? |
| 13 | A | K-9 Abdullah. |
| 14 | Q | Are you aware that K-9 Abdullah actually pursued |
| 15 | | him nine days before? |
| 16 | A | I didn't know exact timeframe, but I knew he did, |
| 17 | | yes. |
| 18 | Q | Is this the first time you're hearing it was |
| 19 | | nine days before? |
| 20 | A | Yes. |
| 21 | Q | When you say previous experience -- did you say |
| 22 | | your previous knowledge of Mr. Pringle? |
| 23 | A | Previous knowledge. |
| 24 | Q | How did you obtain that knowledge, other than |
| 25 | | Abdullah's arrest? |

```
 1   A    Through the DEA task force.
 2   Q    What individuals on the DEA task force?
 3   A    Colin Davis.
 4   Q    Same Colin Davis as your FTO?
 5   A    Yes.
 6   Q    You knew who Mr. Pringle was?
 7   A    Yes.
 8   Q    You had his address, Social Security number, pants
 9        size?
10             MR. GARFIELD:  Object to the form.
11             THE WITNESS:  I wouldn't know all that.  From
12        my understanding, he was homeless.
13   BY MR. JENKINS:
14   Q    Baker 74.  Look at the first sentence at the top
15        slide.  Can you read that for me?
16   A    It is the policy of the Richland County Sheriff's
17        Department that deputies hold the highest value
18        for the sanctity of human life.
19   Q    Read that second sentence as well.
20   A    Deputies, pursuit supervisors, and commanders must
21        always balance the need for immediate apprehension
22        with the danger created by the pursuit as the
23        preservation of all human life is paramount.
24   Q    What does paramount mean to you?
25   A    Most important.
```

```
 1        did you not terminate the pursuit now, at that --
 2        this time?
 3   A    There's many different reasons you terminate a
 4        pursuit, whether you lose the suspect or not.  In
 5        this very incident, the second he crested the
 6        hill, I remember specifically saying that, I can't
 7        see him.  And then within a second after, he -- I
 8        had seen the smoke of the accident.  There was no
 9        opportunity, one.  And even if there was an
10        opportunity, he was still was going to be a
11        wrong-way driver that needed to be taken off the
12        road so that he did not injure somebody.
13   Q    Okay.  So Subparagraph C, road configuration.  Why
14        if whether it's an interstate matter in the
15        decision to initiate or terminate a pursuit?
16   A    Which subparagraph are you talking about?
17   Q    C.  It said road configuration.
18   A    Road configuration, whether it's an interstate,
19        divided highway, or work zone?
20   Q    Yes.
21   A    Because it makes a big difference.  An example,
22        you're on I126.  It's -- there's no turnaround
23        points, barely any shoulders, it could be under
24        construction, it could be whatever the case may
25        be, where there's no potential for somebody to
```

```
 1         actually get off of the highway or go around
 2         people, right, because there's no shoulder.  So
 3         all of those things going into the factor.
 4    Q    And that makes it more dangerous.
 5    A    Yes, it could.
 6    Q    Okay.  But an exit ramp would be a way to get off
 7         of the interstate, correct?
 8    A    It could be a way to get off the interstate.
 9    Q    What is -- can you define an exit ramp for me?
10    A    Well, an exit ramp, when used the right direction,
11         is an exit to get off the interstate.
12    Q    Okay.
13    A    But there were no exit ramps on the direction that
14         we were going.
15    Q    Okay.  If someone drives the wrong way on an exit
16         ramp, can they still exit the interstate?
17             MR. GARFIELD:  Object to the form.
18             THE WITNESS:  State that again.
19    BY MR. JENKINS:
20    Q    All right.  So if someone leaves the interstate
21         via a ramp, commonly referred to as an exit ramp,
22         even if they're going the wrong direction, they
23         still exit the interstate, correct?
24    A    If they are exiting the interstate, yes.
25    Q    Okay.  Existence of vehicular and pedestrian
```

1  A   If I'm working on shift and they send it out, yes.
2      If I'm not, then, no.
3  Q   Okay. Is there a way you can go back and pull
4      that if it's a couple days past? Is it filed
5      somewhere?
6  A   I'm not sure.
7  Q   Okay. When did you learn about Mr. Pringle's
8      arrest on December 20, 2023?
9  A   I believe it was through Abdullah after it
10     happened.
11 Q   Okay.
12 A   K-9, there's not a lot of us, so.
13 Q   Thirteen.
14 A   That's not a lot.
15 Q   Okay. Do you remember approximately when he told
16     you about it?
17 A   I'm assuming it was the day -- day after. Between
18     the day after and the time that I ended up chasing
19     Mr. Pringle.
20 Q   Okay. So you know that Mr. Pringle had been
21     arrested on December 20, 2023.
22 A   I didn't know if he was arrested or not, or if he
23     got -- I couldn't remember if he got away or not.
24     But I knew that he knew of Mr. Pringle when he
25     already chased him.

PAMELA A. BAKER vs LEON LOTT, ET AL.
HODGE, BRYAN 09/19/2025
106

```
 1   Q   Okay.
 2   A   Whether he was arrested or not, I couldn't say for
 3       sure.
 4   Q   Did Mr. Abdullah tell you that he handcuffed him?
 5   A   I don't remember that.
 6   Q   Okay.  Tell me what you do know about his arrest
 7       on December 20, 2023.
 8   A   I'm not 100 percent sure.  I didn't know he was
 9       arrested.  I just remember there being a pursuit,
10       and they knew it was him.  I don't know if they
11       arrested him, but they caught the guy.
12   Q   Okay.  Have you ever escorted an arrested
13       individual to the hospital?
14   A   Yes.
15   Q   Have you ever released an arrested individual at
16       the hospital to go on their own volition instead
17       of being taken to Alvin S. Glenn Detention Center?
18   A   Yes.
19   Q   What is the process for that?
20   A   Well, if it's a blue ticket offense, so something
21       you can put on an arrestable blue ticket, you
22       could -- you could cut them a blue ticket, and
23       then they would get a court date later on that you
24       go to, just as if they went to jail.  It's the
25       same thing as me arresting somebody.  The
```

```
 1                (Audio playing.)
 2   Q    Is that you?
 3   A    Yes.
 4                (Audio playing.)
 5   Q    Is that your supervisor?
 6   A    That is one -- one of the supervisors.
 7   Q    Is that the supervisor that was working that day?
 8   A    Yes.
 9   Q    What is their name?
10   A    Sergeant Blanding.
11   Q    Christopher Blanding?
12   A    I believe that's his first name.
13   Q    And he just said to take him out?
14   A    Correct.
15   Q    What does take him out mean to you?
16   A    Using the forcible vehicle impact to take him off
17        the road.
18   Q    Okay.  Does take him out also -- is that also
19        referred to as a pit maneuver?
20   A    No.
21                (Audio playing.)
22   Q    So Deputy Smith says he's driving real reckless.
23        Would you agree that he was driving real
24        reckless -- Mr. Pringle was driving real reckless.
25   A    Mr. Pringle was driving real reckless, yes.
```

```
 1        come on, the body cam turns on.  Typically when
 2        you pull your gun, the body cams come on.
 3   Q    Shot spotter?
 4   A    No.  It's just -- there's a system on the gun so
 5        when it comes out, it notices -- it's supposed to
 6        turn the cameras on.
 7   Q    Okay.  Do you know why your camera didn't turn on
 8        until this point, your camera?
 9   A    I couldn't tell you.  It should have come on six
10        other times.
11   Q    I'm going to fast-forward to -- I stopped at
12        9 seconds, but I'm going to fast-forward to
13        2:10 -- 2:07.
14            (Video playing.)
15   Q    Stopped at 2:18.  Is that your supervisor,
16        Blanding, talking on the radio?
17   A    I am not sure who that was talking.
18   Q    Okay.  Who do you think was talking?
19   A    I'm assuming one of the DEA people.
20   Q    Okay.  Does he say sigma 10?
21   A    Signal 10.
22   Q    Oh.  Yes.  What is signal 10?
23   A    I can't remember.  That's one we don't use often.
24        Usually if they ingested narcotics, we say 600.
25        It could have been somebody from a different
```

1  Q   And then it also indicates, wanted on general
2      sessions bench warrant, and it has a bench warrant
3      actual number for failure to appear for charges of
4      escape, drugs, and larceny.  Did I read all of
5      that correctly?
6  A   Correct.
7  Q   Is all of that contained in the CAD report
8      pertaining to Mr. Pringle on December 29, 2023?
9  A   Yes.
10 Q   All right.  Based on your qualifications and your
11     training and your experience as a law enforcement
12     officer and a K-9 officer, what, if anything, does
13     all those indicators mean to you about Mr. Pringle
14     and the level of dangerousness?
15 A   To me, I see that many things all at once, I take
16     it that he is of the utmost danger to society if
17     he is free to walk around and do what he pleases.
18 Q   Okay.  When you say the utmost danger to society,
19     just, could you expound on that?  What do you mean
20     by that?
21 A   Just with all the priors, you could tell that he
22     doesn't believe in social construct of any type.
23     That he is going to be aggressive in nature.  He's
24     got multiple different assaults.  He's a fentanyl
25     dealer.  He's not somebody who's out there to do

1      good with all those things.  He's only doing bad.
2   Q  Okay.  And when you say, only doing bad, what does
3      it mean to you that he ran from the police and
4      resisted arrest?
5   A  Resisting arrest on top of the fact that he ran
6      from the police once they did catch him, he
7      clearly fought the police, and that would be
8      resisting arrest.
9   Q  And also domestic violence, that could indicate
10     that he abuses women?
11  A  Yes.
12  Q  Okay.  And I'll go into some of those other
13     particulars also.  Now, a lot was discussed today
14     about the dangers of fentanyl.  Would it be fair
15     to say that you learned from your professional
16     experience the dangers of fentanyl?
17  A  Yes.
18  Q  Would that include your military experience?
19  A  Yes.
20  Q  Your law enforcement experience?
21  A  Yes.
22  Q  Your experience being assigned as a K-9 officer?
23  A  Yes.
24  Q  Would it be fair to say that fentanyl is extremely
25     dangerous?