```
             UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF SOUTH CAROLINA
                   COLUMBIA DIVISION


    PAMELA A. BAKER,

          Plaintiff,

       vs.                          C/A No.: 3:24-cv-04303-JDA

    LEON LOTT IN HIS OFFICIAL CAPACITY
    AS THE SHERIFF OF RICHLAND COUNTY
    SHERIFF'S OFFICE; THE RICHLAND
    COUNTY SHERIFF'S OFFICE; DEPUTIES
    MATTHEW SMITH, MICHAEL DILLARD,
    AND BRYAN HODGE,

          Defendants.


    _____

                DEPOSITION OF MATTHEW SMITH
    _____


    DATE TAKEN:    Tuesday, May 13, 2025

    TIME START:    9:25 a.m.

    TIME END:      3:53 p.m.

    LOCATION:      Burr & Forman, LLP
                   1221 Main Street, Suite 1800
                   Columbia, South Carolina

    REPORTED BY:   SHERI L. BYERS, RPR
                   EVERYWORD, INC.
                   P.O. Box 1459
                   Columbia, South Carolina  29202
                   803.212.0012
```

1     A.  I do not recall.
2     Q.  Was it issued to you by the sheriff's
3  department?
4     A.  Yes, ma'am.
5     Q.  Was it a cell phone?
6     A.  Yes, ma'am.
7     Q.  When you spoke to Sheriff Lott on December
8  the 29th, were you still on duty?
9     A.  Yes, ma'am.
10    Q.  Okay.  And what was the shift that you were
11 working on December 29th?
12    A.  I was working overtime.  It was -- we
13 called it Signal 30.
14    Q.  When you say you were working overtime, had
15 you already worked 12 hours that day?  Is that what
16 you're telling me?
17    A.  No, ma'am.
18    Q.  What does that mean?
19    A.  It's --
20    Q.  What does overtime mean?
21        MR. SPREEUWERS:  Objection.  Please let the
22    witness finish his answer.
23 BY MS. JONES:
24    Q.  What does overtime mean?
25    A.  It's more time than your normal hours.

```
 1        Q.   What were your normal hours?
 2        A.   It was the -- I believe it's 80 hours a
 3   week or 85 hours.  It's between those two numbers.  I
 4   can't recall.  But those are the hours per my normal
 5   shift.  Anything after that is we call Signal 30.  A
 6   special duty.
 7        Q.   On December the 29th, 2023, what time did
 8   you begin working?
 9        A.   I don't recall.
10        Q.   Are there records of it?
11        A.   I don't know.
12        Q.   Were you paid by the hour?
13        A.   Yes.
14        Q.   How did you sign on to work?
15        A.   That day?  Or how did I sign up for the
16   overtime?
17        Q.   Both.
18        A.   For the overtime, there's an email that
19   gets sent out every couple of days about different
20   overtime you can get throughout the county.  So I
21   signed up for this particular event at the JD Shoes.
22   And for that day, I signed on to the MDT.  And I let
23   dispatch know where am I going to be working.
24        Q.   Did you start your day on December the 29th
25   at JD Shoes?
```

```
 1       A.   Start my working day?
 2       Q.   Yes, sir.
 3       A.   Yes, ma'am.
 4       Q.   Okay.  But you don't remember what time it
 5  was?
 6       A.   I do not recall what time.
 7       Q.   What was the event at JD Shoes that you
 8  were working that day?
 9       A.   Officer presence.
10       Q.   What does officer presence mean?
11       A.   Officer present means that the specific
12  business just hires us for officers to be visible at
13  their location to deter crime.
14       Q.   Was there a set number of hours you were
15  supposed to be physically present at JD Shoes on
16  December the 29th?
17       A.   There is a set number of hours that they
18  would like for me to be there, yes.
19       Q.   And did you stay there the entire set
20  number of hours?
21       A.   No, ma'am.
22       Q.   What happened to cause you to leave?
23       A.   What happened to cause me to leave JD
24  Shoes?
25       Q.   Correct.
```

```
 1      A.   I got a call for service over the radio.
 2      Q.   What was that call?
 3      A.   The call was from a Lexington sheriff
 4   undercover unit.
 5      Q.   Who was the individual that called you from
 6   the Lexington sheriff unit?
 7      A.   I do not know.
 8      Q.   How did you receive that call?
 9      A.   Through the radio.
10      Q.   Where was the radio?
11      A.   In my car.
12      Q.   So you were in your car, not in the store
13   JD Shoes?
14      A.   Yes, ma'am.
15      Q.   And was your assignment at JD Shoes to stay
16   in your car outside the store?
17      A.   No, ma'am.  It was to be around to show
18   presence.
19      Q.   Inside and out?
20      A.   Yes, ma'am.
21      Q.   Okay.  So you were in your car when the
22   radio transmission from the Lexington sheriff's
23   unit -- did they contact you or was it a general
24   contact?
25      A.   It was a general contact.
```

```
 1        A.   I'm sorry.  You said what?
 2        Q.   The individual that just got out of the
 3   vehicle in front of you, is that Deputy Hodge and his
 4   dog?
 5        A.   Yes, ma'am.
 6        Q.   Okay.  All right.  And the vehicle that's
 7   crashed in the middle of the -- of the thing, is that
 8   Mr. Pringle's vehicle?
 9        A.   Yes, that is Mr. Pringle's vehicle.
10        Q.   All right.  Do you have -- can you tell me,
11   if you know, how Mr. Pringle's vehicle was turned
12   around so that it's facing going back into Columbia
13   as opposed to going out into incoming traffic?
14             MR. SPREEUWERS:  Object to the form.
15             You can answer.
16             THE WITNESS:  You're asking how his vehicle
17        was flipped around --
18   BY MS. JONES:
19        Q.   Yes.
20        A.   -- instead of going the direction he was?
21        Q.   How did it flip around?
22        A.   From the collision.
23        Q.   What happened in the collision, if you
24   know?
25        A.   I don't know.
```

```
 1   initiated said event has the obligation to notify the
 2   desk.
 3        Q.   Does that individual also have the
 4   obligation to do the paperwork and prepare the
 5   written report?
 6        A.   Yes, that person does have the obligation
 7   to do that report.
 8        Q.   And in this situation, that would be you;
 9   is that correct?
10        A.   Yes, ma'am.  I am the initiating officer.
11        Q.   Okay.  And if you would look in this
12   notebook at Exhibit 10 and look at the entirety of
13   Exhibit 10.  Do you recognize this document?
14        A.   Yes, ma'am.
15        Q.   What is it?
16        A.   This is my incident report of that day.
17        Q.   This is the incident report related to the
18   chase of Mr. Pringle and the head-on collision with
19   Ms. Baker?
20        A.   Yes, ma'am.  This is the incident report
21   that I formulated from the incident.
22        Q.   When did you prepare this report?  This
23   isn't a trick question.  On the very first page where
24   it says event, it's got incident start date and end
25   date and reported date.  Do you see that?
```

```
 1        A.    Just from my experience.
 2        Q.    Okay.  And then you devote "R/O lost eyes
 3   on the vehicle."
 4              Are you referring to yourself?
 5        A.    No.  I'm referring to as a whole, as me and
 6   Hodge.
 7        Q.    You and Hodge lost eyes on the vehicle.  As
 8   it crested the hill that you told me about a minute
 9   ago?
10        A.    Yes, ma'am.
11        Q.    All right.  Now, in your report, you state
12   that Ms. Baker -- that Byron collided head on with
13   Ms. Baker's vehicle.  And that she complained mostly
14   of back pain but sustained minor injuries.
15              Is that correct?
16        A.    Yes, ma'am.  It's stated in my report.
17        Q.    What caused you to conclude that she
18   sustained minor injuries?
19        A.    My experience.
20        Q.    Anything -- can you give me any details on
21   that or explain what in your experience caused you to
22   conclude that she sustained minor injuries?
23        A.    Yes, ma'am.  So from my experience being a
24   firefighter and in the medical field, just by looking
25   at her as a general impression, she has no
```

```
 1   incident and that she wanted a report.  She left her
 2   callback number, so I called her back and got some
 3   information off of her.
 4        Q.   Okay.  Did she make a claim for the -- for
 5   the debris that struck her vehicle?
 6        A.   All I know is that she needed a report.  I
 7   don't know about a claim.
 8        Q.   Okay.  All right.  And then the Richland
 9   County EMS declared Mr. Pringle dead at 2:41?
10        A.   Yes, ma'am.
11        Q.   Okay.  And then it says "Upon RCCO."  Is
12   that -- who is RCCO?
13        A.   RCCO is the Richland County Coroner's
14   Office.
15        Q.   So the coroner's office also came to the
16   scene?
17        A.   Yes, ma'am.
18        Q.   And they are the -- that's the entity that
19   removed Pringle from the vehicle?
20        A.   Yes, ma'am.
21        Q.   Because he was trapped in the vehicle?
22        A.   Correct.
23        Q.   Okay.  And then it says "Two small bags
24   containing a white powdery substance believed to be
25   fentanyl was collected from Byron's clinched hand."
```

```
 1    A.    Correct.
 2    Q.    Did you collect that?
 3    A.    I don't recall if I collected it.
 4    Q.    Well, then it says, "A vehicle search was
 5  conducted."  Did you conduct a vehicle search?
 6    A.    Negative.  And it states, "A vehicle search
 7  was conducted and another small baggy believed to be
 8  containing fentanyl was collected by Deputy Stern."
 9    Q.    And who is Deputy Stern?
10    A.    A deputy that works at the Richland County
11  Sheriff's Department.  I don't know.
12    Q.    Was he involved in the chase?
13    A.    He was not involved in the chase, but he
14  was at the scene.
15    Q.    Who requested -- who, if anyone, if you
16  know, requested Deputy Stern to come to the scene?
17    A.    I don't know.
18    Q.    Is he a supervisor?
19    A.    I don't recall.
20    Q.    And then your report says, "All evidence
21  was collected and submitted to me at Richland County
22  Sheriff's Department headquarters."
23    A.    Yeah.  All evidence was submitted by me.
24    Q.    It says was collected and submitted by you?
25    A.    Yes, ma'am.
```

Matthew Smith

```
 1      Q.   So how did you collect the -- what evidence
 2  did you collect?
 3      A.   I stated in my incident report, the two
 4  small original baggies of white powdery suspect --
 5  excuse me -- white powdery substance.  And the other
 6  bag collected by Deputy Stern.
 7      Q.   Okay.
 8      A.   He chain of custody that to me, and I took
 9  that down to the headquarters to be submitted.
10      Q.   And then it says, "Major Gonzalez responded
11  to the scene."  What is Major Gonzalez's name?
12      A.   His name?
13      Q.   Yeah.
14      A.   I don't know his first name, but last name
15  is Gonzalez.
16      Q.   Okay.  Do you know Chief McDuffie's name?
17      A.   Chief McDuffie's first name is Joanna.
18      Q.   Did you contact Chief McDuffie?
19      A.   She contacted me.
20      Q.   When did she contact you?
21      A.   While I was still on scene.
22      Q.   How did she contact you?
23      A.   Via phone.
24      Q.   And what did she say?
25           MR. SPREEUWERS:  Hang on.  Chief McDuffie
```

```
 1      A.   Call it just the CAD.
 2      Q.   So this was copied and pasted from the CAD?
 3      A.   This was copied and pasted from the CAD
 4  into the notes.
 5      Q.   Okay.  All right.  Did you take any witness
 6  statements from any witnesses?
 7      A.   I don't recall.
 8      Q.   Did another agency come in and investigate
 9  the collision and the chase?
10      A.   Yes.
11      Q.   And who was that?
12      A.   The South Carolina Highway Patrol.
13      Q.   Okay.  And do you know the division of the
14  South Carolina Highway Patrol that conducted an
15  investigation?
16      A.   It would be MAIT.
17      Q.   And what is MAIT?  Do you know what MAIT
18  stands for?
19      A.   It's a big word.  It's multi agency --
20      Q.   Is this it?  This is actually Exhibit 12
21  that's in that notebook.
22      A.   Yes.  SO MAIT stands for multidisciplinary
23  accident investigation team.
24      Q.   Do you know why the MAIT team from the
25  South Carolina Highway Patrol conducted an
```

```
 1  drugs from Mr. Pringle during December of 2023?
 2       A.   I do not.
 3       Q.   Okay.  When you began the chase of
 4  Mr. Pringle, did anyone inform you that the Lexington
 5  County Sheriff's Department had engaged in an
 6  undercover buy with Mr. Pringle a couple of weeks
 7  before the chase?
 8       A.   Did I know, did you say?
 9       Q.   Yeah, did you know that?
10       A.   No, I did not.
11       Q.   Did you know that he had been arrested by
12  Richland County nine days before the chase?
13       A.   No, I did not.
14       Q.   Did you know that your department had the
15  records on Mr. Pringle showing his name, his last
16  known address, his -- the jumpsuit size for his jail
17  suit, his DNA, his date of birth, all that
18  information on him?  Where his tattoo was on his arm?
19       A.   I did not have no knowledge that we had
20  that.
21       Q.   Did you at any point in time on
22  December 29th, 2023, consider not engaging in the
23  chase with Mr. Pringle and arresting him at a later
24  time?
25            MR. SPREEUWERS:  Object to the form.
```

```
 1  counseling?
 2          MS. JONES:  Objection, leading.
 3          MR. SPREEUWERS:  You can answer.
 4          THE WITNESS:  That does not.
 5  BY MR. SPREEUWERS:
 6     Q.   Okay.  Who would have normally done a
 7  verbal counseling?
 8     A.   It would have been my immediate supervisor.
 9     Q.   Okay.  Was your immediate supervisor at the
10  time Ethyn Perkins?
11     A.   Correct.
12     Q.   And the section right above that, does that
13  indicate that your supervisor, Ethyn Perkins,
14  verbally counseled you?
15     A.   Correct.
16     Q.   Okay.  All right.  We heard radio traffic
17  earlier that was all the information that you had
18  available when you initiated this pursuit; is that
19  correct?
20     A.   Correct.
21     Q.   Okay.  And that radio traffic, according to
22  your report, came from an undercover Lexington County
23  Sheriff's Department agent; is that correct?
24     A.   Correct.
25     Q.   What's the import of the fact that this
```

1  call came over your radio from another jurisdiction?
2          MS. JONES:  Objection, calls for
3      speculation and misstates the system.
4          MR. SPREEUWERS:  You can answer.
5          THE WITNESS:  The fact that an undercover
6      officer from a neighboring jurisdiction came
7      over to Richland County Sheriff's Department's
8      tac channel, tac four, pretty much shows the
9      importance of the urgency for which they needed
10     officers to respond to that specific incident.
11 BY MR. SPREEUWERS:
12     Q.   What's the importance of the fact it was an
13 undercover officer?
14     A.   The importance for an undercover officer
15 means that whoever this undercover person was
16 investigating had to be a serious offender.
17     Q.   And during the radio traffic that we heard,
18 you heard that this undercover officer had eyes on
19 the individual; is that correct?
20     A.   Correct.
21     Q.   And that the individual was 72; is that
22 correct?
23     A.   Correct.  He was 10-72.
24     Q.   And you indicated earlier that meant he was
25 a wanted individual?

Matthew Smith

1    A.    Correct.
2    Q.    Okay.  You also heard on that radio traffic
3  that this individual had run from you, meaning the
4  sheriff's department, a week prior?
5    A.    Correct.
6    Q.    Okay.  And you also heard that there were
7  warrants for that individual involving trafficking
8  heroin?
9    A.    Correct.
10   Q.    That's what came over the radio?
11   A.    Yes, sir.
12   Q.    And you heard that?
13   A.    Correct.
14   Q.    Okay.  And you also heard that undercover
15 officer from Lexington County Sheriff's Department
16 say over the radio that he has GSC SC bench warrants?
17   A.    Correct.
18   Q.    Is your understanding that that refers to
19 general sessions court?
20   A.    Correct.
21        MS. JONES:  Objection, leading.  And a
22     misstatement of his prior testimony that he
23     didn't know.
24 BY MR. SPREEUWERS:
25   Q.    Okay.  You can -- you know that general

```
 1  sessions court is where the more serious charges are
 2  prosecuted?
 3       A.   Correct.
 4       Q.   Okay.  And a bench warrant is a directive
 5  from a judge to take a particular individual into
 6  custody, correct?
 7            MS. JONES:  Objection, leading.
 8            MR. SPREEUWERS:  You can answer.
 9            THE WITNESS:  Correct.
10  BY MR. SPREEUWERS:
11       Q.   Okay.  And, in fact, you confirmed through
12  NCIC after the fact that there were valid and
13  outstanding warrants for this individual, correct?
14            MS. JONES:  Objection, misstatement,
15       leading.
16            MR. SPREEUWERS:  You can answer.
17            THE WITNESS:  Correct.
18  BY MR. SPREEUWERS:
19       Q.   Okay.  And during the course of that radio
20  traffic, you also understood that the support of an
21  air unit would not be available due to the weather
22  conditions, right?
23       A.   Correct.
24       Q.   When Mr. Pringle made the decision to
25  divert from the entrance ramp to I-126 inbound to the
```

```
 1        A.    Correct.
 2        Q.    Is that the nature of your counseling that
 3   you received was about the body-worn camera
 4   initiation?
 5             MS. JONES:  Objection, leading,
 6      misstatement of his prior testimony.
 7             MR. SPREEUWERS:  You can answer.
 8             THE WITNESS:  I don't recall.
 9   BY MR. SPREEUWERS:
10        Q.    Okay.  All right.  Trooper Smith, have you
11   read the lawsuit that's been brought against you in
12   this case?
13        A.    I have not.
14        Q.    Okay.  Are you aware that you have been
15   accused of using excessive force against Ms. Baker?
16        A.    I did not.
17        Q.    Okay.  Did you use any force against
18   Ms. Baker?
19        A.    I did not.
20        Q.    Did any law enforcement officer, to your
21   recollection, use any sort of force against
22   Ms. Baker?
23        A.    Did not.
24        Q.    Did anybody even touch Ms. Baker that was a
25   law enforcement officer?
```

Matthew Smith

```
 1        A.   I don't recall.
 2        Q.   Did you ever see any law enforcement
 3   officer touch Ms. Baker?
 4        A.   I did not.
 5        Q.   Okay.  And you yourself did not use any
 6   force against Ms. Baker?
 7        A.   I did not.
 8        Q.   You did not attempt to seize Ms. Baker?
 9        A.   I did not.
10        Q.   So if you didn't use any force against
11   Ms. Baker, you certainly could not have used any
12   excessive force, right?
13        A.   Correct.
14        Q.   Did you engage in a conspiracy to harm
15   Ms. Baker?
16        A.   I did not.
17        Q.   Okay.  Did you know Ms. Baker before this
18   accident took place?
19        A.   I did not.
20        Q.   Had you ever seen her before?
21        A.   I did not.
22        Q.   Did you know Mr. Pringle before this chase
23   took place?
24        A.   I did not.
25        Q.   Had you ever seen him before?
```

Matthew Smith

```
 1        A.    I did not.
 2        Q.    Did you know Mr. Pringle's race?
 3        A.    I did not.
 4        Q.    Did you know Ms. Baker's race?
 5        A.    I did not.
 6        Q.    Did you do anything at all to try to
 7   deprive Ms. Baker of any rights under the
 8   constitution that was based on her race?
 9        A.    I did not.
10        Q.    Okay.  What's your understanding of
11   Ms. Baker's race?
12        A.    She's an African-American female.
13        Q.    And what's your race?
14        A.    African-American male.
15        Q.    And what was Mr. Pringle's race?
16        A.    He was an African-American male.
17        Q.    Do you have any information that anybody
18   knew these folks -- with the Richland County
19   Sheriff's Department, do you have any information
20   that the folks that were involved in this pursuit,
21   any of them knew either Ms. Baker or Mr. Pringle?
22        A.    I do not.
23        Q.    Okay.  Did you have any agreement with any
24   person before this chase began -- did you have an
25   agreement to start this chase --
```