IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Pamela A. Baker, | ) | Civil Action No.: 3:24-cv-04303-JDA |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **NOTICE OF MOTION AND MOTION** |
| Leon Lott in his official capacity as the | ) | **FOR SUMMARY JUDGMENT ON** |
| Sheriff of Richland County Sheriff's Office; | ) | **BEHALF OF DEFENDANTS** |
| the Richland County Sheriff's Office; and | ) | |
| Deputies Matthew Smith, Michael Dillard | ) | |
| and Bryan Hodge, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## INSTANT CIVIL ACTION

Plaintiff's Amended Complaint asserts three federal causes of action. First, under 42 U.S.C. § 1983, she alleges a "14th Amendment Claim of Violation of Due Process and Unlawful Seizure" (Am. Comp., ECF No. 26, p. 12) against the Defendants Lott, Smith, Dillard, and Hodge. Second, under 42 U.S.C. § 1985, she alleges a conspiracy claim against the Defendants Lott, Smith, Dillard, and Hodge. *Id.*, p. 13. Lastly, under § 1983, Plaintiff alleges a "Fourth Amendment Claim of Violation of Unconstitutional seizure and Use of Excessive Force" against the Defendants Lott and Richland County Sheriff's Department ("RCSD").

In addition to the federal causes of action, Plaintiff alleges one state law claim for negligence/gross negligence and one state law claim purportedly arising under S.C. Code Ann. § 23-13-10.

The Defendants assert that they acted appropriately and reasonably at all relevant times and categorically deny that they violated Plaintiff's constitutional rights. Consequently, the

Defendants now move for summary judgment pursuant to Rule 56, Fed. R. Civ. P., based upon the following grounds.

## STANDARD

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). And a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. In ruling on a motion for summary judgment, the court views "all facts and reasonable inferences in the light most favorable to the nonmoving party." *Ballengee v. CBS Broad., Inc*., 968 F.3d 344, 349 (4th Cir. 2020).

The moving party bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party does so, the burden shifts to the nonmoving party to "go beyond the pleadings" and come forward with "specific facts showing that there is a genuine issue for trial." *Id*. at 324. To withstand summary judgment, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).

## I.     PLAINTIFF HAS FAILED TO STATE A CLAIM AGAINST THE DEFENDANT DEPUTIES FOR FOURTH AMENDMENT DEPRIVATIONS UNDER 42 U.S.C. §1983

Plaintiff's Fifth Cause of Action (Am. Comp., ECF No. 26, p. 14), purports to be a "Fourth Amendment Claim of Violation of Unconstitutional seizure and Use of Excessive Force" against the Defendants Lott and RCSD. This claim is legally and factually frivolous.

The Supreme Court decided, nearly 30 years ago, that a police pursuit does not implicate the Fourth Amendment in *Cnty. of Sacramento v. Lewis*, 523 U.S. 833 (1998). *Lewis* involved a police pursuit that came to an end when the motorcycle being chased by police crashed without any affirmative action by the officers to cause it to do so. The Court noted that the Fourth Amendment "covers only 'searches and seizures,' neither of which took place here." *Id.* at 843. In particular, the Court noted that its previous holdings established that "a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied.*" *Id.* at 843-44 (emphasis in original).

In the present case, the pursuit terminated when Pringle crashed the vehicle he was driving into the vehicle driven by Plaintiff. The pursuing officers were not even in visual contact with Pringle's or Plaintiff's vehicle at the time of the collision. Not a single instrumentality of the pursuing officers (vehicle, weapons, et cetera) came into contact with Pringle's vehicle or Plaintiff's vehicle prior to or during the collision. Likewise, the deputies made no attempt to (and had no reason to) restrain Plaintiff's freedom of movement. Therefore, like in *Lewis* and other clear precedent on point, there was no "**governmental** termination of freedom of movement *through means intentionally applied.*"

Because no search or seizure occurred, any claim under the Fourth Amendment fails as a matter of law.

II.    **PLAINTIFF HAS FAILED TO STATE A SUBSTANTIVE DUE PROCESS FOURTEENTH AMENDMENT VIOLATION AGAINST THE DEFENDANT DEPUTIES UNDER 42 U.S.C. §1983**

To establish a substantive due process violation under the Fourteenth Amendment, a plaintiff must show that the law enforcement officer's behavior was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Washington v. Hous. Auth. of the City of Columbia*, 58 F.4th 170, 177 (4th Cir. 2023) (citing *Lewis*, 523 U.S. at 847 n.8). Executive conduct must "shock [ ] the conscience" to be an actionable substantive due process challenge. *Id*. *See also Dean v. McKinney*, 976 F.3d 407, 413-14 (4th Cir. 2020) ("The parties agree that this 'shocks the conscience' standard applies to § 1983 claims alleging a violation of substantive due process based on alleged police misconduct.") *Jones v. Baltimore Police Dep't*, No. CV 24-652-BAH, 2025 WL 896385, at *6 (D. Md. Mar. 24, 2025).

In the context of police pursuits, the Supreme Court has explicitly held that the appropriate standard of culpability for a due process claim arising out of a police pursuit is "intent to harm." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 854 (1998) ("Just as a purpose to cause harm is needed for Eighth Amendment liability in a riot case, so it ought to be needed for due process liability in a pursuit case. Accordingly, we hold that high-speed chases with no intent to harm [the plaintiffs] physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressable by an action under § 1983."). The intent to harm standard applies, in part, because police pursuits require officers "to act decisively and to show restraint at the same moment, and their decisions have to be made in haste, under pressure, and frequently without the luxury of a second chance." *Id.* at 853.

The record fails to demonstrate a plausible claim for Defendant deputies violating the Fourteenth Amendment. For instance, the Amended Complaint does not allege, nor are there any facts that support, that Defendant deputies intended to injure Plaintiff. No Defendant knew Plaintiff

or had any reason to intend her harm. Nor are there any facts to support that the Defendant deputies intentionally misused their vehicle or had any malice towards Plaintiff. This is not even a case where there was any contact between the injured person's vehicle and a law enforcement vehicle that would raise a colorable question of intent to harm.

Rather, the evidence in this case shows that the deputies were attempting to apprehend a fleeing felon that was wanted for a violent crime.[1] The deputies reasonably believed that the threat to the community from having a known drug trafficker loose on the streets was greater than the danger from attempting to apprehend Pringle. The deputies further believed it was necessary to continue to follow Pringle as he recklessly fled the wrong way on the interstate so that they could lend their blue lights and sirens to the situation to provide some modicum of warning to the other motorists.[2] Moreover, the deputies believed that they needed to attempt to catch up to Pringle to terminate his ability to continue the pursuit (as they had been instructed by a supervisor on the radio).

While one may reasonably argue that the deputies could have or should have taken some other approach, like discontinuing the pursuit altogether, this is not what the Constitution or associated precedent requires. The Supreme Court highlighted the problems with such an exercise regarding officers involved in police pursuits in *Scott v. Harris:*

> But wait, says respondent: Couldn't the innocent public equally have been protected, and the tragic accident entirely avoided, if the police had simply ceased their pursuit? We think the police need not have taken that chance and hoped for the best. Whereas Scott's action—ramming respondent off the road—was *certain* to eliminate the risk that respondent posed to the public, ceasing pursuit was not. First of all, there would have been no way to convey convincingly to respondent that the chase was off, and that he

---

[1] S.C. Code § 16-1-60 (Supp. 2007) provides that drug trafficking as defined in § 44-53-370(e) is a violent crime; *see also State v. Whitesides*, 725 S.E.2d 487, 489, 397 S.C. 313, 317 (S.C. 2012).

[2] As can be seen on the videos, it is clear that many of the vehicles on the roadway were able to see and react to the police emergency equipment in time to avoid Pringle.

was free to go. Had respondent looked in his rearview mirror and seen the police cars deactivate their flashing lights and turn around, he would have had no idea whether they were truly letting him get away, or simply devising a new strategy for capture. Perhaps the police knew a shortcut he didn't know, and would reappear down the road to intercept him; or perhaps they were setting up a roadblock in his path. Given such uncertainty, respondent might have been just as likely to respond by continuing to drive recklessly as by slowing down and wiping his brow.

Second, we are loath to lay down a rule requiring the police to allow fleeing suspects to get away whenever they drive *so recklessly* that they put other people's lives in danger. It is obvious the perverse incentives such a rule would create: Every fleeing motorist would know that escape is within his grasp, if only he accelerates to 90 miles per hour, crosses the double-yellow line a few times, and runs a few red lights. The Constitution assuredly does not impose this invitation to impunity-earned-by-recklessness.

550 U.S. 372, 385-86 (2007) (internal citations omitted).

In any event, second-guessing and exercises in hindsight about what deputies could have done or should have done are unquestionably matters relevant, if at all, to an analysis negligence (*e.g.* what a reasonable person would have done under the circumstances). However, negligent police misconduct does not shock the conscience and "is categorically beneath the threshold of constitutional due process." *Lewis*, 523 U.S. at 849. Likewise, even conduct that is potentially "disturbing and lacking in judgment, falls short of the 'shocks the conscience' standard." *Temkin v. Frederick Cnty. Comm'rs*, 945 F.2d 716, 723 (4th Cir. 1991)

Since it cannot be shown that the Defendant deputies acted with a purpose to cause harm unrelated to legitimate police activities, Plaintiff is unable to meet the threshold for a substantive due process violation. Accordingly, the Defendant deputies are entitled to summary judgment on Plaintiff's Fourteenth Amendment claim.

## III.     THE DEFENDANT RCSD IS NOT AMENABLE TO SUIT

Under the laws of the State of South Carolina and the State Constitution, the Sheriff of Richland County is the proper legal entity subject to suit. *See Cone v. Nettles*, 308 S.C. 109, 417

S.E.2d 523 (1992). Under South Carolina law, there is no entity known as the Richland County Sheriff's Department. The RCSD is merely a colloquial term for the Sheriff of Richland County and his employees and deputies. *See e.g. Owens v. Baltimore City State's Att'ys Off.*, 767 F.3d 379, 393-94 (4th Cir. 2014) (holding that the correct party defendant was the person occupying the office of State's Attorney for Baltimore City rather than the "Baltimore City State's Attorney's Office" because, while the office of State's Attorney for Baltimore was created by the state's constitution, no part of the constitution or laws of the state created a legal entity known as the "Baltimore City State's Attorney's Office"); *Brazzle v. Richland Cnty.*, No. 8:25-CV-3126-JD-WSB, 2025 WL 2324933, at *6 (D.S.C. June 16, 2025), *report and recommendation adopted*, No. 8:25-CV-03126-JD-WSB, 2025 WL 2057777 (D.S.C. July 23, 2025) ("Buildings and correctional institutions, as well as sheriff's departments and police departments, are not usually considered legal entities subject to suit.") (internal citations omitted). For this reason, and strictly from a procedural perspective, the proper entity to be sued is the Defendant Richland County Sheriff in his official capacity.

## IV.     THE DEFENDANT SHERIFF IS THE ALTER EGO OF THE STATE OF SOUTH CAROLINA AND, AS SUCH, IS NOT A "PERSON" AMENABLE TO SUIT UNDER 42 U.S.C. § 1983

At the relevant times, Sheriff Lott had been the duly elected sheriff for Richland County. *See* ECF No. 26, ¶¶ 4, 5. It is well settled that a sheriff and his deputies in South Carolina are not county officers but rather are state officers. In *Cone v. Nettles*, 308 S.C. 109, 112, 417 S.E.2d 523, 525 (1992), the South Carolina Supreme Court held that sheriffs and sheriffs' deputies are state officials and, therefore, are not amenable to suit for monetary damages in their official capacities. These same factors persuaded the Federal District Court to conclude that a sheriff is a state officer. *See Gulledge v. Smart*, 691 F. Supp. 947 (D.S.C. 1988), aff'd, 878 F.2d 379 (4th Cir. 1989).

In *Will v. Michigan Department of State Police*, 491 U.S. 58 (1989), the United States Supreme Court held that a state official sued in his official capacity is not a "person" under Section 1983. *Id. at 71* ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.") (internal citation omitted). Therefore, a party may not seek monetary damages against a state or a state agency pursuant to 42 U.S.C. § 1983. The Defendant Sheriff acted as a state official and was, accordingly, an alter ego of the State. As such, the Defendant Sheriff in his official capacity is not a "person" subject to suit for monetary damages.

## V.     THE SHERIFF OF RICHLAND COUNTY CANNOT BE HELD LIABLE UNDER 42 U.S.C. §1983 BASED UPON INDIVIDUAL LIABILITY CONSIDERATIONS

To the extent that Plaintiff alleges in her Amended Complaint that Sheriff Lott is culpable under a cognizable individual liability theory, there is simply no evidence that the Sheriff was personally involved with the relevant events giving rise to the action.

It is well settled that the personal involvement of a defendant is a strict prerequisite for the imposition of monetary liability under §1983. In order for an individual to be liable under § 1983, it must be "affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights ... Consequently, (the defendant) must have had personal knowledge of and involvement in the alleged deprivation of appellant's rights in order to be liable." *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985); *see also Procuneir v. Navarette*, 434 U.S. 555, 556 (1978); *see also Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017) (finding that in order for an individual to be liable under § 1983, it must be affirmatively shown that the "official charged acted personally in the deprivation of the plaintiff's rights") (quoting *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977).

In this action, the record is plainly devoid of even a trace amount of evidence that Sheriff Lott had personal knowledge or participated in any of the relevant events giving rise to this action. First, the Amended Complaint fails to allege any personal participation by Sheriff Lott during the incident. *See generally*, ECF No. 26. Second and by way of Lott's deposition concerning the December 29, 2023 pursuit, the following facts are incontrovertible:

With respect to these December 29, 2023 events, Sheriff Lott was not present in the vicinity and played no role in the pursuit. *See* Lott depo., p. 9. He never issued any directives or relayed instructions to any officer who was participating in the pursuit. All decision-making pertaining to the suit would have been solely undertaken by those deputies involved and the supervisor monitoring the pursuit.[3] It was only after the collision that he even became aware of the events as alleged in the Amended Complaint.

In a § 1983 action, "liability is personal, based upon each defendant's own constitutional violations." *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001). Put differently, a colorable claim of a deprivation of a constitutional right is not sufficient for a § 1983 claim against a defendant because the plaintiff also must establish that such a person personally participated in the deprivation. *See e.g. Haggwood v. Magill, et. al.*, C/A No. 5:15-3271, 2016 WL 4149986, at *4 (D.S.C. August 3, 2016); see also *Bennett v. Georgetown Cty. Det.*, C/A No. 2:10-0762, 2010 WL 5866595, at *4 (D.S.C. Nov. 4, 2010), *report and recommendation adopted*, 2011 WL 723131 (D.S.C. Feb. 23, 2011) (dismissing the plaintiff's claims where plaintiff failed to establish "any personal involvement in a tort of constitutional magnitude on the part of any defendant").

---

[3]  The RCSD is a law enforcement agency with approximately 700 sworn deputies in 2023. *See* Bates BAKER-Q-057.

## VI.    THE DEFENDANT LOTT CANNOT BE HELD LIABLE UNDER 42 U.S.C. §1983 BASED UPON SUPERVISORY LIABILITY CONSIDERATIONS

### A.    Generally

As was previously discussed, there is no liability under § 1983 since Plaintiff cannot show that Sheriff Lott was personally responsible for a deprivation of a constitutional right. However, to the extent that this Court construes that the Amended Complaint purports to establish "supervisory liability" under §1983 against Sheriff Lott, such a claim would fail in any event.

The Supreme Court has held that "masters do not answer for the torts of their servants" under §1983. *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). The Court also noted that mere "knowledge and acquiescence" in the misconduct of subordinates is insufficient to establish supervisory liability. *Id*. On the contrary, "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id*. Stated differently, Plaintiff is required to "plead [and prove] that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id*. at 676.[4] As described by the Fourth Circuit, this requirement is "designed to ensure that the serious burdens of defending against this sort of lawsuit are visited upon a departmental supervisor only when the complaint plausibly suggests that the supervisor engaged in his or her own misconduct." *Evans v. Chalmers*, 703 F.3d 636, 661 (4th Cir. 2012) (Wilkinson, J., concurring) (internal alterations and quotation marks omitted). Since

---

[4] Indeed, the dissent in *Iqbal* opined that, "[l]est there be any mistake, in these words the majority is not narrowing the scope of supervisory liability; it is eliminating [ ] supervisory liability entirely." *Id.* at 693 (Souter, J., dissenting). Moreover, even if the majority in *Iqbal* did not entirely dispense with the concept of liability of a supervisor in a § 1983 case, the instant Amended Complaint fails entirely to plead facts sufficient to go forward on such a theory based on Fourth Circuit precedent. *See Carter v. Morris,* 164 F.3d 215, 221 (4th Cir.1999); *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.1994) (outlining the requirements to hold a supervisor liable for constitutional injuries inflicted by their subordinates). Finally, a claim based upon the doctrine of respondeat superior does not give rise to a § 1983 claim. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691-94 (1978).

Plaintiff cannot prove that Sheriff Lott personally participated and caused a constitutional violation in this matter or caused any type of resulting harm to Plaintiff, she cannot hold him liable in his individual capacity and summary judgment with respect to him should be granted.[5]

## VII. PLAINTIFF HAS FAILED TO STATE A CLAIM FOR CONSPIRACY AS THERE IS NO EVIDENCE THAT THE DEFENDANTS CONSPIRED TO DEPRIVE HER OF HER CONSTITUTIONAL RIGHTS PURSUANT TO 42 U.S.C. §1985(3)

In her Fourth Cause of Action, Plaintiff purports to allege a conspiracy cause of action pursuant to 42 U.S.C. § 1985 against all Defendants. Like her Fourth Amendment claim, this claim is both factually and legally frivolous.

In this claim, Plaintiff pleads only in a conclusory manner that the Defendants engaged in a conspiracy by "engaging in the chase and by failing to stop the chase." *See* ECF No. 26, ¶ 82. There are no specific factual allegations included in the Fourth Cause of Action. Additionally, Plaintiff does not specifically cite the subsections of § 1985 on which she is basing her claim.

By way of background, the statutory provision now codified as 42 U.S.C. § 1985 was originally enacted as § 2 of the Civil Rights Act of 1871 and addressed "five broad classes of conspiratorial activity." *See Kush v. Rutledge*, 460 U.S. 719, 724 (1983) (providing historical background). As the United States Supreme Court explained in *Kush*:

> Three of the five broad categories, the first two and the fifth, relate to institutions and processes of the federal government -- federal officers, § 1985(1); federal judicial proceedings, the first portion of § 1985(2); and federal elections, the second part of § 1985(3). The

---

[5] Should this Court conclude that Sheriff Lott personally undertook some unlawful action with respect to the alleged harm complained of in the Amended Complaint, the unconstitutionality of his conduct was not clearly established. An objectively reasonable governmental official in his position would not know that his conduct was unlawful. Consequently, he would be entitled to qualified immunity from suit. *See Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *see also Rambert v. City of Greenville*, 107 F.4th 388, 397-98 (4th Cir. 2024) ("The protection applies regardless of whether the government official's error is a mistake of law, a mistake of fact or a mistake based on mixed questions of law and fact. It gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law.")

> statutory provisions dealing with these categories of conspiratorial activity contain no language requiring that the conspirators act with intent to deprive their victims of the equal protection of the laws. … The remaining two categories, however, encompass underlying activity that is not institutionally linked to federal interests and that is usually of primary state concern. The second part of § 1985(2) applies to conspiracies to obstruct the course of justice in state courts, and the first part of § 1985(3) provides a cause of action against two or more persons who "conspire or go in disguise on the highway or on the premises of another."

460 U.S. at 724-725.

In the case at bar, Plaintiff is clearly not asserting any conspiratorial activity against federal actors or with respect to federal judicial proceedings or federal elections. Moreover, the two latter categories as described in *Kush* do not appear to be at issue either. As the Supreme Court explained, the second part of § 1985(2) and the first part of § 1985(3) -- which implicate state concerns -- "contain[] language requiring that the conspirators' actions be motivated by an intent to deprive their victims of the equal protection of the laws." 460 U.S. at 725. The Supreme Court then cited to its decision in *Griffin v. Breckenridge*, 403 U.S. 88 (1971), where the Court explained that "[t]he language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Id*., at 102.

A.     **Section 1985(2) Claim**

The second part of § 1985(2) imposes liability when "two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws." 42 U.S.C. § 1985(2). However, "[t]he 'equal protection' language included in the second clause of section 1985(2) requires an allegation

of class-based animus for the statement of a claim." *Chavis v. Clayton County School District*, 300 F.3d 1288, 1292 (11th Cir. 2002). *See Young-Smith v. Holt,* 575 Fed. Appx. 680, 682 (7th Cir. 2014) ("to invoke federal jurisdiction under § 1985 non-frivolously, [plaintiff] needed to allege that the defendants conspired to deprive her of constitutional rights *because of her race*"). (Emphasis in original). *See also Stone v. Town of Cheverly*, 2020 WL 5849497 (D. Md. 2020).

Plaintiff has failed to allege or to produce any evidence that the Defendants acted jointly in concert and that some overt act was done in furtherance of the conspiracy which deprived Plaintiff of a constitutional right. Plaintiff has further produced no evidence of communication between the Defendants that might give rise to an inference of an agreement to commit any acts, wrongful or otherwise. Additionally, no evidence has been offered to give rise to an inference that each alleged conspirator shared the same conspiratorial objective.

Stated differently, the Amended Complaint lacks a plausible factual basis to suggest that a conspiracy existed among the three defendants. There is no proof that these deputies intended to cause physical harm to any member of the public, much less to Plaintiff personally. In the case at bar, Plaintiff has made no race-based or class-based allegations. The Amended Complaint does not even make mention of Plaintiff's race. Plaintiff likewise does not allege that her state court action alleges or relates to a claim for equal protections of the laws. Therefore, as a matter of law, Plaintiff has not pled, nor can she prove the elements of a § 1985(2) claim.

Consider an example. In order for this claim to be anything other than frivolous, Plaintiff must have had some good faith basis to allege, for instance, that these three deputies, acting jointly in concert, had possessed prior knowledge that Pringle was going to flee, take a specific route, and then drive the wrong way on the interstate. There, Plaintiff could expect to be driving on I-126, whereupon Pringle would weave through traffic for a set distance and deliberately collide with

13

Plaintiff. Such a premeditated act by the Defendant deputies[6] would need to have been motivated by "racial, or perhaps otherwise class-based, invidiously discriminatory animus," targeting Plaintiff because she is an African American woman. Clearly, she undertook no effort to make such allegations (or anything approaching them) in the complaint and fared no better in proving such absurdities during discovery.

Likewise, "whether a plaintiff intends to proceed under § 1985(2) or § 1985(3), the Complaint must sufficiently allege an agreement or a meeting of the minds by [the] defendants to violate the plaintiff's constitutional rights." *Rockwell v. Mayor & City Council of Baltimore*, 2014 WL 949859, *10 (D. Md. 2014). *See Stone*, 2020 WL 5849497 at *7 ("an essential element in proving such a conspiracy under § 1985(2) is to show an agreement or a meeting of the minds by defendants to violate the claimant's constitutional rights"). *See also Hinkle v. City of Clarksburg, W. Va.,* 81 F.3d 416, 421 (4th Cir. 1996) (holding that for a civil conspiracy claim generally a plaintiff must allege sufficient factual allegations that would "reasonably lead to the inference" that the co-conspirators "positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan" to deprive the plaintiff of a constitutional right). Plaintiff has not pled facts that plausibly show an agreement or meeting of the minds by the Defendants to violate her equal protection rights. The Amended Complaint includes no such facts and discovery certainly has not uncovered them.

For these reasons, the § 1985(2) claim should be dismissed.

## B.    Section 1985(3) Claim

Plaintiff has also failed to set forth any plausible claim of a violation of § 1985(3). In *Griffin v. Breckenridge*, 403 U.S. 88 (1971), the Supreme Court held that a plaintiff must allege and prove

---

[6] Matthew Smith and Michael Dillard are people of color. *See* Smith depo., p. 223; *see also* ECF Nos. 56-8, 56-9, 56-10.

four elements to make out a violation of § 1985(3): "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of conspiracy; and (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." 403 U.S. at 102-103. Additionally, in *Griffin*, the Supreme Court held that the conspiracy must be motivated by "some racial, or perhaps otherwise class-based invidiously discriminatory animus behind the conspirators' action." *Id*., at 102.

In the case at bar, however, Plaintiff has not alleged any facts plausibly suggesting an invidiously discriminatory or racial animus by the Defendants. Likewise, Plaintiff alleges no concrete facts to demonstrate that the Defendants came to a mutual understanding or acted jointly in concert to deprive Plaintiff of any constitutional right. Without question, Plaintiff's allegations of a conspiracy are entirely lacking under the *Iqbal* and *Twombley* standard.

In *Strickland v. United States*, 32 F.4th 311 (4th Cir. 2022), the Fourth Circuit affirmed the district court's dismissal of the plaintiff's conspiracy claims based on the failure to plead a sufficient factual basis for the claims.  The Fourth Circuit explained:

> [W]e conclude that the allegations in Strickland's complaint are otherwise insufficient to state a claim for relief under § 1985(3). "[T]he law is well settled that to prove a section 1985 'conspiracy,' a claimant must show an agreement or a 'meeting of the minds' by defendants to violate the claimant's constitutional rights." More specifically, the plaintiff must show "that there was a single plan, the essential nature and general scope of which was known to each person who is to be held responsible for its consequences." "This Court, under that standard, has rarely, if ever, found that a plaintiff has set forth sufficient facts to establish a section 1985 conspiracy." "Indeed, we have specifically rejected section 1985 claims whenever the purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts."

32 F.4th at 360-61.  (Citations omitted).

Despite clear direction from the Fourth Circuit in *Strickland*, Plaintiff has nonetheless alleged her conspiracy claims in a "merely conclusory manner" and "in the absence of concrete supporting facts." 32 F.4th at 361. In sum, there are simply no facts pled that meet the *Iqbal* and *Twombley* pleading standard. Instead, Plaintiff has pled a conclusory allegation of a conspiracy and that is clearly insufficient under the prevailing pleading standard and the applicable substantive law on § 1985 claims. For these reasons, the § 1985(3) claim should be dismissed.

C.     **Intracorporate Immunity**

As an additional basis for dismissal as a matter of law, Plaintiff's conspiracy causes of action are barred by intracorporate immunity. In *Buschi v. Kirven*, 775 F.2d 1240 (4th Cir. 1985), the Fourth Circuit recognized that "officers or employees of the same firm do not provide the plurality of actors" required to satisfy the first element of a civil conspiracy claim. 775 F.2d at 1252, *citing Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984). Moreover, the immunity provided by the intracorporate conspiracy doctrine is not destroyed even if the agents are sued in their individual capacity. *See Buschi*, 775 F.2d at 1252 ("Simply joining corporate officers as defendants in their individual capacities is not enough to make them persons separate from the corporation in legal contemplation"). The Defendants are correctly alleged to all be employees of the Richland County Sheriff's Department. In sum, based on the defense of intracorporate immunity, Plaintiff's claims should be dismissed with prejudice.

For the reasons discussed above, Plaintiff's claim under § 1985 should be summarily dismissed.

**VIII.   THE DEFENDANT SHERIFF LOTT IS NOT VICARIOUSLY LIABLE UNDER S.C. CODE ANN. § 23-13-10**

In her Second Cause of Action, Plaintiff alleges vicarious liability under S.C. Code Ann. § 23-13-10, which provides in part that "[t]he sheriff shall in all cases be answerable for neglect of

duty or misconduct in office of any deputy." S.C. Code Ann. § 23-13-10. That liability provision in S.C. Code Ann. § 23-13-10, however, was impliedly repealed by the adoption of the Tort Claims Act, which reinstated sovereign immunity then waived it with exceptions. In *McCall v. Batson*, 285 S.C. 243, 329 S.E.2d 741 (1985), the South Carolina Supreme Court recognized that "exceptions [to the doctrine of sovereign immunity] that have been carved out by the legislature reflect a scattered patchwork of sovereign liability that lack continuity, logic or fairness." 329 S.E.2d at 742. S.C. Code Ann. § 23-13-10 is one example of the statutorily created "scattered patchwork of sovereign liability" referred to in *McCall*.

The Defendants' position is fully supported by well-settled case law. Most specifically, in *Robinson v. Metts*, 86 F.Supp.2d 557 (D.S.C. 1997), this Court ruled that the liability provision in S.C. Code Ann. § 23-13-10 was impliedly repealed by the enactment of the Tort Claims Act. In *Robinson*, this Court ruled that "§ 23-13-10 is not applicable to the present case because the statute was been repealed by implication with the enactment of the South Carolina Tort Claims Act." 86 F.Supp.2d at 564. This Court further reasoned that "if § 23-13-10 were to allow a cause of action against the Sheriff in the present case, it would be in direct conflict with the SCTCA." *Id.*

By way of background, in response to the South Carolina Supreme Court's abrogation of sovereign immunity in *McCall*, the General Assembly enacted the Tort Claims Act in 1986. With the Act, the legislature first reinstated sovereign immunity in full. S.C. Code Ann. § 15-78-20(b) of the Tort Claims Act provides that "[t]he General Assembly in this chapter intends to grant the State, its political subdivisions, and employees, while acting within the scope of official duty, *immunity from liability and suit for any tort except as waived by this chapter*." S.C. Code Ann. § 15-78-20(b). (Emphasis added). The legislature then proceeded to set forth specific waivers and limitations on sovereign immunity as reinstated.

This historical background has been best summarized by the Supreme Court in its 1995 decision in *Murphy v. Richland Memorial Hospital*, 317 S.C. 560, 455 S.E.2d 688 (1995). The Supreme Court wrote:

> Historically, all persons were barred from bringing tort claims against governmental entities. The doctrine of sovereign immunity began to come under fire as being "archaic and outmoded." The legislature subsequently passed various exceptions to the doctrine. We noted, however, the exceptions reflected "a scattered patchwork of sovereign liability that lack[ed] continuity, logic or fairness." Thus, in *McCall* we abolished the doctrine of sovereign immunity. In response to our decision in *McCall*, the legislature implemented a comprehensive act providing for the logical disposition of governmental liability. The Act first completely restores sovereign immunity. The Act then provides specific waivers and limitations on actions against governmental entities. Thus, the Tort Claims Act is a limited waiver of governmental immunity.

455 S.E.2d at 690. (Citations omitted). In effect, as the Supreme Court summarizes in *Murphy*, in 1986, absolute sovereign immunity was restored by the General Assembly. That had the important effect of eliminating the "scattered patchwork of sovereign liability" that had been created by prior legislation passed to limit or ameliorate the effects of absolute sovereign immunity. The General Assembly then had a "clean slate" from that point forward on which to legislate the waivers and limitations to be placed on sovereign immunity. As of 1986, absolute sovereign immunity was no longer the law, but neither was the "scattered patchwork of sovereign liability" including the statute at issue, S.C. Code Ann. § 23-13-10. That "scattered patchwork" had been repealed.

The Supreme Court has explained that "[a] later statute on a given subject, not repealing an earlier one in terms, is not to be taken as a repeal by implication, unless it is plainly repugnant to the former, or unless it fully embraces the whole subject matter." *State v. Hood*, 181 S.C. 488, 188 S.E. 134, 136 (1936). There can be no question that the Tort Claims Act "fully embraces the whole subject matter" of governmental liability. The history set forth in *Murphy* shows that the Tort Claims Act was intended to reinstate sovereign immunity in full thereby eliminating the

"scattered patchwork of sovereign liability" that preexisted it, which includes the liability provision in S.C. Code Ann. § 23-13-10. By fully embracing the whole subject matter, statutes including the liability provision in S.C. Code Ann. § 23-13-10 were impliedly repealed. This is likewise evident from the express language of the Tort Claims Act providing that "[*n*]*otwithstanding any provision of law*, this chapter, the South Carolina Tort Claims Act, is the *exclusive and sole remedy* for any tort committed by an employee of a governmental entity while acting within the scope of the employee's official duty." S.C. Code Ann. § 15-78-200. (Emphasis added).[7] The use of phrase "notwithstanding any provision of law" compels the conclusion that the Tort Claims Act is the exclusive and sole remedy regardless of any other provision of law, which would necessarily include the liability provision in S.C. Code Ann. § 23-13-10.

In addition to the *Robinson* case as discussed above, the federal courts have specifically looked at whether the Tort Claims Act impliedly repealed part of the "scattered patchwork of sovereign liability" referred to in *McCall*. Of particular significance is *Sadek v. Lambert*, 2014 WL 117671 (D.S.C. 2014), in which Judge Terry Wooten adopted a magistrate judge's report and agreed with the very analysis offered by the Defendants in the present case, except that Judge Wooten was addressing the implied repeal of S.C. Code Ann. § 16-5-60. Judge Wooten concluded that "the Tort Claims Act impliedly repealed § 16-5-60." 2014 WL 117671, *3. Judge Wooten determined that S.C. Code Ann. § 16-5-60 is irreconcilable with the Tort Claims Act. The court recognized that "the Tort Claims Act expressly and completely restores sovereign immunity" which is "incapable of reconcilement with § 16-5-60's unlimited waiver of a county's immunity from suit based on wrongful acts of third parties." *Id*. Judge Wooten also explained that "the Tort

---

[7] Similarly, S.C. Code Ann. § 15-78-20(b) states that the Tort Claims Act is the "exclusive civil remedy available for any tort committed by a governmental entity, its employees, or its agents except as provided in § 15-78-70(b)." S.C. Code Ann. § 15-78-20(b). The exceptions as set forth in S.C. Code Ann. § 15-78-70(b) have no applicability here.

Claims Act provides for limited liability of a governmental entity for the wrongdoing of its own employees whereas § 16-5-60 contrarily provides for unlimited and strict liability of a county for the acts of others. Such a result is contrary to both the plain language of the Tort Claims Act and the recorded legislative intent of the Act." *Id*. Ultimately, this Court ruled "that § 16-5-60, enacted to provide strict liability of counties for constitutional torts committed by others, is repugnant to and therefore was impliedly repealed by the South Carolina Tort Claims Act's complete restoration of sovereign immunity and limited waiver for certain torts committed by governmental employees. The plaintiff's cause of action against York County under § 16-5-60 therefore fails to state a claim upon which relief can be granted." 2014 WL 117671, *6.[8]

As reflected by Judge Wooten's analysis in *Sadek* and Judge Duffy's analysis in *Robinson*, the position taken by the Defendants in the case at bar is a correct one. With the adoption of the Tort Claims Act and its restoration of sovereign immunity in full followed by a limited waiver, the "scattered patchwork of sovereign liability" from pre-Tort Claims Act times was wiped clean. The liability provision in S.C. Code Ann. § 23-13-10, as part of that archaic "scattered patchwork," was impliedly repealed. As S.C. Code Ann. § 15-78-200 makes clear with its use of phrase "notwithstanding any provision of law," the Tort Claims Act is the exclusive and sole remedy for any tort committed by a governmental entity and the liability provision in S.C. Code Ann. § 23-13-10 cannot co-exist with the Tort Claims Act by providing a different tort claim against the Defendants.

---

[8] Other federal judges have addressed the same issue and agree with Judge Wooten's analysis. *See Doe v. Charleston County Sheriff's Office*, 2018 WL 4224063 (D.S.C. 2018) (Judge Richard Gergel); *Doe v. McGowan*, 2017 WL 659938 (D.S.C. 2017) (Judge Richard Gergel); *Mial v. Charleston County Sheriff's Department*, 2018 WL 4725288, *adopted in* 2018 WL 4701366 (D.S.C. 2018) (Judge Joseph F. Anderson, Jr.).

IX.    **THE DEFENDANT DEPUTIES ARE ENTITLED TO QUALIFIED IMMUNITY FROM ALL LIABILITY**

A.    <u>**Overview**</u>

The relevant question becomes whether Defendant deputies are entitled to qualified immunity for their pursuit of Pringle after he refused to stop. This question turns on the fault standard or level of culpability required to establish conscience-shocking conduct in a § 1983 police pursuit case. In *Lewis,* the Supreme Court held that "in a high-speed automobile chase aimed at apprehending a suspected offender ... only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience." 523 U.S. at 836.

The doctrine of qualified immunity "'balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Wilson v. Prince George's Cty.*, 893 F.3d 213, 219 (4th Cir. 2018) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231, (2009)); *see also Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019). Put another way, "[q]ualified immunity shields government officials who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Hunter v. Town of Mocksville, N.C.*, 789 F.3d 389, 401 (4th Cir. 2015) (internal quotations omitted); *see also Humbert v. Mayor and City Council of Baltimore City*, 866 F.3d 546, 555 (4th Cir. Cir. 2017), *cert. denied*, 138 S. Ct. 2602 (2018); *Osborne v. Georgiades*, 679 F. App'x 234, 237 (4th Cir. Cir. 2017); *Scinto v. Stansberry*, 841 F.3d 219, 235 (4th Cir. Cir. 2016). In *Owens v. Baltimore City State's Att'ys Off.*, 767 F.3d 379, 395 (4th Cir. 2014), 767 F.3d at 395, the Fourth Circuit reiterated: "Qualified immunity protects government officials from liability for 'civil damages insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" (Quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982)).

As the Fourth Circuit recently held in *Rambert v. City of Greenville*, 107 F.4th 388, 397-98 (4th Cir. 2024):

> The protection applies regardless of whether the government official's error is a mistake of law, a mistake of fact or a mistake based on mixed questions of law and fact. It gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law.

(internal citations omitted)

**B.     Plaintiff has not shown that her federal constitutional rights were violated**

In the Fourth Circuit, plaintiffs bear the burden of proof to show that a constitutional violation occurred, while "defendants bear the burden of showing that the violation was not clearly established, and they are therefore entitled to qualified immunity." *Mays v. Sprinkle*, 992 F.3d 295, 302 n.5 (4th Cir. 2021).

The Defendants submit that, based upon the foregoing grounds, the evidence taken in a light most favorable to Plaintiff expressly fails to demonstrate any violation of such rights. *Supra*. Because the facts do not support Plaintiffs' allegations of any constitutional injury, the qualified immunity analysis need not proceed further. The Defendants are entitled to judgment as a matter of law.

**C.     The unconstitutionality of the individual Defendants' conduct was not clearly established such that a reasonable police officer in their position would have known that their conduct was unlawful**

If an officer is shown to have violated the rights of a plaintiff, courts must then "evaluate whether the right at issue was 'clearly established' at the time of the officer's conduct. [ ] Accordingly, even when the facts in the record establish that the officer's conduct violated a plaintiff's constitutional rights, the officer still is entitled to immunity from suit 'if a reasonable

person in the [officer's] position could have failed to appreciate that his conduct would violate those rights.'" *Wilson*, 893 F.3d at 219 (quoting *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991)) (other citation omitted); *see also Williams v. Strickland*, 917 F.3d 763, 768 (4th Cir. 2019); *Greene v. Feaster*, 733 F. App'x 80, 82 (4th Cir. 2018) (per curiam) ("Even when a prison official [is shown to have violated a constitutional right of a plaintiff], qualified immunity will shield him from liability as long as his 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'") (quoting *Goines*, 822 F.3d 159, 170).

The second inquiry "turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). If the law at the time of the alleged violation was not "clearly established," the official will be entitled to qualified immunity because "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818. On the other hand, "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Id*. at 818-19.

Federal constitutional law allows police pursuits under these circumstances. On December 29, 2023, an objectively reasonable officer in these deputies' position would be dealing with a suspect at large -- a drug trafficker with a lengthy criminal history. Such an officer would readily conclude that those involved in drug trafficking -- a violent crime in South Carolina -- often carry firearms and pose a danger to the community. Hodge testified that, "I take it he is of the utmost danger to society if he is free to walk around and do what he pleases. [ ] Just with all the priors, you could tell that he doesn't believe in social construct of any type. That he is going to be

aggressive in nature. He's got multiple different assaults. [ ] He's not somebody who's out there to do good with all those things. He's only doing bad." *See* Hodge depo., pp. 171-172. An objectively reasonable officer would share Hodges' concerns. Therefore, when Pringle was observed abruptly proceeding the wrong way on the interstate exit, the deputies believed it necessary to catch up and physically stop Pringle from continuing the chase.

In a recent concurrence in *Barnes v. Felix*, 605 U.S. 73, 84-89 (2025), Justice Kavanaugh articulated the extremely precarious situations that police officers face both at the beginning and during a pursuit.

> What should the officer do when a driver flees from a traffic stop? There are no easy or risk-free answers. Every feasible option poses some potential danger to the officer, the driver, or the public at large -- and often to all three. ***And an officer in that situation must make a split-second choice among those various dangerous options.***
>
> First, the officer could simply let the driver go. But because the fleeing driver might be a threat to the community, letting the driver go may exacerbate the dangers, rather than mitigate them. Encouraging officers to stand back and allow drivers to take off would also create "perverse incentives" for those who are stopped by the police. *Scott v. Harris*, 550 U. S. 372, 385 (2007). If doing nothing in response to a fleeing driver became a known and regular practice among police officers, that would presumably embolden some drivers who otherwise might have thought twice about taking off.
>
> Of course, the officer could let the driver go in the moment but then attempt to catch the driver by, for example, tracking the car's license plate or reviewing surveillance footage. See Tr. of Oral Arg. 8. But after letting the driver go, the police may not be able to later track down the car or the driver of the car. Even if the police are able to do so, the escaped driver may pose a serious risk to the public in the interim. And given that the driver has already shown a propensity to evade law enforcement by fleeing a traffic stop, attempting to execute an arrest upon finding the driver could itself be dangerous for the police and others.
>
> [ ] I could go on. ***The point here is that when a driver abruptly pulls away during a traffic stop, an officer has no particularly good or safe options. None of the options available to the officer avoids***

> ***danger to the community, and all of them require life-or-death***
> ***decisions that must be made in a few seconds in highly stressful***
> ***and unpredictable circumstances.***

(Emphasis added)

In describing the routine dangers unique to law enforcement, Justice Kavanaugh recognized that officers face high-stress "no-win" situations. By their nature, each possible response carries significant risk to the community, requiring immediate, life-altering decisions under unpredictable, dangerous conditions. There is no constitutional duty for officers to terminate a pursuit. In a qualified immunity context, an objectively reasonable officer in these deputies' position would not have known that they were violating the Constitution under such circumstances. Since there is no fixed blueprint for determining the law in every scenario, it is now clear why the "intent to harm" standard applies. *See e.g. Kedra v. Schroeter*, 876 F.3d 424, 437 (3d Cir. 2017), *cert. denied*, 138 S.Ct. 1990, 1991 (2018). ("In 'hyperpressurized environment[s] requiring a snap judgment,' an official must actually intend to cause harm in order to be liable.")

Here, as Pringle unexpectedly hopped the median and proceeded onto the exit ramp, the deputies "faced a life-or-death decision" that had to be made in a split-second under "highly stressful and unpredictable circumstances." *Supra*. Subsequently, they had no "particularly good or safe options" as they continued their pursuit. *Supra.* The deputies certainly did not transgress any bright line. *See Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992) ("[O]fficials are not liable for bad guesses in gray areas, they are liable for transgressing bright lines.") As a result, any alleged "unconstitutionality" of their conduct was not clearly established such that a reasonable police officer in their position would have known that their conduct was unlawful.

## CONCLUSION

For the numerous reasons set forth above, the Defendants respectfully request that this Court enter an order granting summary judgment in their favor as to all federal claims and the

claim under S.C. Code Ann. § 23-13-10. That as for Plaintiff's negligence and gross negligence claim, the Defendants submit that it should be remanded to state court for disposition.

Respectfully submitted,

GARFIELD SPREEUWERS LAW GROUP

*/s/ Robert D. Garfield*
Robert D. Garfield, Fed. ID 7799
Steven R. Spreeuwers, Fed. ID 11766
1220 Pickens Street
Columbia, South Carolina 29201
T: 803.964.9600
robert@gslawsc.com
steve@gslawsc.com

*Counsel for the Defendants*

Columbia, South Carolina
March 10, 2026