**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | | |
|---|---|---|
| Pamela A. Baker, | ) | C/A No.: 3:24-cv-04303-JDA |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **PLAINTIFF'S RESPONSE IN** |
| v. | ) | **OPPOSITION TO DEFENDANTS'** |
| | ) | **MOTION FOR SUMMARY** |
| Leon Lott, individually and in his official | ) | **JUDGMENT** |
| capacity as the Sheriff of Richland County; | ) | |
| the Richland County Sheriff's Department; | ) | |
| and Deputies Matthew Smith, Michael | ) | |
| Dillard and Bryan Hodge, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## I.    INTRODUCTION

Leon Lott has condoned and encouraged a culture at his Richland County Sheriff's Department where deputies routinely engage in conscience shocking vehicular pursuits of fleeing suspects. RCSD deputies do not terminate their pursuits when the danger of continuing outweighs the risks of letting a suspect escape. RCSD deputies do not adjust the aggressiveness of their pursuit to the dangerousness of the suspected crime—RCSD deputies will scorch the earth to capture people suspected of anything from felonies to misdemeanors and traffic offenses. And despite vehicle pursuits being the most dangerous activity that law enforcement officers engage in, Lott does not enforce RCSD's safety policies for pursuits, does not investigate or discipline RCSD deputies for engaging in unlawful pursuits, and provides RCSD deputies with minimal training on when or how to engage in a vehicle pursuit.

The inevitable and foreseeable result of the policies, customs, and lack of training Lott provided to RCSD deputies was that when Byron Pringle fled at a high speed on busy commercial roads and continued speeding against the flow of traffic on a crowded, barricaded interstate, the

Deputies pursued him with a conscience-shocking disregard for the safety of everyone on the road—ultimately resulting in Pringle crashing head-on into Plaintiff Pamela Baker at a combined closing speed exceeding 120 miles per hour.

Defendants now tell this Court that they are entitled to summary judgment. The Deputy Defendants base their argument on the claim that "[t]here is no constitutional duty for officers to terminate a pursuit." No matter the danger posed to bystanders. No matter the severity of the suspected crime. And no matter whether they could simply later arrest Pringle with the plethora of information they had available to them, as they had done just days before.

Lott, in turn, claims he cannot be held responsible because he "was not present in the vicinity and played no role in the pursuit." Apparently, the Richland County Sheriff does not believe he is responsible for enforcing RCSD's policies or the training of RCSD's deputies.  But the State of South Carolina and the U.S. Constitution do not let Defendants off that easy.

When a law enforcement officer's continued pursuit of a fleeing suspect displays a conscience shocking disregard for the life and liberty of others on the road, there is a duty to terminate that pursuit. The Deputy Defendants deliberately violate that duty as a routine practice, and in this instance, it nearly cost Ms. Baker her life.

When the final policymaker of a law enforcement agency is deliberately indifferent for the safety of those routinely endangered by his department's deputies, and that dereliction of duty directly results in a conscience-shocking vehicle pursuit that kills one person and nearly kills another, it doesn't matter if that leader wasn't behind the wheel. Lott is liable.

Based on this evidence, Defendants' Motion for Summary Judgment must be denied.

## II.    <u>STANDARD</u>

The court can only grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In § 1983 cases alleging violations of substantive due process, the case goes to the jury unless no rational jury could find that the defendant's conduct was conscience-shocking. *See Dean for & on behalf of Harkness v. McKinney*, 976 F.3d 407, 417 (4th Cir. 2020) ("[A] reasonable jury could conclude that McKinney knowingly disregarded a substantial risk of serious harm, and that his deliberate indifference to life and safety was conscience-shocking, in violation of Harkness's Fourteenth Amendment substantive due process rights."); *Just. v. Dennis*, 793 F.2d 573, 577 (4th Cir. 1986) ("*Rochin* makes clear that the 'conscience' at issue is that of the community in light of evolving societal norms, not that of any particular judge or court.") (cleaned up), *on reh'g*, 834 F.2d 380 (4th Cir. 1987), *cert. granted, judgment vacated on other grounds*, 490 U.S. 1087 (1989).

## III.    <u>ARGUMENT</u>

### I.    **The Deputy Defendants' conscience shocking conduct caused Ms. Baker's constitutional injuries.**

A claim under § 1983 requires proving that Defendants (1) acted under color of law; and (2) deprived the Plaintiff of a Constitutional right. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Mentavlos v. Anderson*, 249 F.3d 301, 310 (4th Cir. 2001). The first element is not in dispute in this case. *See* Pl.'s Am. Compl., ¶¶ 6, 7, 73, & 82, (ECF No. 26) (alleging the Deputy Defendants acted under the color of law at all relevant times); Defs.' Answer to Am. Compl., ¶ 9 (ECF No. 5) (admitting same); Defs.' Motion for Summary Judgment (ECF No. 61) ("Defendants' Motion") (not arguing that Deputy Defendants did not act under the color of law at all relevant times).

**A. The Deputy Defendants' conduct is properly analyzed under the "deliberate indifference" standard because Pringle's pursuit was not an emergency.**

The benchmark for determining whether a law enforcement officer violates a person's Fourteenth Amendment right to substantive due process is whether their conduct "shocks the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998). Courts apply one of two standards to determine whether conduct "shocks the conscience"—the "deliberate indifference" standard and the "purpose to harm" standard. Which test applies to a given case depends on "'an exact analysis of context and circumstances'" of a specific case. *Dean for & on behalf of Harkness v. McKinney*, 976 F.3d 407, 414 (4th Cir. 2020) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998)). Most importantly, the appropriate standard depends on whether the officer had time to deliberate their course of conduct. *See Dean*, 976 F.3d at 415.[1]

The "intent to harm" standard applies only "in rapidly evolving, fluid, and dangerous situations which preclude the luxury of calm and reflective deliberation." *Id.* For example, a prison guard's decision to shoot a charging inmate in the leg during a violent prison riot is analyzed under the "intent to harm" standard. *See Whitley v. Albers*, 475 U.S. 312 (1986).

By contrast, when a government actor has time to deliberate his actions and make calculated judgments, the appropriate standard is "deliberate indifference." *Dean*, 976 F.3d at 415. Said differently, the Fourth Circuit has made clear that "when an officer is able to make unhurried judgments with time to deliberate, such as in the case of a non-emergency, deliberate indifference is the applicable culpability standard for substantive due process claims involving driving decisions." *Id.*

---

[1] *See also* Defendants' expert, Karen M. Blum & John J. Ryan, *Recent Developments in the Use of Excessive Force by Law Enforcement*, 24 Touro L. Rev. 569, 580 (2008) ("[I]n certain situations that do not involve a seizure and where there is time to deliberate, conduct of a less-culpable nature may be sufficient. In these circumstances, deliberate indifference might be sufficient to shock the conscience.").

For example, in *Dean*, a deputy radioed a request for emergency assistance after making a traffic stop. Deputy McKinney activated his emergency lights and siren and began driving to the radioing officer's location. A few seconds later, the deputy calling for help told the responding officers to "back down on emergency response but continue to him 'priority.'" *Id.* at 412. McKinney turned off his lights and sirens, as required for non-emergency responses, but continued driving towards the radioing officer's location at speeds of over 80 MPH—38 MPH above the speed limit. About two minutes and fifteen seconds after the "emergency" was cancelled, McKinney lost control of his vehicle on a curved and unlit section of the road and collided head-on with oncoming traffic. The Fourth Circuit held that the deliberate indifference standard applied in *Dean* because "there was no emergency" and the pursuing officer "had ample time to deliberate his actions." *Id.* at 416.

There is sufficient evidence for a reasonable jury to conclude that the Deputy Defendants, like the officers in *McKinney*, were not responding to an emergency. Instead, the evidence indicates that the Deputy Defendants had time to deliberate their course of conduct both before pursuing Pringle and multiple times during their pursuit. Seven facts warrant particular emphasis:

1. None of the Deputy Defendants testified that this was an emergency. To the contrary in fact, Hodge testified the pursuit was "not necessarily" high stress for him,[2] and Dillard testified that vehicle pursuits are "not really" stressful for him in general.[3]

2. Before the pursuit even began, the Deputy Defendants had time to deliberate and consider their plan for apprehending Pringle, evident from the fact that Deputy Hodge testified that he was contacted by a DEA task force officer "in the morning" before the pursuit began at approximately 2:16 PM.[4]

3. Before the pursuit began, Pringle posed no immediate danger to anyone around him. *See generally* Pl.'s Movant's Statement of Material Facts, Exs. 6-9 (ECF No. 56).

---

[2] Opponent's Statement of Additional Material Facts, ¶ 1.
[3] Opponent's Statement of Additional Material Facts, ¶ 2.
[4] Opponent's Statement of Additional Material Facts, ¶ 3

4. The chase was more than four minutes long (twice as long as the chase in *McKinney*), during which time the deputies had multiple opportunities to stop the pursuit. *See generally id.*

5. Supervising officers, who were removed from the immediate situation and thus afforded "the luxury of calm and reflective deliberation," issued instructions over the radio to the pursuing deputies. *See Terrell v. Larson*, 396 F.3d 975, 978 (8th Cir. 2005).

6. There was extensive communication both between the responding RCSD deputies and between RCSD deputies and individuals from the Lexington County Sheriff's Department. *See Sauers v. Borough of Nesquehoning*, 905 F.3d 711, 715 (3d Cir. 2018) (finding the fact that an officer in a high-speed chase had time to relate what was occurring to the neighboring police department supported application of "deliberate indifference" standard).

7. Pringle was well known by the Deputy Defendants (their fellow deputies released him from custody just days before), making Pringle's later and safer apprehension substantially likely. Pl.'s Statement of Material Facts, ¶ 8–9; *See e.g.*, *City of Ellisville v. Richardson*, 913 So. 2d 973, 978 (Miss. 2005) ("The officer was not in pursuit of an unknown suspect. In fact, the officer had previous encounters with Evans, knew where Evans lived, knew Evans's mother, and knew that Evans was likely to try to avoid arrest which he did even after colliding with the Richardson's vehicle. Nevertheless Tolbert elected to continue the pursuit while Evans weaved in and out of traffic at excessive speeds and endangered the safety of innocent citizens.").

A reasonable jury viewing these facts together, could find that there was no emergency, and that the Deputy Defendants had sufficient time to deliberate their decision to pursue Pringle onto the interstate. Accordingly, the appropriate standard by which to gauge the Deputy Defendants' conduct is "deliberate indifference."

Naturally, Defendants argue for a higher standard to apply. On this point, Defendants assert two arguments. Both lack merit. First, Defendants proclaim the "intent to harm" standard applies to any case remotely involving a police pursuit, no matter the circumstances. *See* Defendants' Motion at 4. This "bright-line rule" was anointed by the Supreme Court, Defendants claim, in *Lewis. See Id.*

Defendants are wrong. As the Fourth Circuit explained in *Dean*, "the intent-to-harm standard most clearly applies 'in rapidly evolving, fluid, and dangerous situations which preclude

the luxury of calm and reflective deliberation.'" 976 F.3d at 414 (4th Cir. 2020) (quoting *Lewis*, at

978). However, "when an officer is able to make unhurried judgments with time to deliberate, such

as in the case of a non-emergency, deliberate indifference is the applicable culpability standard for

substantive due process claims involving driving decisions." *Id.* at 416. Applying that test, the

Fourth Circuit held that "deliberate indifference" was the appropriate test to apply in that case

because "a jury could conclude that [the officer] was not responding to an emergency and had time

to deliberate his actions." *Id.* at 415. The facts of this case warrant the same result. Thus, this Court

should reject Defendants' self-proclaimed bright-line rule.

Second—and quite paradoxically in light of their first argument—Defendants argue that

the facts of this particular case warrant the application of the "intent to harm" standard.

Defendants' Motion at 4. Notably however, in advancing this argument, Defendants make this

argument with "facts" that, although unsupported by *any* citations to evidence,[5] indicate that the

Deputy Defendants did indeed deliberate their course of conduct. Specifically, Defendants claim

that, during the pursuit, the Deputy Defendants:

1. Weighed the danger of continuing the pursuit against the dangers of stopping the chase; Defendants' Motion at 5;

2. Determined that pursuing Pringle onto the interstate was necessary to "lend their blue lights and sirens to the situation to provide some modicum of warning to the other motorists" (as if blue lights and sirens more than 100 yards behind Pringle was what warned approaching motorists rather than the Nissan driving 67 MPH directly towards them); *Id.*; and

3. Decided "that they needed to attempt to catch up to Pringle to terminate his ability to continue the pursuit (as they had been instructed by a supervisor on the radio)." *Id.*

---

[5] This failure to cite to the evidentiary record is in disregard of this Court's instructions in the initial Scheduling Order. *See* ECF No. 6, pp. 9-11. This failure independently requires rejecting Defendants' argument.

These facts don't indicate (much less *prove*, as would be required on summary judgment) the Deputy Defendants were making split-second judgments in response to a fast-paced emergency. Instead, these facts show the Deputy Defendants had time to consider what they were doing—time to appreciate the danger their pursuit of Pringle was creating—but consciously chose to continue the pursuit nonetheless. In such circumstances, "deliberate indifference" is the appropriate test.

**B. Conducting a high-speed chase against the flow of traffic on a crowded, barricaded interstate with the intent to harm a fleeing suspect shocks the conscience under any standard.**

To survive Defendants' Motion for Summary Judgment, Ms. Baker must merely show that "a reasonable jury could conclude" that the Deputy Defendants' conduct was "'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Dean*, 976 F.3d at 415. Ms. Baker has easily met that burden. As an initial matter, there is substantial evidence indicating that Deputy Defendants intended to harm Pringle. This intent is evident from two categories of facts.

First, Deputy Defendants verbalized their intent to harm Pringle over the radio during the pursuit. Hodge is the first to declare "he's going to get bit." Pl.'s Statement of Material Facts, ¶ 27, (ECF No. 56). In response to Hodge, another deputy cheers for him and says "get him Hodge." *Id.*, ¶ 42. And the RCSD supervisor, not once, but twice directs the Deputy Defendants to "take him out." *Id.*, ¶¶ 36 & 38.

Second, the Deputy Defendants admitted that they intended to make Pringle crash his car by using a "PIT maneuver." *Id.*, ¶ 50. When asked how he planned to "get Mr. Pringle off the road" while driving the wrong way on the interstate, Hodge testified: "Do what—what is considered a pit maneuver ... the idea was to push his car off the road utilizing mine." *Id.*, ¶ 58. Given that Hodge and Pringle were travelling against the flow of traffic at high speeds, Hodge

knew that this maneuver would cause serious injury to Pringle. In fact, Hodge testified to using this maneuver "all the time" while he was serving the military "**in Afghanistan**." Opponent's Statement of Additional Material Facts, ¶ 4 (emphasis added). Deputy Dillard testified to similar experiences with using these maneuvers while serving "overseas." *Id.*, ¶ 5.

Moreover, a reasonable jury could conclude the Deputy Defendants had no lawful purpose to use a PIT maneuver because when Pringle drove onto the interstate, the Deputy Defendants' job was done. At that point, the only two possible outcomes were that Pringle would crash his car (most likely into another vehicle) or get off the interstate. The Deputy Defendants chasing Pringle onto the interstate certainly increased the likelihood of a crash, but it hardly can be said to have encouraged him to get off the interstate. There was no "off the road" to push Pringle's vehicle toward; there were only concrete barriers on one side and dozens of innocent individuals and families, including Ms. Baker, in oncoming vehicles on the other. Thus, by continuing their pursuit of Pringle onto the interstate, the RCSD deputies were *only* working towards one possible outcome—causing Pringle to crash.

Given that Pringle was driving at high speeds against the flow of interstate traffic, a reasonable jury could conclude that Deputy Defendants knew that the crash they intended to cause was inevitably going to be catastrophic for Pringle and anyone else unfortunate enough to be nearby. In short, there is sufficient evidence for a reasonable jury to conclude that the Deputy Defendants intended to harm Pringle.

To dance around their true motives for continuing to pursue Pringle onto the interstate, Defendants ignore and mislead in their version of the facts. The Defendants barely acknowledge their attempted PIT maneuver in their Statement of Material Facts. Instead, Defendants emphasize that "[i]n attempt to stop Pringle, all three deputies continued the pursuit by engaging their blue

lights and siren while traveling west in the eastbound lanes on I-126." Defs.' Statement of Material Facts, ¶ 25 (ECF No. 60).

That is not what happened. As it is clearly shown by video and audio, the Deputy Defendants engaged their lights and sirens long before Pringle drove onto the Interstate. *See* Pl.'s Movant's Statement of Material Facts, Exs. 6-9 (ECF No. 56). But telling the story accurately does not fit Defendants' narrative because it begs the question—why would the Deputy Defendants think their lights and sirens would stop Pringle when he got onto the interstate when their lights and sirens had been on the entirety of the pursuit? They would not, and Defendants know this. So why else were the Deputy Defendants still chasing him? To make him crash. Defendants achieved their intended result.

Defendants also attempt to distract from their intent to harm Pringle in their Motion, instead emphasizing the lack of evidence that the "Defendant deputies intended to injure Plaintiff." Defendants' Motion at 4. But Defendants miss the point—intent to harm *the plaintiff* is not required even under the "intent to harm" standard.

The fundamental question for the purpose of deciding whether a plaintiff has stated a substantive due process claim is whether Defendants' alleged conduct shocks the conscience. And as the Supreme Court has explained, "conduct intended to injure . . . is the sort of official action most likely to rise to the conscience-shocking level." *Lewis*, 523 U.S. at 849. There is no logical reason to think that conduct is any less shocking when it injures someone other than the intended target, particularly when harm to a third party is a clear, known risk and is entirely foreseeable.

Instead, it "shocks the conscience" when a law enforcement officer injures an innocent bystander while engaging in a reckless high-speed chase with the intent to harm a fleeing suspect without a legitimate law enforcement objective. *See, e.g.*, *Est. of Soakai v. Abdelaziz*, 137 F.4th

969, 980-81 (9th Cir. 2025), *cert. denied sub nom. Abdelaziz v. Soakai*, No. 25-427, 2026 WL 568296 (U.S. Mar. 2, 2026). The law enforcement officer does not have to intend to harm the suspect specifically. *Id.*; *See Johnson v. Baltimore Police Dep't*, 452 F. Supp. 3d 283, 303 (D. Md. 2020) ("An officer's actions motivated by an intent to harm a suspect are no less conscience shocking, whether the resulting harm accrues to the intended target (the suspect), or an innocent third party.").

Further, even if Defendants' intent to harm Pringle is ignored, a reasonable juror could conclude that the Deputy Defendants' conduct shocks the conscience. Specifically, "a reasonable jury could conclude that [the Deputy Defendants] deliberately operated [their] police vehicle[s] in a dangerous and reckless manner with full knowledge of the risks involved." *Dean*, 976 F.3d at 416.

The dangerousness of the Deputies' conduct is self-evident from their dashcam videos. *See Scott v. Harris*, 550 U.S. 372 (2007) (holding that video evidence can establish an undisputed visual record). Thereafter, Deputies continued their pursuit on to the interstate where the Deputy Defendants were driving over 50 MPH against the flow of traffic on a barricaded, crowded interstate.

Although there could conceivably be situations where such a pursuit could be warranted, there is substantial evidence from which a reasonable juror could conclude that such a pursuit was conscience shocking in this case. Specifically:

1. Defendants were not responding to an emergency situation—they created one;

2. The circumstances of this chase made a safe resolution highly improbable if not impossible if the Deputy Defendants continued chasing Pringle on the interstate;

3. The Deputy Defendants knew that apprehending Pringle later-on would have been easy; *See* Pl.'s Statement of Material Facts, ¶¶ 4, 6-9;

4. Once the Defendant Deputies began the pursuit, they had over four minutes "to deliberate—to apply [their] knowledge and training to the situation, reflect on [their] actions, and conform [their] behavior" before they caused Pringle's crash. *See* 976 F.3d at 415.

## II.    Leon Lott's deliberate indifference caused Ms. Baker's constitutional injuries.[6]

### A.  Lott, in his individual capacity, is liable for RCSD's unconstitutional policies, customs, and training under § 1983.

Defendants' Motion belabors multiple irrelevant points, including that "the Amended Complaint fails to allege any personal participation by Sheriff Lott during the incident" and that "Sheriff Lott was not present in the vicinity and played no role in the pursuit." Defendants' Motion at 8. Those arguments fail to address Ms. Baker's theory of liability against Lott.

Lott is liable in his individual capacity for his deliberate indifference to RCSD's vehicle pursuit policies and the training RCSD deputies receive on vehicle pursuits. Defendants' Motion does not argue that Ms. Baker has failed to prove a constitutional violation through this theory of liability. Accordingly, Lott has conceded for summary judgment purposes that Ms. Baker has produced sufficient evidence to create a jury question as to the constitutionality of RCSD's policies, customs, and training. *See Ergon-W. Virginia, Inc. v. United States Env't Prot. Agency*, 980 F.3d 403, 419 (4th Cir. 2020) ("We typically do not allow parties to raise new issues in a Reply Brief."); *Hunt v. Nuth*, 57 F.3d 1327, 1338 (4th Cir. 1995) ("[C]ourts generally will not address new arguments raised in a reply brief because it would be unfair to the [other party] and would risk an improvident or ill-advised opinion on the legal issues raised."). Moreover, Lott does not deny that he is the relevant policymaker for this theory of liability. To the extent that he tries to make either of these arguments in his response, Ms. Baker requests that this Court either ignore

---

[6] Defendants assert various grounds for summary judgment on Plaintiff's claims against Leon Lott in his official capacity in sections IV, V and VI of their Brief. All of those arguments ignore Lott's individual liability under § 1983.

them or afford her the opportunity to file a sur-reply. *See Ergon-W. Virginia, Inc*, 980 F.3d at 419; *Hunt*, 57 F.3d at 1338.

These procedural points notwithstanding, Lott's argument(s) would have failed had he made them. This Court has recognized that Lott can be held liable for a "custom for which he was responsible which resulted in illegal action." *Werts v. Cnty. of Richland*, No. 3:05-3203-MBS, 2007 WL 914039 at *10 (D.S.C. Mar. 23, 2007) (citing *Monell v. Dep't of Social Services,* 436 U.S. 658 (1978)). Similarly, this Court has recognized that a South Carolina sheriff can be held liable in his individual capacity for failure to train. *See Best v. Richardson*, No. 2:25-CV-13514-RMG, 2026 WL 660587, at *2 (D.S.C. Mar. 9, 2026) ("[T]he Court grants Plaintiff leave to move before the Magistrate Judge to amend her complaint regarding § 1983 individual capacity claims against Defendant [Sheriff] Richardson for supervisory liability and failure to train."); *Scott v. Vandiver*, 476 F.2d 238 (4th Cir. 1973) (holding that § 1983 liability can be established against a South Carolina sheriff "based on the deputy's position as the sheriff's representative for whose official acts the law holds the sheriff strictly accountable.").[7]

In fact, Lott can be liable under § 1983 for a failure to train his deputies "even if no individual officer participating in the chase violated the Constitution." *Fagan v. City of Vineland*, 22 F.3d 1283 (3d Cir. 1994); *Int'l Ground Transp. v. Mayor And City Council Of Ocean City, MD*,

---

[7] Lott has repeatedly claimed that *Scott v. Vandiver* is no longer good law by claiming that the South Carolina Tort Claims Act impliedly repealed the liability provision in S.C. Code Ann. § 23-13-10 ("The sheriff shall in all cases be answerable for neglect of duty or misconduct in office of any deputy."). *See, e.g.*, Def. Lott's Brief in *Webb v. Lott*, Civil Action No. 3:19-cv-02031-JMC (D.S.C. 2022) (ECF Doc. No. 217). But while the South Carolina Supreme Court has held that the South Carolina Tort Claims Act impliedly repealed the liability provision in S.C. Code Ann. § 23-13-10 with respect to vicarious liability for *state law tort* claims, it has never made such a holding with respect to *federal law* claims not based on tort law or vicarious liability. Moreover, the Fourth Circuit has never overruled *Scott v. Vandiver* despite Lott asking for that ruling explicitly. *See Webb v. Lott*, No. 23-1941, 2024 WL 3887273 (4th Cir. Aug. 21, 2024).

475 F.3d 214, 219 (4th Cir. 2007) ("[A] situation may arise in which a finding of no liability on the part of the individual municipal actors can co-exist with a finding of liability on the part of the municipality."); *Watkins v. Butler*, No. 1:20-CV-00208-JRR, 2024 WL 2273384, at *8 (D. Md. May 20, 2024) ("The court will decline to decide at this juncture whether Plaintiff's *Monell* claim would proceed if a jury were to exonerate the Individual Medical Defendants.").

### B. Lott caused Ms. Baker's injuries by condoning and compounding RCSD's widespread custom and practice of engaging in unnecessary and dangerous, pursuits with no consideration of safety to the public, suspects, or officers involved.

An actionable custom or policy arises when "policymakers fail 'to put a stop to or correct a widespread pattern of unconstitutional conduct.'" *Owens v. Balt. City State's Att'y's Off.*, 767 F.3d 379, 403 (4th Cir. 2014) (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir. 1987)). Generally, to prevail under a condonation claim, "[a] plaintiff must point to a 'persistent and widespread practice of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" *Id.* (quoting *Spell*, 824 F.2d at 1386–91). "Both knowledge and indifference can be inferred from the 'extent' of employee's misconduct." *Id.* (quoting *Spell*, 824 F.2d at 1391). However, "[s]poradic or isolated violations of rights will not give rise to *Monell* liability; only 'widespread or flagrant' violations will." *Id.*

Lott's pursuit policies are simple—there are none. Granted, as Lott testified, RCSD has guidelines on paper that purport to govern high-speed chases, but RCSD deputies treat them as mere "guidelines." Pl.'s Statement of Material Facts, ¶ 67. Similarly, RCSD's Deputy Chief of Legal Affairs testified that "we don't have high-speed chase procedures." Opponent's Statement of Additional Material Facts, ¶ 6. Furthermore, RCSD's Deputy Chief of Legal Affairs testified

that RCSD "does not have a position" regarding the responsibility and duty of RCSD deputies to abide by RCSD's written policies and procedures. Pl.'s Statement of Material Facts, ¶ 79.

For example, RCSD's Paper Policies instruct its deputies to terminate a pursuit whenever the need for apprehension is outweighed by the danger created by the pursuit. Id., ¶ 64. However, Defendants submitted no evidence indicating that any RCSD deputy has *ever* voluntarily chosen to terminate a pursuit. To the contrary, Smith specifically testified that he could not recall ever voluntarily terminating a pursuit. *Id.*, ¶ 68.

The results of Lott's customs and practices are widespread and flagrant constitutional violations committed by RCSD deputies during police pursuits. RCSD's pursuits are widespread and flagrant. In 2023 alone, RCSD deputies reported engaging in 448 vehicle pursuits; 85 ended in crashes; 70 crashes resulted in death or injury to the suspect or RCSD deputies involved. *Id.*, ¶¶ 75-76. These deadly pursuits are almost always related to misdemeanors, directly in violation of RCSD policies (and common sense). Of the 448 vehicle pursuits conducted by RCSD deputies in 2023, only *nine* were related to felonies. *Id.* And this problem has only been growing in recent years. In 2018, RCSD deputies performed only 164 vehicle pursuits. *See* Pl.'s Statement of Material Facts ¶¶ 70-77.[8]  By 2020, that number increased to 243. *Id.* By 2022, 413. *Id.* In 2023, there were 448.

From these sheer numbers, a reasonable juror could infer that Lott knew or should have known that RCSD deputies: (1) engaged in a disproportionately high number of pursuits, (2) believe they were permitted to engage in high-speed pursuits without regard to the severity of an

---

[8] *See also* Richland County Sheriff's Department 2025 Professional Standards Report on Complaints, Defensive Actions, Traffic Collisions, and Assaults on Richland County Deputies, Professional Standards Unit, at 22, https://www.rcsd.net/_files/ugd/72f17c_2daba47a39c942d49756b2a45df30fda.pdf

offense—whether a misdemeanor, felony, or absent any identifiable offense at all; (3) either RCSD deputies recklessly disregarded the safety of bystanders, suspects, and other officers, or believed that causing those peoples' deaths or injuries was justified to apprehend suspects; and (4) were routinely placing innocent bystanders at a substantial risk of death or serious harm. From those facts, a reasonable jury could conclude that Lott knew or should have known that constitutional violations committed by RCSD deputies during police pursuits were widespread and flagrant.

Granted, Plaintiff cannot yet say what number of these chases involved violations of RCSD pursuit policies, or what percentage of these chases resulted in death or serious injury to the pursuit participants or innocent bystanders. But that is simply because the Defendants unlawfully withheld that data from discovery. *See generally* Pl.'s Mot. for Sanctions at 10-12 (ECF No. 57). Had Defendants complied with their discovery obligations, Plaintiff's expert, Dr. Roy G. Taylor, would have written a report analyzing prior incidents—precisely the sort of evidence courts have found to prove a pattern of deficiency. *See Harris v. City of Philadelphia*, 171 F. Supp. 3d 395, 400–03 (E.D. Pa. 2016) (Kelly, J.) (finding Department of Justice investigation into municipal defendant's deficient use of force policy allowed plausible failure to train and custom liability claims). To the extent the Plaintiff's expert report and other evidence falls short, Defendants should not be allowed to profit from their suppression of evidence. Thus, to the extent this Court determines that such evidence is necessary or sufficient for Plaintiff to survive summary judgment, Plaintiff respectfully requests for the Court to draw an adverse inference. *See Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995) ("[T]he trial court has broad discretion to permit a jury to draw adverse inferences from a party's failure to present evidence, the loss of evidence, or the destruction of evidence.").

Lott's reaction was inaction. Despite knowing about the widespread and flagrant constitutional violations committed by RCSD deputies during police pursuits, Lott has neither tried to train RCSD deputies to pursue fleeing suspects safely nor disciplined them for failing to do so.

As the Supreme Court has recognized, there are some circumstances where "the need for training . . . is so obvious" that a law enforcement agency's "failure to provide that training amounts to deliberate indifference to constitutional violations." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 n. 10 (1989).[9] For example, when a law enforcement agency puts guns into its officers' hands "know[ing] to a moral certainty that" they will pursue "fleeing felons," the agency has a constitutional duty to train their officers on both when and how to deploy deadly force. *Id.*

The same duty exists to train law enforcement officers on when and how to conduct a high-speed police chase. Lott "kn[e]w to a moral certainty that [his deputies]" would engage in high-speed police chases to pursue "fleeing felons." *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 nt. 10 (1989) ("[C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons."). Likewise, Lott is aware of the undeniable danger high-speed pursuits pose to innocent bystanders. And yet, Lott provides his deputies with almost *zero* training on when or how to conduct a high-speed police chase. Pl.'s Statement of Material Facts, ¶ 80 (ECF No. 56).

---

[9] *See Bd. of Cnty. Comm'rs of Bryan Cnty., Okl., 520 U.S.*, at 409 (1997) ("[I]n a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations. The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected 'deliberate indifference' to the obvious consequence of the policymakers' choice. . . . The high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable.") (cleaned up).

Lott should get credit for one of his omissions. In fairness to the RCSD deputies (given the lack of training the Department provides them) Lott does not discipline RCSD deputies for engaging in unnecessary and dangerous pursuits, Lott does not punish deputies for continuing pursuits past the point of safety, and Lott seemingly does not punish deputies for anything else that would violate RCSD's paper pursuit "policies." On this point, Lott testified that he "ha[d] no idea" if RCSD deputies were ever disciplined for violating RCSD's pursuit "policies." Opponent's Statement of Additional Material Facts, ¶ 7. Moreover, each Deputy Defendant specifically testified that they weren't disciplined or even investigated for their involvement in the Pringle pursuit, despite the pursuit involving multiple blatant violations of RCSD "policies", serious injuries in an innocent bystander, and the death of the fleeing suspect. *Id.*, ¶ 8. And, most starkly, Defendants produced no evidence of an RCSD deputy for being disciplined for involvement with *any* police pursuit.[10]

However, what is fair to the RCSD deputies only exacerbates the danger to the public created by the RCSD deputies' lack of training. By failing to discipline RCSD deputies for their involvement with unconstitutional vehicle pursuits, Lott showed all RCSD deputies that reckless and unjustified conduct during pursuits was acceptable. That reckless conduct Lott has encouraged has caused an exploding number of vehicle pursuits resulting in property damage, serious injuries, and death to suspects, RCSD deputies, and innocent bystanders like Ms. Baker. This lack of disciplinary action is further evidence of Lott's deliberate indifference. *See McKnight v. D.C.,* 412 F.Supp.2d 127, 133 (D.D.C. 2006) (holding that a police department's failure to discipline officers

---

[10] Again, Plaintiff requested Defendants produce this data in discovery (if it existed), (Plaintiff's First Requests for Production to Defendants, ¶¶ 3 & 16) but Defendants chose not to produce it. Defendants' Responses to Plaintiff's First Requests for Production, ¶¶ 3 & 16. If the Court deems such data necessary or sufficient for Plaintiff to overcome summary judgment, Plaintiff requests the Court make an adverse inference.

for use of excessive force can indicate deliberate indifference to the rights of persons with whom the police come into contact); *Vineyard v. Cnty. of Murray, Ga.,* 990 F.2d 1207, 1212 (11th Cir. 1993) (same).

In short, Lott gave his deputies the keys to multi-ton death machines and pointed them where to go. This "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees" is sufficient evidence for a reasonable juror to conclude that he acted with "deliberate indifference." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 407 (1997). Further, a jury could easily conclude that Lott's condonation of RCSD's policies and customs coupled with his failure to provide meaningful training caused his deputies to engage in this conscience shocking pursuit and, consequently, Ms. Baker's injuries. *See Donahue v. Borough of Collingdale*, 714 F. Supp. 3d 504, 522 (E.D. Pa. 2024). As such, a reasonable jury could conclude that Lott's conscience shocking lack of leadership caused Ms. Baker's injuries. Thus, Defendants' Motion is due to be denied.

### III. RCSD's deliberate indifference caused Ms. Baker's constitutional injuries.

#### A. RCSD is amenable to suit.

RCSD claims that it cannot be sued because "there is no entity known as the Richland County Sheriff's Department." Defendants' Motion at 7. But the facts belie this contention.

First, an entity referring to itself as "RCSD" and represented by Defendants' counsel has appealed cases to the Supreme Court of South Carolina and South Carolina Court of Appeals. *See Richland County Sheriffs Dept. v. Awde*, 2014 WL 3016205 (2014); *Taylor v. Richland Cnty. Sheriff's Dep't*, No. 2020-000589, 2024 WL 260940, at *1 (S.C. Ct. App. Jan. 24, 2024) ("[T]he Richland County Sheriff's Department (the Department) appeals the trial court's ruling reversing its grant of the Department's motion for a directed verdict and granting Bridgett Taylor's (Taylor's) motion for a new trial."). South Carolina courts, including the Supreme Court, have

even imposed legal duties on South Carolina sheriffs' departments. *See, e.g.*, *Hamilton v. Charleston Cnty. Sheriff's Dep't*, 399 S.C. 252, 254, 731 S.E.2d 727, 728 (Ct. App. 2012) (allowing a negligent training and supervision claim against a S.C. Sheriff's department to proceed to a jury trial); *Edwards v. Lexington County Sheriff's Dep't*, 386 S.C. 285, 688 S.E.2d 125 (2010) (holding the Lexington County Sheriff's Department owed plaintiff a duty of care). And an entity referring to itself as "RCSD" has routinely appeared before this Court representing itself as a "governmental entity." *See e.g.*, *Fields v. Richland Cnty. Sheriff's Dep't*, No. 3:17-CV-0443-MGL-TER, ECF No. 4-1, p. 5.

In this case, an entity referring to itself as "RCSD": (1) filed a Notice of Removal; (2) filed two answers; and (3) appeared for deposition in this case through not one, but **six** Rule 30(b)(6) witnesses (Designees Kelvin Ashe, Karen Gilman, Dominick Pagano, Michael Pritchett, Jennifer Spurrier and Joanna McDuffie). A Rule 30(b)(6) representative can only appear on behalf of a "corporation, a partnership, an association, a governmental agency, or other entity." *See* Fed. R. Civ. P. 30(b)(6).  Neither RCSD nor any of RCSD's **six** corporate representatives claimed that RCSD was not a "proper legal entity subject to suit."

Moreover, RCSD itself has admitted that "[i]f the policy, custom, or practice of the department can be seen as the 'moving force' behind an officer's action and can be tied to plaintiff's injury, then municipal liability is a relative certainty. (Monell v. Department of Soc. Svcs., 436 U.S. 658, 98 S. Ct. 2018 (1978)." Pl.'s Statement of Material Facts, ¶ 54 (ECF No. 56).

Finally, the positions Defendants have taken in this case prove that they too know that RCSD is a legal entity (and thus amenable to suit). For instance, in response to Ms. Baker's § 1985 claim, Defendants argue they couldn't have conspired together because "[t]he Defendants are correctly alleged to all be employees of the Richland County Sheriff's Department." Defendants'

Motion at 16.  If there "is no entity known as the Richland County Sheriff's Department," as the Defendants claim, then how could all Defendants be "employees of the Richland County Sheriff's Department"?

Granted, RCSD did cite a decision from this Court with language saying that buildings, correctional institutions, and law enforcement offices "usually" aren't legal entities subject to suit. Defendants' Motion at 7 (citing *Brazzle v. Richland Cnty.*, No. 8:25-CV-3126-JD-WSB, 2025 WL 2324933, at *6 (D.S.C. June 16, 2025), *report and recommendation adopted*, No. 8:25-CV-03126-JD-WSB, 2025 WL 2057777 (D.S.C. July 23, 2025)). However, the *dicta* RCSD quoted from *Brazzle* was discussing claims brought against the Columbia Police Department, not the § 1983 claims asserted against RCSD in that case. *Id.* The part of the decision that addressed the claims against RCSD instead held that "[a]lthough Richland County is not an individual, it can be sued under § 1983 for violations of a federal right pursuant to *Monell.*" *Id.*

That is exactly what Ms. Baker is doing here. This Court should reject RCSD's smoke and mirrors and hold that RCSD can be sued under § 1983 for violations of a federal right pursuant to *Monell.*

### B. RCSD's widespread practice and custom of engaging in unnecessary and dangerous, high-speed car chases with no consideration of safety to the public, suspects, or officers involved caused Ms. Baker's injuries.

RCSD is a "person" that can be held liable under 1983 pursuant to *Monell. See Mincy v. Richland Cnty. Det. Ctr.*, No. CIV.A. 4:12-00741, 2013 WL 4018604, at *4 (D.S.C. Aug. 6, 2013), *aff'd*, 547 F. App'x 224 (4th Cir. 2013) ("Defendant Richland County is an entity subject to suit under § 1983, *see Monell v. Dep't of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)"); *Brazzle v. Richland Cnty.*, No. 8:25-CV-3126-JD-WSB, 2025 WL 2324933 (D.S.C. June 16, 2025), *report and recommendation adopted*, No. 8:25-CV-03126-JD-WSB, 2025 WL 2057777 (D.S.C. July 23, 2025) ("Although Richland County is not an individual, it can be sued

under § 1983 for violations of a federal right pursuant to *Monell*."); *Werts v. Cnty. of Richland*, No. 3:05-3203-MBS, 2007 WL 914039, at \*6 (D.S.C. Mar. 23, 2007) ("As for the Defendant Richland County, this entity is subject to suit under § 1983.") (citing *Monell*). And RCSD is responsible for the same policies, customs, practices and lack of training as Lott is, as discussed in Section II.B *supra*.

### C.  RCSD is not entitled to Eleventh Amendment Immunity.

RCSD does not assert Eleventh Amendment Immunity in its Motion for Summary Judgment. Granted, Lott does cite to *Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989), a decision which draws from the Eleventh Amendment. However, Lott made this argument only in response to claims against him in his official capacity, making this argument inapplicable to Plaintiff's claims against RCSD as a separate entity.

The burden is on RCSD to prove it is entitled to Eleventh Amendment Immunity. *Hutto v. South Carolina Retirement System*, 773 F.3d 536, 542–48 (4th Cir. 2014). Because RCSD did not assert Eleventh Amendment Immunity in its Motion for Summary Judgment, it is not entitled to it. Thus, to the extent that RCSD claims such immunity it its Reply, this Court should not consider the issue. When this issue is properly before this Court, the Court should determine that RCSD is not an arm of the State and, therefore, is not entitled to Eleventh Amendment Immunity.[11]

---

[11] The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Although the text only specifically mentions citizens of *other* states, the Supreme Court has ignored that plain language to more broadly interpret the Amendment to also prohibit citizens from suing *their own state* in federal court. *Hans v. Louisiana*, 134 U.S. 1, 21 (1890). Since *Hans*, the Supreme Court has nearly overruled that interpretation and returned to the plain language of the Amendment. *Welch v. Texas Dept. of Highways and Public Transp.*, 483 U.S. 468 (1987) (wherein four Justices urged that *Hans* be overruled and that the Court hold the Eleventh Amendment bars only suits brought against a state by citizens of another state); *Port Authority Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 309 (1990) (same) (Brennan, J., dissenting). That result is required under modern Supreme Court precedent. *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S.

Whether an entity is entitled to Eleventh Amendment Immunity depends on whether it is considered an "arm of the state." In the Fourth Circuit, whether an entity is a "arm of the state" is analyzed under the four-factor test from *Ram Ditta v. Maryland Nat'l Capital Park Planning Comm'n*, 822 F.2d 456 (4th Cir. 1987), *as refined by Md. Stadium Auth. v. Ellerbe Becket Inc.*, 407 F.3d 255, 261-62 (4th Cir. 2005). The four factors are: (1) whether the state treasury will be responsible for paying any judgment; (2) whether the entity exercises a significant degree of autonomy from the state; (3) whether the entity is involved with local versus statewide concerns; and (4) how the entity is treated under state law. *Id.* The first factor—state treasury risk—is the "'largely, if not wholly, dispositive' factor," and "must be considered." *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 45–51 (1994); *Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 430 (1997).

All factors point to the same answer here—RCSD is not an arm of the state and is therefore unentitled to Eleventh Amendment Immunity.

### a. *Ram Ditta* Factor 1: The State of South Carolina will not be responsible for paying any portion of a judgment against RCSD.

Overwhelming evidence supports this point, including RCSD's repeated admissions that "Richland County is self-funded, with no excess insurance,"[12] which is a fact that this Court has since then acknowledged as well. *See Williams v. Pelletier*, No. 2:23-CV-02149-DCN, 2024 WL 1075444, at *5 (D.S.C. Mar. 12, 2024) ("Richland County self-insures the sheriff's office."). Moreover, in this case, RCSD's Deputy Chief of Legal Affairs Joanna McDuffie, when asked how

---

1, 19 (2022) (explaining the interpretation of a Constitutional Amendment "must be rooted in the . . . Amendment's Text").

[12] Pl.'s Mot. for Sanctions, Ex. 2, at 5 of 12, ¶ 3; *see also*, Opponent's Statement of Additional Material Facts, ¶ 9. Notably, Defendants refused to produce copies of their insurance policies in this case on this basis. *See* Pl.'s Mot. for Sanctions, Ex. 2, at 10 of 12, ¶ 13.

RCSD handles lawsuits, testified unequivocally: "When a lawsuit is filed, those are sent — I send those to the county attorney's office, and then the county attorney's office decides whether to hire outside counsel." Opponent's Statement of Additional Material Facts, ¶ 10. She confirmed that this process routes through the county attorney, not through any state official or state agency. *Id.*

This separation of RCSD and the State is a byproduct of South Carolina's Constitution and statutes. Counties in South Carolina are financially and operationally structured as single political subdivisions with subordinate departments for the purposes of budgeting and accounting—the State is not involved. *See* S.C. Code Ann. §§ 4-9-30 (identifying enumerated powers of counties, including power to "to establish such agencies, departments, boards, commissions and positions in the county as may be necessary and proper to provide services of local concern for public purposes"); 4-9-140 ("All county offices, departments, boards, commissions or institutions receiving county funds shall make a full, detailed annual fiscal report to the county council at the end of the fiscal year."). RCSD is funded by Richland County with County funds. *See* S.C. Code Ann. §§ 4-1-80 ("The governing body of each county shall furnish the . . . sheriff . . . of their respective counties office room, together with necessary furniture and stationery for the same, . . . and it shall supply the offices of such officials with fuel, lights, postage and other incidentals necessary to the proper transaction of the legitimate business of such offices."); 4-9-140 (5)(a)(providing the County the power "to assess property and levy ad valorem property taxes and uniform service charges, . . . related to the nature and level of governmental services provided and make appropriations for functions and operations of the county, including . . . public safety, including police and fire protection."). The South Carolina State Constitution and Code of Laws expressly <u>forbid</u> the State treasury from paying the judgments against, or insurance premiums of, any County office, including RCSD. *See* S.C. Const. art. X §§ 7(a); 7(b); 8; S.C. Code Ann. §§ 1-

11-140(A)(emphasis added) (providing "the exclusive means for the procurement" of insurance for "the State, its departments, agencies, institutions, commissions, boards, and the personnel employed [thereby] so as to . . . protect these personnel against tort liability arising in the course of their employment. . . ."); 1-11- 445(A) (imposing absolute duty on the State to defend and indemnify its agencies, departments, and instrumentalities). Even if or when Lott/RCSD elects to purchase liability insurance from the State Insurance Reserve Fund (IRF), there are no State funds liable for the claims, because the IRF is a self-insurance mechanism, collecting premiums, making investments, and paying claims only from the fund and can only use these funds (and reinsurance) to pay claims. *See* S.C. Code Ann. §§ 1-11-140(A); 15-78-150(b).

In sum, this first and "largely, if not wholly, dispositive" factor points only in one direction—RCSD is not an arm of the state. RCSD is a county department—and a county is not entitled to Eleventh Amendment Immunity. *Lake Country Ests., Inc. v. Tahoe Reg'l Plan. Agency*, 440 U.S. 391, 401 (1979) (held that political subdivisions such as counties and municipalities are not entitled to Eleventh Amendment immunity even though such entities exercise a "slice of state power"); *Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 280 (1977) (Arm-of-the-state status does "not extend to counties and similar municipal corporations."); *Edelman v. Jordan*, 415 U.S. 651, 667 n. 2 (1974) citing *Lincoln*, 133 U.S. at 530 (1890) ("a county does not occupy the same position as a State for Eleventh Amendment purposes").

### b. *Ram Ditta* Factor 2: RCSD has a substantial degree of autonomy from the State.

Again, the evidence on this element powerfully indicates that RCSD is not an "arm of the state." Starting with the Statutory and Constitutional structure,

1. South Carolina law requires counties to budget and fund the operations of the County, including their County Sheriff's Offices. S.C. Code Ann. §§ 4-9-30; 4-9-140; 4-1-80. The State of South Carolina has no involvement in the County's budget process—the

State provides no input, approval, veto power, or funding of any county budget. *See* S.C. Code Ann. §§ 4-9-30; 4-9-140.

2. County sheriff's offices lack the authority to levy taxes or establish their own budget and must submit their proposed budget for approval and vote to their respective county councils—not the State of South Carolina. S.C. Code Ann.§§ 4-9-30; 4-9-140.

3. County sheriff's offices in South Carolina hold no title to any land, property, buildings, vehicles, or otherwise, and all County assets used by them are titled, owned, and furnished to them by the county, not the State. S.C. Code Ann. §§ 4-9-30; 4-9-140; 4-1-80.

4. Richland County Council and its citizens, by statute, control who exercises law enforcement authority in their county, including the power to arrest, limited by law to within the county and adjacent county only. S.C. Code Ann. §§ 4-9-33; 17-13- 40; 23-13-60; 23-13-70.

Here again, the facts in this case reflect South Carolina's Constitutional and Statutory Scheme. When asked directly, "Does the sheriff have the ultimate authority to decide if a policy change should take place?", RCSD Designee McDuffie answered: "Yes, ma'am. He's the sheriff. He—he is the ultimate decision maker." Opponent's Statement of Additional Material Facts, ¶ 11. There is no state approval process, no state veto power, and no state input on any policy change. The chain of authority runs from deputy to command staff to the Sheriff and stops there.

When asked what happens if a deputy violates RCSD's policies and procedures, Major Dominick Pagano testified: "The consequences would be the — it would — their actions would be reviewed to determine if there was any malice or wrongdoing on the officer, and then appropriate action would be dictated. Ultimately, the sheriff is the final disciplinary person. So he will make that decision." *Id.*, ¶ 13. No state official, no state board, and no state agency play any role in the disciplinary process. The entire chain of accountability for RCSD deputies' conduct flows internally to Lott.

### c. *Ram Ditta* Factor 3: RCSD's operations are geographically and functionally limited to Richland County.

South Carolina law draws a clear geographic line around county sheriff operations, confining RCSD's concerns to Richland County. *See* S.C. Code Ann. § 23-13-70 (limiting deputy sheriffs' duty to patrol to "the entire county"); S.C. Code Ann. § 17-13-40 (limiting arrest authority "within the county" and, in pursuit situations, into "an adjacent county").

Defendants' testimony reinforces RCSD's local focus. McDuffie testified that deputies are not authorized to even "drive [their] vehicle outside of Richland County unless permission is obtained," and that in most circumstances they "would be required to get permission to drive their county vehicle outside of Richland County." Opponent's Statement of Additional Material Facts, ¶ 14. The example she gave of an exception—an active pursuit crossing into a neighboring count— only reinforces the point: the *default* is county-bounded operation, and crossing into another county requires is the *exception*. *Id.*

Granted, all RCSD deputies must be certified by the South Carolina Criminal Justice Academy, a State-level entity that's "the governing body for certification." *Id.*, ¶ 15. However, the academy only purports to provide *minimum standards,* not day-to-day operational control. RCSD's daily operations are instead guided by RCSD's policy and procedure manual. And RCSD's policy and procedure manual is not state law. "It's not law." *Id.*, ¶ 16.

### d. *Ram Ditta* Factor 4: State Law treats RCSD as a County department, not a State organization.

The South Carolina Code of Laws expressly refers to county sheriffs as "County Officers" under S.C. Code Ann. § 4-11-10 *et seq.*, who are paid from their County treasury, along with their deputies. Further, it is the County Council—not the State—that bears the statutory obligation to fund the operations of its county sheriff's office. *See* S.C. Code Ann. §§ 4-9-30; 4-9-140.

### e. *Cromer* didn't decide this issue.

RCSD will attempt to steer this Court away from conducting the *Ram Ditta* analysis by claiming that the Fourth Circuit settled this issue once and for all in *Cromer v. Brown*, 88 F.3d 1315 (4th Cir. 1996). But *Cromer* was decided *thirty years ago*, and the arm of the state analysis, by its nature, yields *impermanent* results. What was an arm of the state one day could be the foot of a county another. Moreover, the Fourth Circuit has already indicated that it agrees with the need to more deeply examine *Cromer's* application to RCSD specifically, expressly leaving the issue of whether RCSD is entitled to Eleventh Amendment Immunity "for another day." *English v. Clarke*. 90 F.4th 636, 649–50 (4th Cir. 2024).

Further, the *Cromer* panel did not know, and therefore didn't consider, that the State of South Carolina wouldn't be liable for any judgment. In fact, the *Cromer* panel readily admitted "it was unclear whether the state treasury would be partially liable for a judgment in th[at] case." *Cromer*, 88 F.3d at 1332. But it *was* clear (just not to the panel) because state law expressly prohibited the State from being on the hook for a county sheriff's office. *See* S.C. Const. art. X, §§ 7(a); 7(b); 8; S.C. Code Ann. §§ 1-11-140(A); 1-11-445(A); 15-78-30; 15-78-140.

### IV. Defendants are not entitled to Qualified Immunity.

As Defendants acknowledge, they are not entitled to qualified immunity if they fail to prove "that the violation was not clearly established." *Mays v. Sprinkle*, 992 F.3d 295, 302 n. 5 (4th Cir. 2021). In making this determination, this Court must look at cases from the Supreme Court, the Fourth Circuit, and the Supreme Court of South Carolina. *See Booker v. S.C. Dep't of Corrs.*, 855 F.3d 533, 538 (4th Cir. 2017); *Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999). However, the Court may also consider a "consensus of cases of persuasive authority from other jurisdictions." *Booker*, 855 F.3d at 539.

A defendant cannot receive qualified immunity by merely claiming the absence of a perfectly factually analogous case. "'Clearly established' does not mean that 'the very action in question has previously been held unlawful,' but it does require that, 'in the light of pre-existing law the unlawfulness [of the official's conduct] must be apparent.'" *Owens*, 372 F.3d at 279 (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). Nor does a defendant meet their burden of showing the law was not clearly established by simply saying so.

As explained above, this Court must decide whether to apply the "intent to harm" or "deliberate indifference" standard to the Deputy Defendants' conduct. That initial decision will necessarily shape the Court's subsequent analysis of whether Deputy Defendants' conduct violated clearly-established law. Under either standard, however, the Defendants violated clearly-established law.

### A. An officer acting with intent to harm cannot hide behind Qualified Immunity.

Defendants do not argue that evidence of the Deputy Defendants' intent to harm would be insufficient to show a violation of clearly established law. Accordingly, if this Court finds that a reasonable juror could conclude that the Deputy Defendants acted with an intent to harm, then Defendants appear to concede that such conduct would violate clearly established law, and thus they would have failed to meet their burden of showing the law wasn't clearly established. *See Henry v. Purnell*, 501 F.3d 374 (4th Cir. 2007) ("The defendant bears the burden of proof on the second question [for Qualified Immunity].").

*Lewis* established that conducting a high-speed chase in response to an emergency "with [the] intent to harm suspects physically or to worsen their legal plight" violates substantive due process. *Lewis*, 523 U.S. at 854; *Checki v. Webb*, 785 F.2d 534, 538 (5th Cir. 1986) (*quoted in Lewis*, 523 U.S. at 854 n. 13) (viable due process claim can arise when person suffers serious physical injury "due to a police officer's intentional misuse of [a] vehicle"). The Fourth Circuit has

since clarified that *Lewis'* "intent to harm" standard does not apply to non-emergencies and that the same Fourteenth Amendment protections extend to injured bystanders. *Dean*, 976 F.3d at 419.

For the reasons stated above, a reasonable juror could conclude that the Deputy Defendants' intent to harm Pringle caused Ms. Baker's injuries. Thus, on December 29, 2023, the unlawfulness of the Deputy Defendants conduct was "apparent," and the Deputy Defendants are not entitled to qualified immunity. *See Owens ex rel. Owens v. Lott*, 372 F.3d 267, 279 (4th Cir. 2004) (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).

**B. It was clearly established that recklessly pursuing a nonviolent suspect in a non-emergency situation with deliberate indifference to the safety of the suspect and all bystanders involved was unconstitutional.**

Even ignoring the Defendants' intent to harm, only a "plainly incompetent" law enforcement officer would have believed that pursuing a nonviolent suspect with deliberate indifference to the safety of bystanders was lawful. *See Hunter v. Bryant,* 502 U.S. 224, 229 (1991)*.* Granted, there is scant caselaw evaluating facts as egregious as those presented in this case.[13] However, "some conduct is so obviously unlawful that an officer does not need a detailed explanation." *Dean for & on behalf of Harkness v. McKinney*, 976 F.3d 407, 419 (4th Cir. 2020) (quoting *Browder v. City of Albuquerque*, 787 F.3d 1076, 1082 (10th Cir. 2015)).

This case presents such "obviously unlawful" conduct. Years before this tragedy occurred, the Fourth Circuit held that "it was clearly established" that a recklessly driving law enforcement

---

[13] Plaintiff posits that the most factually analogous cases are *Wells v. Bisard*, No. 1:11-CV-1049-WTL-DML, 2011 WL 5827213 (S.D. Ind. Nov. 18, 2011) (where a drunk police officer that was texting and driving hit a motorcycle stopped at a redlight while driving 73 mph in a 40 speed zone en route to a fellow officer who didn't radio for help looking for a suspect on a bicycle wanted on a probation warrant) and *Flores v. City of S. Bend*, 997 F.3d 725, 730 (7th Cir. 2021) (where an officer overheard other officers discussing a routine traffic stop on the radio and drove to the traffic stop through a residential area with a posted speed limit of 30 miles per hour at speeds up to 98 miles per hour).

officer "in a non-emergency, non-pursuit situation could be subject to liability under the Fourteenth Amendment for deliberate indifference to a substantial risk of harm to those around him." *Dean*, 976 F.3d at 419. With that general principle in mind, a reasonable officer in the Deputy Defendants' position could not have believed it was lawful to pursue Pringle with deliberate indifference to the safety of bystanders. Thus, the Deputy Defendants are not entitled to qualified immunity. *See Amaechi v. West*, 237 F.3d 356, 362 (4th Cir.2001) ("exact conduct at issue need not have been held unlawful for the law governing an officer's actions to be clearly established").

The weakness of Deputy Defendants' arguments for qualified immunity under the "deliberate indifference" standard is revealing. Defendants claim that because "[t]here is no constitutional duty for officers to terminate a pursuit," that "an objectively reasonable officer in these deputies' position would not have known that they were violating the Constitution." Defendants' Motion at 25.

This argument is far reaching because—as Defendants undoubtedly know—it has to be. That is because either Defendants' absurd proposition is correct that there is never a "constitutional duty for officers to terminate a pursuit,"[14] or the Deputy Defendants breached their duty in this case.

**C. Lott's deliberate indifference to the safety of bystanders to police pursuits was unconstitutional.**

Lott's Motion mentions qualified immunity only once, in a footnote, where he asserts that if this Court finds any of his conduct unconstitutional, such conduct did not violate clearly established law. *See* Defendants' Motion at 11, n. 5. But a government official cannot meet his burden to show a right was not clearly established through mere conclusory assertion—he must

---

[14] Defendants' Motion at 25.

identify the specific conduct at issue and demonstrate why that conduct did not violate clearly established law. Lott has done neither. Moreover, because ruling on an issue minimally addressed by a party in his motion is both "unfair" and "risk[s] an improvident or ill-advised opinion on the legal issues raised," *Hunt v. Nuth*, 57 F.3d 1327, 1338 (4th Cir. 1995), district courts decline to consider arguments only raised in a footnote. *See, e.g., Sanders v. Callender*, No. CV DKC 17-1721, 2018 WL 337756 *7 nt. 5 (D. Md. Jan. 9, 2018) (citing cases). The Court should follow that approach here and deem Lott to have waived the "clearly established" element of his qualified immunity defense for purposes of this motion.

If this Court decides to consider this issue now, it should find that Lott violated clearly established law by providing almost no training on vehicle pursuits and failing to enforce his RCSD's pursuit policies. First, as explained above, the Supreme Court has recognized circumstances where "the need for training . . . is so obvious" that a law enforcement agency's "failure to provide that training amounts to deliberate indifference to constitutional violations." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 nt. 10 (1989); *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl.*, 520 U.S. at 409 ("[I]n a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations. The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected 'deliberate indifference' to the obvious consequence of the policymakers' choice. . . . The high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable.") (cleaned up).

The need to train RCSD deputies on when and how to engage in police pursuits is just as obvious as the need to train officers on the use of deadly force. On average, RCSD deputies engage in a police pursuit more than once a day, with a large number of those pursuits ending in death or injury to the suspect or RCSD deputies involved. The danger to bystanders from police pursuits is comparable to the danger posed to bystanders by police officers' use of deadly force. [15]

Second, although caselaw addressing facts as egregious as these is (thankfully) rare, all cases identified held that it is unconstitutional to completely fail to train law enforcement officers or enforce safety policies for vehicle pursuits. *See Frye v. Town of Akron*, 759 F. Supp. 1320, 1325 (N.D. Ind. 1991); *Brown v. Bryan Cnty., OK*, 219 F.3d 450 (5th Cir. 2000); *Hockenberry v. Village of Carrollton*, 110 F. Supp. 2d 597, 602 (N.D. Ohio 2000); *Gillyard v. Stylios*, No. Civ.A. 97-6555, 1998 WL 966010, at **6-8 (E.D. Pa. Dec. 23, 1998).

## IV.    CONCLUSION

For the foregoing reasons, including those briefed in Plaintiff's Motion for Summary Judgment and Memorandum in Support (ECF No. 55), Defendants' Motion for Summary Judgment should be denied.

[*signature page to follow*]

---

[15] *See Michael Avery, Police Chases: More Deadly Than a Speeding Bullet?*, Trial, Dec. 1997, at 52 (footnotes omitted) ("There is a virtual statistical certainty that [each] day, someone in the United States will die in a high speed vehicular police pursuit.").

Respectfully submitted,

**BURR & FORMAN, LLP**

s/Celeste T. Jones
Celeste T. Jones, Fed. ID #2225
ctjones@burr.com
Benjamin R. Jenkins, IV, Fed. ID #14138
bjenkins@burr.com
Burr & Forman, LLP
P.O. Box 11390
Columbia, South Carolina 29211
803-799-9800
803-753-3278 (Fax)

Michael K. K. Choy, Admitted *pro hac vice*
mchoy@burr.com
John Wilson Booth, Admitted *pro hac vice*
jwbooth@burr.com
Burr & Forman, LLP
420 20th St. N #3400
Birmingham, Alabama 35203

*Attorneys for Plaintiff*

Columbia, SC
April 23, 2026