PAMELA A. BAKER V. LEON LOTT, IN HIS OFFICIAL CAPACITY AS THE SHERIFF OF RICHLAND COUNTY SHERIFF'S OFFICE, ET AL.
CASE NO. 3:24-CV-04303-JDA

# EXHIBIT 24

## TO PLAINTIFF'S OPPONENT'S STATEMENT OF MATERIAL FACTS

***BRYAN HODGE DEPOSITION EXCERPTS***

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

PAMELA A. BAKER,

Plaintiff,

vs. CASE NO.:3:24-CV-04303-JDA

LEON LOTT, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS THE SHERIFF OF RICHLAND COUNTY; THE RICHLAND COUNTY SHERIFF'S DEPARTMENT; AND DEPUTIES MATTHEW SMITH, MICHAEL DILLARD AND BRYAN HODGE,

Defendants.

D E P O S I T I O N

WITNESS: BRYAN HODGE

DATE: Friday, September 19, 2025

TIME: 9:34 a.m.

LOCATION: Burr & Forman
1221 Main Street, Suite 1800
Columbia, South Carolina 29201

TAKEN BY: Attorney for the Plaintiff

REPORTED BY: Robin Dunn
South Carolina Court Reporter

LEGAL EAGLE

Post Office Box 5682

Greenville, South Carolina 29606

864-467-1373

depos@legaleagleinc.com

to push his car off the road utilizing mine.
Q Okay. So it was your intent once you caught up to him to push his car off the road?
A Yes.
Q Okay. Have you -- so at the time, you weren't trained on what is commonly referred to as a pit maneuver?
A At the time, no.
Q When did you get trained on pit maneuvers?
A This year.
Q Okay. Have you performed a pit maneuver without being certified and trained to do so?
A In law enforcement, no.
Q Okay. Did you do it in the military?
A I did do it in the military, yes.
Q Okay. Can I ask when you did it in the military?
A Sure. We used it all the time, specifically in Afghanistan driving on roadways, pushing cars out of the way.
Q Okay. Can you tell me a little bit about other pursuit intervention techniques outside of a pit maneuver that you know?
A Say that one more time for me, please.
Q What other techniques can you use to -- outside of a pit maneuver, to stop a pursuit, a high-speed

the pursuit was for. The pursuit was for -- we didn't pursue him because he didn't appear. We pursued him because after a traffic stop, he decided to run. And our knowledge was that he had fentanyl warrants and that he's a fentanyl dealer and he had just left a buy.

BY MR. JENKINS:

Q Okay. How do you know he had just left a buy?

A There was DEA task force who was following him.

Q Okay. He was just at a buy. Why didn't you arrest him while he was at the buy?

A Because at the time it would have been more dangerous.

Q Please explain to me how that would have been more dangerous than pursuing him backwards up I26 at 70 miles an hour.

MR. GARFIELD: Object to the form.

THE WITNESS: Sure. Let's say you're a drug dealer, and he is the person buying the drugs. Typically, drug dealers and people buying drugs carry guns. There's no point in getting in a shoot out where you can't control where the bullets are going, and they could go wherever, versus apprehending somebody during a vehicle pursuit where, for the most part, you can control

where they go.
BY MR. JENKINS:
Q So bullets are a dangerous, lethal weapon.
A Yes.
Q Does Richland County Sheriff's Department policy say that your patrol vehicle is more lethal than a bullet, a 50 caliber bullet?
A That's -- I believe that's what it said, but that doesn't mean we agree with it.
Q When you say we, what do you mean?
A Lethal in general. People that work as sworn officers of the Richland County Sheriff's Department. Like I personally, just because I don't agree with the policy doesn't mean that it's not the policy.
Q Okay. So if you don't agree with the policy, can you just not follow it?
A That's not true.
Q Okay.
A Me and my wife can agree and disagree on what to eat for dinner, but I still eat what's for dinner if she makes it.
Q Because you're a smart man.
When you said he had fentanyl warrants, how -- so, how did you know he had fentanyl

warrants?
A That's what was relayed from the DEA task force.
Q Okay. Did they radio that to you?
A I believe they were on there, some channel. I can't remember if it was radio or phone call or what it was. They -- they contact us in many different ways.
Q Okay. On this day, how did they contact you to let you know that he had warrants?
A I can't remember exactly how they contacted us, whether it was through radio traffic.
Q When -- when did they contact you with regards to the pursuit, 30 minutes before?
A I don't know the exact time frame. But it was before the pursuit was initiated.
Q Was it that afternoon, that morning?
A I was on dayshift. It was probably sometime between morning and afternoon timeframe. I can't remember exactly what timeframe. But I assume it would be in the morning.
Q Okay. This policy, 802.12, on pursuit termination, had you seen this policy before December 29, 2023?
A Yes.
Q Were you trained on it?

Q Okay. Did anyone with the Richland County Sheriff's Department tell you to withhold information from the MAIT interviewer?
A No.
Q Okay. Did anyone with the Richland County Sheriff's Department tell you to lie to the MAIT interviewer about how fast you were going?
A No.
Q When you get involved in a pretty vehicular pursuit, would you describe it as a high stress situation?
A Not necessarily.
Q Okay. When you get involved in a vehicular pursuit, do you fall back on your training?
A Yes.
Q Do you fall back on the department's policies?
A Yes.
Q Okay. Do you believe you fell back on your training in the pursuit on December 29, 2023?
A Yes.
Q Okay. Do you believe you fell back on your policies and procedures in the chase on December 29, 2023?
A Yes.
Q So we talked about Mr. Pringle being a fentanyl

dealer. Is that the main danger you believe that he posed to the Richland County community?

MR. GARFIELD: Object to the form.

THE WITNESS: No.

BY MR. JENKINS:

Q Okay. What do you believe the main danger he posed to the Richland County community was?

A Main danger. It's a cumulative thing. It's not just one thing. It's every aspect.

Q Okay. Did you ever receive any disciplinary action for your involvement in the pursuit of Byron Pringle on December 29, 2023?

A No, I did not.

Q Okay. Do you know if a discussion of the pursuit on December 29, 2023, was concluded in the next desk sergeant report that was sent out?

A I -- I would assume so. But that also just depended on if the person who initiated the call (unintelligible.)

Q Okay. Do you know if you attended the next deputy advisory committee meeting after this incident?

A I don't believe so.

Q Okay. I'm sorry to circle back. How many -- you said in 2023, you believe you were in more than 10 to 15 pursuits. How many pursuits do you think