IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Pamela A. Baker, | ) | Civil Action No.: 3:24-cv-04303-JDA |
| | ) | |
| Plaintiff, | ) | |
| | ) | **RESPONSE IN OPPOSITION** |
| v. | ) | **TO PLAINTIFF'S MOTION FOR** |
| | ) | **SANCTIONS ON BEHALF OF** |
| Leon Lott in his official capacity as the | ) | **DEFENDANTS** |
| Sheriff of Richland County Sheriff's Office; | ) | |
| the Richland County Sheriff's Office; and | ) | |
| Deputies Matthew Smith, Michael Dillard | ) | |
| and Bryan Hodge, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

On March 10, 2026, Plaintiff filed a Motion for Sanctions, including but not limited to striking Defendants' Answer and Awarding Plaintiff Attorney's Fees (hereinafter, "Plaintiff's Motion") [Dkt 57-1]. The Defendants oppose that motion for the reasons discussed below.

**INTRODUCTION**

As discussed in the Defendants' motion for summary judgment, Plaintiff faces a significant challenge in proving her Section 1983 claims against the Defendant deputies. In an arguably suicidal move, on December 29, 2023, Byron Pringle consciously decided to flee from the police, proceed the wrong way up the interstate, drive into oncoming traffic, and dodge vehicles as he pressed on until he finally collided with three vehicles, including the one involving Plaintiff.

The three Defendant deputies had lawful and legitimate reasons to initiate and pursue Pringle, a fleeing felon. While there may be factual questions whether the Defendant deputies were negligent in following Pringle up the interstate, the undisputed facts show that they never made physical contact with any vehicle or person, not Pringle or Plaintiff. Since there was no use of force and no evidence suggesting these deputies intended to harm Plaintiff personally -- as one of

1

dozens of motorists unknown to them -- there can be no violation of the Fourth or Fourteenth Amendment, and Plaintiff's federal claims fail on the merits. Nonetheless, there is more than a sufficient backstop, if necessary, as the deputies should be afforded qualified immunity under a proper analysis of these facts.

From the Defendants' perspective, the factual assessment of this four-minute pursuit was never complicated. Video recordings from nine dashcams and body cameras captured the entire pursuit. The audio included voices from the undercover Lexington County Sheriff's Office ("LCSO") investigator, three RCSD deputies, the RCSD supervisor monitoring the pursuit, and other first responders, providing additional details such as weather conditions and the status of other emergency vehicles. These uncontroverted facts, which clearly do not rise to a constitutional dimension, primarily involve a negligence claim, similar to other RCSD pursuit cases, commonly filed as tort claims in state court.

Sheriff Lott and the RCSD face lawsuits regularly. State court claims involving the Sheriff and falling within the statutory cap are common and sometimes even anticipated. In Plaintiff's Motion, she claims that the Sheriff and/or his counsel acted in bad faith "throughout the entirety of this case." This begs the question: Why would an elected Sheriff with 30 years of service engage in such egregious behavior by defending a lawsuit whose allegations question the appropriateness of a defensible pursuit? A pursuit in which neither his deputies nor their patrol vehicles made any physical contact with another vehicle or a person?

Similarly, the undersigned has been the Sheriff's primary litigation attorney for the past 25 years and has defended hundreds of RCSD lawsuits, including pursuit cases. Again: What incentive would the undersigned have, for example, to "intentionally withhold" and "provide[ ] inaccurate and false information" to opposing counsel in a straightforward pursuit case that was

entirely captured on multiple videos?[1] Possessing a good faith belief that there are no viable federal claims, why would it be worth risking his client's stellar reputation, defense counsel's professional and personal status, and exposing his self-insured client to fees, costs, and exorbitant sanctions? The answer is that no such motivation exists. Quite the contrary, Sheriff Lott, the Defendant deputies, and defense counsel have acted in good faith throughout this case and further have complied with both this Court's Orders and the rules of court.

The Defendants respectfully submit that the impetus for Plaintiff's motion is as follows: Plaintiff and her lead counsel have a professional relationship as longtime partners at Plaintiff's counsel's law firm. On December 29, 2023, Plaintiff suffered physical and emotional injuries when Byron Pringle drove head-on and struck her vehicle. The Defendants would offer that, given these lawyers' professional and personal connection, Plaintiff's counsel has over-personalized this case by injecting her ego or personal feelings into the litigation. These emotions have surfaced as excessive,[2] meritless accusations of misconduct and nefarious behavior, and have escalated into vexatious litigation. As a result, Plaintiff's counsel has filed the instant motion and alleged innumerable claims, attempting to manufacture bad faith by falsely accusing defense counsel of dishonest and malicious conduct, and discovery violations to gain a tactical advantage.

The reality is that both sides have intensely litigated this case and zealously advocated for their clients. But what Plaintiff's counsel has done is villainize the normal "back and forth" of litigation as unethical conduct. As will be shown in this discussion, Plaintiff's counsel has weaponized the litigation process by misrepresenting standard litigation behavior (*e.g.*, typical

---

[1] These comprised nine videos in the form of body-worn camera ("BWC") and dashcam videos, all of which were produced to Plaintiff during the early stages of discovery on November 15, 2024.

[2] To illustrate, in her 33-page memorandum, she refers to defense counsel's "bad faith" more than 10 times and to "delay" tactics and to the "withholding" of key information more than 20 times each.

discovery disputes, scheduling conflicts, document production, and supplemental production as additional documents are received) as a deliberate, malicious intent to obstruct justice or hide evidence. Thus, by labeling nearly every routine action or inaction by defense counsel as "bad faith," she hopes to convince this Court that defense counsel's behavior was so manifestly egregious as to justify the award of costs, attorney's fees, and the ultimate sanction of striking the Defendants' Answer.

As will be discussed further below, the instant motion is nothing more than an attempt to gain a strategic advantage to prop up an otherwise weak federal case. Plaintiff has proceeded through discovery in this case with a scorched-earth approach where the truth and the actual facts no longer matter. *See Oncology & Hematology Assocs. of S.C., LLC v. S.C. Dep't of Health & Env't Control*, 387 S.C. 380, 387-88, 692 S.E.2d 920, 924-925 (2010) (South Carolina supreme court taking the extraordinary step of reviewing and vacating interlocutory discovery orders resulting from scorched-earth discovery approach and noting that "[w]hile discovery serves as an important tool in the truth-seeking function of our legal system, we are concerned that 'discovery practice' has become a cottage industry and the merits of a claim are being relegated to a secondary status."). That is precisely what Plaintiff is attempting. The best example of this is Plaintiff's allegation that she so desperately needed all pursuit records for a five-year period, which comprised thousands of pages of documents, in order to properly present her case. However, Plaintiff has not cited to a single document from that production in support of or in response to any dispositive motions in this case, nor has she used any of those documents in depositions. The reason is simple. Those documents are not relevant to any cause of action before this Court. Instead, she chooses to weaponize the exorbitant discovery she sought, which now she claims constituted a document dump. She confusingly asks the Court to sanction Defendants for giving

her what she asked for. Similarly, despite giving lip service to all of the supposed prejudice she has suffered from the discovery process in this case, she has not identified a single shred of evidence she claims she did not receive that would actually be relevant to or impact any of the dispositive motions currently pending before the Court.

In any event, as discussed further below, Plaintiff's allegations of bad faith and discovery abuse are unfounded and should be rejected by the Court.

## I.     Defendants' Alleged Failure to Produce Documentation as Ordered by this Court

### A.     Training Materials (RFP No. 1)

Plaintiff's Requests for Production ("RFP") No. 1 sought "All documents and materials related to the training policies or practices of the Defendants related to high speed chases." Plaintiff's Motion:

> *Defendants, after being ordered by this Court, produced a copy of a PowerPoint used by RCSD to train its deputies, inter alia, on pursuit driving. Included within the PowerPoint are links to various instructional videos related to the dangers of pursuit driving, including the dangers to civilians not involved in the pursuit who ultimately are injured, as Plaintiff was here. Defendants have failed, despite being ordered by this Court, to provide these videos or any others, related to their training policies and practices.*
>
> *Plaintiff sent Defendants a deficiency letter on June 12, 2025. Plaintiff specifically noted Defendants' failure to produce documentation responsive to RFP No[ ]. 1…*

In their discovery responses of November 15, 2024, the Defendants objected on the grounds that the request is "overly broad, unduly burdensome, vague, and not proportional to the needs of the case." Notwithstanding the objection, because the request ostensibly sought written policy and procedure guidelines, defense counsel produced the table of contents of the 879-page Policies and Procedures Manual. Further, defense counsel offered that if Plaintiff would simply "identif[y] specific policies she desires in discovery," the Defendants would review the identified

5

policies (to confirm they were in effect on December 29, 2023) and produce the particular guideline. In these responses, the Defendants additionally produced 366 pages consisting of training files for the three Defendant deputies.

By March 11, 2025, the Defendants supplemented their responses by producing updated training records for the deputies (91 pages); the unabridged policy and procedure manual (879 pages) including *Policy 802: Pursuit Driving* in effect in December 2023; and training and instructional materials for driver training (*i.e.* a folder of native files consisting of seven PowerPoint files, two Word files, and a single MP4 video file, available in both PPT and PPTX formats and Bates set N comprising 374 pages).

Through formal written discovery responses (dated November 15, 2024, February 7, 2025, March 6, 2025, March 11, 2025, and May 5, 2025) and informal communications with opposing counsel concerning these requests, defense counsel produced these "documents and materials" related to the training policies and procedures. Notably, opposing counsel's June 12, 2025 Rule 11 letter does not reference RFP No. 1 or production omissions in training documents and materials. In fact, it was not until Plaintiff's Motion last month that defense counsel were first advised of alleged deficiencies in responding to RFP No. 1.

Now, according to Plaintiff's Motion, she complains that the Defendants failed to produce training videos during this time span. First of all, RFP No. 1 only seeks "documents and materials."[3] Nevertheless, defense counsel produced a driving instructional video on March 11, 2025. Additionally, Defendants provided numerous PowerPoint files (in native format) that

---

[3] Plaintiff's initial discovery requests did not include the typical written requests for videos, audio files, or similar digital content. Additionally, the claim that "Plaintiff sent Defendants a deficiency letter on June 12, 2025, in which Plaintiff specifically noted Defendants' failure to produce documentation responsive to RFP No. 1" is outright false.

contained embedded videos and clickable links to videos, allowing Plaintiff, had she bothered, to easily access numerous videos shown to deputies during the training process. Plaintiff also ignores the obvious point that pursuit driving and emergency vehicle operation, as inherently practical exercises, are primarily taught hands-on, outside the classroom.[4] Plaintiff also fails to point out to the Court that the bulk of a law enforcement officer's training in South Carolina is conducted by the South Carolina Criminal Justice Academy. Despite claiming how badly she was prejudiced by the supposed inability to uncover all materials relating to Defendants' training, she never sent a subpoena to the Criminal Justice Academy for its training materials. Plaintiff conspicuously fails to note these issues to the Court of this because, as previously noted, the actual facts or any genuine "search for truth" have taken a back seat to her preferred narrative of alleged discovery abuse.

B. **Professional Standards Records**

Plaintiff's complaints related to "professional standards records" seems to relate the "underlying data utilized to compile the summary reports" that the PSD generates at the end of each year. As an initial matter, these reports, containing the "data" have been produced to Plaintiff, as she acknowledges.

In any event, Plaintiff never sent an interrogatory requesting RCSD identify any specific data point or statistic. She did, however, include a topic concerning PSD "data" in her 30(b)(6) notice.[5] Specifically, she included the following topic in the 30(b)(6) notice: "Identify and explain

---

[4] Defendants crave reference to the discussion concerning the way deputies are trained on pursuit driving and emergency vehicle operation contained in Defendants' Response in Opposition to Plaintiff's Motion for Summary Judgment for a more thorough discussion on these topics.

[5] This notice, which contained more than 30 separate topics, was sent on October 14, 2025. The notice set the deposition for November 20, 2025. This was a blind notice for which Plaintiff did not consult with Defendants or their counsel about their availability. Any shortcomings in the preparation of the witnesses for these depositions that Plaintiff may allege would therefore be inadvertent as counsel had only a single day available on which witnesses were available to be prepared prior to the deposition. In fact, one witness, Dominick Pagano, was actually on vacation

all data the Professional Standards Division uses to review all police vehicular pursuits." Thus, the 30(b)(6) deposition was Plaintiff's opportunity to ask questions concerning the "data" she now claims was so essential to proving her case. Not surprisingly, given her primary focus on her own narrative, **the only question she asked the witness designated to respond to this topic concerning data** is the following:

> Q: How many pursuits has the Richland County Sheriff's Department engaged in on a yearly basis during the last ten years?
>
> A: In the last ten years -- the number of pursuits have risen over the last ten years. Year-to-date, we're probably at 330. Reasons why the pursuits have increased, technology, proactive policing, maybe COVID might have something to do with it, and the fact that bad guys just don't want to go to jail.
>
> Q: And can you tell me how many on a yearly basis?
>
> A: I can show you the documents if I'm allowed to do that.
>
> Q: Yes, sir. Did you bring some documents with you?
>
> A: I have -- I have this. Year 2015, we had 100 pursuits. Year 2016, we had 91. 2017, we had 111. 2018, we had 163. 2019, we had 161. 2020, we had 213. 2021, we had 256. 2022, we had 398. 2023, we had 448. 2024, we had 419. And this year, so far to date, we have 335.[6]

*See* Prichett Dep., p. 12, filed herewith as an exhibit. This was the only question she asked concerning data or statistics. For instance, she never asked Capt. Prichett for a breakdown of pursuits by felony versus misdemeanor, race, whether such pursuits involved a collision, or any

---

on the scheduled day and had to be deposed the same day that was available for witness preparation, further curtailing the available preparation time for him and the other witnesses.

[6] After this exchange is when Plaintiff's counsel attempted to take from the witness the single-page document containing the information referred to in the question that was the subject of a motion for protective order filed by Defendants. *See* Dkt. 48. Nonetheless, Plaintiff was provided the only data contained on the single page she was asking about by the witness in the quoted colloquy and again later by email from Mr. Spreeuwers dated December 1, 2025, filed as an exhibit hereto.

other statistic or data point. Plaintiff now attempts to parlay this into Defendants' failure, when all she needed to do what ask the question of the witness designated to testify about the subject.

More importantly, this "data" that Plaintiff's counsel did not even deign to ask about is not relevant to any issues in this case. While Plaintiff has cited certain data in her motion for summary judgment, it was limited to a breakdown in pursuit numbers based on whether they were initiated for a felony or for a misdemeanor. This distinction is not relevant to any issues in this case. For example, there is no constitutional requirement that officers only pursue for felony offenses and prohibiting pursuits for misdemeanor offenses. It is undisputed in this case that the RCSD pursuit policy permits pursuits for felony offenses and for misdemeanor offenses which permit custodial arrests. In any event, the felony versus misdemeanor distinction is irrelevant for an additional reason—Pringle was being pursued because of felony charges. Moreover, even if such data is even minimally relevant, which Defendants dispute, it would only be relevant to alleged policy-based or failure to train claims Plaintiff has asserted only in the context of her patently frivolous 42 U.S.C. § 1985 conspiracy claim (Fourth Cause of Action) and frivolous Fourth Amendment claim excessive force claim (Fifth Cause of Action). *See* Amended Complaint, Dkt. 26, pp. 13-15. Such data, which Plaintiff did not even ask about when provided the opportunity, clearly does not provide any support for any supposed conspiracy or use of force.

### C. <u>High Speed Vehicle Pursuit Records</u>

Plaintiff's RFP No. 6 requested, <u>"All documents related to high speed chases involving Defendants for the last five (5) years."</u>

Per Plaintiff's Motion:

> *Defendants have produced only six (6) pursuit reports for Smith, Dillard, and Hodge, despite the fact that: (1) Smith testified he was involved in ten (10) pursuits while he worked for RCSD; (2) Hodge testified he has filled out somewhere between fifty (50) and one*

> *hundred fifty (150) post-pursuit reports on pursuits while he has worked for RCSD; and (3) Dillard testified he was involved in twenty to thirty (20-30) pursuits while he worked for RCSD. Plaintiff's rough math based upon the aforementioned testimony would yield, at minimum, eighty (80) pursuits, with a maximum of one hundred fifty (150) involving Smith, Hodge, and Dillard.*

This is yet another instance of Plaintiff's counsel failing to serve interrogatories or ask the correct questions of 30(b)(6) deponents, then blaming defense counsel for allegedly not having the full picture at this point in the litigation. The deputy who initiates a pursuit is typically the only one to complete a pursuit packet unless the initiating deputy falls behind or becomes less informed than other deputies based on later developments in the pursuit. *See* Affidavit of Jennifer Spurrier, ¶¶ 11-13, filed as an exhibit hereto. To find a specific incident report or pursuit packet, RCSD records can be searched using case number, date, or name. Searching by name may return reports authored by that deputy, reports listing that deputy as the initiating officer, or both. *Id.* Often, not all deputies involved in a pursuit are named. In fact, most incident reports and pursuit packets do not list every deputy involved, making it impossible to identify all pursuits in which a deputy actually participated. *Id.* Deputies in the RCSD K-9 Unit often join pursuits at higher rates than other deputies, as suspects fleeing by vehicle are likely to run on foot afterward. As a result, K-9 deputies usually participate in more pursuits than the average deputy. However, RCSD records do not necessarily reflect this higher level of involvement. *Id.* To be clear, in responding to discovery, RCSD performed a search of its system for pursuits involving Smith, Dillard, or Hodge and produced everything that the search returned. *Id.*, ¶ 6. Despite these qualifications, the Defendants still produced Bates L: Pursuit documentation for Defendant deputies (29 pages); Bates O: Pursuit

packets from 2018 to 2023 (7,441 pages[7]); and Bates Q: Professional Standards Annual Reports (107 pages).

### D. Individual Defendants' Discipline and Complaints

Plaintiff's RFP No. 3 requested, *"All documents of any complaints against any Defendant related to any high speed chase or any alleged violation of a constitutional right."*

Plaintiff's RFP No. 7 requested, "All lawsuits and/or claims made against Defendants for the last five (5) years related to high speed chases, tort claims, negligence claims, and/or 1983 actions/claims."

Per Plaintiff's Motion:

> *Defendants have also failed to produce documents related to the discipline of Smith, Dillard, and Hodge ... During Smith's deposition, he testified prior claims had been made against him for his actions as a RCSD Deputy. Despite Smith's testimony that he has had multiple prior claims made against him – which are related to his discipline[8] – Plaintiff has not received any such records. These claims pertaining to Smith are both relevant and discoverable and Plaintiff continues to be prejudiced by the lack of production by Defendants.*

In his deposition, Matthew Smith testified as follows:

Q:     Has anybody ever sued you before?

A:     No, ma'am.

Q:     Have you ever had any ***claims*** made against you that [ ] didn't turn into ***lawsuits***?

A:     Yes.

Q:     What prior ***claims*** have been made against you?

---

[7] Again, these documents comprise all pursuit packets during the stated years, which removes any technical limitations from the equation.

[8] Plaintiff's RFP No 2 did request documents relating to any discipline of the deputies involved. Defendants responded by producing the deputies' personnel files, which would contain any record of discipline against them. Plaintiff never indicated that this response was inadequate and filed no motion to compel.

A:     I don't know verbatim the case, but I have had some ***complaints***.

Q:     What did they involve?

A:     I don't recall.

Q:     You don't remember any details?

A:     I don't recall.

Smith and opposing counsel conflate the terms "claim" and "complaint." To a law enforcement officer, and in police parlance, these terms are often used interchangeably to refer to a citizen's complaint or an internal administrative report, such as when an officer files a complaint against another officer. (To an attorney, claims and complaints may be legal terms of art.) In this sense, a complaint does not necessarily mean that, after investigation, it was sustained or deemed founded. Thus, many "complaints" against a deputy may not result in any discipline. In any event, despite Plaintiff's counsel's conjecture, it does not mean that Smith was ever disciplined.

### E. **Defendants' willful failure to produce records in electronic format**

Per Plaintiff's Motion:

> *On May 5, 2025, Defendants provided their Third Supplemental Response to Plaintiff's First Requests for Production at 4:02 P.M. That day, after 4:00 P.M., Plaintiff received three banker boxes from NOVA Copying Services ("NOVA") at her office containing approximately eight thousand eight hundred sixty-three (8,863) pieces of paper in response to this Court's Order compelling Defendants to fully and completely respond to Plaintiff's Requests for Production 1, 3, 6 and 7.*

As an initial matter, the Richland County Sheriff's Department ("RCSD") Professional Standards Division ("PSD") furnished defense counsel with the pursuit documents strictly in paper

form (*i.e.*, 7,441 pieces of paper).[9] *See* Declaration of Adam Bruyere, filed herewith as an exhibit. Defense counsel arranged for pickup at the RCSD Annex on Decker Boulevard. *Id.* These documents were placed in several banker's boxes in defense counsel's conference room.

Thereafter, defense counsel's law firm undertook a demanding, labor-intensive task involving Plaintiff's so-called "bad faith 8,863-page document dump," as nearly every PSD case contained multiple stapled pages, many of which were printed on both the front and back of the paper, which then had to be manually un-stapled and scanned (both sides). Defense counsel's staff generated distinct Bates sets for each category of documents and identified which portions of each document corresponded to specific requests. To preserve the integrity of the original documents, they were re-stapled and reordered, with the pages in exactly the same order as received. The Defendants absorbed the expense associated with this daunting project, which required three law firm employees, including two full-time paralegals, and took 36.7 hours to complete.[10] *Id.*

> *After this Court's Order compelled production, Defendants orchestrated an eleventh-hour "paper dump" of 8,863 mostly illegible pages while withholding the electronic files. [ ] Defendants instructing a vendor to withhold delivery until later business hours and to produce unreadable hard copies in black and white,[11] while withholding the electronic files, is not a mere oversight – it was a targeted strategy to obstruct discovery in defiance of this Court's orders and the Rules of Civil Procedure.*

---

[9] The response to RFP No. 6 for pursuit documents consisted of 7,441 pages and the response to RFP No. 7 was 1,422 pages, totaling 8,863 pages.

[10] Parenthetically, Plaintiff's firm has 462 employees operating in over 20 cities across the United States. Its Columbia office alone comprises 35 attorneys and at least 35 staff members. In contrast, defense counsel's firm has 6 lawyers and 3 full-time staff members.

[11] Given the high-volume job, the Defendants note that printing in black and white was far more economical than in color.

These accusations are categorically false, and opposing counsel either knows or should know that the Defendants have complied with this Court's Orders and the Rules of Civil Procedure. Per Plaintiff's September 23, 2024 Discovery Requests:

> <u>Definitions & Instructions:</u> H. "All documents requested for production are to be produced as kept in the usual course of business so that the electronic files in which they were located can be ascertained, the relative order of the documents within these files and how the files themselves are maintained."

> <u>Rule 34(b)(2)(E)(i), Fed. R. Civ. P., provides:</u>

> (E) *Producing the Documents or Electronically Stored Information.* Unless otherwise stipulated or ordered by the court, these procedures apply to producing documents or electronically stored information:
> (i) <u>A party must produce documents as they are kept in the usual course of business or must organize and label them to correspond to the categories in the request</u>

There are several reasons why there is no violation in this case. First, the Defendants acted in accordance with Plaintiff's instructions in her discovery requests. All paper documents were produced exactly as they are kept in the usual and normal course of business, allowing identification of the electronic files in which they were stored, their order within those files, and the organization of those files. Specifically, the documents were produced exactly as they were kept: organized in paper format, in roughly chronological order, and grouped by year. The documents were scanned exactly in the order they were stored.

Second, the Defendants fully complied with Rule 34(b)(2)(E)(i). The rule requires documents to be produced as they are kept in the ordinary course of business. In this case, the pursuit packets are kept in paper form, and that is the manner in which they were produced. Of course, the fact that the documents may also exist in another format (*i.e.*, entered into an electronic database) is of no import. The Rules do not require a party to produce documents in more than one

form. Plaintiff's requests and the governing rule dictated that the documents be produced as they were kept, and the Court's Order for production did not require a different format.

As indicated, defense counsel produced these documents as they are kept in the ordinary course of business. Paper documents were organized and labeled to correspond to the categories in the requests, separated into Bates sets, and the portion of each document that related to which request was identified. By way of explanation, because every pursuit undertaken by RCSD deputies is reviewed by PSD, the pursuit packet is usually considered complete only after it has been entered into the system (*see generally*, Spurrier Aff., ¶¶ 6, 9, 10 (describing different systems used by RCSD covered by the years requested), printed, assigned a PSD number, and reviewed by PSD. In those instances, there may be an electronic entry, but the final product -- which includes the PSD case file information and handwritten notations -- is kept and maintained on paper. Finally, defense counsel's task was grounded in quality control considerations. The application Bates numbers was to avoid any confusion about what defense counsel's office produced in this litigation, which could not have been done without first scanning the documents, applying the Bates stamp, and re-printing the documents.[12]

The documents were also produced in a reasonably usable format.[13] The only advantage of an electronic copy over a paper one is searchability. However, this is not a true difference, as a paper copy can also be made searchable by simply scanning the document and performing an

---

[12] This, as opposed to what may have been provided to the media (*e.g.* WIS-TV) via a South Carolina Freedom of Information Act ("FOIA") request. A FOIA production may omit certain documents or include redacted information in accordance with the statute's requirements and exceptions.

[13] An example of the opposite situation – such as an unusable format -- would be the producer randomly scattering thousands of responsive documents. Instead, the rule mandates that counsel organize them clearly, ensuring that each set directly references its specific requests. For example, five pages should correspond to request six, and 2,000 pages to request seven, and so forth, making it straightforward to determine which documents relate to each request.

optical character recognition (OCR) function through Adobe or similar, standard desktop software. Consequently, both formats offer the same capabilities, as a paper version can be adapted to match all functionalities of an electronic copy. Stated differently, the only thing Plaintiff can obtain from an electronic copy that is not available in a paper copy is nothing -- they can access everything. Defense counsel followed not just Plaintiff's instructions but also the letter and spirit of the rule, complying with all its parts.

Per Plaintiff's Motion:

> *The production of 8,863 pages in paper form was an intentional "poke in the eye" to Plaintiff and this Court. Defendants intentionally instructed NOVA to delay delivery until after 4:00 PM on the day the production was due (May 5, 2025), despite Defendants sending them to NOVA early in the afternoon of May 2, 2025.*

On Friday, May 2, 2025, at 2:26 p.m., defense counsel's paralegal, Adam Bruyere, sent the following email to the NOVA representative:

**From:** Adam Bruyere <adam@gslawsc.com>
**Sent:** Friday, May 2, 2025 2:26 PM
**To:** Columbia Desk <columbia@novaoffice.net>
**Subject:** Copy job/delivery: Baker v. RCSD

Our file: Baker v. RCSD

Rebekah, as we discussed over the phone, I have uploaded 10 PDFs of bates stamped records (BAKER-O0001 to 7441) to a shared folder in OneDrive, and the link to access them is below.

Please print these records in black and white and have them delivered to Burr & Forman on Monday after 4 PM.  I will send you a letter on Monday to include with the delivery.

Mr. Bruyere, on defense counsel's behalf, spearheaded the production of two large document batches as set forth in the Monday, May 5, 2025, deadline. On Friday, May 2, Mr. Bruyere spoke by phone with the NOVA representative, followed by an email confirming instructions for completing the job. By that Friday afternoon, he had finished organizing the 'Bates

16

O' batch, consisting of 7,441 pages, and sent it to NOVA. He was still compiling and finalizing the 'Bates P' batch, which included lawsuits. The final submission would comprise both the Bates O and Bates P batches, accompanied by a service letter that could not be drafted until he finished compiling, reviewed, and Bates-stamped both. Aware that his work on Bates P batch would continue into Monday and that the letter would be the final item, Mr. Bruyere requested that NOVA delay submission until late Monday afternoon, giving him ample time to complete the compilation and production properly for hand delivery.[14] *See* Bruyere Declaration.

On May 6, 2025, Plaintiff sent the following formal correspondence to defense counsel:

> *[I]t appears that these documents were stored electronically and then sent to a third-party printing service for production, rather than providing them as they were maintained. [ ] If Defendants fail to produce these documents via electronic transmission by close of business today [as well as] requir[ing] that you provide a complete written explanation of Defendants' actions to me, [ ] we will move the Court for sanctions for failure to comply with the Court's Orders and for costs and attorney's fees necessitated by this proceeding.*

Upon receipt of the letter, the undersigned telephoned Attorney Jones. He explained that the documents are not maintained at RCSD headquarters but are kept in paper form at an off-site location and that they were produced in the format in which they were stored in the ordinary course of business. Specifically, the documents were hand-delivered to defense counsel in banker's boxes. Undersigned then explained that defense counsel's firm made a substantial effort and incurred expenses to have these scanned and copied at 600 DPI (above the standard resolution for greater clarity and detail). The undersigned further explained that if any PDF page is not fully clear or readable, it is likely because the stored copy/original was not fully legible for whatever reason.[15]

---

[14] Of course, the Court's order regarding production did not specify a particular time of day for production. It simply set a date by which responses were due, and that date was met.
[15] Pursuit packets for the year 2018 are largely handwritten.

If they want to inspect any originals that were not sufficiently legible, defense counsel would be happy to make these available for inspection. Otherwise, defense counsel's firm invested significant time and effort in converting these paper documents into digital format, adding Bates numbering, and printing them.

In the months following the May 6, 2025 phone call, no one from Plaintiff's counsel's office followed up with defense counsel with any questions or concerns, or requested to inspect the original documents. Of course, permitting the inspection of the documents themselves, which remained in defense counsel's office throughout discovery for such an eventuality, is itself sufficient to comply with Rule 34 and the Court's Order. *See* Rule 34(b)(2)(B), Fed. R. Civ. P. It is also telling that despite the May 6, 2025 threat to file a motion regarding the manner of production, no motion materialized until nearly a year later. This is because the manner of production, which complied with the rules, had absolutely no impact on Plaintiff's ability to litigate this case.

By way of additional explanation, although incident report and pursuit packets are filled out and related information is stored electronically (through several systems over the years covered), the requested documents are not reasonably available in electronic format when it comes to bulk production. As set forth in the attached affidavit of Jennifer Spurrier, producing the electronic versions of pursuit packets, one would have to manually identify and select each pursuit from the database, click on that document, and save a local copy of that document. *See* Spurrier Aff., ¶ 10. This would have to be done for every single one of the more than 2,000 pursuits during the stated timeframe. *Id.* It would also have to be repeated across the three different databases used by RCSD during that timeframe. There is no mechanism to bulk-select and bulk-export documents in these systems. For these reasons, counsel elected to produce them as they are kept in the ordinary course of business (paper) as the rules require. In any event, what Plaintiff claims is "clearest

18

example of Defendants' bad-faith actions in discovery," Dkt. 57-1, p. 31, was compliant with the

rules and provides no support for allegations of bad faith.[16]

## II.  **Intentional Discovery Abuses**

### A.  **Defendant Lott's Failure to be Fully Deposed**
Per Plaintiff's Motion:

> *Plaintiff requested to start the depositions at 9:30 a.m., but Lott represented he was <u>not available</u> until 10:00 a.m. A review of the RCSO's FB page reveals that Lott was "<u>not available</u>" until 10:00 a.m. .... [ ] Lott's deposition began a little after 10:00 a.m.*

On August 12, 2025, counsel agreed that Sheriff Lott would be deposed on September 4,

2025. The email exchange between offices is as follows:[17]

| Golding: | Hello Adam -- Lott's video deposition will start at 9:30 am on Thursday September 4.  thanks Henri |
| Bruyere: | Would it be possible to begin at 10 o'clock? |
| Golding: | Adam -- I bet it is an attorney who wants the deposition to start at 10 am. I'm ok with 10 am at Burr office. Henri |
| Bruyere: | Thank you for accommodating him. |

*See* August 12, 2025 Email, filed as an exhibit hereto.

It is the defense counsel's usual preference to begin depositions no earlier than 10:00 a.m.,

if feasible. In this case, defense counsel was informed that the Sheriff also preferred to begin at

10:00 a.m. on that date. Counsel was not advised of the reason. More importantly, at no time did

counsel or the Sheriff indicate **that he was unavailable** before 10:00 a.m.

---

[16] Plaintiff also states that she was forwarded a link to the scanned copy of the documents generated by defense counsel, which is itself an independent reason her arguments lack merit.

[17] Plaintiff did not include this email exchange as an exhibit, presumably because the actual facts have taken a back seat to her preferred narrative.

The Sheriff's deposition began at 10:03 a.m. It opened with an unnecessary and derisive comment by opposing counsel directed at the Sheriff.

> Q:     [A]s you walked in, you walked by Pamela Baker, the plaintiff in this lawsuit. As you walked in, you did not introduce yourself, nor did you ask Ms. Baker's name. So I'm at this time going to introduce you to the victim, and that's Pamela Baker. Have you reached out to her any time before today?
>
> A:     [ ] Not that I'm aware of.
>
> Q:     Why not?
>
> A:     I just did not.
> Q:     Did anything prevent you from reaching out to the victim?
>
> A:     No, ma'am.

*See* Excerpts from the Deposition of Sheriff Lott, p. 6, filed as an exhibit hereto.

The Sheriff entered a large conference room already filled with at least seven people for his deposition. He did not speak directly to anyone before going on the record. Opposing counsel knew he would not have had the opportunity to make personal introductions, as a deponent is usually, as was the case here, led directly to his chair, flanked by a videographer and a court reporter, in a room full of lawyers. Moreover, opposing counsel knew that her preservation letter (dated February 26, 2024) was sent to the Sheriff's representative about a month after the collision, and by the time of their deposition of the Sheriff, Plaintiff had been represented by counsel for 19 months. It would be unethical and inappropriate for a party-Defendant to attempt to contact an opposing litigant. Opposing counsel, learned counsel with nearly 50 years of practice, intentionally set out to embarrass and harass the Sheriff and did so in a formal setting while being videotaped (*see* Rule 26(c)(1), Fed. R. Civ. P.).

Per Plaintiff's Motion:

> *Approximately 2.5 hours into the deposition, defense counsel stated that it had "come to (defense counsel's) attention that the Sheriff is*

20

> *needed back at the RCSD headquarters. Upon review of RCSD FB*
> *page, Plaintiff discovered Lott left the deposition to host a press*
> *conference. Lott leaving the deposition on the pretext that he was*
> *"needed" at HQ was false ...*

The Facebook link in Plaintiff's Motion does not reference a September 2025 press conference. Assuming a press conference had been scheduled, it was reasonable for the Sheriff or his staff to consider it necessary for him to return to headquarters, since keeping the public informed about whatever he had to address at a press conference is a proper part of an elected official's job. The more complete exchange between counsel is the following:

Garfield:     It's come to my attention that the sheriff is needed back at the Richland County Sheriff's Department headquarters. We're going to have to take a hard stop, and I was going to say, you know, in the next half hour. And then I understand Ms. Golding made an assertion that we have not provided [ ] some type of written discovery, and I'd just like to know what that is.

Golding:     Okay. I'll have to provide that to you a little bit later.

Garfield:     Well, I'm not going to [ ] agree to hold anything open or anything on that note. [I]t's my information that we have responded [to discovery]

Golding:     [ ] On request of defense counsel, we are now adjourning this and we'll pick this up.

Spreeuwers:     Plaintiff's counsel. [ ]

Golding:     No. No. [Mr. Garfield] requested we adjourn and take a hard stop in 30 minutes. We can't do that.

Garfield:     Well, in 30 minutes.

Golding:     We can't do that. I have to continue [the deposition]. There's more to this deposition than that, so we have to adjourn at this time. Over half of it's done but I can't complete it in 30 minutes.

Garfield:     [Are you] saying that you need to stop now and not use the next 30 minutes because we owe you discovery or just because it's more convenient for a hard stop right now? Because we're good until, I think, 1:00.

Golding:     No -- well, all of the above. How about that, okay?

21

*See* Excerpts from the Deposition of Sheriff Lott, pp. 109-10.

At 12:27 p.m., the undersigned stated that the Sheriff was needed (after already going 2.5 hours without a break) and informed opposing counsel that the deposition should end at 1:00 p.m. Defense counsel repeatedly offered to continue the deposition for about 30 more minutes, but opposing counsel firmly declined and ended it immediately. Subsequently, the discovery deadline (with extensions) ran for an additional five months. Throughout this period, Plaintiff's counsel never served the Defendants with interrogatories or any additional written discovery requests. Plaintiff never sought to reconvene the deposition. Additionally, Plaintiff's counsel never explained to defense counsel the discovery deficiency that had supposedly justified not asking the Sheriff further questions.

Plaintiff also complains in her motion that defense counsel "chuckled" during the Sheriff's deposition when he was questioned about the production of paper documents. Dkt. 57-1, p. 31. While the undersigned recalls Mr. Spreeuwers scoffing at the question, the distinction is not relevant. Whatever sound Mr. Spreeuwers made, it was because Plaintiff's counsel misrepresented the facts to the Sheriff in the question she asked. Specifically, Plaintiff's counsel asked the Sheriff if he knew that his lawyers "produced three banker boxes of lawsuits relating to high-speed chases, lawsuits against the Richland County Sheriff's Department?" *See* Dkt. 57-24, p. 119, ln. 107:1-8. As indicated by the undersigned counsel's resulting objection, this was an untrue statement, as the vast majority of the documents produced (7,441 of 8,863) were pursuit packets and not lawsuits against RCSD relating to pursuits as she intimated. Moreover, the documents relating to lawsuits against the RCSD or the Sheriff included more than just pursuit cases (excessive force, wrongful arrest, etc) as Plaintiff had sought. This is another example of how Plaintiff's counsel was more

22

interested in confronting or embarrassing the Sheriff than in seeking the truth. Again, the true facts take a back seat to the narrative.

### B.  **Defendants' Failure to Produce Records Regarding Pringle**

Per Plaintiff's Motion:

> *Defendants have failed to produce all relevant, discoverable information 'related to Byron L. Pringle.' Defendants have slowly produced information regarding Pringle only when prompted by Plaintiff. They also continue to withhold highly relevant information related to the arrest and decision to release Pringle to go home.*

The timeline of discovery pertaining to Byron Pringle offers valuable insights.

February 6, 2024:    Opposing counsel sent a preservation letter to the Sheriff's representative. In this correspondence, there is no mention of Pringle's prior arrest history.

June 27, 2024:    Plaintiff's state court Complaint contains a singular reference to an LCSD and/or RCSD arrest of Pringle on February 20, 2023.

September 23, 2024:   Plaintiff's RFP sought "All documents related to Byron Pringle."

November 15, 2024:    The Defendants produced numerous incident reports regarding Pringle. The reports, totaling 102 pages, covered 26 RCSD-Pringle interactions from 2002 to 2023. The reports also include events from December 20 and December 29, 2023.

March 27, 2025:    Plaintiff filed her Amended Complaint in this Court. For the very first time, Plaintiff contends that the Defendant Sheriff's actions or inactions on December 20, 2023 were part of her theory of the case.

April 14, 2025:    The Defendants filed their Answer to the Amended Complaint. The Defendants admitted that RCSD arrested Pringle on December 20, 2023.

April 25, 2025:    Opposing counsel's email asked the Defendants to produce "all records in your possession regarding Pringle' December 20, 2023 arrest.

April 29, 2025:    Opposing counsel's email asked the Defendants to produce Abdullah's BWC video from December 20, 2023.

Plaintiff's Motion:

> *On April 25, 2025, Plaintiff notified Defendants of the deficiencies in production of documents pertaining to the arrest and subsequent*

> booking on December 20, 2023 of Pringle. [ ] Plaintiff's request for this missing information was highly relevant, as Defendants' conscious choices[18] 9 days prior to the pursuit were the catalyst for Plaintiff's catastrophic injuries.

The first time Plaintiff's counsel informed defense counsel that the December 20, 2023 encounter/arrest was "highly relevant," much less "the catalyst for Plaintiff's catastrophic injuries," was on March 27, 2025, when Plaintiff filed her Amended Complaint. Despite having the December 20, 2023 RCSD incident report in their possession for 18 weeks (via the Defendants' November 25, 2024 written discovery responses), Plaintiff's counsel made no mention of December 20, 2023 nor did they serve a single interrogatory concerning that event during that time. Therefore, prior to late March 2025, Defendants were completely unaware that Plaintiff intended to advance a narrative that the December 20, 2023 event was "highly relevant" to causation.

From the defense counsel's perspective, the only materials they had regarding Pringle consisted of approximately 26 incident reports spanning from 2002 to 2023. Specifically, the sole information concerning December 20, 2023 was Deputy Zaid Abdullah's narrative in his incident report, *to wit*:

> The subject was then handcuffed and walked towards a patrol vehicle. While [Abdullah] was walking Pringle to the patrol vehicle, he dropped an additional baggie on the ground. Pringle was arrested for multiple narcotics charges and his vehicle was towed by Midlands Auto and the puppy was transported by Animal Control to Shelter. The narcotics were bagged and submitted into evidence at RCSD HQ.

---

[18] This is another example of Plaintiff trying to mislead the Court. The three individual deputies named as Defendants (Smith, Dillard, and Hodge) had no involvement in or knowledge of the December 20, 2023 arrest of Pringle.

Thus, at the time the Defendants filed their Answer to the Amended Complaint on April 14, 2025, the only fact that defense counsel could reasonably admit was that Pringle had been arrested on December 20, 2023. *See* Dkt 33, ¶ 17 ("[T]he Defendants admit upon information and belief that on or about December 20, 2023, the RCSD placed Byron Pringle under arrest."). Defense counsel had no unique insight into the December 20, 2023 event beyond the information provided in the 100+ pages of documents produced relating to Pringle's 25+ other arrests by RCSD dating back to 2002. When Plaintiff's counsel emailed to follow up concerning their request for things like fingerprints, jail intake information, intake officer observations, and documents relating to Pringle's release from the detention center, counsel's email specifically stated, "if you are not in possession of these records please identify who is in possession of these records." *See* Dkt. 57-16, pp. 2-3. While Mr. Spreeuwers had no information as of April 25, 2025 concerning whether Pringle actually ended up in jail on December 20, 2023, he responded to Plaintiff's counsel's email shortly thereafter advising Plaintiff's counsel that the "jail is run by Richland County and not the Sheriff, so you would have to ask the County for any documents relating to his booking, fingerprints, photographs, jail intake, jail release, property release, etc." *Id.*, p. 2. In other words, Plaintiff was seeking documents from the jail, which is run by Richland County, not the Sheriff, so Plaintiff should seek that information from the jail, not the Sheriff. In accordance with Plaintiff's counsel's request, defense counsel directed Plaintiff's counsel to the entity that would be in possession of any such documents. The responsive email from Mr. Spreeuwers expressly did not represent or suggest that any such documents existed and certainly did not suggest or intimate that Pringle had, in fact, ended up at the jail that night. This was because discovery had not progressed to the point that the question was answered, and the fact that Pringle did not actually end up in jail that night was not known to the undersigned or Mr. Spreeuwers in April 2025.

25

In the weeks that followed, Plaintiff's counsel finally got around to pursuing information regarding December 20, 2023. On April 25, 2025, opposing counsel informally asked defense counsel (via email) for "all records in your possession regarding Pringle's December 20, 2023 arrest." Four days later, opposing counsel followed up by emailing defense counsel to request Abdullah's December 20, 2023 BWC video.[19]

In May and June 2025, the Defendants worked with limited information concerning Pringle. All defense counsel could gather was that there was no paperwork regarding transportation or booking into the ASGDC on December 20, 2023. Although Pringle had roughly two dozen bookings at Alvin S. Glenn Detention Center ("ASGDC") and 80 adult charges, there was no information for December 2023. Per Plaintiff's request, defense counsel obtained and sent Abdullah's BWC to opposing counsel. By mid-June 2025, and based on Plaintiff's Complaint, her Amended Complaint, and Abdullah's BWC, it became apparent that Pringle had an active history with Lexington-based law enforcement in 2023. Given these facts, defense counsel hired a private investigator to delve into Pringle's 2023 interactions with LCSD, LCDC, and the Lexington Medical Center.

Plaintiff also had the opportunity to and did take the deposition of Deputy Abdullah in which he identified that the officer that had accompanied Pringle to the hospital that night was Deputy Sterling Morrow. Deputy Abdullah also identified another deputy involved, Colin Davis. Plaintiff never sought to depose either of these individuals (despite the fact that Colin Davis was

---

[19] In Plaintiff's Motion, she avers that "[o]n June 24, 2025, Defendants finally produced the body camera footage, despite it being requested by Plaintiff's initial discovery requests, nearly a year prior." This representation is misleading at best. In Plaintiff's initial requests, she broadly requested "all documents related to Byron L. Pringle." At no time did opposing counsel follow up with a Rule 11 letter, a supplemental discovery request, or even an email or phone call requesting videos before their April 29, 2025 email. Therefore, defense counsel had no reason to pursue the December 20, 2023 videos and, as a result, had no knowledge of what the videos depicted.

also the deputy and DEA task force officer that responded to the scene of the December 29, 2023

pursuit and would have had insight into the DEA's activities relating to Pringle). *See* Dkt. 55-1, p.

8 n. 8 (describing a supposedly "highly improbable tale" involving an unnamed DEA task force

officer).

Meanwhile, opposing counsel issued a subpoena to LCSD (which would include LCDC,

since the jail is run by the Sheriff) on April 24, 2025, and advised defense counsel that they would

provide copies of any responses they had received. **It was not until August 12, 2025** – four months

later -- that counsel received responses to subpoenas to LCDC and Prisma Health, and only then

did defense counsel for the first time piece together what had likely transpired prior to December

29, 2023. [*See* Statement of Facts ¶¶ 1 – 14].

––––––––––––––––––

In this action, Plaintiff contends that RCSD personnel were negligent on December 20,

2023, for failing to take Pringle into custody and ensure he was booked at the detention center. In

her Motion, Plaintiff points out that "RCSD did not take Pringle to ASGDC, but rather released

him to the Prisma Health Richland Hospital for treatment and then to be released to go 'home.'"

Plaintiff's police procedures expert criticizes the December 20 RCSD rotation for ignoring an

active bench warrant. (Pringle "had a warrant that was on file for failure to appear that, you know,

they knew about when he was released from the hospital on December 20th. And they didn't bother

to serve it …") Additionally,

> *after Plaintiff conducted the depositions of four separate*
> *deputies/former deputies and Lott, Defendants, on October 6, 2025,*
> *produced a document that purports to show a Bench Warrant for*
> *Failure to Appear [for Pringle] for which Defendants allegedly*
> *were engaging in the Pursuit. October 6, 2025 was the first time*
> *Plaintiff saw this alleged Bench Warrant. [ ] Defendants have*
> *ignored this Court's Orders by delaying production of responsive*
> *documents and [ ] willingly withheld the bench warrant, that*

27

> *purportedly supports their decision to pursue Pringle, until after the*
> *depositions of Smith, Hodge, Dillard, and Lott.*

As a threshold matter, at the early stages of discovery, on November 15, 2024, the Defendants provided the RCSD Computer-Aided Dispatch ("CAD") report for the December 29, 2023 pursuit that gave rise to this action. *See* Dkt 57-28. A portion of that report states the following regarding Pringle:

- WANTED ON GENERAL SESSIONS BENCH WARRANT G230961 FOR FAILURE T0 APPEAR [ ] FOR CHARGES OF ESCAPE, DRUGS AND LARCENY

- ORI IS LEXINGTON CO SO LEXINGTON 803 785-2400

- NIC/W353958585 DTE/20231229 1128 EST DLU/20231229 1128 EST

*Id*., p. 21.

A plain reading of this portion of the CAD report shows that Pringle was wanted on General Sessions Bench Warrant Number G230961 for failure to appear on multiple felonies, including escape, drugs, and larceny. A cursory Google search for "NCIC abbreviations" would have revealed each term, *to wit*: ORI: Originating Agency Identifier; NIC: NCIC Number; DTE: Date and Time of Entry; and DLU: Date of Last Update. The meaning of particular abbreviations in the NCIC information in the CAD report was also discussed at length during Defendant Smith's deposition. Thus, even a layperson, let alone Plaintiff's litigation team or their police procedures expert, should have been able to easily deduce that the LCSD was the originating agency that entered Pringle's bench warrant information on December 29, 2023, at 11:28 a.m. The pursuit of Pringle began at or about 2:22 p.m. (some three hours later).

Therefore, as early as November 2024, Plaintiff's counsel knew or should have known the following: (1) LCSD was the originating and primary law enforcement agency responsible for securing the relevant bench warrant against Pringle and that RCSD was not involved in this

capacity; (2) Because LCSD did not enter the bench warrant information until the morning of December 29, neither RCSD Deputy Abdullah nor any RCSD employee could have been aware of a bench warrant during their interactions with Pringle on December 20 and 21, 2023; and (3) Bench Warrant No. G230961 was issued for Pringle's failure to appear. It would have been filed and/or maintained at the Lexington Clerk of Court's Office.[20]

On or about September 27, 2025, defense counsel received a copy of the bench warrant from their private investigator, which he obtained from Lexington County. Prior to this date, the document was not in Defendants' or counsel's possession. This document was produced to Plaintiff on October 6, 2025. The timing of defense counsel's receipt and production of the bench warrant, and Plaintiff's lack of the document to question the Defendant deputies and the Sheriff (which was not Defendants' fault), is of no import. There is no evidence that the deputies were aware of this bench warrant prior to December 29, 2023. Plaintiff having the actual bench warrant would be significant only if Abdullah or other RCSD deputies were aware of it. Even so, Plaintiff never asked to reopen these deputies' depositions to ask about the bench warrant. For these reasons, the discussion concerning the bench warrant was not a violation of any rule or court order and Plaintiff was not prejudiced in this respect.

————————————

Per Plaintiff's Motion:

> [O]n March 5, 2026, Defendants emailed Plaintiff, seeking to supplement the record, with: (1) four different arrest warrants from 2023 for Pringle and (2) Pringle's 2023 ASGDC history. This intentionally delayed production is yet another example of Defendants' callous disregard and brazen indifference for this

———————————————

[20] To be sure, the Defendants cannot be blamed for opposing counsel's failure to seek a Lexington County-based bench warrant from the Lexington County Clerk of Court or LCSD where such warrants are stored.

*Court's authority, Plaintiff's right to develop her case, and the Federal Rules of Civil Procedure.*

In response to their incomplete and inaccurate statement of facts submitted in preparation for summary judgment, which was prepared without conducting the appropriate inquiries, defense counsel went back and sought and obtained additional information from the governmental entities responsible for maintaining records, namely the Richland County Clerk of Court and Richland County. This included five arrest warrants dated February 20, 2023, and a PDF memorializing this information. These documents were obtained on March 5, 2026, and sent to Plaintiff's counsel the same day. These records were equally available to opposing counsel as to defense counsel, had opposing counsel bothered to go to the right place. Rather than agreeing to supplement the record, which is what one would do if one were interested in the true facts, Plaintiff declined to supplement the record in an attempt to bolster their narrative of alleged bad faith. This is because they would prefer to harangue Defendants for their own failure to go to the correct entity for the documents they needed.

## C.  Interference with Depositions

Per Plaintiff's Motion:

> *Defendants' counsel throughout the course of the six (6) depositions taken by Plaintiff, objected continuously, withheld discoverable documents[21], and instructed witnesses not to answer, interrupting, impeding and attempting to help the witnesses to formulate answers. This is not proper advocacy, but is instead, a violation of the rules of Civil Procedure and the Rules of Professional Conduct. [ ] To illustrate, in the deposition of Abdullah, counsel objected thirty-one (31) times stating, "objection, relevance, . . . it's irrelevant, . . . it's vague, . . . vagueness, . . . asked and answered, . . . compound, . . . misstates the testimony, . . . it's vague and confusing, . . . lack of foundation."*

---

[21] Although Plaintiff cites no examples, the only example of a single document being withheld during depositions in this case is the single-page document referred to in Defendants' motion for protective order. *See* Dkt. 48.

30

The Defendants do not believe it is necessary to address the oft-repeated allegation of withholding discovery documents. *Supra*. Otherwise, with respect to the number and manner of objections, there is no violation of the Rules of Civil Procedure or the Rules of Professional Conduct. Despite Plaintiff's bald allegation that rules were not followed, the opposite is actually true. The Rules of Civil Procedure provide that "The examination and cross-examination of a deponent ***proceed as they would at trial*** under the Federal Rules of Evidence." Fed. R. Civ. P. Rule 30(c)(1) (emphasis added). Similarly, the Local District Rules provide in part that "Counsel's objections shall be stated concisely and in a non-argumentative and non-suggestive manner, ***stating the basis of the objection and nothing more.***" Local Civ. Rule 30.04(D) (D.S.C.) (mphasis added).

The Defendants assert that typical grounds for objections at trial include relevance, asked-and-answered, compound question, vagueness, and lack of foundation. This conforms to the letter of Fed. R. Civ. P. Rule 30. Also, counsel stating the grounds of the objection and nothing more are clearly not "speaking objections," nor are they objections that suggest a particular answer.

In Plaintiff's Motion, she alleges that: *"[i]n the 30(b)(6) deposition of RCSD, five individuals were presented as designees to testify on behalf of RCSD. Counsel [ ] objected approximately forty-eight (48) times, improperly asserting questions were outside the scope of the notice."* However, these objections were necessary because Plaintiff's counsel failed to either properly consider and draft the topics on which they actually wanted to ask questions or failure to adequately prepare to question on the topics actually noticed.

Asserting objections to questions outside the scope is both commonplace and completely permissible. *See e.g. Detoy v. City & Cnty. of San Francisco*, 196 F.R.D. 362, 367 (N.D. Cal. 2000) ("If Defendants have objections to either questions outside the scope of the 30(b)(6) designation

or a question whether certain conduct falls inside or outside Departmental policy, counsel shall state the objection on the record and the witness shall answer the question, to the best of the witness's ability."); *see also Goodyear Tire & Rubber Co. v. CEVA Logistics Singapore, Ltd.,* 348 F.R.D. 54, 73 (E.D. La. 2024) ("If the examining party asks questions outside the scope of the Rule 30(b)(6) deposition notice, the corporation is under no obligation to have prepared the designee to answer the question. ); *see also Jones v. Dow Chem. Co.,* No. 1:23-CV-11814, 2024 WL 5004323, at *7 (E.D. Mich. Dec. 6, 2024) ("[W]hen the Rule 30(b)(6) deponent is asked a question outside the scope of the noticed topics [ ] the deponent must answer the question over their attorney's objection, **but** the answer does **not** bind the corporate defendant.") (Emphasis in original) Plaintiff's counsel might be displeased that defense counsel made multiple objections during each designee's deposition, but those objections were justified. Quite frankly, if Plaintiff's counsel preferred a smoother deposition with fewer objections, she should have been better prepared for the deposition and asked questions within the scope of the 30(b)(6) designations.

For example, Jennifer Spurrier was designated as a witness to testify on behalf of RCSD on two specific topics: "Identify and explain all records related to Byron Pringle and the contents of such records," and "Identify and explain all records related to Plaintiff's collision and injury and the contents of such records." Despite these narrow topics, Plaintiff's counsel persisted in asking Ms. Spurrier questions relating to RCSD's accreditation with the Commission on Accreditation for Law Enforcement Agencies (referred to in the transcript as SCALEA) and documents submitted to that entity in furtherance of accreditation. Only after the questioning, which was clearly outside of the scope of her designated topics, went on for several pages, *see* Dkt. 57-24, pp. 38-42, did defense counsel interpose the objection/question to Plaintiff's counsel cited in Plaintiff's motion, Dkt. 57-1, pp. 22-23. Defense counsel wanted to understand how long

32

the questions were going to continue in order to determine whether the deposition was being conducted in a way that crossed the line from unintentionally or briefly straying from the noticed topics into annoyance, harassment, or the like. *See* Rule 30(d)(3)(A), Fed. R. Civ. P., ("At any time during a deposition, the deponent or a party may move to terminate or limit it on the ground that it is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party."). In fact, the Rules expressly require an objection to be stated on the record. *See* Rule 30(c)(2) ("An objection at the time of the examination—whether to evidence, to a party's conduct, to the officer's qualifications, to the manner of taking the deposition, or to any other aspect of the deposition—must be noted on the record . . . ."). The objection in no way suggested an answer, nor was it otherwise improper under the Rules.

Plaintiff submitted 164 pages of deposition excerpts to the Court without discussing almost any of them, ostensibly shifting the burden to the Court to review and determine whether any were improper. *See, e.g.*, *Preis v. Lexington Ins. Co.*, 508 F. Supp. 2d 1061, 1068 (S.D. Ala. 2007) ("Parties may not, by the simple expedient of dumping a mass of evidentiary material into the record, shift to the Court the burden of identifying evidence supporting their respective positions."). Most of the objections were based on misstating the evidence in the question, compound questions, vague or confusing questions, or repeating questions that have already been asked. The Rules require that counsel state the basis for an objection, Local Civ. Rule 30.04(D) (D.S.C.). The purpose of stating the basis for the objection is to permit counsel an opportunity to rephrase the question to cure the objection and to provide the Court with a basis to evaluate the objection should it become necessary. *See Butler-Bohn v. Walmart, Inc.*, No. 7:22-CV-156-TMC-KFM, 2023 WL 11922158, at \*6 (D.S.C. Feb. 3, 2023) ("A review of the transcript shows defense counsel adopted the unfortunate practice of interposing an "object to form" to questions without

<u>specifying the specific defect</u> so as to allow the questioner to cure the objection – as is contemplated by the Rules . . . When 'objection to form' does not indicate what is wrong with the form so that the questioner can correct the problem, it becomes nothing more than a statement that the objector finds the question 'objectionable.'") (emphasis added).[22] The complained-of objections complied with the letter and spirit of the Rules by alerting Plaintiff's counsel to the problem with the questions and providing them with an opportunity to rectify them.

If Plaintiff's counsel held the genuine belief that defense counsel's conduct was blatantly violating the rules, such that the objections contained "explanatory narratives that rephrased the questions, thereby disrupting the flow of testimony and influencing the witness's answers," she should have pursued the remedy as set forth in the court rules. *See* Fed. R. Civ. P. Rule 30(d)(3) ("At any time during a deposition, the deponent or a party may move to terminate or limit it on the ground that it is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party."); *see also* Local Civ. Rule 30.04(I) ("If an objecting party or deponent demands, after good faith consultation [ ] that the deposition be suspended pursuant to Fed. R. Civ. P. 30(d), the assigned judge's office shall be contacted to allow that judge to resolve the matter telephonically, if possible.").

Plaintiff's counsel never sought such relief and instead proceeded with the depositions. Defendants have now realized that opposing counsel's methodology is to wait for months before asserting in a sanctions motion that defense counsel engaged in inappropriate conduct.

### III. <u>Defendants' False Representations and Delay Tactics throughout Discovery</u>

Plaintiff's Motion:

---

[22] In fact, Plaintiff's counsel objected during depositions in the same manner, albeit while yelling and periodically interrupting defense counsel mid-question. *See e.g.* Dkt. 57-24, pp. 154-59 (15 examples).

*Defendants' tactics and goals in discovery are clear: delay as long as possible, irrespective of the Federal Rules of Civil Procedure and directives of this Court, in an attempt to hide the truth and prejudice Plaintiff. [ ] It is blatantly clear Defendants have attempted to delay and deny Plaintiff relevant information at every turn of this lawsuit ...*

In her Motion, Plaintiff paints a grim and troubling picture of the Defendants and their counsel, contending that they acted in bad faith and with intentionality throughout this litigation. So much so that only the harshest penalty is warranted. In this Response, defense counsel have attempted, to the best of their ability, to address the numerous unfounded accusations of their alleged "strategic" and "intentional delay tactics" throughout the discovery phase. *See e.g.* Dkt. 57-1, p. 15 ("***After months of difficulty in scheduling depositions***, Plaintiff was ***finally able*** to obtain Lott's availability on September 4, 2025.") (Emphasis added).

By way of explanation (and without excuse), the 15-month discovery period was significantly and unusually affected by extenuating[23] and tragic personal circumstances affecting counsel. Attorney Jones, Plaintiff's lead counsel, was out of the office and/or unavailable from May 2025 to October 2025 -- a five-month span -- due to a family medical emergency. Furthermore, the undersigned's father passed away in June 2025, followed by the death of his sister seven months later in January 2026. During the December holidays, the undersigned's mother-in-law suffered a severe stroke. Consequently, the undersigned was able to work in the office only briefly during June 2025, December 2025, and January 2026.

Defense counsel brings these circumstances to the Court's attention because Plaintiff not only failed to mention them, even though Plaintiff's counsel were kept apprised of these exceptional circumstances every step of the way, but also asked this Court to punish Defendants

---

[23] This includes defense counsel's transition to a new law firm in late 2024 and early 2025.

35

and their counsel for alleged continual delays. The fact of the matter is that if Plaintiff's counsel revealed these hardships, many of which were unexpected and unplanned, it would undermine Plaintiff's narrative of defense counsel's supposed relentless and egregious conduct during the case.

## IV.  Application of the *Wilson* Factors

### A.  Bad Faith

Per Plaintiff's Motion:

> *Defendants' bad faith is apparent. Defendants' conduct reflects a calculated strategy to obstruct discovery. [ ] Plaintiff has no way of knowing what information has been withheld from her, and Defendants' behavior in strategically withholding and delaying the release of key information has prevented Plaintiff from being able to develop her case. Any attempt by Defendants to correct nearly two years of discovery misdeeds is too little, too late. This behavior throughout this prolonged litigation is definitive "bad faith.."*

An overview of the litigation timeline is most instructive. Plaintiff served written discovery requests on defense counsel on September 23, 2024. The Defendants responded on November 15, 2024, producing 750 pages of documents and nine police videos. On December 5, 2024, Plaintiff's counsel was dissatisfied with the production and served a deficiency letter pursuant to Rule 11.

On December 18, 2024, Mr. Spreeuwers spoke with Attorney Jones by phone. He explained that he and Mr. Garfield had resigned from Crowe LaFave Garfield and Bagley, LLC and, as of December 1, had formed the new Garfield Spreeuwers Law Group, LLC, though they did not yet have a physical office.[24] Mr. Spreeuwers then stated that defense counsel would seek

---

[24] It is common knowledge among lawyers that starting a new firm is a labor-intensive and time-consuming endeavor that typically requires acquiring or leasing a building, relocating, migrating client files to new practice management software, and managing the financial responsibilities associated with moving a book of business. Upon information and belief, some or all of this subject matter was disclosed to opposing counsel during calls in December 2024 and January 2025.

additional information and greater clarity from the client regarding how complaints are stored and categorized, which he specifically told her he would not be able to do until after the first of the year. He advised would follow up with Attorney Jones as he obtained more information on that front. Accordingly, defense counsel projected that their responses would be supplemented after the first of the year.

On January 3, 2025, Mr. Spreeuwers emailed Attorney Jenkins stating that he had been out of pocket during the holidays and hoped to have additional information the following week. Before that could occur on January 13, 2025, Plaintiff filed a motion to compel more complete discovery responses. One week later, on January 21, 2025, all counsel participated in a phone conference in an effort to resolve the discovery dispute. During that call, defense counsel explained that, while they were working from their residences because they had not yet moved into a new office[25], they were assiduously working toward supplementing discovery. Defense counsel also attempted to follow the Court's directive during this call to engage in a good faith effort to resolve the dispute. However, Ms. Jones obstinately refused to discuss any potential comprise in the scope of the disputed requests or the manner of their production. In fact, she essentially stated words to the effect of "no, I want everything and that's it," which shut down any efforts to come to any kind of resolution. This is another example where Plaintiff's counsel's approach to this case has stymied any kind of reasonable working relationship among counsel.

Ten days later, on January 31, 2025, Plaintiff filed a supplement to her motion alleging that:

> *Defendants have* **stonewalled Plaintiff's attempt at engaging in discovery** *and have further frustrated Plaintiff's attempts by* **deploying evasion and delay tactics**. *Upon information and belief, this evasive behavior is designed to not only stall Plaintiff's progress in unveiling the plethora of negligent actions undertaken by Defendants that ultimately resulted in catastrophic injuries to*

---

[25] The undersigned counsel did not move into an office space until the first week of March 2025.

> *Plaintiff, but additionally is an attempt to prevent this Court and the public from understanding the true depth of Defendants' negligent actions.*

(Emphasis added)

Thus, **as early as January 2025**, Plaintiff began a campaign of vexatiousness, accusing defense counsel of malicious and redressable conduct, specifically alleging that defense counsel "stonewalled Plaintiff's attempt at engaging in discovery" and "deploy[ed] evasion and delay tactics."[26] In other words, Plaintiff's counsel seized on a rather benign discovery dispute and began to manufacture bad faith by constructing a deceptive and inaccurate storyline. From that point forward, Plaintiff's counsel adopted a pattern of choosing the most malicious or negative interpretation of defense counsel's intent or actions, assuming the worst rather than considering neutral or positive explanations (which were expressly conveyed to them in the dozens of phone calls and emails throughout the litigation).

Continuing to advance her storyline, throughout the 2025 calendar year, Attorney Jones wrote the following letter[27] to defense counsel on November 12, 2025:

> *I am preparing to file a Rule 37 motion against the defendants for failure to comply with the Court's prior Orders, ECF 19 and 32, and the delays in producing the documents related to Byron Pringle, training videos, high-speed chases, the 8863 pages from NOVA that you had in a link, the Annual Reports, Tri Tech records, Professional Standards Reports and underlying data, desk sergeant reports, Deputy Advisory Committee (DAC) meeting records, and Lott's walking out of his deposition to host a press conference; also the representations directing us to the detention center for Pringle's 12/20/2023 arrest records and representing that records are not maintained in electronic format. I am seeking all costs and attorney's fees associates [sic] with these issues and/or the striking*

---

[26] Plaintiff's counsel used the exact same language 14 months later in their instant Motion, accusing defense counsel of "blatantly stonewalling Plaintiff's discovery efforts" and "employing blatant delay tactics ..."

[27] This letter was neither referenced in Plaintiff's Motion nor included as an exhibit. *See* November 12, 2025 Letter, filed herewith as an exhibit.

> *of Defendants' Answer. I am happy to consult to resolve any of these items, but the cost to cure these deficiencies is and will be significant.*

On November 13, 2025, the undersigned initiated a teleconference with Attorney Jones for the following day to discuss these issues. Attorney Jones provided her cell number and a time frame when she would be available to speak. Prior to the call, the undersigned made adequate preparations and was ready to discuss the list of purported deficiencies and work toward resolving the issues. While there was agreement to amend the scheduling order, Attorney Jones was not prepared to discuss the items on her list that she contended were insufficient. Despite her written assurance that she would be "happy to consult to resolve any of these items," she was unprepared to do so during the pre-scheduled 19-minute telephone call. She assured the undersigned she would follow up once she had the information in front of her. That call never came. The next time much of this subject matter was raised was in Plaintiff's Motion four months later.[28]

In her motion, in which Plaintiff attempts to reframe an entire 15-month period of discovery as, and any resulting shortcomings in Plaintiff's case, as defense counsel's fault. Defendants submit that any such shortcomings were not actually violative of the Rules or the Court's Order, were the result of inadvertence as discussed below, or were wholly immaterial to the merits of the claims in this case. Defendants have bent over backwards to provide the needed discovery and respond in a relatively timely fashion to every concern raised by Plaintiff's counsel.

Defendants also submit that many of the supposed shortcomings were actually the result of Plaintiff's counsel not having handled the case effectively, failing to ask the right questions or to focus on discoverable, relevant material. The information she believes exists might not actually

---

[28] In light of Plaintiff's allegations of unconscionable conduct and bad faith, the Defendants respectfully point to the equity axiom that, "[S]he who comes into equity must come with clean hands."

be available in that form. Plaintiff's counsel has, throughout this litigation, sanctimoniously engaged in hardball tactics and falsely accused defense counsel of ethical breaches or discovery violations at every turn to gain a tactical advantage. What else might explain suing the deputies individually, asserting a profoundly weak Fourth Amendment claim in the absence of a seizure, or of a frivolous race-based Section 1985 conspiracy claim in light of the facts?

**B.  <u>Prejudice Incurred by Plaintiff</u>**

Plaintiff has not been prejudiced in this litigation. Quite simply, Plaintiff has been more interested in making the discovery process painful and in employing burdensome discovery production than in finding the truth. This is precisely the kind of scorched-earth discovery tactics decried by the South Carolina supreme court in the *Oncology* case cited above where the cottage industry of drowning opposing counsel in needless discovery has relegated the merits of a case to the back seat.

Perhaps the best indication that Plaintiff has not and cannot demonstrate any prejudice, aside from repeatedly and baldly claiming prejudice, is the fact that Plaintiff never filed a motion to compel relating to anything other than the requests to produce addressed in this Court's February 2025 order. Despite threatening such motions during discovery, she did not file any motion relating to discovery until several months *after* fact discovery was closed. This plainly violates the letter and the spirit of Local Civ. Rule 37.01(A) ("Motions to compel discovery must be filed within twenty-one (21) days after receipt of the discovery response to which the motion to compel is directed or, where no response has been received, within twenty-one (21) days after the response was due."). This intentionally prevented the Defendants and the Court from addressing the issues in a timely fashion. The result is that the Court and Defendants are now faced with reconstructing 15-months of discovery long after the subject events. If there is any obvious purpose in Local Rule

37.01, it is to require a party to act with some diligence in bringing matters to the Court and to opposing counsel's attention (consistent with counsel's obligations under Rule 11, Fed. R. Civ. P.) in a timely fashion so issues can be addressed and resolved as they arise. Plaintiff was never interested in resolving any issues during discovery in this case. Rather, she was concerned with advancing her own narrative. At a minimum, Plaintiff's lack of attempt to comply with Local Rule 37.01 demonstrates that she never actually needed any of the discovery she now claims is missing.

Additionally, Plaintiff's counsel conducted all 12 of her depositions without ever asking the deponent about the content of any of the 8,863 pages or making any of these documents exhibits. Opposing counsel has never identified a single page in these voluminous pursuit packets as illegible. Despite being specifically invited to do so, no one from Plaintiff's litigation team (*i.e.*, five counsel of record and multiple paralegals) has ever contacted defense counsel or Mr. Bruyere about any concerns or the legibility of the documents.[29]

The reason Plaintiff's counsel did not use these documents in discovery, the reason no deponent was questioned about them, and the reason the undersigned's office was not contacted about a single illegible copy is because these pursuit packets, PSD files (none of which involve the three defendant deputies), claims, and lawsuits are clearly not material to the allegations in this lawsuit. This is readily apparent to defense counsel, since throughout the litigation, opposing counsel did not hesitate to contact the three-member defense team (comprising the counsel below and a paralegal) by phone or email regarding even the most minimal aspects of the case. Here, Plaintiff's counsel merely needed to initiate a call, send an email, or even a text message, or return the calls they said they would return to discuss the issues, and their concerns would have been

---

[29] In fact, the entirety of these files was kept (and still remains) in defense counsel's office in the event any page needed to be pulled and darkened.

addressed. This never took place. The fact that it did not demonstrates that there is no prejudice to Plaintiff.

_____

Following the Sheriff's deposition, the discovery process continued for an additional five months. During this period, Plaintiff's counsel did not serve any interrogatories on the Defendants.[30] Moreover, Plaintiff's counsel did not notify defense counsel of any discovery deficiencies that might justify halting questioning of the Sheriff. Additionally, Plaintiff never contacted defense counsel to reschedule the Sheriff's deposition.

_____

According to Plaintiff's Motion, discovery has ended, and a number of questions remain unanswered after the conclusion of discovery. Plaintiff claims that this is the result of the Defendants deliberately and strategically hindering the discovery process and obfuscating the truth from Plaintiff and that she was prejudiced as a result.

Responding to Plaintiff's parade of absurdities, and purely by way of example, Plaintiff sought answers relating to numerous subjects from the various 30(b)(6) designees. A partial list of the topics as to which she questioned witnesses is as follows: (1) identify the type of discipline and/or counseling Smith received as a result of the pursuit; (2) describe the nature and manner of any actions undertaken by the PSD as a result of the December 29, 2023 pursuit; (3) identify and describe any and all distinctions between RCSD internal policies or protocols and the RCSD written policy and procedure guidelines; (4) list and describe any documents, records, and reports generated by RCSD (or in RCSD possession) related to Pringle; (5) describe the accreditation

---

[30] In fact, no interrogatory response has ever been disputed or subject to a motion. Neither have any of the

process and whether RCSD was accredited in any given year; (6) what is the status of Chris Duke's employment; (7) the type of records management system used (on any given date) to write and store incident reports.

Any of these questions could have been presented in the form of interrogatories throughout discovery, but Plaintiff's counsel chose not to. Instead, these questions were asked of the 30(b)(6) designees, often beyond the scope of the listed issues for examination. Then, when attempting to shoehorn an inappropriate and objectionable question to a designee, Plaintiff's counsel complained that the nature and form of the objection were improper and that it was carried out in bad faith and with malicious motives.

A prime example of Plaintff's unseriousness about the existence of documents is the argument in her Motion: *"[N]o: [ ] desk sergeant reports [or] DAC meeting minutes [ ] have been produced at this point. This information is clearly relevant and the fact that Plaintiff was denied and/or delayed this information until after key depositions were taken is highly prejudicial."*

Foremost, the Defendants admit that the desk sergeant reports and DAC meeting minutes have not been produced. Defense counsel apologizes for the oversight and the resulting inconvenience. However, the oversight was unintentional and inconsequential, causing no prejudice for the following reasons. Defendants also note that these documents were first requested from RCSD by way of a so-called "Rule 30(b)(5)" request that accompanied the Rule 30(b)(6) deposition notice that Plaintiff sent on October 14, 2025, which would make responses due by November 17, 2025. At the time the request was sent, discovery was set to close on November 28, 2025 (Dkt. 39). As Plaintiff's counsel was aware, having blind-noticed the 30(b)(6) of RCSD on 31 topics to take place on November 20, 2025 while the parties were simultaneously attempting to schedule expert depositions in November and December with no crossover in availability given

43

counsel's schedule and the holidays. Yet, Plaintiff never followed up on the requests as required by Rule 11 and Local Rule 37.01, indicating that they did not actually want or need the items.

During this same period, on November 14, 2025, the undersigned and Attorney Jones participated in a pre-scheduled teleconference. Attorney Jones was not ready to address the list of issues she considered inadequate. These specifically included the desk sergeant reports and DAC meeting minutes. She promised to reach out after reviewing the information, but that follow-up never happened. The issue was only revisited in Plaintiff's Motion four months later.

The DAC minutes are stored only on the intranet and are typically retained for only 6-8 months. Also, the desk sergeant reports are not what she perceives them to be. For instance, such a report might contain a single brief description of the events occurring in the same or a previous shift by a desk sergeant, who is a second-line supervisor managing the front desk at headquarters and has no personal knowledge of the relevant facts. That is the purpose and benefit of the multiple police videos. These would have been the kinds of things the undersigned would have wanted to discuss with Plaintiff's counsel, if she were prepared, and/or to bring to the court's attention, had she filed a motion to compel. Nevertheless, these documents are simply not relevant to this matter, and consequently, Plaintiff has suffered no prejudice.

Consider this: At any given time, when Plaintiff perceived that she was hindered in any way by defense counsel, she could have moved to reopen discovery for any limited or general purpose. She could have asked the Court to permit interrogatories or requests to admit. She could have asked defense counsel or the Court to reconvene a deposition. She could have sought the Court's guidance whenever she felt prevented from engaging in full and complete discovery. She did none of these things. There are only two sensible explanations. Either she never cared what additional discovery might yield, or she deliberately set up the Defendants by raising routine

44

document disputes as evidence of defense counsel's dishonest, malicious, or improper "bad faith" conduct. In either scenario, Plaintiff has not been prejudiced by any actions of defense counsel in this case.

### C. **Deterrence of Future Actions by Defendants**

In her Motion, Plaintiff argues that:

> *Defendants apparently believe they are above the law and the dominion of this Court [and that] [d]eterrence is necessary to protect the integrity of and respect for this Court's orders. [ ] Defendants have demonstrably made false representations to Plaintiff throughout the entirety of this case. Simply put, Plaintiff has no faith in any representations made to her by Defendants, as Defendants cannot be trusted ... [Therefore this] false and misleading representations discussed above – warrant striking Defendants' Answer and entering default in favor of Plaintiff.*

Here, Plaintiff accuses the Defendants of believing they are exempt from the legal rules or accountability that apply to everyone else. That the Defendants have made so many false and misleading representations -- to the detriment of the Court's integrity -- that they are now untrustworthy. As a result, she contends this Court should impose the civil equivalent of the death penalty by striking their Answer.

Speaking of one's belief that he is above the law, false representations, and disrespect for the integrity of the Court, the Defendants submit the following:

On April 25, 2025, opposing counsel emailed defense counsel requesting ASGDC records regarding Pringle's December 20, 2023 arrest. Defense counsel immediately responded, explaining that the detention center is operated by Richland County, not the Sheriff, and that opposing counsel would need to pursue any such information through the County. In Plaintiff's motion, she alleges that:

> [B]ased on Defendants' representations, Plaintiff sent a subpoena to
> ASGDC for Pringle's arrest and booking records. On May 9, 2025,

45

> Plaintiff received correspondence from Richland County Attorney Christopher Zeigler. Mr. Zeigler noted that Richland County/ASGDC did not have any records responsive to Plaintiff's request and directed Plaintiff to reach out to RCSD to obtain the information regarding Pringle's Arrest. Defendants were blatantly stonewalling Plaintiff's discovery efforts.

In what might be the most striking example of opposing counsel losing professional detachment and entering the realm of harassing litigation, Plaintiff's counsel, Ben Jenkins, and several other attorneys in Plaintiff's counsel's law firm filed a Notice of Appearance in Richland County Common Pleas on June 24, 2024, on behalf of Richland County, South Carolina, in the matter of *Zillow, Inc. v. Richland County* (2024-CP-40-03600). Thus, for nearly two years, Jenkins has been a lawyer representing Richland County, South Carolina.[31]

Ironically, or perhaps disturbingly, on March 19, 2025, Plaintiff's counsel, who was then actively representing Richland County, filed an Amended Complaint in this matter, adding Richland County as a party-Defendant. The Amended Complaint, filed without leave of this Court, alleged a Section 1983 Fourth Amendment violation against Richland County, contending that Richland County "allowed and condoned … practices … related to high speed chases and pursuits;" Additionally, that "Richland County acted with deliberate indifference and actual intent as to be the moving forces behind the actions of the Defendant deputies that caused Plaintiff's deprivation of her rights and injuries." And that Richland County "is liable to Plaintiff for actual damages." After this Amended Complaint was filed, and unaware that Burr Forman and Jenkins specifically were then representing Richland County, the undersigned sent an email to Ms. Jones explaining the reasons why Richland County would not be an appropriate party-defendant to this

---

[31] Referring back to the discussion at pp. 24-26, *supra*, concerning whether Pringle ended up at the detention center in December 2023, all Plaintiff's counsel would have needed to do to clarify the issue on their own would have been to call their own client—Richland County.

46

case because the County had no involvement in or control over the operation of the Sheriff's Department. *See* March 19, 2025 Email, filed as an exhibit hereto. Aside from Plaintiff's counsel concurrently representing the party they were attempting to (inappropriately) add as a party, they failed to undertake even basic legal research to determine whether a valid claim existed against their own client before filing the Amended Complaint. This despite the fact that one of Plaintiff's counsel from Birmingham, Alabama has been admitted *pro hac vice* ostensibly because of Section 1983 experience.

This Amended Complaint[32] was substituted by a later one filed eight days later, which conspicuously removed all references to Richland County. Among the extensive list of allegations against the Sheriff, RCSD, or their counsel -- such as "blatantly stonewalling Plaintiff's discovery efforts" to obtain information about the detention center -- it is staggering that the same counsel making the present allegations against defense counsel is the lawyer for the entity he inferred was complicit in withholding information.

Put differently, Jenkins, the lawyer who sues his own client (Richland County), then consults with a key client representative (County Attorney) in an attorney-client conversation, and then accuses defense counsel of playing fast and loose with Richland County departments, now asks this Court to find that defense counsel acted in bad faith in numerous alleged instances of "failure to disclose" and the withholding of critical information from counsel and the Court. In sum, opposing counsel attributes the discovery issues to defense counsel and their clients while intentionally concealing critical information from the Court in the current motion.

In any event, as set forth in detail above, defense counsel has attempted to act in good faith throughout this litigation, and many of the shortcomings about which Plaintiff complains are of

---

[32] Plaintiff's first Amended Complaint is still accessible via ECF.

her own making, are immaterial, or inadvertent. As such, they do not demonstrate bad faith. *Cf., Computer Task Grp., Inc. v. Brotby*, 364 F.3d 1112, 1115 (9th Cir. 2004) (finding bad faith where a party "engaged in a consistent, intentional, and prejudicial practice of obstructing discovery by not complying with repeated court orders and not heeding multiple court warnings.") (cleaned up).

### D. Less Drastic Sanctions Lack the Teeth Necessary to Punish this Behavior

The Defendants have not disregarded or failed to engage in the discovery process. During discovery, the Defendants have produced in excess of 11,200 pages of Bates-numbered documents, Incident and accident reports from December 20, 2023; Pringle's incident reports reflecting his long criminal history; complete personnel and training files for Smith, Dillard, and Hodge; pursuit reports for each of these deputies; LCSD and Lexington General Sessions documents concerning Pringle; the complete RCSD policy and procedure manual; training materials, PowerPoint files; years' worth of lawsuits and pursuit packets; PSD Annual Reports; Word and MP4 video files; and 10 BWC & dash videos, among responses to interrogatories and other requested information.

After Plaintiff's January 13, 2025 motion to compel and the Court's ruling on April 4, 2025, Plaintiff never filed another motion to compel related to any of the Defendants' discovery responses or to the objections made. Plaintiff never requested any assistance from the Court as to any discovery issues until her counsel filed the current motion, which was filed after the close of discovery and on the same day the Defendants filed their motion for summary judgment.

With respect to the voluminous written discovery requests, the Defendants worked diligently to provide the requested documents, to answer supplemental discovery requests, and to supplement their responses to address issues raised by Plaintiff's counsel, particularly under challenging circumstances throughout the litigation, especially in 2025.

There are certainly less severe sanctions that can cure any alleged deficiencies in discovery claimed by Plaintiff. For instance, the Court could order that one or more depositions be reconvened, even at Defendants' or counsel's expense. The Court could permit discovery to be briefly reopened for interrogatories, requests to produce, or requests to admit on certain topics. Of course, the Court can award fees or costs as a lesser sanction for discovery failures, especially where Defendants have at least substantially complied with their discovery obligations and any resulting prejudice has been minimal or non-existent as set forth herein at length. In any event, the Court has ample options available to it well short of striking an answer that would cure any deficiencies.

More importantly, to determine whether sanctions have teeth, it is only fair to consider the allegations against each Defendant separately. None of the three individually-named deputies or Sheriff Lott individually had any involvement whatsoever in the written discovery phase of this case. In fact, none of the individually-named deputies are even still employed by the RCSD. Similarly, none of the allegations made by Plaintiff in her motion concerning depositions relate to alleged actions or inactions by the individual defendants with the exception of the allegations concerning Sheriff Lott's deposition discussed above. In the event the Court concludes any sanctions are warranted, they should not be against these individual defendants.

In short, to the extent that defense counsel made missteps or errors along the way, any such acts or omissions were the result of good-faith mistakes, oversight, or reasonable legal interpretations. It was never defense counsel's deliberate intention to mislead Plaintiff. However, if the Court concludes that sanctions are warranted, the sanctions sought by Plaintiff are clearly disproportionate to defense counsel's conduct, especially because no real prejudice resulted. The Defendants respectfully submit that the Court's role is to correct errant behavior while maintaining

fairness to the litigants and counsel. As discussed throughout, that can certainly be accomplished in this case by simply denying Plaintiff's motion for sanctions because there was no sanctionable conduct. If, instead, the Court should find any sanctions warranted, far less drastic sanctions or cures will be sufficient.

## CONCLUSION

For the reasons set forth above, Defendants respectfully submit that Plaintiff's motion for sanctions should be denied in its entirety.

**By our signatures below, we hereby affirm that the factual assertions set forth in this memorandum are, consistent with Rule 11, Fed. R. Civ. P. and counsel's obligations to the Court, true and correct to the best of our knowledge.**

Respectfully submitted,

GARFIELD SPREEUWERS LAW GROUP

*/s/ Robert D. Garfield*
Robert D. Garfield, Fed. ID 7799
*/s/ Steven R. Spreeuwers*
Steven R. Spreeuwers, Fed. ID 11766
1220 Pickens Street
Columbia, South Carolina 29201
T: 803.830.5496
robert@gslawsc.com
steve@gslawsc.com

*Counsel for the Defendants*

Columbia, South Carolina
April 23, 2026

50