IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Pamela A. Baker,<br><br>Plaintiff,<br><br>v.<br><br>Leon Lott, individually and in his official capacity as the Sheriff of Richland County; the Richland County Sheriff's Department; and Deputies Matthew Smith, Michael Dillard and Bryan Hodge,<br><br>Defendants. | ) | Civil Action No.: 3:24-cv-04303-JDA |

**PLAINTIFF'S REPLY IN SUPPORT OF HER MOTION FOR PARTIAL SUMMARY JUDGMENT**

## INTRODUCTION

Plaintiff, by and through her undersigned counsel, respectfully submits this reply in support of her Rule 56 for Entry of Partial Summary Judgment filed with this Court at ECF 55.

## ARGUMENT

### I. This Court can determine the Defendants violated the Constitution as a matter of law without consideration of Defendants' qualified immunity.

Defendants' first argument—that Plaintiff's Motion for Partial Summary Judgment must be denied because she did not address their qualified immunity defense—reflects a misunderstanding of Plaintiff's Motion.

Plaintiff agrees with Defendants that the Court will not end this case if it grants Plaintiff summary judgment on the issue of *liability*—that is, whether the Defendants violated the Fourteenth Amendment. Qualified immunity is a separate issue that operates as an affirmative defense to damages. However, nothing prevents this Court from determining whether a constitutional violation occurred as a matter of law. Indeed, the qualified immunity inquiry itself requires the Court first to determine whether the plaintiff has alleged a violation of a constitutional right. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). Thus, courts are well within their discretion to grant plaintiffs partial summary judgment in § 1983 cases before addressing qualified immunity. *See, e.g.*, *Paton v. LaPrade*, 471 F. Supp. 166, 174 (1979). That is all Plaintiff's Motion seeks—judgment as a matter of law with respect to the constitutional violations.

### II. The deliberate indifference standard governs the Deputy Defendants' conduct because the undisputed facts prove the Pursuit was not an emergency.

Defendants contend that Plaintiff's claims against the Deputy Defendants should be judged under the intent-to-harm standard because the pursuit constituted an "emergent situation." *See* ECF 75, pp. 3–8. But, as explained below, the undisputed facts disprove Defendants' characterization

and show that Pringle's pursuit was not an emergency. And even if it had been an emergency, the Deputy Defendants created it.

As the Fourth Circuit held in *Dean for & on behalf of Harkness v. McKinney*, the intent-to-harm standard applies only "in rapidly evolving, fluid, and dangerous situations which preclude the luxury of calm and reflective deliberation." 976 F.3d 407, 415 (4th Cir. 2020). By contrast, "when an officer is able to make unhurried judgments with time to deliberate . . . , deliberate indifference is the applicable culpability standard for substantive due process claims involving driving decisions." *Id.* The undisputed facts show that the Deputy Defendants had the amount of time to deliberate sufficient to support the application of the deliberate indifference standard.

Unlike the split-second prison-riot scenario in *Whitley v. Albers*, 475 U.S. 312 (1986), or the substantially shorter pursuits in *Sacramento v. Lewis*, 523 U.S. 833, 837 (1998) ("For 75 seconds over a course of 1.3 miles….") and *Dean* ( "two minutes and fifteen seconds"), Deputy Defendants had both the quality and quantity of time to deliberate their course of conduct before and during the Pursuit, precisely what was missing in *Whitley* and *Sacramento*. As explained in Plaintiff's Response to Defendants Motion for Summary Judgment (ECF 71), the undisputed facts show:

> (1) no Deputy Defendant testified that this was an emergency; Opponent's Statement of Additional Material Facts, ¶¶ 1 & 2;
>
> (2) the Deputies had hours to plan for apprehending Pringle, having been contacted by the DEA task force officer "in the morning" before the pursuit began at approximately 2:16 PM; *Id.* ¶ 3;
>
> (3) Pringle posed no immediate danger before the pursuit began; *See generally* ECF 56, Exs. 6-9;
>
> (4) the chase lasted over four minutes, giving the Deputies multiple opportunities to terminate the pursuit; *See id.*, ¶¶ 14-41
>
> (5) supervising officers removed from the situation issued instructions over the radio, demonstrating the availability of calm and reflective deliberation; *See Terrell v. Larson*, 396 F.3d 975, 978 (8th Cir. 2005);

> (6) there was extensive communication between RCSD deputies and individuals from the Lexington County Sheriff's Department; *See Sauers v. Borough of Nesquehoning*, 905 F.3d 711, 715 (3d Cir. 2018) (finding the fact that an officer in a high-speed chase had time to relate what was occurring to the neighboring police department supported application of "deliberate indifference" standard over "intent to harm"); and
>
> (7) Pringle was well known to the Deputy Defendants and had been released from custody just days before, making later and safer apprehension substantially likely. Pl.'s Statement of Material Facts, ¶¶ 1-6.

Those undisputed facts are sufficient to determine that this was not an emergency situation as a matter of law and, therefore, that deliberate indifference is the governing standard.

Defendants next try to assert that the pursuit eventually became an "emergent situation" when Pringle drove the wrong way onto the interstate. This does not warrant applying a stricter standard of culpability. *See* ECF 75 p. 6 ("Clearly, at that inflexion point, there can be no reasonable question that the deputies were facing an emergent situation. The decision to continue the pursuit was objectively reasonable at that juncture for two principal reasons."). If, as Defendants imply, the Pursuit was not an emergency before that point, then the Deputy Defendants *created* the emergency by continuing to pursue Pringle on the interstate rather than terminating the chase—which they had ample time and opportunity to do before and after Pringle entered the interstate. A law enforcement officer cannot manufacture an emergency through their deliberate indifference and then invoke that emergency to shield themselves from liability.

Defendants further write about six "facts" to argue this case presents an emergency. *See id.* pp. 6–7. Notably, none of these "facts" are supported by a citation to evidence, which itself warrants disregarding the arguments upon which Defendants use these "facts." *See* Initial ECF 6, pp. 9-11. Additional specific issues with each of these "facts" are discussed below.

Defendants describe Pringle as a "known drug trafficker." ECF 75, p. 6. This is a clear mischaracterization. As Defendants acknowledge just a page prior, Pringle was merely a

"**suspected** . . . drug trafficker." *Id.*, p. 5 (emphasis added). Defendants' Statement of Material Facts cite no evidence of drug trafficking convictions, instead only describing Pringle's previously dismissed charges for drug trafficking and "warrants for Pingle involving trafficking" at the time of his death. *See* ECF 60 ¶¶ 4-6 & 19. Being charged with drug trafficking does not make a person a "known drug trafficker." *See generally* U.S. Const. amends. V and XIV. And previously dismissed drug trafficking charges certainly do not justify a conscious-shocking disregard for the safety of bystanders to pursue a fleeing suspect for failure to appear.

Similarly, Defendants write about "bags containing what was believed to be fentanyl" in Pringle's possession at the time of his death. ECF 75, p. 6. The Deputy Defendants certainly had no idea that Pringle possessed such a bag while they pursued him, so this "fact" is irrelevant in evaluating whether Pringle's pursuit was an emergency. *See Dean for & on behalf of Harkness v. McKinney*, at 415-16 (exclusively analyzing facts the officer was subjectively aware of).

Next, Defendants describe the Pursuit as "brief in duration and short in distance," allowing insufficient time "for deliberation, reflection, or unhurried judgments." ECF 75 p. 6. This description is inaccurate. The Pursuit was not "brief"—it lasted four minutes, about twice as long as the chase in *Dean for & on behalf of Harkness v. McKinney* and more than thrice as long as the chase in *Sacramento v. Lewis*, at 837. Moreover, Pringle's Pursuit travelled more than four miles—more than three times the distance travelled during the chase in *Sacramento v. Lewis*. *See id.*; Plaintiff's Movant's Statement of Material Facts (Doc. 56) ¶ 47. Finally, Defendants write:

> Frankly, if the deputies decided to terminate the pursuit when Pringle jumped the median and began driving against oncoming traffic on I-126, the deputies would have been subject to potential liability for failing to take action to stop Pringle and for failing to provide warning to the oncoming motorists.

ECF 75 p. 6. Defendants cite no legal authority for this supposed "potential liability." *See id.* Further, like Defendants' discussion of the "bags containing what was believed to be fentanyl,"

there is no evidence that the Deputy Defendants were aware of or considered this "potential liability" during the Pursuit. Thus, this unsupported "fact" is also irrelevant to determining whether Pringle's pursuit constituted an emergency for the purpose of evaluating the Deputy Defendants' culpability. *See Dean for & on behalf of Harkness v. McKinney*, at 415-16 (exclusively analyzing facts the officer was subjectively aware of).. Moreover, a casual viewing of the dashcam videos proves that the Deputy Defendants ***did***, in fact, "fail[] to provide warning to the oncoming motorists." The Deputy Defendants could not even see Pringle when he collided with Pam Baker. *See* ECF 56, ¶¶ 25-41. Thus, this post-hac justification for pursuing Pringle onto the interstate does not indicate that a higher culpability standard should apply either.With Defendants' irrelevant and misleading facts to the side, only two of the "facts" Defendants cited to show the Pursuit was an emergency remain. First, Defendants note that Pringle had a bench warrant for failure to appear. ECF 75 p. 6; ECF 60 ¶ 9; ECF 56 ¶ 28. The undersigned is unaware of any cases, and Defendants cite no cases from this jurisdiction or any other, holding that a bench warrant for failure to appear creates an emergency akin to a prison riot.

Second, Defendants claim that the deputies and supervising officer "recognized the need to stop Pringle by such means as a PIT maneuver" and "the deputies' continued pursuit with their blue lights and sirens provided warning to the oncoming traffic of the emergent situation that such traffic was approaching." ECF 75 p. 6. The fruits of their endeavors, Defendants claim, is seen from "the fact . . . that at least 73 motorists were able to get by Pringle on I-126 with no harm." ECF 75 p. 7. But again, Defendants cited no evidence in support of these claims. Thus, there is certainly no evidence that the reason why any of those 73 motorists avoided Pringle because of the deputies' lights and sirens rather than simply because they saw Pringle barreling towards them.

In the end, Defendants are left claiming Pringle forced their hand—that they had no choice but to pursue him onto the interstate:

> To do nothing but terminate the pursuit at that point would not have eliminated the risk of harm that Pringle posed to the oncoming traffic. He was driving the wrong way on a highway within a construction zone, and there is no evidence nor any reasonable factual basis for concluding that Pringle would have (or even feasibly could have) stopped his reckless driving at that instant.

*Id.* There is no logical reason to assume Pringle would have continued driving against the flow of interstate traffic if the Deputy Defendants had terminated their pursuit after Pringle entered the intestate. There is certainly no evidence supporting that assumption.

Instead, both common sense and the evidence indicates that Pringle drove onto the Interstate to escape the pursuing Deputy Defendants. Therefore, if the Deputy Defendants had terminated their pursuit after Pringle entered the Interstate, the most likely inference is that Pringle would have gotten off the Interstate himself or otherwise stopped his reckless driving. His ability to do so—despite Defendants protestations to the contrary—is self-evident from the dashcam video and again a matter of common sense. The video proves Pringle could have driven off the Interstate by driving the wrong way on the exit ramp he passed while on the Interstate. ECF 56, ¶ 45. Or, instead of crashing head-on into Pam Baker, Pringle could have stopped driving, exited his vehicle, and fled on foot.

## III. The Deputy Defendants' Conduct Shocks the Conscience Under Any Standard.

Even if this Court applies the intent-to-harm standard, Plaintiff is still entitled to summary judgment because the undisputed facts prove the Deputy Defendants intended to harm Pringle. These facts include Hodge declaring over the radio that Pringle was "going to get bit"; another deputy cheering "get him Hodge"; and the RCSD supervisor twice directing the Deputies to "take him out." ECF 56, ¶¶ 27, 36, 38-39, 42. Moreover, the Deputies admitted they intended to execute a PIT maneuver on Pringle while driving against the flow of traffic on a barricaded interstate—a

maneuver Hodge testified to performing "all the time" while serving in the military in Afghanistan. ECF 72, ¶ 4. Viewed together, these facts demonstrate the Defendants' intent to harm. Rather than wrestle with these facts, Defendants inaccurately and irrelevantly claim in their Response:

> "[Plaintiff] claims that the deputies had an 'intent to harm' Pringle once he was on I-126 because the order was given to stop him using a PIT maneuver, and that such intent to stop Pringle is somehow imputable to the Plaintiff. Not surprisingly, no authority is cited for that proposition as it has no basis in law or fact."

ECF 75 p. 8. Seemingly, Defendants are claiming that evidence that the Deputies intended to harm Pringle cannot show the "intent to harm" necessary to show their conduct violates the Fourteenth Amendment. By implication, Defendants seem to believe that Plaintiff's claim requires proof the Defendants intended to harm Plaintiff specifically.

Defendants are wrong. There is substantial authority holding that a law enforcement officer who injures an innocent bystander while engaged in a reckless high-speed chase with the intent to harm a fleeing suspect "shocks the conscience." *See, e.g.*, *Est. of Soakai v. Abdelaziz*, 137 F.4th 969, 980-81 (9th Cir. 2025), *cert. denied sub nom. Abdelaziz v. Soakai*, No. 25-427, 2026 WL 568296 (U.S. Mar. 2, 2026); *Johnson v. Baltimore Police Dep't*, 452 F. Supp. 3d 283, 303 (D. Md. 2020) ("An officer's actions motivated by an intent to harm a suspect are no less conscience shocking, whether the resulting harm accrues to the intended target (the suspect), or an innocent third party."). The fact that Defendants lacked an intent to harm Plaintiff specifically is irrelevant.

As the Supreme Court explained in *Lewis*, "conduct intended to injure . . . is the sort of official action most likely to rise to the conscience-shocking level." 523 U.S. at 849. There is no logical reason to think that conduct is any less shocking when it injures someone other than the intended target.

Further, Defendants' contention that the Deputies intent to perform the PIT maneuver is "meaningless to the analysis" because it was never executed is equally unavailing. *See* ECF 75 p.

8. As Defendants' own Response acknowledges, the Deputies' intent to execute the PIT maneuver created the situation that caused Pringle to crash into Pam Baker. *Id.*, p. 7 (claiming "there is no evidence nor any reasonable factual basis for concluding that Pringle would have (or even feasibly could have) stopped his reckless driving" if Defendants hadn't continued to pursue him). Thus, but-for Defendants intent to harm Pringle by executing the PIT maneuver, Pringle wouldn't have crashed, and Ms. Baker's injuries would not have occurred. In sum, Defendants' arguments fail to create a genuine dispute of fact and, therefore, Plaintiff is entitled to judgment as a matter of law.

## IV. The *Monell* claims against Sheriff Lott and RCSD are properly pled and proven by the undisputed facts.

Defendants raise four arguments against Plaintiff's *Monell* claim: (1) that Plaintiffs' Amended Complaint failed to allege either a failure to train or a policy or custom-based *Monell* claim; (2) Sheriff Lott and RCSD are "arms of the state" not amenable to suit under § 1983; (3) that *Monell* claims cannot be asserted against state actors; and (4) that the claim fails on the merits. Each argument fails, as explained below.

### A. <u>Plaintiff properly pled its *Monell* claims.</u>

Citing to a single paragraph of Plaintiff's Amended Complaint, Defendants curiously argue "[t]hat [single] allegation does not adequately plead a *Monell* claim." ECF 75 p. 9. In the next sentence, Defendants further argue "Plaintiff certainly has not alleged a *Monell* failure to train claim." *Id.* Defendants even go so far as to claim: "There are no allegations in the Amended Complaint alleging a failure to train the deputies involved in the pursuit as the Plaintiff now appears to be asserting." *Id.*

It is unclear why Defendants only cited to a single paragraph of Plaintiff's Amended Complaint to support this argument. But to be sure, the Amended Complaint contains additional allegations relating to a standard *Monell* claim in ¶¶ 9, 42-43, 53, 62, 64(k), and 86. And the

Amended Complaint also contains additional allegations relating to Plaintiff's failure to train claim in Paragraphs 26, 63, 64(j), 64(k), 72, 79-80, 89. These allegations more than suffice to state Plaintiff's *Monell* claims.

B. <u>RCSD is amenable to suit under § 1983.</u>

As Plaintiff predicted in its Response in Opposition to Defendants' Motion for Summary Judgment, RCSD is attempting to steer this Court away from conducting the *Ram Ditta* analysis by claiming that the Fourth Circuit settled this issue thirty years ago in *Cromer v. Brown*, 88 F.3d 1315 (4th Cir. 1996). But *Cromer* is clearly not decisive on this issue, as Defendants and their Counsel are undoubtedly aware, since the last time Lott and RCSD's Eleventh Amendment Immunity was raised to the Fourth Circuit, the Court expressly left the issue "for another day." *English v. Clarke*. 90 F.4th 636, 649–50 (4th Cir. 2024).

C. <u>Lott and RCSD are not arms of the state.</u>

A proper application of the *Ram Ditta v. Maryland Nat'l Capital Park Planning Comm'n*, 822 F.2d 456 (4th Cir. 1987), factors demonstrates that Lott and his RCSD are not arms of the state. First, and most critically, the State will not be responsible for paying any judgment against RCSD. RCSD has repeatedly admitted that "Richland County is self-funded, with no excess insurance," a fact this Court has itself acknowledged. *See Williams v. Pelletier*, No. 2:23-CV-02149-DCN, 2024 WL 1075444, at *5 (D.S.C. Mar. 12, 2024). The South Carolina Constitution and Code of Laws expressly prohibit the State treasury from paying judgments against or insurance premiums of any county office. *See* S.C. Const. art. X, §§ 7(a), 7(b), 8; S.C. Code Ann. §§ 1-11-140(A); 1-11-445(A). This first factor is "'largely, if not wholly, dispositive,'" *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 45–51 (1994), and points decisively towards finding that RCSD is not an arm of the state. Notably, RCSD doesn't contend otherwise. *See generally* ECF 75. Second, RCSD exercises substantial autonomy from the State. Lott is the "ultimate decision

maker" on RCSD policy, with no state approval, veto, or input on any policy change. ECF 72, ¶¶ 11-13. Third, RCSD's operations are geographically and functionally limited to Richland County. Fourth, state law treats RCSD as a county department—county sheriffs are designated "County Officers" under S.C. Code Ann. § 4-11-10 et seq., paid from the county treasury.

D. Lott is individually liable under § 1983.

Regardless of the arm-of-the-state analysis, Defendants' *Monell* arguments ignore Lott's individual-capacity liability under § 1983 for his deliberate indifference to RCSD's unconstitutional pursuit customs and training deficiencies. Defendants' Motion did not address this basis of liability, instead only addressing Lott's liability in his official capacity.

This Court has recognized that Lott can be held liable for "a custom for which he was responsible which resulted in illegal action." *Werts v. Cnty. of Richland*, No. 3:05-3203-MBS, 2007 WL 914039, at *10 (D.S.C. Mar. 23, 2007). And a South Carolina sheriff can be held individually liable under § 1983 for failure to train. *See Best v. Richardson*, No. 2:25-CV-13514-RMG, 2026 WL 660587, at *2 (D.S.C. Mar. 9, 2026); *Scott v. Vandiver*, 476 F.2d 238 (4th Cir. 1973). A cursory review of Lott's video-taped deposition shows this Court all it needs to know regarding Lott's approach to the customs, practices, and discipline of his officers. ECF 56, ¶¶ 66-67, 78; ECF 72, ¶ 7.

E. Plaintiff's Standard *Monell* Claim Succeeds on the Merits.

Defendants contend Plaintiff has failed to identify a "persistent and widespread" practice of unconstitutional pursuits. ECF 75 pp. 13–18. In essence, Defendants argue Plaintiff lacks evidence regarding how often RCSD deputies violate RCSD's vehicle pursuit policies. *See id.* p. 15. This argument fails for two reasons.

First, the evidence overwhelmingly demonstrates such a practice. In 2023 alone, RCSD deputies engaged in 448 vehicle pursuits—a staggering increase from just 164 in 2018. Of those

448 pursuits, 85 ended in crashes, 70 resulted in death or injury, and only 9 were related to felonies. Meanwhile, Defendants submitted no evidence that any RCSD deputy has ever voluntarily terminated a pursuit or been disciplined for violating RCSD's pursuit policies. In fact, Lott himself testified he "ha[d] no idea" (ECF 72 ¶ 7) whether deputies were ever disciplined for violating pursuit policies, and each Deputy Defendant testified they were not disciplined or even investigated for their involvement in the Pringle pursuit—despite multiple blatant policy violations, serious injuries to an innocent bystander, and the death of the suspect. *See* Dillard Dep. 80:6-9; Hodge Dep. 164:10-13; Smith Dep. 80:2-8.

Second, to the extent that this Court determines that Plaintiff lacks sufficient data to entitle it to summary judgment that inadequacy was caused by Defendants' unlawfully withholding information from discovery. *See generally* Pl.'s Mot. for Sanctions at 10-12 (ECF No. 57). Thus, Plaintiff requests for this Court to disallow Defendants from profiting from their misdeeds and enter summary judgment in Plaintiff's favor.

F. Plaintiff's Failure to Train Claim succeeds on the merits.

Defendants acknowledge a failure to train claim can be established by demonstrating (1) specific training deficiencies and (2) either that inadequately trained employees engaged in a pattern of unconstitutional conduct or that a violation of a federal right is a "highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." ECF 75 p. 17. Plaintiff has shown both.

**1. The undisputed facts prove RCSD deputies have a "specific training deficiency."**

The "specific training deficiency" upon which Plaintiff's claim is based is the RCSD deputies' vehicle pursuit training. This deficiency is self-evident from the undisputed facts regarding the extent of the deputies' training on vehicle pursuits (or lack thereof). Defendants pushback on this evidence, claiming:

> "[T]he deputies, upon hiring, had eight weeks of in-house training, followed by an additional eight weeks at the South Carolina Criminal Justice Academy, and then the completion of two months of field training through the FTO process… The training at the Criminal Justice Academy includes a week-long course on pursuit driving…. The deputies also undergo driving training at McIntrye Air Force Base and also at Denny Terrace. . . . .

ECF 75 p. 17. But Defendants' descriptions of the facts and pleadings are misleading in multiple ways. For starters, Defendants' claim "there is not citation to the record for that assertion" is simply false. The quote Defendants pulled from Plaintiff's Motion immediately follows a numbered list citing to the deposition testimony of Defendants Smith, Dillard, and Hodge. *See* ECF 55 p. 30. Moreover, the only evidence of pursuit training Defendants cited pertained to Smith's training. *See id.* As for the other Deputy Defendants' training, Defendants' Response was silent. *See id.*

Further, the eight-weeks of training at the South Carolina Criminal Justice Academy ("SCCJA") is provided to the RCSD deputies by the State of South Carolina, not RCSD. *See* S.C. Code Section 23-23-20. Moreover, the only evidence in the record relevant to the pursuit driving training the RCSD deputies received from SCCJA is Deputy Smith's testimony: "We had the week of training at the Criminal Justice Academy." Smith Dep. p. 21:3-4. That off-handed remark is insufficient to establish a genuine dispute of fact.

As for "driving training . . . at Denny Terrace" that Defendants refer to, the only evidence Defendants offered regarding this training was Smith's testimony that this training occurred during his initial eight-week training period, included "a mixture . . . of in-class and . . . hands on" activities such as "doing different stuff" such as "traffic stops" and "the physical tactics" in simulations. *See id.* 17:21–19:13. This vague testimony does not create a genuine dispute of fact.

Finally, as for the "driving training at McIntrye Air Force Base" to which Defendants refer, the only evidence of this training is Deputy Smith's deposition testimony. Deputy Smith's testimony indicates that this training lasted "about a day." Smith Dep. 21:5. Moreover, Deputy

Smith's testimony indicates that this training consisted of "lane changing, three-point turns, [and] cross traffic." *Id.* p. 21:9–11. "About a day" of training on how to change lanes, perform three-point turns, and drive across traffic is constitutionally insufficient as a matter of law.

**2. Plaintiff does not need evidence of a pattern of unconstitutional conduct because federal rights violations are a "highly predictable consequence" of the inadequate pursuit training RCSD provides deputies "to handle recurring situations."**

As explained above, to the extent Defendants claim Plaintiff lacks evidence that RCSD deputies engaged in a pattern of unconstitutional conduct, that deficiency is the result of Defendants' failure to comply with their discovery obligations. Thus, the adverse inference on this issue to which Plaintiff is entitled satisfies the second prong of Plaintiff's failure to train claim.

Regardless, Plaintiff does not need that evidence of a pattern because severe injuries to bystanders to vehicle pursuits is a "highly predictable consequence" of the grossly inadequate pursuit training RCSD provides to its deputies "to handle recurring situations." In fact, the failure to train law enforcement officers on how to lawfully and safely pursue fleeing suspects is the precise prototypical example used by the U.S. Supreme Court to illustrate this rule. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 & nt. 10 (1989) ("For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons.")

a. <u>A failure to train claim does not require expert testimony.</u>

Defendants argue that Plaintiff's expert testimony hurts their claim, writing that Plaintiff's expert offered no criticisms of Defendants' training. ECF 75 p. 18. There are two main issues with this argument. First, Defendants cited no caselaw indicating that a failure to train claim requires expert testimony. That was not their fault—the cases do not exist. *See Morgan v. D.C.*, 824 F.2d 1049, 1062 (D.C. Cir. 1987) ("[W]e conclude that the district court's decision to permit the jury to reach its verdict without the benefit of expert testimony was not manifestly erroneous.").

Second, Defendants' issues with Taylor's testimony once again point back to Defendants' efforts to obstruct discovery. As Taylor testified, the information concerning the pursuit-driving training the Deputy Defendants received was extremely limited: "The only thing I know is what Deputy Smith testified, that they went to the runway of the former Air Force Base, I believe, and did some cone courses down there, but nothing really that high speed." Taylor Dep. 33:7-14.

Finally, Taylor's testimony does not indicate that the Deputy Defendants received more hands-on training than what Plaintiff described in her Motion for Summary Judgment. Instead, Taylor's testimony just refers to unspecified RCSD deputies receiving generalized "pursuit training **or** emergency vehicle operation training, at least, on an annual basis." *Id.* 120:4-8 (emphasis added). Taylor did not testify as to whether the Deputy Defendants received this training as opposed to other RCSD deputies, whether the training was hands-on or not, or whether the Deputy Defendants' annual training (if they received any) was for emergency vehicle operations.

b. A failure to train claim does not require an underlying constitutional violation.

Defendants argue an underlying constitutional violation is a necessary element to a failure-to-train claim. Defendants are wrong. Although the Fourth Circuit has not joined the majority of Circuits in expressly holding that a failure to train claim does not require proving an underlying constitutional violation,[1] the Fourth Circuit has expressly acknowledged the possibility of this standalone municipal liability. *See Int'l Ground Transp. v. Mayor And City Council Of Ocean City, MD*, 475 F.3d 214, 219 (4th Cir. 2007) ("[A] situation may arise in which a finding of no liability on the part of the individual municipal actors can co-exist with a finding of liability on the part of the municipality.")); *see also Fagan v. City of Vineland*, 22 F.3d 1283 (3d Cir. 1994).

[1] The Fifth Circuit is the only other Circuit following the minority approach. *See* Avery Figo Comar, *Standalone Municipal Liability*, (Univ. Mich. Law. Rev. 2025) (available at https://michiganlawreview.org/journal/standalone-municipal-liability/).

Relying on that instruction, district courts in the Fourth Circuit have expressly left the door open to standalone municipal liability. *Watkins v. Butler*, No. 1:20-CV-00208-JRR, 2024 WL 2273384, at *8 (D. Md. May 20, 2024).

The present case clearly illustrates why requiring proof of an underlying constitutional violation should not be required. If Plaintiff proves—as she intends to—that Lott was deliberately indifferent to the need to train his deputies to safely perform vehicle pursuits, then any failure to establish individual deputy liability would only confirm that Lott's training deficiencies were themselves the moving force behind the constitutional injury. Holding local governments accountable for constitutional harms they directly caused is the animating purpose of *Monell*. Requiring proof of an individual violation undermines that purpose by barring the purest expression of direct municipal liability—a standalone claim.

**<u>CONCLUSION</u>**

For the foregoing reasons, and those set forth in Plaintiff's Motion for Partial Summary Judgment and her Response in Opposition to Defendants' Motion for Summary Judgment, the Court should grant Plaintiff's Motion for Partial Summary Judgment as to liability.

*[signature page to follow]*

Respectfully submitted,

**BURR & FORMAN, LLP**

*s/Celeste T. Jones*
Celeste T. Jones, Fed. ID #2225
ctjones@burr.com
Benjamin R. Jenkins, IV, Fed. ID #14138
bjenkins@burr.com
Burr & Forman, LLP
P.O. Box 11390
Columbia, South Carolina 29211
803-799-9800
803-753-3278 (Fax)

Michael K. K. Choy, Admitted *pro hac vice*
mchoy@burr.com
John Wilson Booth, Admitted *pro hac vice*
jwbooth@burr.com
Burr & Forman, LLP
420 20th St. N #3400
Birmingham, Alabama 35203

*Attorneys for Plaintiff*

Columbia, South Carolina
May 15, 2026