IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Pamela A. Baker,<br><br>Plaintiff,<br><br>v.<br><br>Deputy Matthew Smith; Deputy Michael Dillard; Deputy Bryan Hodge; Leon Lott, *individually and in his official capacity as the Sheriff of Richland County*; Richland County Sheriff's Department,<br><br>Defendants. | Case No. 3:24-cv-04303-JDA<br><br>**OPINION AND ORDER** |

This matter is before the Court on the parties' cross-motions for summary judgment and Plaintiff's motion for sanctions.[1] [Docs. 55; 57; 61.] Plaintiff filed this action in the Richland County Court of Common Pleas on June 27, 2024. [Doc. 1-1.] Defendants removed the action to this Court, and Plaintiff subsequently filed an Amended Complaint, which includes both federal and state law claims. [Docs. 1; 26.] For the reasons stated below, the Court grants Defendants' summary judgment motion as to the federal claims, denies Plaintiff's partial summary judgment motion, denies Plaintiff's motion for sanctions, and remands the state law claims to state court along with the other pending motions in the case.

[1] Plaintiff moves for summary judgment as to liability on her claims under 42 U.S.C. § 1983. [Docs. 55; 55-1.] Defendants move for summary judgment as to Plaintiff's federal claims and state statutory claim and ask that her negligence and gross negligence claim be remanded to state court. [Doc. 61.]

## BACKGROUND[2]

This case stems from the tragic outcome of a high-speed police chase that occurred on December 29, 2023. [Docs. 56 ¶¶ 9, 25, 26, 51; 76 ¶¶ 9, 25, 26, 51.] On that day, Richland County Sheriff's Department ("RCSD") Deputy Matthew Smith was on an off-duty special assignment when an undercover Lexington County Sheriff's Department ("LCSD") investigator (the "Undercover Investigator") requested an RCSD marked unit for a known wanted individual traveling toward Richland County on Bush River Road. [Docs. 60 ¶ 15; 72 at 3 ¶ 15.] LCSD officials provided the vehicle description and tag information for a black Nissan Sentra. [Docs. 60 ¶ 16; 72 at 3 ¶ 16.] The driver occupying the Nissan was Byron Pringle, who was wanted out of Lexington County and had a suspended driver's license. [Docs. 60 ¶¶ 1, 17; 72 at 1 ¶ 1; *id.* at 3 ¶ 17.] Smith located Pringle operating the Nissan at or near the Bush River Road crossing of I-26, heading toward Broad River Road, in Richland County. [Docs. 60 ¶ 18; 72 ¶ 18.]

At 2:21:48 p.m., Smith announced on the radio that he was behind Pringle and initiated a suspicious vehicle stop. [Docs. 56 ¶ 25; 60 ¶ 18; 72 ¶ 18; 76 ¶ 25.] Pringle failed to yield, however, and he evaded Smith at a high rate of speed. [Docs. 60 ¶ 18; 72 ¶ 18.] At 2:22:12 p.m., Smith was in pursuit of Pringle, driving at about 50 miles per hour. [Docs. 56 ¶ 26; 76 ¶ 26.]

---

[2] Pursuant to the undersigned's Rule 56 Summary Judgment Motion Procedures, the parties submitted movants' statements of material facts, opponents' statements of material facts, reply statements of material facts, and various attachments. [Docs. 56; 56-1–25; 60; 60-1–10; 63; 72; 72-1–8; 76; 76-1–2; 82; 86.] The Court will cite to these documents as well as other parts of the record for the relevant background included herein.

RCSD K-9 Specialist Bryan Hodge and RCSD Deputy Michael Dillard were also involved in the pursuit, with their lights and sirens engaged. [Docs. 60 ¶¶ 23, 25; 72 ¶¶ 23, 25; 86 ¶¶ 23, 25.]. At 2:22:17 p.m., Hodge announced on the radio that he was the third car back and that he needed to move in front of the second car because: (1) if Pringle decided to run, he was going to "get bit"; (2) Pringle was known to RCSD; and (3) RCSD had "a bunch of other stuff on him." [Docs. 56 ¶ 27 (internal quotation marks omitted); 76 ¶ 27.] Hodge passed Dillard shortly thereafter. [Docs. 56 ¶ 30; 76 ¶ 30.]

During the pursuit, Smith heard on radio traffic that the Undercover Investigator had been observing Pringle, who was wanted by law enforcement; Pringle had run from RCSD the week before; there were active warrants for Pringle involving heroin trafficking; General Sessions bench warrants had been issued for Pringle; and the support of an air unit would not be available during the pursuit due to weather conditions. [Docs. 60 ¶ 19; 72 ¶ 19.] As the pursuit continued, Pringle drove in the opposite lane of travel on Greystone Boulevard before proceeding onto the on-ramp to I-126 inbound toward downtown Columbia. [Docs. 60 ¶ 20; 72 ¶ 20.] While on the on-ramp, Pringle abruptly hopped the median and began driving into oncoming traffic on I-126. [Docs. 60 ¶ 21; 72 ¶ 21.] Pringle was traveling approximately 60 to 65 miles per hour on the interstate in the opposite direction of traffic. [Docs. 60 ¶ 24; 72 ¶ 24.]

At some point, Hodge overtook Smith and became the lead vehicle in the chase. [Docs. 60 ¶ 27; 72 ¶ 27.] As Pringle was driving into oncoming traffic on I-126, Sgt. Christopher Blanding, an RCSD supervisor, instructed deputies via the radio, "If you get the chance, go ahead and take him out. We don't need nobody getting hurt." [Docs. 60 ¶ 22 (internal quotation marks omitted); 72 ¶ 22; 86 ¶ 22.] Blanding also later told Smith,

Dillard, and Hodge (the "Deputy Defendants") that they had "permission to take [Pringle] out if he's going into oncoming traffic." [Docs. 56 ¶ 38; 76 ¶ 38 (internal quotation marks omitted).] Indeed, the Deputy Defendants' intention as they pursued Pringle into oncoming traffic was to get close enough to him to perform a PIT maneuver.[3] [Docs. 56 ¶ 50; 76 ¶ 50.]

The chase ended tragically, before the officers were able to execute that maneuver, when Pringle's Nissan collided head-on with a 2023 Mercedes vehicle that Plaintiff was driving. [Docs. 60 ¶ 28; 72 ¶ 28.] Pringle died in the accident [Docs. 60 ¶ 32; 72 ¶ 32], and Plaintiff suffered life-altering injuries from the collision [Docs. 56 ¶ 51; 76 ¶ 51].

The high-speed chase lasted a little more than three minutes. [Docs. 56 ¶¶ 25, 26, 41; 76 ¶ 25, 26, 41.] The Deputy Defendants passed approximately 85 vehicles while pursuing Pringle before reaching I-126 and approximately 73 vehicles while pursuing Pringle in the wrong direction on I-126. [Docs. 56 ¶¶ 43–44; 76 ¶¶ 43–44.] Although the Deputy Defendants had intended to perform a PIT maneuver if the opportunity arose, at no time prior to the collision did any of them or their vehicles make physical contact with Plaintiff, Pringle, or their respective vehicles. [Docs. 56 ¶ 50; 60 ¶ 31; 72 ¶ 31; 76 ¶ 50.]

Plaintiff's Amended Complaint alleges causes of action under 42 U.S.C. § 1983 against Defendants Sheriff Lott and the Deputy Defendants for violation of Plaintiff's Fourth and Fourteenth Amendment Due Process rights ("Count Three") and for violation of Plaintiff's Fourth Amendment rights ("Count Five"); under 42 U.S.C. § 1985 against Sheriff Lott, the Deputy Defendants, and unknown supervisors/officers for conspiracy

[3] A PIT maneuver is an immobilization technique in which law enforcement approaches the side rear of the fleeing vehicle and uses the front of the law enforcement vehicle to spin the fleeing vehicle to a stop. [Doc. 56-12 at 8–9 (104:23–105:13).]

("Count Four"); under state law against all Defendants for negligence/gross negligence ("Count One"); and against Sheriff Lott and the Deputy Defendants for vicarious liability under S.C. Code Ann. § 23-13-10 ("Count Two"). [Doc. 26 ¶¶ 55–90.] As relief, Plaintiff requests compensatory and punitive damages, attorneys' fees and costs, and other relief that the Court deems just and proper. [*Id.* at 15–16.]

On March 10, 2026, Defendants filed a motion for summary judgment and Plaintiff filed motions for sanctions and for partial summary judgment on the issue of liability. [Docs. 55; 57; 61.] Those three motions are now fully briefed and ready for review. [*See* Docs. 56; 60; 72; 75; 76; 77; 81; 82; 83; 85; 86.]

## APPLICABLE LAW

Rule 56 of the Federal Rules of Civil Procedure states, as to a party who has moved for summary judgment: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. When determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-

moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. *Id.* at 324. Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue. *Id.* Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id*. Further, Rule 56 provides in pertinent part:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). Accordingly, when Rule 56(c) has shifted the burden of proof to the non-movant, he must produce existence of a factual dispute on every element essential to his action that he bears the burden of adducing at a trial on the merits.

The Fourth Circuit summarized the Court's obligation when faced with cross motions for summary judgment in *Rossignol v. Voorhaar*:

> When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law. When considering each individual motion, the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion.

316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks and citation omitted).

## DISCUSSION

In their summary judgment motion, Defendants argue that they are entitled to summary judgment on each of Plaintiff's causes of action. [Doc. 61.] For the reasons to be discussed, the Court agrees with Defendants that they are entitled to summary judgment on each of Plaintiff's federal causes of action, and the Court declines to exercise supplemental jurisdiction over the two remaining state claims. Accordingly, the Court remands those claims to state court.

### Count Three

Count Three alleges that the Deputy Defendants and Lott violated Plaintiff's Fourteenth Amendment rights "by deploying and operating the police vehicles and pursuing a chase into oncoming traffic at an extreme rate of speed" and by "deliberately failing to train, re-train, supervise and adopt necessary customs and practices." [Doc. 26 ¶ 72.] It also alleges that these Defendants violated Plaintiff's Fourth Amendment right "to be free from an unlawful seizure and the excessive force caused by an unlawful seizure." [*Id.* ¶ 73(c).]

#### *Fourteenth Amendment Allegations Against the Deputy Defendants*

Defendants first argue that Plaintiff has not forecasted evidence creating a genuine dispute of material fact as to whether Plaintiff's substantive due process rights were

violated. [Doc. 61 at 4–6.] Specifically, Defendants argue that Plaintiff has not forecasted evidence that any of the Deputy Defendants acted with an intent to cause harm unrelated to legitimate police activities. [*Id.*] The Court agrees.

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. "The substantive component of the Due Process Clause bars certain government actions regardless of the fairness of the procedures used to implement them." *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 391 (4th Cir. 1990) (alteration and internal quotation marks omitted). "To prove a violation of substantive-due-process rights under the Fourteenth Amendment, a plaintiff must show that a defendant's behavior was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Washington v. Housing Auth.*, 58 F.4th 170, 177 (4th Cir. 2023) (internal quotation marks omitted). The question of what sort of conduct violates that standard is one that is central to this case.

The Supreme Court has explained that "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998). "It is, on the contrary, behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* The Fourth Circuit has noted, however, that "conduct falling in between those two poles—deliberate-indifference conduct which is more than negligence but less than intentional harm—presents a closer call." *Washington*, 58 F.4th at 178.

"Ultimately, the applicable standard of culpability for a substantive-due-process claim—either intent to harm or deliberate indifference—depends on an exact analysis of the context and circumstances of the case." *Id.* (alteration and internal quotation marks omitted). The deliberate-indifference standard applies "only when actual deliberation is practical." *Lewis*, 523 U.S. at 851. Further, "actual deliberation" does "not mean 'deliberation' in the narrow, technical sense in which it has sometimes been used in traditional homicide law." *Id.* at 851 n.11. Rather, liability for deliberate indifference "rests upon the luxury enjoyed by . . . officials of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." *Id.* at 853.

*Lewis* governs here. In that case, a sheriff's deputy ("James"[4]) and another officer ("Stapp") were in their vehicles after having responded to an unrelated call when Stapp observed two people approaching on a speeding motorcycle. *Id.* at 836. Stapp activated his emergency lights, yelled for the people to stop, and attempted to use his car along with James's to block the motorcycle's path. *Id.* When the motorcycle slowly maneuvered between the two police vehicles and sped off, James immediately activated his emergency lights and siren and "began pursuit at high speed." *Id.* at 837. After the high-speed pursuit had continued for 75 seconds through a residential neighborhood and oncoming traffic, the motorcycle tipped over as the driver attempted a sharp turn. *Id.* By the time James slammed on his brakes, the motorcycle driver was out of the way, but the passenger, 16-year-old Philip Lewis, was not. *Id.* James's patrol car skidded into Lewis,

---

[4] The deputy's name was James Smith, *Lewis*, 523 U.S. at 836, but, because one of the Defendants in the case before this Court also has the surname Smith, the Court uses "James" to avoid confusion.

killing him. *Id.* Lewis's parents brought a substantive due process claim under § 1983 on Lewis's behalf against James and other defendants. *Id.*

The Supreme Court applied the intent-to-harm standard and concluded that no genuine dispute of material fact existed regarding whether James violated Lewis's Fourteenth Amendment substantive due process rights. *Id.* at 854–55. Specifically, the Court "h[e]ld that high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressible by an action under § 1983." *Id.* at 854. Because nothing in the record supported a finding that the officers acted with an intent to harm, the Court concluded that the defendants were entitled to summary judgment. *Id.* at 855.

Plaintiff argues that the intent-to-harm standard does not apply here because the Deputy Defendants "had time to deliberate their course of conduct both before pursuing Pringle and multiple times during their pursuit." [Doc. 71 at 5.] It is often the case that officers generally plan how they might respond to certain circumstances. Nonetheless, the Deputy Defendants' decision of whether to initiate or continue a chase based on the facts existing at that moment was a hurried one.[5] *See Lewis*, 523 U.S. at 853 ("A police officer deciding whether to give chase must balance on one hand the need to stop a suspect and show that flight from the law is no way to freedom, and, on the other, the high-speed threat to all those within stopping range, be they suspects, their passengers, other drivers, or bystanders."). Plaintiff points out multiple factors that she argues

[5] Plaintiff argues that Hodge in particular was contacted by a DEA task force officer "'in the morning'" before the pursuit began at approximately 2:16 p.m. [Doc. 71 at 5 (citing Doc. 72 at 7 ¶ 3).] But Hodge's testimony was merely that he had advanced notice that Pringle had fentanyl warrants. [Doc. 72-2 at 5–6 (89:24–90:20).]

indicated that chasing Pringle in that moment was not important or worth the risk. [Doc. 71 at 5–6.] In particular, she notes that Pringle posed no immediate danger to those around him before the pursuit began and that he was well known by the Deputy Defendants, making it substantially more likely that they would be able to apprehend him later if he were allowed to escape. [*Id.*] These arguments, however, although possibly relevant to what decision the officers should have made, do not alter the reality that the officers had to make their decision hurriedly; taking time to deliberate would have made the decision for them.

As for the argument that the pursuit here lasted longer than that in *Lewis*, "[t]he length of the pursuit is beside the point . . . . What matters is whether Defendants had time during the pursuit to make an unhurried decision." *Cason v. City of Greenville*, No. 6:25-cv-13712-JDA, 2026 WL 1005133, at *4 (D.S.C. Apr. 14, 2026); *see Mathis v. Anderson Cnty.*, No. 8:22-234-DCC-KFM, 2024 WL 4486601, at *16 (D.S.C. May 29, 2024) ("[T]he fact that the pursuit in *Lewis* was shorter than the pursuit here is insufficient to warrant a departure from the intent to harm standard given the totality of the circumstances and the fact that these defendants were forced to make decisions with competing obligations in haste and under pressure."), *Report and Recommendation adopted by* 2024 WL 4024019 (D.S.C. Sept. 3, 2024). A decision made while an officer is racing down the road attempting to apprehend a suspect and prevent him from harming others is not unhurried.

For that reason, *Lewis*'s intent-to-harm standard governs, and liability "turn[s] on whether [the chase was] a good faith effort to [pursue legitimate law enforcement objectives] or maliciously and sadistically for the very purpose of causing harm." *Lewis*,

523 at 853 (internal quotation marks omitted). Thus, it is insufficient to show that "the officers were merely deliberately indifferent to the risk posed by the force used. Rather, officers can be held culpable under section 1983 only if they applied force . . . with a purpose to cause harm . . . ."[6] *Howerton v. Fletcher*, 213 F.3d 171, 175 n.4 (4th Cir. 2000) (citations and internal quotation marks omitted); *see also Lewis*, 523 U.S. at 849 ("[C]onduct intended to injure in some way unjustifiable by any governmental interest is the sort of official action most likely to rise to the conscience-shocking level.")

Plaintiff also argues that even if she was required to forecast evidence that the Deputy Defendants intended to harm Pringle, she forecasted such evidence. [Doc. 71 at 8–11.] She points to Hodge's statement that if Pringle were to run, he would "get bit"; a statement from another deputy cheering for Hodge to "get him"; and Blanding's direction for the Deputy Defendants to "take [Pringle] out." [*Id.* at 8 (citing Doc. 56 ¶¶ 27, 36, 38, 42) (internal quotation marks omitted).] Plaintiff also points to evidence that the Deputy Defendants admitted that, once Pringle began driving into ongoing traffic on the interstate, they decided to attempt to try to execute a PIT maneuver. [*Id.* at 8–9 (citing Doc. 56 ¶¶ 50, 58).] Plaintiff further contends that the Deputy Defendants knew that maneuver would cause Pringle serious injury. [*Id.* at 9.] Plaintiff argues that there was no safe way to execute the maneuver because "there were only concrete barriers on one side and dozens of innocent individuals and families . . in oncoming vehicles in the other." [*Id.*]

---

[6] Defendants argue that even evidence that the Deputy Defendants intended to harm Pringle would not be sufficient and that Plaintiff is required to show that the Deputy Defendants intended to harm *Plaintiff*. [Doc. 61 at 4–5.] Plaintiff, on the other hand, maintains that intent to harm Pringle is sufficient. [Doc. 71 at 10–11 (citing *Estate of Soakai v. Abdelaziz*, 137 F.4th 969 (9th Cir. 2025); *Johnson v. Balt. Police Dep't*, 452 F. Supp. 3d 283 (D. Md. 2020)).] The Court need not address this issue, as Plaintiff has not forecasted evidence that any of the Deputy Defendants even intended to harm Pringle.

Plaintiff therefore maintains that the obvious danger to Pringle of continuing the pursuit creates a genuine dispute of material fact concerning whether the Deputy Defendants intended to harm Pringle. [*Id.*]

The Court disagrees. In *Lewis*, the Court explicitly noted that, during the chase at issue, the motorcycle and the patrol car pursuing the motorcycle reached speeds up to 100 mph, with James following at a distance as short as 100 feet, meaning that he would have required 650 feet to stop. *Lewis*, 523 U.S. at 837. Despite the obvious danger to the suspect in that situation, the Court concluded that "there [was] no reason to believe" that James harbored any "improper or malicious motive" in continuing the pursuit. *Id.* at 855.

Similarly, in this case, although Pringle's conduct placed the Deputy Defendants in the difficult position of having to hurriedly decide whether to take a course of action that would carry obvious risks for Pringle, the Court concludes there is no basis for a finding that any of them acted "with a purpose to cause harm," as opposed to in a good faith effort to further legitimate law enforcement interests. *Howerton*, 213 F.3d at 175 n.4 (internal quotation marks omitted). Count Three therefore fails as against the Deputy Defendants to the extent it is based on a Fourteenth Amendment violation.

***Fourth Amendment Allegations Against the Deputy Defendants***

Additionally, to the extent Count Three alleges an unlawful seizure in violation of the Fourth Amendment, the claim fails because the Fourth Amendment does not cover the Deputy Defendants' conduct in chasing Pringle.

The Supreme Court has explained that a Fourth Amendment seizure occurs "only when there is a governmental termination of freedom of movement *through means*

*intentionally applied*." *Brower v. Cnty. of Inyo*, 489 U.S. 593, 597 (1989). In *Brower*, the Court held that a seizure occurred when law enforcement erected a roadblock that crossed both lanes of a highway as a suspect was involved in a high-speed pursuit. *Id.* at 598. The Court explained that a seizure occurred on those facts because a roadblock "is designed to produce a stop by physical impact if voluntary compliance does not occur." *Id.* The Court contrasted the aforementioned scenario with the hypothetical scenario under which a suspect being pursued by police cars seeking to stop him only with "the show of authority represented by flashing lights and continued pursuit" loses control of his vehicle and crashes. *Id.* at 597. Under those facts, the Supreme Court explained, no seizure has occurred. *Id.*

That same reasoning applied by the *Brower* Court in its hypothetical applies here. Plaintiff does not allege that the Deputy Defendants erected a blockade, contacted his vehicle, or arranged for the collision that stopped the pursuit.[7] Rather, the facts at issue here—even as to Pringle—are the very facts in which the Supreme Court has explained no seizure has occurred. *See Sanger v. Dodrill*, 675 F. Supp. 3d 638, 646 (S.D.W. Va. 2023) (holding that plaintiff failed to state a § 1983 claim for a Fourth Amendment violation because no seizure had occurred based on the allegations that the suspect crashed while he has leading officers on a high-speed pursuit). Count Three therefore fails as against the Deputy Defendants to the extent it is based on a Fourth Amendment theory.

***Allegations Against Sheriff Lott***

Plaintiff has not forecasted any evidence that Sheriff Lott was personally involved in the events giving rise to this action. *See Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir.

[7] Although they had planned to execute a PIT maneuver, they never did so.

2017) (explaining that liability will lie under § 1983 only "where it is affirmatively shown that the official charged acted personally" in violating a plaintiff's rights). And because Plaintiff's claim that the chase violated her Fourteenth Amendment and Fourth Amendment rights fails, Count Three also fails to the extent it alleges that Sheriff Lott is liable under theories of supervisory or municipal liability. *See Evans v. Chalmers*, 703 F.3d 636, 654 (4th Cir. 2012) (stating that "[b]ecause we hold that [the] plaintiffs failed to state predicate § 1983 claims against the individual officers, we must also hold that [the] plaintiffs have failed to state supervisory liability [or municipal liability]" claims); *Hinkle v. City of Clarksburg*, 81 F.3d 416, 420 (4th Cir. 1996) (holding that absent an underlying constitutional violation, supervisory and municipal liability claims under § 1983 also fail).

In sum, for all of these reasons, the Court grants Defendants' summary judgment motion as to Count Three.

**Count Five**

Count Five alleges that RCSD and Sheriff Lott violated Plaintiff's Fourth Amendment rights by virtue of their policies, customs, and practices regarding high-speed chases and their supervision of their officers regarding the same subject. [Doc. 26 ¶¶ 85–86.] For the reasons stated as to Count Three, Plaintiff has failed to forecast evidence that the Deputy Defendants violated Plaintiff's Fourth Amendment rights. And, as explained regarding Count Three, because Plaintiff's constitutional claims fail against the Deputy Defendants, her claims also fail to the extent they are based on supervisory or municipal liability. *See Evans*, 703 F.3d at 654; *Hinkle*, 81 F.3d at 420. Accordingly, the Court grants Defendants' summary judgment motion as to Count Five as well.

**Count Four**

Plaintiff alleges in Count Four that Sheriff Lott, the Deputy Defendants, and unknown supervisors or officers had a duty to intervene and stop the chase and that they engaged in deliberately indifferent training and supervision and deliberately failed to implement appropriate customs and practices, in violation of 42 U.S.C. § 1985. [Doc. 26 ¶¶ 76–83.] The Amended Complaint does not specify which subpart of 42 U.S.C. § 1985 Plaintiff claims Defendants violated, but the Court concludes that § 1985(3) is the only subpart that arguably applies here,[8] and Plaintiff's failure to forecast evidence that Defendants violated her constitutional rights dooms Plaintiff's § 1985 claim, *see McNutt v. Duke Precision Dental & Orthodontic Lab'ys, Inc.*, 698 F.2d 676, 680 (4th Cir. 1983) ("Section 1985(3) merely provides a remedy for the violation of rights guaranteed by federal law or the Constitution."); *Kirksey v. Greenville Cnty. Sheriff's Office*, No. 6:25-cv-11182-JDA, 2026 WL 1430525, at *2 (D.S.C. May 21, 2026) ("[I]n the absence of any underlying constitutional violation, Plaintiff's claim[] for . . . violation of 42 U.S.C. § 1985(3)" also fails.). In any event, Plaintiff cannot forecast sufficient evidence supporting the elements of a violation.

To prove a conspiracy claim under § 1985(3), a plaintiff must prove

---

[8] That subsection provides, as relevant here:

> If two or more persons in any State or Territory conspire . . ., for the purpose of depriving, either directly or indirectly, any person . . . of the equal protection of the laws, or of equal privileges and immunities under the laws . . . , the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

> (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

*A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011) (internal quotation marks omitted). Here, Plaintiff has not forecasted any evidence of any agreement between Defendants to do anything other than attempt to apprehend Pringle, nor has she forecasted evidence of any discriminatory animus by any Defendant. Accordingly, the Court grants Defendants' motion for summary judgment on Count Four.

**Counts One and Two**

The remaining state law claims—Counts One and Two—could be heard by this Court through the exercise of supplemental jurisdiction, which allows federal courts to hear and decide state law claims along with federal claims.[9] Federal courts are permitted to decline to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3), however, if "the district court has dismissed all claims over which it has original jurisdiction." A court has "wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished." *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995). In deciding whether to exercise supplemental jurisdiction, courts look at "convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial

---

[9] A civil action for the state law claims could be cognizable in this Court under the diversity statute if that statute's requirements are satisfied. However, the Amended Complaint alleges only federal-question jurisdiction [Doc. 26 ¶ 1], and, in any event, does not allege that the requirements for diversity jurisdiction are satisfied.

economy." *Id.* "[G]enerally, when a district court dismisses all federal claims in the early stages of litigation—e.g., at the summary-judgment stage—it should decline to exercise jurisdiction over any remaining pendent state law claims by dismissing those claims without prejudice." *Henderson v. Harmon*, 102 F.4th 242, 251 (4th Cir. 2024) (internal quotation marks omitted) (affirming district court's granting of summary judgment to the defendants on the only remaining federal claim and declining to exercise supplemental jurisdiction and dismissing the state law claim without prejudice).

In this case, declining to exercise jurisdiction over the state law claims is appropriate in light of the *Shanaghan* factors. The remaining claims present state law questions. Additionally, judicial economy will not be hindered by declining to exercise supplemental jurisdiction over the state law claims. Accordingly, the court declines to exercise supplemental jurisdiction over Plaintiff's state law claims in this case and remands them to state court.[10]

**CONCLUSION**

Wherefore, based upon the foregoing, Defendants' motion for summary judgment [Doc. 61] is GRANTED IN PART as to Counts Three, Four, and Five; Plaintiff's motion for

[10] Still pending are motions by Defendants for protective order [Doc. 48] and to exclude the report and testimony of John J. Ryan as to law enforcement and vehicular pursuit standards [Doc. 58]. Because these motions do not affect Defendants' entitlement to summary judgment as to the three federal claims, the Court does not address them, but rather, remands them to the state court along with Plaintiff's two state law claims. Plaintiff also has a pending motion for sanctions based on allegations relating to Defendants' actions and omissions in responding to discovery. [Doc. 57.] The Court denies that motion. Plaintiff sets out a laundry list of actions and omissions by Defendants upon which she bases her motion. [*See generally* Doc. 57-1.] Without addressing them individually, the Court notes that Defendants' response [Doc. 77]—most of which Plaintiff's reply [Doc. 83] does not address—persuades the Court that Plaintiff's complaints are unfounded and that sanctions are not warranted.

partial summary judgment [Doc. 55] is DENIED; Plaintiff's motion for sanctions [Doc. 57] is DENIED; and the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims, which are remanded to the Richland County Court of Common Pleas along with Defendants' motions for protective order and to exclude the report and testimony of John J. Ryan [Docs. 48; 58].

IT IS SO ORDERED.

s/Jacquelyn D. Austin
United States District Judge

September 10, 2026
Columbia, South Carolina